UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DEFENDERS OF WILDLIFE                )
     1130 17th Street, N.W.       )
     Washington, DC 20036         )
                                  )
THE FUND FOR ANIMALS,                )      No. _____
     519 C Street, N.E.           )
     Washington, D.C. 20002,      )
                                  )
SIERRA CLUB,                         )
     85 2nd Street,               )
     San Francisco, CA  94105,    )
                                  )
LAURIE A. MACDONALD,                 )
     103 Wildwood Lane            )
     St. Petersburg, FL 33705,    )
                                  )
MARTHA L. CLUTTER,                   )
     9955 South Forestline Avenue )
     Inverness, FL 34452,         )
                                  )
RANDY CULLOM                         )
     P.O. Box 1060                )
     Hawthorne, FL 32640          )
                                  )
           Plaintiffs,      )
                                  )
           v.               )
                                  )
GALE NORTON,                         )
     Secretary, U.S. Department   )
     of the Interior,             )
     1849 C Street, N.W.          )
     Washington, D.C.  20240,     )
                                  )
and                                  )
                                  )

```
Dale Hall,                          )
      Director,                     )
      United States Fish and        )
      Wildlife Service,             )
      1849 C Street, N.W.           )
      Washington, D.C.  20240,      )
                                    )
                  Defendants.       )
```

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.    This case challenges the defendants' January 14, 2004 decision that the imperiled Florida black bear (*Ursus americanus floridanus*), a subspecies of the black bear, is neither an endangered nor a threatened species under the Endangered Species Act ("ESA"), 16 U.S.C. § 1531, <u>et seq.</u>  Defendants violated the ESA, the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, and this Court's remand Order in <u>Defenders of Wildlife v. Norton</u>, No. 99-2072 (HHK) (D.D.C. Dec. 13, 2001), by a) making their decision based on 1998 regulatory mechanisms rather than currently existing and enforced regulatory mechanisms; and b) making their decision based on 1998 information, rather than the "best scientific and commercial data available."  16 U.S.C. § 1533(b)(1)(A).

## JURISDICTION

2.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 16 U.S.C. § 1540(g).

## PARTIES

### A.    Plaintiffs

3.    Plaintiff Defenders of Wildlife ("Defenders") is a
national nonprofit organization with more than 500,000 members
and supporters across the nation, including more than sixty-five
thousand in Florida.  Defenders is dedicated to the protection
and restoration of all native wild animals and plants in their
natural communities.  Defenders brings this action on its own
institutional behalf and also on behalf of its members.

4.    Defenders has invested considerable organizational
resources in conserving the Florida black bear and its habitat.
For example, in 1993, Defenders co-launched the "Habitat for
Bears Campaign" ("Campaign"), a campaign of over 3500 state,
national and international activists working to save the black
bear and its habitat in Florida.  The Campaign, which educates
the public concerning threats to such species, also works to
improve transportation projects in bear habitat.  It publishes a
periodic newsletter, Florida Bear.  In May 1999, the Habitat for
Bears Campaign celebrated the availability of the Conserve
Wildlife specialty license plate in the state of Florida, after
the state Senate approved the plate by a 36-0 vote.  Proceeds
from the $15 optional tag are expected to generate millions of
dollars for wildlife research, habitat management, environmental
education and law enforcement programs conducted by Florida Fish

and Wildlife Conservation Commission.  The Habitat for Bears
Campaign is only one facet of broader Defenders conservation
efforts in Florida, spearheaded by a four-person staff located in
St. Petersburg, known as the Campaign to Save Florida.  In
addition to its bear advocacy efforts, the campaign also works to
protect endangered species such as the Florida panther and
manatee, improve transportation planning to better incorporate
wildlife considerations, protect forests and habitat from
off-road vehicle use, protect endangered habitat from sprawl and
inadequately planned development, and work on growth management
at a state-wide level.  Defenders will continue to aggressively
advocate for the conservation of the Florida black bear through
this and other initiatives.

     5.   Members of Defenders enjoy observing, photographing and
appreciating Florida black bears in the wild, and studying the
species and its habitat.  The interests of Defenders and its
members in observing, studying and otherwise enjoying the Florida
black bear in its natural habitat, and in obtaining and
disseminating information regarding the survival of the species,
are harmed by the defendants' decision not to list the species
under the ESA, because activities permitted in the absence of
listing are contributing to the extinction of the species, and,
absent listing, defendants will not take the steps necessary to
ensure the species' recovery.

6.   Plaintiff The Fund for Animals ("The Fund"), is an animal protection organization with an office in Washington, D.C. On January 1, 2005, The Fund and The Humane Society of the United States ("The HSUS") combined, and now pursue their adjoining programs jointly.  The Fund and The HSUS have over nine and a half million members and constituents, including over 580,000 members and constituents in Florida.  The Fund brings this action on its own institutional behalf and also on behalf of its members.

7.   The Fund and The HSUS are dedicated to protecting imperiled species and the habitats on which they depend.  The Fund and The HSUS accomplish their objectives through public education, litigation, legislation, and research and investigations.  They publish a bi-monthly newsletter, special reports, and activist alerts to inform their members and constituents of their activities and to request assistance in protecting animals and species.  The Fund has been involved in efforts to list the Florida black bear under the ESA since 1991.

8.   Members of The Fund enjoy observing, photographing and appreciating Florida black bears in the wild, and studying the species and its habitat.  The interests of The Fund and its members in observing, studying and otherwise enjoying the Florida black bear in its natural habitat, and in obtaining and disseminating information regarding the survival of the species,

are harmed by the defendants' decision not to list the species under the ESA, because activities permitted in the absence of listing are contributing to the extinction of the species, and, absent listing, defendants will not take the steps necessary to ensure the species' recovery.

9.   Plaintiff The Sierra Club is a national nonprofit organization of over 750,000 members.  The Sierra Club's members are dedicated to exploring, enjoying, and protecting the wild places of the earth; to practicing and promoting the responsible use of the earth's ecosystems and resources; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives.  The Florida Chapter of the Sierra Club is co-founder of the Habitat for Bears Campaign.  Since 1993, Habitat for Bears Campaign staff, volunteers and more than 1,000 citizen activists have worked to protect the Florida black bear through grassroots advocacy and public education at the local, regional, state, and national levels.

10.  Sierra Club members enjoy observing, photographing and appreciating Florida black bears in the wild, and studying the species and its habitat.  The interests of the Florida Chapter of the Sierra Club, and its members, in observing, studying, and otherwise enjoying the Florida black bear in its natural habitat, and in obtaining and disseminating information regarding the

survival of the species, are harmed by the defendants' decision
not to list the species under the ESA, because activities
permitted in the absence of listing are contributing to the
extinction of the species, and, absent listing, defendants will
not take the steps necessary to ensure the species' recovery.

11.  Plaintiff Laurie A. Macdonald is a resident of St.
Petersburg, Florida, with a longstanding interest in Florida
black bears.  Ms. Macdonald was the Senior Field Coordinator for
the Habitat for Bears Campaign from 1994 through 1999, during
which time she oversaw programs to educate the public and policy
makers on the plight of the Florida black bear and to conserve
the subspecies and its habitat.  In her current capacity as the
Director of Florida Programs for Defenders of Wildlife, she works
on habitat and species protection with an emphasis on imperiled
species, including the Florida black bear.  In this capacity, she
seeks to preserve a state network of core and connected natural
areas to support imperiled species, including the Florida black
bear.  Ms. Macdonald has applied her education and experience as
a wildlife zoologist by assisting with various Florida black bear
research projects and by leading field trips to observe the
subspecies in the wild.  Ms. Macdonald also regularly hikes,
bikes, kayaks, canoes and camps in areas containing black bear
habitat, such as Florida's Big Bend region, including
Chassahowitzka, and the Okefenokee region, including Oceola and

Ocala National Forests, because Ms. Macdonald enjoys the chance
to observe the bear in its natural wild habitat and enjoys seeing
its markings.

12.  Ms. Macdonald's interests in observing and studying
Florida black bears in the wild, and in conserving the subspecies
and its habitat, have been injured by defendants' decision not to
list the species under the ESA, because activities that are
permitted, and the manner in which activities are permitted to be
undertaken, in the absence of listing, are contributing to the
extinction of the species, and, absent listing, defendants will
not take the steps necessary to ensure the species' recovery.
These activities include but are not limited to certain road
planning, design and construction in bear habitat.

13.  Martha L. Clutter is a resident of Inverness, Florida.
Since 1988, Ms. Clutter has frequently hiked and kayaked in black
bear habitat, including Weekiwachee Preserve and Ocala National
Forest, as much as every two or three months, specifically so she
could see the black bear in the wild, and see signs of the black
bear.  She no longer hikes in the Weekiwachee Preserve as much as
she once did because this bear population is going extinct and
there is an increasing lack of bear signs.  Since 1995, Ms.
Clutter has engaged in extensive volunteer efforts to protect the
black bear, including serving as Education Chair for the Habitat
for Bears Campaign which includes black bear education programs;

helping to establish a black bear hotline to document black bear
sightings; documenting illegal off road vehicle ("ORV") usage in
the Ocala National Forest and its effects on black bears and
their habitat; assisting veterinarians and bear researchers with
black bear research; and testifying at hearings and meetings
about the effects of roads and illegal ORV use on the black bear.

14.  Ms. Clutter's interests in observing and studying
Florida black bears in the wild, and in conserving the subspecies
and its habitat, have been injured by the defendants' decision
not to list the species under the ESA, because activities that
are permitted, and the manner in which activities are permitted
to be undertaken, in the absence of listing are contributing to
the extinction of the species, and, absent listing, defendants
will not take the steps necessary to ensure the species'
recovery.  These activities include but are not limited to
illegal ORV use, including in National Forests; road projects,
including poor road planning, design, and construction, and as a
result, highly lethal roads, which alone leads to an annual "road
mortality" of 100 bears; and illegal hunting.

15.  Randy Collum is a resident of Hawthorne, Florida.  For
years he has hiked in Florida black bear habitat, including the
Ocala National Forest, with the express purpose of seeing the
bear and its markings.  He has witnessed how the construction and
expansion of roads has damaged the bear populations and its

9

habitats, and as a result, he has decreased his hiking in these areas.

16. Mr. Collum's interest in observing the Florida black bears in the wild has been injured by the defendants' decision not to list the species under the ESA, because activities that are permitted, and the manner in which activities are permitted to be undertaken, in the absence of listing are contributing to the extinction of the species, and, absent listing, defendants will not take the steps necessary to ensure the species' recovery.

**B.    Defendants**

17. Defendant Gale Norton is the Secretary of the Interior and has ultimate responsibility for the implementation of the ESA.

18. Defendant Dale Hall is the Director of the United States Fish and Wildlife Service ("FWS"), the agency within the Department of the Interior which has been delegated the responsibility for implementing the ESA.

## STATUTORY FRAMEWORK AND FACTS GIVING RISE TO PLAINTIFFS' CAUSES OF ACTION

**A.    Statutory and Regulatory Framework**

19. Recognizing that certain species of plants and animals "have been so depleted in numbers that they are in danger of or threatened with extinction," 16 U.S.C. § 1531(a)(2), Congress enacted the ESA to provide both "a means whereby the ecosystems

upon which endangered and threatened species depend may be conserved, [and] a program for the conservation of such endangered species and threatened species . . . ." Id. at § 1531(b).  The duties the Act imposes upon the Secretary of the Interior for species such as the Florida black bear have been delegated to the FWS.  50 C.F.R. § 402.01(b).

20.  The ESA provides protection for threatened or endangered "species," which includes "any subspecies of fish or wildlife or plants . . . ."  16 U.S.C. § 1532(16).  A species is "endangered" if it "is in danger of extinction throughout all or a significant portion of its range ...."  Id. at § 1532(6).  It is "threatened" if it "is likely to become endangered species within the foreseeable future throughout all or a significant portion of its range."  Id. at § 1532(20).

21.  Once listed, a species is entitled to significant protections designed to both prevent the destruction of individual members of the species, and restore the species as a whole.  For example, it is illegal for anyone to "take" an endangered or threatened animal without a permit.  16 U.S.C. § 1538(a)(1); 50 C.F.R. §§ 17.21, 17.31.  The term "take" includes to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."  16 U.S.C. § 1532(19).

22.   In addition, Section 7 of the ESA requires every federal agency to conserve listed species, id. at § 1536(a)(1), and to consult with the FWS to "insure that any action authorized, funded or carried out by such agency ....is not likely to jeopardize the continued existence of any endangered species or threatened species ...." Id. at § 1536(a)(2).  The Act also requires that the FWS "develop and implement ... recovery plans" to recover listed species to the point where federal protection is no longer necessary.  16 U.S.C. § 1533(f)(1).

23.  A species must be listed as endangered or threatened if the FWS finds that "any one or a combination of the following factors" are present:

> (A)   the present or threatened destruction, modification, or curtailment of its habitat or range;
>
> (B)   overutilization for commercial, recreational, scientific, or educational purposes;
>
> (C)   disease or predation;
>
> (D)   the inadequacy of existing regulatory mechanisms; or
>
> (E)   other natural or manmade factors affecting its continued existence.

Id. at § 1533(a)(1); 50 C.F.R. § 424.11(c).  This analysis must be conducted "solely on the basis of the best scientific and commercial data available ...."  16 U.S.C. § 1533(b)(1)(A).

24.  Any interested person may petition for a species to be designated as threatened or endangered.  Id. at § 1533(b)(3)(A);

50 C.F.R. § 424.14(a).  Within 90 days after receiving a petition, the FWS must "make a finding as to whether the petition presents substantial scientific or commercial information indicating that the petitioned action may be warranted."  16 U.S.C. § 1533(b)(3)(A); 50 C.F.R. § 424.14(b).  If the petition presents such information, the FWS must "commence a review of the status of the species concerned."  Id.

    25.  Within one year after receiving such a petition, the FWS must decide whether listing the species is warranted.  16 U.S.C. § 1533(b)(3)(B); 50 C.F.R. § 424.14(b)(3).  If so, the FWS must promptly propose a regulation for public comment in the Federal Register, unless the Service finds that, although listing is warranted, a proposed rule is precluded by other pending proposals and the Service is making expeditious progress on these proposals.  16 U.S.C. § 1533(b)(3)(B); 50 C.F.R. § 424.14(b)(3).  Within one year after a proposed regulation is published, the FWS must conclude the rulemaking process, by either publishing a final rule protecting the species, or by withdrawing the rule.  16 U.S.C. § 1533(b)(6)(A); 50 C.F.R. § 424.17(a)(1).  In making this determination, the FWS must consider both public comments and appropriate scientific peer review.  16 U.S.C. § 1533(b)(5); 59 Fed. Reg. 34270 (1994) (Peer Review Policy).

B.    <u>Relevant Facts</u>

    1.    <u>The Florida Black Bear</u>

    26.    The Florida black bear (*Ursus americanus floridanus*) is a subspecies of the black bear (*Ursus americanus*).  The Florida black bear historically occurred in Florida, and the coastal plains areas of Georgia, Alabama, and southeastern Mississippi. As the result of extensive human development, it is estimated that the Florida black bear has been extirpated from more than 70% of its former range in Florida alone.

    27.    The Florida Fish and Wildlife Conservation Commission (the "Commission") estimates that 11,500 bears once inhabited the State of Florida.  In the late 1990s, the Commission estimated the total population to be as few as 1282 bears.

    28.    Although the Commission currently lists the bear as threatened under State law, it is considered a game species in Baker and Columbia counties and in Apalachicola National Forest. In addition, hunting of Florida black bears is still permitted in Georgia.  69 Fed. Reg. 2101.

    **2.    The Petition to List the Florida Black Bear and the FWS's First Decision Not To Protect The Species Under the ESA.**

    29.    Several times in the 1980s, the FWS designated the Florida black bear as a "Category 2" candidate species.  Category 2 species were those for which the FWS had determined that

listing might be appropriate, but for which additional data had
to be gathered before a listing proposal could be published.

30.    Responding to a Florida black bear listing petition, in
October 1990, the FWS published a 90-day finding that
"substantial information has been presented to indicate that the
petitioned action may be warranted."  55 Fed. Reg. 42223 (1990).
In January, 1992, the agency made its one-year finding,
concluding that "listing the Florida black bear as threatened <u>is</u>
<u>warranted.</u>"  56 Fed. Reg. 596 (1992)(emphasis added).  However,
at that time, the FWS declined to pursue listing on the grounds
that it was "precluded" by other actions.  <u>Id.</u>

31.    In determining that listing of the Florida black was
warranted, the FWS considered each of the listing factors.
Regarding the destruction of habitat, the FWS concluded that
"habitat loss has been, and continues to be the most serious
threat to the continued existence of the Florida black bear."
<u>Id.</u> at 598.  The agency also found that "[r]esidential,
agricultural, commercial, highway, and other forms of human
development have already eliminated viable populations of Florida
black bears on many private lands throughout the range . . . ."
<u>Id.</u>  The FWS further determined that "local extinctions are an
important threat to the existence of the [Florida black bear]"
and "habitat linkages are essential to insure long-term viability
of the Florida black bear."  <u>Id.</u>

32.   In concluding that federal listing of the Florida black bear was "warranted," the FWS also found that "[r]oad mortality is a serious threat to the Florida black bear in Florida," and one that "is likely to worsen with increases in human population, road-building, and vehicular traffic."  Id. at 599.  In particular, the Service noted that "[f]rom 1976 to 1991, 250 bears were killed on Florida highways, with a steady increase over the years."  Id.  FWS also identified illegal killing and poaching as serious threats to the species, threats that "could be especially detrimental to smaller, isolated populations . . . ."  Id.

33.   The agency also considered whether existing regulatory mechanisms were adequate to protect the Florida black bear.  The FWS found that bears enjoy a reasonable degree of habitat security on public lands.  Nonetheless, the agency explained that this security was not sufficient to avoid listing, because, without a concerted effort to also protect the species on private lands throughout the state, the "future of this subspecies is likely to be restricted to 'islands' of suitable habitat on public lands, preventing movements between bear populations." Id.

34.   Federal listing would provide that protection, the agency explained, by providing "additional take prohibitions and penalties through sections 9 and 11 of the Act, and section 7 of

the Act would require Federal agencies to insure that their actions were not likely to jeopardize the continued existence of the Florida black bear or to adversely modify critical habitat designated for the species." Id.

35.  In December 1992, FWS settled a lawsuit brought by various conservation and animal protection groups -- including plaintiffs The Fund for Animals and Defenders of Wildlife -- claiming that the agency had violated the ESA and APA by unreasonably delaying final listing determinations for hundreds of species, including the Florida black bear.  The Fund for Animals, Inc., et al. v. Babbitt, Civ. No. 92-0800 (SS) (D.D.C.). Pursuant to the settlement agreement, as subsequently modified on January, 1997, FWS agreed to make a final, judicially reviewable determination, by December 1998, whether or not to propose listing the Florida black bear under the ESA as threatened or endangered.

**C.    The FWS's About-Face Regarding Whether Listing
       The Species Is Warranted.**

36.  In December, 1998, the FWS published a Federal Register notice reversing its earlier finding that listing of the Florida black bear is "warranted," finding instead that the species did not require federal protection.  63 Fed. Reg. 67613 (1998).

37.  The agency continued to acknowledge that "[m]uch of the historical habitat of the Florida black bear has been lost to land clearing and alteration by man," and that many of the few

remaining black bear populations are threatened by road construction, residential and industrial development, timber cutting, and other forms of habitat loss and fragmentation. Id. The agency also acknowledged that, in the absence of federal listing, the complete extirpation of four of the nine remaining Florida black bear populations – (a) Alabama, (b) the middle Gulf coast of Florida; (c) Highlands County, and (d) St. Johns County – is likely , and that a fifth population, at Elgin Air Force Base, also faces serious imperilment. Id. at 67614-67616. As a result, the agency acknowledged that, absent listing, the Florida black bear will be reduced to four black bear population "islands" on four public lands and nearby areas – the Ocala National Forest, the Apalachicola National Forest, the Osceola National Forest - Okefenokee National Wildlife Refuge, and the Big Cypress National Preserve.

38.  The FWS also acknowledged that, according to conservation biologists, assuring the long-term protection of the Florida black bear requires ten secure populations with an effective population size of at least 200 bears per population. Id. at 67617.  Recognizing that, without listing the species, there was no prospect of increasing Florida black bear populations to anywhere near that level, the agency emphasized that "appropriate management" of the remaining few populations would be critical to the species' persistence.  Id.

39.  As for the existing regulatory mechanisms in place to achieve the objective of "appropriate management," the FWS stated that, on Forest Service lands, a Forest Service Land and Resources Management Plan "is expected to be compatible" with the survival of the Florida black bear in the National Forests – which comprise most of the four remaining public land areas where the species persists.  Explaining that the Plan's "goal" is to "restore ecosystem[s]," the FWS stated that meeting this goal "should ensure" the protection of the species.  Other measures in the Plan were "expected" or "predicted" to also assist the bears. Id. at 67,618.

40.  Similarly, the Service relied on the National Park Service's "goals" at the Big Cypress National Preserve to "preserve" the flora and fauna within the area – a general goal shared by all natural areas.  The Service found the Park Service's management of the Park toward this goal "is expected" to protect the population of Florida black bears in this area. Id.  The FWS relied on the same kind of "management goals" in the National Wildlife Refuge system.

41.  In sum, the agency concluded that, as to all the critical public land areas where Florida black bears remain, "these lands are predicted to continue providing secure bear habitat into the foreseeable future" because of "projected compatible habitat management for bears" in these areas. Id. (emphasis added).

**D.    Plaintiffs' Prior Lawsuit Challenging The FWS's Refusal To List The Species**.

42.    In light of the disconnect between the agency's own findings concerning the serious threats facing the Florida black bear and the decision not to list the species, plaintiffs filed suit challenging the agency's finding.  In December 2001, the Court granted plaintiffs' summary judgment motion in part, finding that the agency had not adequately evaluated whether listing the species is warranted.  <u>Defenders of Wildlife v. Norton</u>, No. 99-2072 (HHK) (D.D.C. Dec. 13, 2001) ("Mem. Op.").

43.    In particular, the Court held that the FWS had not adequately supported its finding that "existing regulatory mechanisms" were sufficient, in the absence of listing, to prevent the further decline of the species.  <u>Id.</u> at 19-22. The Court explained that, in evaluating whether "existing regulatory mechanisms" are adequate to protect a species, the FWS may only consider those mechanisms "that are being currently implemented and enforced, as opposed to regulations which might be enacted in the future, or current regulations authorizing future government action but which do not require that such action take place."  <u>Id.</u> at 20.

44.    For example, the Court explained, while the FWS had relied on state authorities to manage the Florida black bear, the agency had not explained whether the states were actually exercising that authority.  Similarly, the Court pointed out that

the FWS had relied on a Forest Service plan that the agency
"expect[ed] to be compatible" with maintaining the species, but
the agency had failed to explain whether the plan was even being
implemented, and if so, in what manner.  Id. at 21.

45.  In sum, the Court ruled that the FWS "must judge the
viability of the black bear based on threats to its existing
status and therefore can rely only on regulatory actions
currently in effect when making its decision."  Id. at 21-22
(emphasis added).  The Court then remanded the matter to the FWS
to make a new decision that considers only mechanisms "in effect
when making [the] decision."  Id.

**E.    The FWS's Latest Decision Not To Protect The Florida Black
Bear.**

46.  In June 2002, Defenders submitted to the FWS a letter
detailing the reasons why existing regulatory mechanisms, as of
the date of that letter – three-and-one-half years after the
Service's December 1998 decision, and before the Service had made
any new decision in response to the Court's remand – were wholly
inadequate to protect the Florida black bear.  With regard to
protections of the four remaining populations on federal lands,
the letter explained that off-road trails and vehicle use in
these areas is increasing, and that, as a result, existing
regulatory mechanisms in these areas are not adequate to protect
against the habitat destruction, road kills and poaching, and
other adverse effects associated with these trails and vehicles.

47.  Similarly, Defenders explained that habitat areas
adjoining these public lands – which the FWS had also found
critical to the survival of the Florida black bear – are also not
subject to adequate regulatory mechanisms to protect the black
bear.  Instead, Defenders detailed numerous specific projects
that will destroy or degrade these areas, and how, as even the
Forest Service itself has explained, without appropriate
controls, much of this remaining land will be developed, and thus
no longer available as Florida black bear habitat.

48.  Defenders also explained that, rather than providing
adequate regulatory mechanisms to protect the Florida black bear,
the State of Florida had significantly cut back on its
protections.  Defenders pointed out that, while the FWS had based
its earlier decision in part on the expectation of further
acquisition of land by Florida, in fact the State had cut the
funding available to acquire further habitat to protect the
species.

49.  Nonetheless, in January 2004 – more than two years
after the Court had issued its ruling, and more than five years
after the Service's 1998 decision – the agency once again decided
that listing the Florida black bear under the ESA was not
warranted.  69 Fed. Reg. 2100 (2004).

50.  In reaching its conclusion, the FWS violated the ESA,
16 U.S.C. § 1533(a)(1)(D), and this Court's order that it
consider the adequacy of "existing," "undertaken and enforced,"

regulatory mechanisms that are "currently in effect when making
its decision." Mem. Op. at 21, 22. Instead, the FWS expressly
limited its consideration to "regulatory mechanisms in effect at
the time of our previous 1998 12-month finding." 69 Fed. Reg.
2100; see also id. 2108 ("[W]e conclude that the existing
regulatory mechanisms applicable in 1998 are not inadequate and
do not warrant listing the Florida black bear")(emphasis added).

    51.  Because the Service relied on outdated 1998
regulations, and not 2004 regulations, its analysis failed
predictably to address the relevant regulatory mechanisms. For
example, the Service relied on the section 404 permitting process
mechanism of the Clean Water Act that requires developers to
obtain a federal permit before they may dredge or fill wetland
areas, stating that the mechanism "protect[s] wetland habitats
important to the bear throughout its range." 69 Fed. Reg. 2103.
However, a 2001 Supreme Court ruling, see Solid Waste Agency of
Northern Cook County v. Army. Corps. of Engs., 531 U.S. 159
(2001), significantly restricted the wetlands subject to this
program, and, as a result, many Florida wetlands areas may no
longer be protected by the Section 404 permitting process.
Although this change could severely limit the number of acres of
Florida black bear habitat that would otherwise benefit from the
permitting process, the FWS ignored this change by restricting
its analysis to the state of this regulatory mechanism in 1998.
69 Fed. Reg. 2103.

52.  Similarly, the Service relied on a now non-existent
Forest Service regulation requiring it "to maintain viable
populations of native species . . . ."  69 Fed. Reg. 2105, 2106
citing 36 C.F.R. § 219.19.  While the Forest Service had that
mandate in 1998, in 2002, the agency proposed to eliminate this
regulation, 67 Fed. Reg. 72,770 (2002), and in 2005 the agency
issued new final regulations that, as the Forest Service itself
explained, do "not include a requirement to provide for viable
populations of plant and animal species."  70 Fed. Reg. 1023,
1029 (2005).  In short, the Service relied on a "regulatory
mechanism" that the Forest Service had already declared its
intention to eliminate and that has now been eliminated.

53.  Yet another example concerns Florida's land acquisition
program.  While the Service appeared to rely on this program as a
regulatory mechanism protecting the Florida black bear, 70 Fed.
Reg. 2104, that reliance was based on the agency's prediction
that it was "reasonable to conclude that future land acquisition"
will further protect bear habitat.  69 Fed. Reg. 2104.  And
although the Service cited to some post-1998 statistics, as
Defenders pointed out in its June 2002 letter, cuts in the
acquisition program since 1998 have hampered the effectiveness of
this regulatory mechanism to protect the species.  Yet in its
2004 decision the Service did not evaluate the utility of the
acquisition program as of the date the decision was made.

54.   Even as to regulatory mechanisms which may not have
changed since 1998, the Service's latest decision still fails to
explain, as required by the Court, whether the agency is relying
solely on mechanisms that are being implemented and enforced.
For example, while the FWS relies on regulatory mechanisms in
Florida designed to protect the Florida black bear from
development pressures, the agency acknowledges that the
regulating agencies "can decide to ignore" these mechanisms "in
whole" in approving development in bear habitat.  69 Fed. Reg.
2104.

55.   Just as the Service failed to consider existing and
enforced regulatory mechanisms, it also failed to consider
current relevant information, violating its duty under the ESA to
base its determination on the "best scientific and commercial
data available."  16 U.S.C. § 1533(b)(1)(A).  Indeed, the Service
never addressed the information provided, nor the issues raised,
in Defenders' June 2002 submission.  For example, it did not
consider whether, since the 1998 decision, increased off-road
vehicle use and the decrease in funding for Florida's land
acquisition program had changed the adequacy of existing
regulatory mechanisms to protect the species.  Nor did it assess
whether, in light of the 12,000 Section 404 permits that were
issued between 1999 and 2003, during which time only a single
permit was denied, the Section 404 process is adequately
protecting the Florida black bear.

56.  The Service's failure to review recent data and existing regulations - including data that illuminates the efficacy of those regulations - undermines its examination of whether regulatory mechanisms are in fact adequately protective in their application, and reduces the bases for the Service's determination to, at times, conjecture and assumptions.  For example, FWS concludes that a revised forest plan "should continue to maintain quality forested habitats," citing 1998 data, 69 Fed. Reg. 2106, without considering, for example, the increase of off-road vehicle use since 1998.  Likewise, FWS discusses State land management plans and concludes, "because [land management] plans are required under State law, they should ensure the preservation of forested bear habitat."  69 Fed. Reg. 2107 (emphasis added).  Yet at the same time, though it states the plans are implemented in some respects, FWS essentially admits it does not know the degree of the plans' implementation when it states it "do[es] not assume" every goal and prescription is being implemented.  Id. (emphasis added).

57.  The Service's failure to consider the best data available was foreseeable, preventable, and unlawful.  The FWS did not solicit any public comments before making its new listing decision; it did not conduct any scientific peer review pursuant to its own Peer Review Policy, 59 Fed. Reg. 34270 (1994); and, as noted above, it did not address Defenders' June 2002 submission of more recent information.

58.  On June 20, 2005, plaintiffs sent the FWS a letter detailing the Service's violations of section 4 of the ESA, 16 U.S.C. § 1533, in once again deciding not to protect the Florida black bear.  This letter, which serves as plaintiffs' notice of suit pursuant to ESA section 11(g), 16 U.S.C. § 1540(g), details the agency's failure to consider "existing regulatory mechanisms," and failure to base its decision on the "best scientific and commercial data available."

59.  On August 18, 2005, the FWS responded to plaintiffs' notice letter, once again reiterating that, in making its 2004 decision, it limited its consideration to a "reexamination of the regulatory mechanisms being undertaken and enforced <u>at the time of our 1998 finding</u>."

### PLAINTIFFS' CLAIM FOR RELIEF

60.  By deciding, in 2004, that listing of the Florida black bear is not warranted due to the adequacy of regulatory mechanisms in 1998, defendants have violated section 4 of the ESA, 16 U.S.C. § 1533, which requires the FWS to base its listing decisions on the "best scientific and commercial data available," <u>id.</u> § 1533(b)(1)(A), and to evaluate the adequacy of "<u>existing</u> regulatory mechanisms," <u>id.</u> § 1533(a)(1)(D), and have therefore also acted in a manner that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," in violation of the APA.  5 U.S.C. § 706(2)(A).

61.  By once again failing to examine or explain the adequacy and efficacy of regulatory mechanisms to protect the Florida black bear, and by limiting its consideration to outdated regulatory mechanisms rather than examining whether <u>existing</u> regulatory mechanisms are effective in adequately protecting the species, defendants have violated this Court's ruling in <u>Defenders of Wildlife v. Norton</u>, No. 99-2072 (HHK) (D.D.C. Dec. 13, 2001), and have acted in a manner that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," in violation of the APA.  5 U.S.C. § 706(2)(A).

62.  These violations are injuring plaintiffs in the manner described in paragraphs 3-16 above.

Wherefore, plaintiffs respectfully request that this Court:

(1) declare that defendants have violated the ESA and APA;

(2) set aside and vacate defendants' January 14, 2004 finding that listing of the Florida black bear is not warranted;

(3) direct defendants to issue a proposed rule listing the Florida black bear as an endangered or threatened species according to a timetable to be determined by the Court;

(4) award plaintiffs their costs, attorneys' fees, and other disbursements for this action, including any expert witness fees; and

(5) grant plaintiffs such other and further relief as this Court may deem just and proper.

Respectfully submitted,

_____
Howard M. Crystal (D.C. Bar No. 446189)

_____
Eric R. Glitzenstein (D.C. Bar No. 358287)

_____
Joshua R. Stebbins (D.C. Bar. No. 468542)

Meyer Glitzenstein & Crystal
1601 Connecticut Ave., N.W.
Suite 700
Washington, D.C.  20009
(202) 588-5206

Of Counsel:      Michael P. Senatore (D.C. Bar No. 453116)
                 Brian Segee (D.C. Bar. No. 492098)
                 Defenders of Wildlife
                 1101 Fourteenth Street, N.W.
                 Suite 1400
                 Washington, D.C.  20005

                 Attorneys for Plaintiffs

Dated: February 2, 2006