# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DEFENDERS OF WILDLIFE, et al.     )
                                  )
            Plaintiffs,     )
                                  )     No. 06CV00180
                    v.            )
                                  )
DIRK KEMPTHORNE, et al.       )
                                  )
           Defendants.    )
_____)

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, plaintiffs hereby move for summary judgment. For the reasons set forth in the accompanying memorandum, there are no genuine issues of material fact in dispute and plaintiffs are entitled to judgment as a matter of law. In support of this motion, plaintiffs submit the accompanying memorandum of law, a statement of material facts as to which there is no genuine issue, Exhibits 1-12, and a proposed Order.

Respectfully submitted,

_____
/s/

Of Counsel:

Brian Segee
(D.C. Bar. No. 492098)

Defenders of Wildlife
1101 Fourteenth Street, N.W.
Suite 1400
Washington, D.C. 20005
(202) 772-3221

Joshua R. Stebbins
(D.C. Bar. No. 468542)
Howard M. Crystal
(D.C. Bar No. 446189)
Eric R. Glitzenstein
(D.C. Bar. No. 358287)

Meyer Glitzenstein & Crystal
1601 Connecticut Ave., N.W.
Suite 700
Washington, D.C. 20009
(202) 588-5206

October 30, 2006

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

DEFENDERS OF WILDLIFE, et al.     )
                                       )
               Plaintiffs,     )
                                       )       No. 06CV00180
              v.           )
                                       )
DIRK KEMPTHORNE, et al.      )
                                       )
               Defendants.    )
                                       )
                                       )
                                       )
_____)

# MEMORANDUM OF LAW IN SUPPORT OF
# PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Respectfully submitted,

_____
/s/

Of Counsel:                               Joshua R. Stebbins
                                       (D.C. Bar. No. 468542)
Brian Segee                               Howard M. Crystal
(D.C. Bar. No. 492098)              (D.C. Bar No. 446189)
                                       Eric R. Glitzenstein
Defenders of Wildlife              (D.C. Bar. No. 358287)
1101 Fourteenth Street, N.W.
Suite 1400
Washington, D.C.  20005          Meyer Glitzenstein & Crystal
(202) 772-3221                        1601 Connecticut Ave., N.W.
                                       Suite 700
                                       Washington, D.C.  20009
                                       (202) 588-5206

October 30, 2006                         Attorneys for Plaintiffs

**TABLE OF CONTENTS**

**PAGE**

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I.    The Endangered Species Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.   Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      A.    The Florida Black Bear's Ecology And The Threats To Its Survival . . . . . . . . . . 5

      B.    Ongoing Habitat Loss In The State Of Florida . . . . . . . . . . . . . . . . . . . . . . . . . 9

      C.    Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

            1.    The Service's Administrative Review Of The Florida Black
                  Bear For Listing Under The ESA. . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

            2.    The Service's 1998 Decision That The Florida Black Bear
                  Did Not Warrant Listing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

            3.    This Court's 2001 Order Remanding The Service's 1998
                  Decision. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

            4.    The Service's 2004 Decision Challenged In This Case. . . . . . . . . . . . . . 17

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

THE SERVICE'S 2004 DECISION VIOLATES THE ESA AND THE 2001
ORDER'S MANDATE TO ANALYZE WHETHER EXISTING REGULATORY
MECHANISMS ARE ADEQUATE TO PROTECT THE FLORIDA BLACK BEAR
FROM EXTINCTION GIVEN THE PRESENT STATUS OF THE BEAR. . . . . . . . . . . . . . . 20

I.    Standard Of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

II.   Section Four Of The ESA, And This Court's 2001 Order Enforcing The ESA,
      Requires The Service To Analyze Whether Existing Regulatory Mechanisms Are
      Adequate To Protect The Florida Black Bear Given The Present Status Of The
      Bear And The Threats To The Species. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

III.    The Service's 2004 Decision Failed To Undertake The Analysis Required By
        Section Four And The Court's 2001 Order. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

IV.     By Limiting Its Decision To Mechanisms And Information That Existed In 1998,
        Rather Than 2004, And By Failing To Meaningfully Examine The Efficacy Of The
        Regulations Analyzed, The Service Violated Section Four Of The ESA And The
        Court's Remand Order. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

        A.    Clean Water Act Regulations And State Land Use Regulations. . . . . . . . . . . . 27

        B.    Land Acquisition Programs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

        C.    Regulatory Mechanisms Governing The Public Lands That Support The
              Four Core Bear Populations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

        CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

## TABLE OF AUTHORITIES

**FEDERAL CASES**                                                            **PAGE**

Babbitt v. Sweet Home Chapter of Communities for a Great Oregon,
    515 U.S. 687 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Biodiversity Legal Foundation v. Babbitt,
    943 F. Supp. 23 (D.D.C. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Carlton v. Babbitt,
    900 F. Supp. 526 (D.D.C. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Citizens to Preserve Overton Park v. Volpe,
    401 U.S. 402 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Defenders of Wildlife v. Babbitt,
    958 F. Supp. 670 (D.D.C. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 23, 30

Defenders Of Wildlife v. Kempthorne,
    Civ. No. 04-1230 2006 WL. 2844232 (D.D.C. Sept. 29, 2006) . . . . . . . . . . . . . . . . . 26

Defenders of Wildlife v. Norton, No. 99-02072 (HHK), slip op.
    (D.D.C. Dec. 13, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Forest Guardians v. Animal & Plant Health Inspection Service,
    309 F.3d 1141 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Friends of the Earth v. Laidlaw Environmental Services,
    528 U.S. 167 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Las Vegas v. Lujan,
    891 F.2d 927 (D.C. Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Lujan v. Defenders of Wildlife,
    504 U.S. 555 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

_____

* Authorities upon which plaintiffs chiefly rely are marked with asterisks

Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.,
    463 U.S. 29 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20, 40

*Oregon Natural Resources Council v. Daley,
    6 F. Supp. 2d 1139 (D. Or. 1998)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21, 22

Public Citizen v. Federal Trade Commission,
    829 F.2d 149 (D.C. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

*Save Our Springs v. Babbitt,
    27 F. Supp. 2d 739 (W.D. Tex. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22, 23, 37

Solid Waste Agency of Northern Cook County v. Army. Corps. of Eng'rs
    531 U.S. 159 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Southwest Center for Biological Diversity v. Babbitt,
    215 F.3d 58 (D.C. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24

Southwest Center for Biological Diversity v. Babbitt,
    939 F. Supp. 49 (D.D.C. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

Southwest Center for Biological Diversity v. Badgley,
    No. 98-CV-2234, - F.Supp. 2d -  2006 WL. 2993210 (S.D.Cal. Oct. 13, 2006) . . . . . .  28

The Fund for Animals, Inc., et al. v. Babbitt,
    No. 92-0800 (SS) (D.D.C. Jan. 21, 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

Tennessee Valley Authority v. Hill,
    437 U.S.153 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**FEDERAL STATUTES AND REGULATIONS**

5 U.S.C. § 706(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 20, 40

16 U.S.C. § 1531 et seq . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3

---

\* Authorities upon which plaintiffs chiefly rely are marked with asterisks

iv

16 U.S.C. § 1532(19) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*16 U.S.C. §1533 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

16 U.S.C. § 1538(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

16 U.S.C. § 1540(g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

H.R. Rep. No. 97-567, at 19 (1982) reprinted in 1982 U.S.C.C.A.N. 2807, 2819 . . . . . . . . . . 4

36 C.F.R. § 219 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 36

36 C.F.R. § 219.20 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

50 C.F.R. § 402.01(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

## MISCELLANEOUS

Clutter Decl. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

David N. Wear & John G. Greis, The Southern Forest Resource Assessment Summary Report
(November 19, 2001) (draft) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 10, 11, 34

Defenders of Wildlife, Out of Control: The Impacts of Off-Road Vehicles and Roads
    on Wildlife and Habitat in Florida's National Forests (June 2002) . . . . . . . . . . . . . . . 38

Defenders Decl. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Email from Diane Ikeda to Kelly Bibb and John Kasbohm (August 21, 2003) . . . . . . . . . . . 25

Email from Kelly Bibb to Diane Ikeda (August 18, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . 25

Stewards of Florida's Land, Background on Preservation 2000, Florida Department of
Environmental Protection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Email from John Kasbohm to Stan Simpkins (August 7, 2002) . . . . . . . . . . . . . . . . . . . . . . 29

Email from Stan Simpkins to John Kasbohm (August 19, 2002) . . . . . . . . . . . . . . . . . . . . . 30

* Authorities upon which plaintiffs chiefly rely are marked with asterisks

Email from Hildreth Cooper to John Kasbohm (October 4, 2002), A.R. 312 . . . . . . . . . . . . . . 30

Finding on a Petition to List the Florida Black Bear as a Threatened Species,
57 Fed. Reg. 596, 597 (Jan. 7, 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 14

James Cox et al., Florida Game and Freshwater Fish Commission, Closing the Gaps in Florida's
Habitat Conservation System (1994) ("Closing the Gaps") . . . . . . . . . . . . . . 6, 7, 9, 12

John W. Kasbohm & Michael M. Bentzien, The Status of the Florida Black Bear
(1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 10

Land Acquisition and Management Advisory Council, Florida Preservation 2000 Remaining
Needs and Priorities (October 1, 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Letter from Courtney Taylor, U.S. Department of Justice, to Joshua Stebbins . 11, 19, 32, 34,39

Letter from David S. Maehr to Dr. Jamie Clark, FWS (November 21, 1998) . . . . . . . . . . . . . . 15

Letter from J. Cox Letter to Dr. Jamie Clark, Director, U.S. Fish and Wildlife
Service (November 24, 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 30

Letter from Robert Brantly, Executive Director, Florida Game and Freshwater Fish
Commission, to Michael Bentzein, Acting Field Supervisor, U.S. Fish and Wildlife
Service (August 6, 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 13

Letter from Michael Senatore, Defenders of Wildlife, to Steven Williams, Director,
U.S. Fish and Wildlife Service (June 2002) . . . . . . . . . . . . . . . . . . . . . . . 12, 17, 32, 34, 38

Macdonald Decl. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

National Forest System Land Management Planning Final Rule,
70 Fed. Reg. 1023, 1029 (Jan. 5, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

National Forest System Land and Resource Management Planning,
67 Fed. Reg. 72770 (Dec. 6, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

National Park Service, General Management Plan and Final Environmental Impact Statement:
Big Cypress (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

New 12-month Finding for a Petition to List the Florida Black Bear,

63 Fed. Reg. 67613, 67614 (Dec. 8, 1998) . . . . . . . . 5, 8, 9, 11, 12, 14, 15, 18, 18, 33, 34

Notice of Finding on a Petition to List the Florida Black Bear, 55 Fed. Reg. 42223, 42223  (Oct. 18, 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Rare and Endangered Biota of Florida (S.R. Humphrey ed. 1992) . . . . . . . . . . . . . . . . . . *passim*

RARE II Evaluation of Buck Lake Roadless Area . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 38, 39

RARE II Evaluation of Baptist Lake Roadless Area, A.R. 5343 . . . . . . . . . . . . . . . . . . . . . . . 10

RARE II Evaluation of Impassable Bay Roadless Area. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Reexamination of Regulatory Mechanisms in Relation to the 1998 Florida Black
        Bear Petition, 69 Fed. Reg. 2100, 2108
        (Jan. 14, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Sierra Club Decl. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Terry Gilbert & John Wooding, FGFWFC, An Overview of Black Bear Roadkills in Florida
        1976- 1995 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

USDA Forest Service, Final Environmental Impact Statement and Land and Resources
        Management Plan: National Forests in Florida (1986) . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

12-Month Finding for a Petition To List the Contiguous United States
        Population of the Canada Lynx,
        62 Fed. Reg. 28653, 28654 (May 27, 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

12-Month Finding for a Petition To List the Queen Charlotte Goshawk,
        62 Fed. Reg. 46710, 46711 (Sept. 4, 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

1997 Candidate and Listing Priority Assignment Form . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

1998 Wekiva Basin GEOpark Unit Management Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

## INTRODUCTION

This action challenges the Fish and Wildlife Service's ("FWS's" or "Service's") 2004 decision once again refusing to list the Florida Black Bear as endangered or threatened under the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 et seq.  See Reexamination of Regulatory Mechanisms in Relation to the 1998 Florida Black Bear Petition, 69 Fed. Reg. 2100, 2108 (Jan. 14, 2004) ("2004 Decision") A.R. 0002, 0009 (Pls.' Ex. 1).  The 2004 Decision fundamentally violates this Court's December 13, 2001, Order in Defenders of Wildlife v. Norton, No. 99-02072 (HHK), slip op. (D.D.C. Dec. 13, 2001) ("2001 Order") (Pls.' Ex. 2) as well as the ESA, which the 2001 Order enforced.  In the 2001 Order, the Court specifically directed the Service to determine whether "existing" regulatory mechanisms are adequate to protect the bear given the "present status" of the bear, but in its 2004 Decision, the Service concludes that the Florida Black Bear does not warrant listing under the ESA on the ground that six years earlier, in 1998, the bear was adequately protected by the regulatory mechanisms purportedly in place and enforced in 1998.

More specifically, the Court's 2001 Order remanded the Service's earlier 1998 Decision that the Florida Black Bear did not warrant listing with instructions that the Service examine only "'existing regulatory mechanisms' . . . that are being currently implemented and enforced" in determining whether or not the bear should be listed.  See 2001 Order at 20 (emphasis added) (Pls.' Ex. 2).  Rather than comply with the Court's order to address "current" regulatory mechanisms, the Service issued a new determination - in 2004 - that the Florida Black Bear did not warrant listing on the ground that "regulatory mechanisms applicable in 1998 are not inadequate and do not warrant listing the Florida black bear."  2004 Decision, 69 Fed. Reg. at

2108 (Pls.' Ex. 1) (emphasis added).  Thus, the Service did not determine that at the time of the

new listing decision the "<u>existing</u> regulatory mechanisms" then in effect were adequate to protect

the bear.  <u>See</u> 2001 Order at 20-22 (Pls.' Ex. 2).

The Service's 2004 Decision is unlawful and arbitrary and capricious and should be set

aside under the ESA and the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), for

several reasons.  First, it is inconsistent with both section 1533(a)(1)(D) of the ESA, and the

Court's 2001 Order enforcing section 1533(a)(1)(D), pursuant to which the Service was required

to determine whether "regulatory mechanisms which are <u>currently</u> being undertaken and

enforced" are adequate to protect the Florida Black Bear from becoming extinct in all or a

significant part of its range.  <u>See</u> 2001 Order at 20 (Pls.' Ex. 2) (emphasis added); 16 U.S.C. §

1533(a)(1)(D) (requiring analysis of "<u>existing</u> regulatory mechanisms" in evaluating whether

listing is warranted).  Second, it is inconsistent with the ESA's mandate that the Service make

listing decisions using "<u>solely</u>" the "best scientific and commercial data available," 16 U.S.C. §

1533(b)(1)(A) (emphasis added), including current information that post-dates 1998.  Third, the

Service's Decision is inconsistent with the Service's obligation to actually examine the efficacy

of the regulatory mechanisms that it relies upon.  <u>E.g.</u>, <u>Defenders of Wildlife v. Babbitt</u>, 958 F.

Supp. 670, 684 (D.D.C. 1997).  As a result, the Service's 2004 Decision must be set aside as

arbitrary and capricious and lacking in observance of required procedures.  <u>See</u> 5 U.S.C. §

706(2)(A), (D).

## **<u>BACKGROUND</u>**

### I.        **The Endangered Species Act**

The ESA is "the most comprehensive legislation for the preservation of endangered

2

species ever enacted by any nation." Babbitt v. Sweet Home Chapter of Communities for a Great Oregon, 515 U.S. 687, 698 (1995), quoting Tennessee Valley Authority v. Hill, 437 U.S. 153, 180 (1978). "The plain intent of Congress in enacting th[e] statute" was nothing less than "to halt and reverse the trend toward species extinction, whatever the cost." Sweet Home, 515 U.S. at 699 (citations omitted). Having found that "fish, wildlife, and plants in the United States have been rendered extinct as a consequence of economic growth and development untempered by adequate concern and conservation," 16 U.S.C. § 1531(a)(1), and that "other species . . . have been so depleted in numbers that they are in danger of or threatened with extinction," id. 1531(a)(2), Congress enacted the ESA with the express purposes of conserving "the ecosystems upon which endangered species and threatened species depend" and developing programs for the conservation of the species themselves. 16 U.S.C. § 1531(b).

The principal responsibilities under the ESA are imposed on the Secretary of the Interior, id. § 1532(15), who, in turn, has delegated day-to-day implementation of the Act to the FWS. See 50 C.F.R. § 402.01(b). As part of this responsibility, the FWS is required to list, and thereby protect, species that are "threatened" or "endangered." 16 U.S.C. § 1533(a)(1). Under the ESA, a species is "threatened" if it "is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." Id. § 1532(20). And it is "endangered" if it "is in danger of extinction throughout all or a significant portion of its range." Id. § 1532(6).

The Service is required to list a species under the ESA if it is threatened or endangered due to any of the following factors:

(A)    the present or threatened destruction, modification, or curtailment of its habitat or range;

3

(B)    overutilization for commercial, recreational, scientific or educational purposes;
(C)    disease or predation;
(D)    the inadequacy of existing regulatory mechanisms; or
(E)    other natural or manmade factors affecting its continued existence.

Id. § 1533(a)(1); 50 C.F.R. § 424.11(c).  Each of these factors must be considered both

"singularly and in combination," so that the presence of any one of them requires listing.  E.g.,

Carlton v. Babbitt, 900 F. Supp. 526, 530 (D.D.C. 1995).  In reviewing a species for listing, the

Service is obligated to use "solely" "the best scientific and commercial data available," 16 U.S.C.

§ 1533(b)(1)(A) (emphasis added), and neither political and nor economic factors may be

considered in deciding whether to list a species.  H.R. Rep. No. 97-567, at 19 (1982) reprinted in

1982 U.S.C.C.A.N. 2807, 2819.

       The ESA specifies procedures and deadlines that guide the Service's listing process.  See

16 U.S.C. § 1533(b).  For example, the Service must publish a notice of a proposed listing rule in

the Federal Register, with an opportunity for comment, and make a final decision within one

year.  16 U.S.C. § 1533(b)(5).

       Once a species is listed, it is entitled to immediate protection under the ESA.  For

example, it is ordinarily illegal for anyone to "take" a listed species.  16 U.S.C. § 1538(a)(1); see

also 16 U.S.C. § 1532(19) (defining "take" to include "harass, harm, pursue, hunt, shoot, wound,

kill, trap, capture, or collect, or to attempt to engage in any such conduct").  The Service must

also develop and implement a recovery plan to restore the species to the point where the Act's

protections are no longer necessary.  Id. § 1533(f).  Moreover, all federal agencies must consult

with the Service to "insure that any action authorized, funded, or carried out by such agency . . .

is not likely to jeopardize the continued existence of any" listed species.  Id. § 1536.

**II.    Factual Background**

**A.    The Florida Black Bear's Ecology And The Threats To Its Survival**

The Florida Black Bear (*Ursus americanus floridanus*), a subspecies of the North American Black Bear (*Ursus americanus*), is the largest land mammal in Florida today.  D.S. Maehr & J.B. Wooding, <u>Rare and Endangered Biota of Florida</u> (S.R. Humphrey ed. 1992), Administrative Record ("A.R.") 2200.[1]  Although it was once widespread, occurring throughout Florida, as well as in Georgia, Alabama and Mississippi, "extensive human development" has since fragmented and reduced the range of the bear and its population.  <u>See</u> 2004 Decision, 69 Fed. Reg. at 2100, A.R. 0002 (Pls.' Ex. 1).  By 1998, the bear had been rendered extinct in over 70% of its former habitat. New 12-month Finding for a Petition to List the Florida Black Bear, 63 Fed. Reg. 67613, 67614 (Dec. 8, 1998) ("1998 Decision") (Pls.' Ex. 3).  The Florida Game and Fresh Water Fish Commission ("FGFWFC") estimates that there were once 11,500 Florida Black Bears in Florida, 2004 Decision, 69 Fed. Reg. at 2101, A.R. 0002 (Pls.' Ex. 1), but estimates of the remaining number of black bears in Florida have plummeted: the Service estimates there are between 1,600 and 3000 bears, 2001 Order at 15 (Pls.' Ex. 2), though estimates vary.  As a result of the bears' decline it is listed as threatened under State law, with certain exceptions.  <u>E.g.</u> 1998 Decision, 63 Fed. Reg. at 67614 (Pls.' Ex. 3); 2004 Decision, 69 Fed. Reg. at 2102, A.R. 0003 (Pls.' Ex. 1).

The Service agrees that the single greatest threat to the Florida Black Bear's survival is habitat loss and fragmentation.  <u>E.g.</u>, 1997 Candidate and Listing Priority Assignment Form ("1997 Listing Form"), ("Habitat loss and fragmentation has been and continues to be the most

---

[1]    Citations to documents included in the Administrative Record are prefaced by "A.R."

serious threat") A.R. 6431 (Pls.' Ex. 5); Finding on a Petition to List the Florida Black Bear as a

Threatened Species, 57 Fed. Reg. 596, 597 (Jan. 7, 1992) ("1992 Decision") A.R. 6408 (Pls.' Ex.

4).  There are several aspects of the bear's ecology that join together to render it particularly

vulnerable to such habitat loss.  First, the Florida Black Bear has a large range and is "dependent

upon extensive forested landscapes."  Rare and Endangered Biota of Florida, A.R. 2204.  The

recorded ranges of individual bears in Florida has reached 457 km², id., A.R. 2206, or roughly

three times the square area of Washington D.C.'s landmass: the average range for males is

approximately 170 km².  Id.  In one possible "dispersal event," a two and a half year old bear was

tracked traveling 140 kilometers, id., roughly the distance from Philadelphia to New York City.

Second, the bears' population density - the number of bears that populate a given area - is

relatively low.  Id., A.R. 2204.  Thus, not only does any given bear require a large expanse of

habitat, but because individual bears do not share habitat in great numbers, a much larger amount

of land is then needed to sustain a population of bears.  For example, the FGFWFC calculated

that a "potentially secure population" of black bears requires a habitat base of 2,000 - 4,000 km²

(490,000 - 980,000 acres), James Cox et al., Florida Game and Freshwater Fish Commission,

Closing the Gaps in Florida's Habitat Conservation System (1994) ("Closing the Gaps"), A.R.

505, or roughly 12-25 times the area of D.C.'s landmass, and that ten such populations would

help to ensure the bear's survival by "protect[ing] genetic diversity, provid[ing] security against

catastrophic events, and further limit[ing] the effects of seasonal environmental variation."  Id.,

A.R. 504, 505.

Third, the Florida Black Bear needs a variety of forest habitats in a remote area.  E.g.,

Rare and Endangered Biota, A.R. 2200, 2203; 1992 Decision, 57 Fed. Reg. at 596, A.R. 6406

(Pls.' Ex. 4); Closing the Gaps, A.R. 518.  The bear is a "secretive" and "solitary" animal, Rare and Endangered Biota, A.R. 2200, 2206, that beds in "remote swamps or thickets" and nests in "nearly impenetrable tangle[s] of vines and stems." Id., A.R. 2203.  Its use of habitat varies with the seasons according to food availability, id., and human use or development of an area is considered to be in direct conflict with the bears' use of its habitat.  E.g., RARE II Evaluation of Buck Lake Roadless Area, A.R. 5358 ( bear "directly compet[es] with increasing public use and development").

Fourth, the black bear has a low reproductive rate, which makes the population sensitive to increased mortality.  Rare and Endangered Biota, A.R. 2204.  Such mortality results from, among other things, the ongoing construction of roads and highways, which creates lethal barriers to the movement of the bears and fragments their range. Terry Gilbert & John Wooding, FGFWFC, An Overview of Black Bear Roadkills in Florida 1976- 1995 (1996) ("Overview of Black Bear Roadkills"), A.R. 2125.[2]

Together, these four factors help to drive the Florida Black Bear's need for very large and remote tracts of forests, a need that renders the bear highly vulnerable to development, and highly

---

[2] In fact, road mortality is not only a concern because of the direct mortality of the bears that are hit, but it is also reflective of habitat loss and fragmentation.  E.g., Overview of Black Bear Roadkills, A.R. 2125 ("We believe that roadkills are probably symptomatic of the much larger and more serious problem of habitat loss and fragmentation.").  In 1976, two or three bears were killed annually in Florida; in 1987, roughly 30 were killed annually; in 1995, the number had risen to 55, and in every year since 2000 it has topped 100, with 132 kills in 2002, the highest yet and a 4,400-6,600 percent increase in under 30 years.  See http://myfwc.com/bear/roads.htm (last visited October 17, 2006); see also Overview of Black Bear Roadkills in Florida, 1976-1995, A.R. 2133; FGFWFC, Management of the Black Bear in Florida, A.R. 1887.  With respect to the core Ocala population, for example, there were 187 road kills between 1976 and 1995, Overview of Black Bear Roadkills in Florida, 1976-1995, A.R. 2129, but by 2004 the number had spiked to 615 roadkills.  http://myfwc.com/bear/roads.htm (last visited October 17, 2006).

sensitive to the use of its habitat for other purposes. E.g., Rare and Endangered Biota, A.R. 2204. By 1998, habitat loss and habitat fragmentation had reduced the bears to seven remnant bear populations, 1998 Decision, 63 Fed. Reg. at 67614 (Pls.' Ex. 3), of which the Service itself concluded that only four were "viable" and likely to survive. Id. at 67616.

The four "viable" populations exist on a mix of public and private lands, each centered to some extent on a large federal land holding. Id. at 67614-16. They are 1) the Apalachicola population, centered on the Apalachicola National Forest and surrounding lands, and located in the Florida Panhandle on the Gulf of Mexico coast; 2) the Ocala population, centered on the Ocala National Forest and surrounding lands in Central Florida; 3) the Osceola - Okefenokee population, centered on the Osceola National Forest, the Okefenokee National Wildlife Refuge, and surrounding lands, in northeastern Florida and extreme southern Georgia; and 4) the Big Cypress population, centered on the Big Cypress National Preserve and surrounding lands, in South Florida adjacent to the Gulf of Mexico Coast. Id.; see also John W. Kasbohm & Michael M. Bentzien, The Status of the Florida Black Bear (1998) ("Status of the Florida Black Bear"), A.R. 2148.

As for the remnant populations that are not "viable," the causes and effects of habitat loss and fragmentation are evident. Expanding development and roads consume and fragment bear habitat, which reduces the quantity of habitat available for the bears and fragments the bears' population. 1998 Decision, 63 Fed. Reg. at 67614-17 (Pls.' Ex. 3). This in turn increases mortality, suppresses population numbers, and ultimately undermines the health of the bear population as is evidenced by, e.g., inbreeding-related genetic abnormalities such as "kinked or absent tails, prolapsed (slipping outward) rectums, and no external scrotum or testes." 1998

Decision, 63 Fed. Reg. at 67615 (Pls.' Ex. 3); see also, id. at 67614-17.

In sum, the greatest threat to the Florida Black Bear is the ongoing human development that consumes, fragments, degrades and usurps its habitat. The bears' survival therefore depends on protecting large expanses of bear habitat from development and fragmentation. E.g., Rare and Endangered Biota, A.R. 2207 ("[l]ong-term conservation of the Florida black bear is dependent upon preservation of large contiguous woodlands"); 2004 Decision, 69 Fed. Reg. at 2103, A.R. 0004 (Pls.' Ex. 1) ("sufficient quantity and quality of bear habitat also must remain available to the four core bear populations"); Closing the Gaps, A.R. 505 (estimating 490,000-980,000 acres per population is necessary, if the habitat is properly managed, and that ten such habitats are necessary). Moreover, once sufficient habitat is protected, it must be managed in a manner that is compatible with the bears' survival. E.g. 2004 Decision, 69 Fed. Reg. at 2104-05, A.R. 0005-0006 (Pls.' Ex. 1) ("bear habitat protection cannot be assured if public lands . . . are not managed in a manner compatible with maintaining a viable bear population.").

## B.    Ongoing Habitat Loss In The State Of Florida

To fully appreciate the plight of a large mammal like the Florida Black Bear struggling to survive in a state like Florida, it is necessary to understand the extraordinary changes occurring in that state. Florida is defined in large part by its tremendous population growth and urbanization. The Administrative Record states that Florida is undergoing "extremely rapid population growth," USDA Forest Service, Final Environmental Impact Statement and Land and Resources Management Plan: National Forests in Florida (1986) ("1986 EIS & Forest Plan"), A.R. 3891, is "one of the fastest growing states," 1992 Decision, 57 Fed. Reg. at 598, A.R. 6408 (Pls.' Ex. 4); see also 1997 Listing Form, A.R. 6431, and is "rapidly expanding." National Park Service,

General Management Plan and Final Environmental Impact Statement: Big Cypress (1992) ("Big Cypress FEI & Plan") A.R. 2484. Indeed, since its statehood in 1845, Florida's growth has always outpaced the rest of the nation, but after World War II the growth "accelerated dramatically" with the population "surg[ing]" from 2,771,305 in 1955 to 9,739,992 in 1985. 1986 EIS & Forest Plan, A.R. 3892. Between 1970 and 1980 alone, the population of Florida grew by 43%. 1986 EIS & Forest Plan, A.R. 3894. By 1997 the surge had reached 14,700,000 million people: 290,000 new residents were moving to Florida each year, see Land Acquisition and Management Advisory Council, Florida Preservation 2000 Remaining Needs and Priorities (October 1, 1997), A.R. 6917, and by 2000 the Census counted 15,982,378 Floridians. U.S. Census Bureau Web Site, http://quickfacts.census.gov/qfd/states/12000.html (last visited October 25, 2006).

Perhaps just as important as the rate of growth is its dispersion: Florida's rapid development has not been focused around a single dominant urban center. 1986 EIS & Forest Plan, A.R. 3891. Instead, it initially spread along the coastline and in the south, but with time it has moved progressively north and inland into central Florida and beyond. Id., A.R. 3892, 3895. By 1997, 60 % of the 600-1000 people that moved to Florida each day moved to central Florida. See RARE II Evaluation of Baptist Lake Roadless Area, A.R. 5343. Florida now consists of an H-shaped "megalopolis" that runs up both coasts and through the center of Florida. See Status of the Florida Black Bear, A.R. 2174. And the growth continues to spread past central Florida: in 2001, the Forest Service issued a report on the state of southern forests - a report that it developed with the Fish and Wildlife Service - in which the Services predict "a rapid increase in population and development [in the Florida Panhandle] spreading from central Florida." David

N. Wear & John G. Greis, The Southern Forest Resource Assessment Summary Report

(November 19, 2001) (draft) ("Southern Forest Resource Assessment Summary Report")

(emphasis added), S.A.R. P299 (Pls.' Ex. 6).[3]

 The consequences for the bear of the rapid and decentralized sprawl are grave. As

discussed further below, the mix of public and private lands that support the core populations are,

quite literally, in the path of Florida's inexorable growth. E.g., Letter from Robert Brantly,

Executive Director, Florida Game and Freshwater Fish Commission, to Michael Bentzein,

Acting Field Supervisor, U.S. Fish and Wildlife Service (August 6, 1991) ("1991 FGFWFC

Letter") A.R. 6300-02 (listing private lands supporting core populations which "will most likely

be lost in the foreseeable future."). Non-federal lands - and the parts of the core populations that

they support - are at risk of becoming developed and/or fragmented and isolated from federal

lands and the parts of the populations that exist there. E.g., id.; 1998 Wekiva Basin GEOpark

Unit Management Plan ("1998 Wekiva Plan"), A.R. 1190. Even federal lands - which are not

adequate to independently support the core bear populations, see 1998 Decision, 63 Fed. Reg. at

67615-17 (Pls.' Ex. 3) (including non-federal lands in calculations of acreages sufficient to

support secure, viable populations) - face declining and fragmenting habitat quality due to,

among other things, road construction. E.g., 1991 FGFWFC Letter, A.R. 6301 (discussing

---

 [3] In a separate motion filed concurrently with the motion for summary judgment, plaintiffs are moving to supplement the administrative record with information that plaintiffs submitted to the Service while the 1998 decision was on remand, but that the Service refused to consider - and refused to include in the record - because it post-dated 1998. See August 28, 2006 Taylor Letter at 1 (Pls.' Ex. 7). They are included as Plaintiffs' Exhibit 6, attached hereto, and to distinguish these documents from the Administrative Record filed by the Service, they are referred to as the Supplemental Administrative Record ("S.A.R."), and the documents are stamped with a prefix beginning with the letter "P."

threats to Ocala National Forest habitat).

The core Ocala population provides a good example of the threats facing a core population.  The Service concluded that the Ocala bear population would survive based on there being 2,600 km² (642,000 acres) of protected habitat.  1998 Decision, 63 Fed. Reg. 67615; see also 2004 Decision, 69 Fed. Reg. 2104 (incorporating the 1998 Decision regarding sufficiency of protected acreage).  Yet the Ocala National Forest ("Ocala NF") is only about 381,930 acres, or 1545 km².  Final Environmental Impact Statement, Land and Resource Management Plan, U.S. Forest Service, 1985, A.R. 3901.  As many as 1055 km² of core population habitat may therefore be at risk of development and/or fragmentation unless they are publicly owned conservation lands that are physically connected to Ocala NF.  Yet only 678 km² are publicly owned conservation lands, and of these, not all are physically connected to Ocala NF.  Cf. 1998 Decision, 63 Fed. Reg. 67615 (noting that 2223 km² of "nearly contiguous public conservation lands" exist and acquisition would increase conserved lands to 2,600 km²); FGFWFC, Closing the Gaps, at A.R. 509 ("[s]everal conservation areas to the south of Ocala National Forest contain black bear habitat yet are not currently contiguous with protected habitat on the forest.").

For example, the Wekiva GEOpark - which supports an important part of the Ocala population - faces fragmentation, and an unfinished land acquisition "charge" has been launched "in an attempt to assure that the Wekiva Basin black bear population remains linked to the Ocala National Forest population."  1998 Wekiva Plan, A.R. 1190, 1237-38, 1271 (emphasis added).  Even then, however, by 1998 roads and traffic "bound[ing]" Wekiva were having such a "large impact" on the bear population that the 1998 Wekiva Plan warned "park staff must be very vigilant to assure that the perpetuation of Wekiva bear population is not compromised by road

12

widening projects." A.R. 1216 (emphasis added). Meanwhile unprotected land will eventually be developed. Id. at 1237. And even Ocala NF itself is threatened with, among other things, fragmentation by highway expansion. E.g., 1991 FGFWFC Letter, A.R. 6301 (discussing threats to the Ocala habitat).

### C.    Procedural History

#### 1.    The Service's Administrative Review Of The Florida Black Bear For Listing Under The ESA.

This case continues fourteen years of repeated litigation seeking a final - and lawful - listing determination regarding the Florida Black Bear.[4] The Service's consideration of the bear for listing dates back even further. Four times over the span of a decade - in 1982, 1985, 1989

---

[4]    Plaintiffs have standing to bring this action and include Laurie Macdonald, Martha Clutter, Randy Cullom, Defenders of Wildlife, The Fund for Animals, and The Sierra Club. For example, Laurie Macdonald and Martha Clutter regularly hike and kayak in habitat that supports the Florida Black Bear specifically so that they might see the bear, or at least see signs of the bear. Macdonald Decl. ¶ 5 (Pls.' Ex. 10); Clutter Decl. ¶ 2 (Pls.' Ex. 9). Both Ms. Macdonald and Ms. Clutter have dedicated many years to increasing public awareness and education concerning the bear and to helping protect the bear. Macdonald Decl. ¶¶ 2-4 (Pls.' Ex. 10); Clutter Decl. ¶ 3 (Pls.' Ex. 9). Their interests in observing the bear are injured by the Service's failure to comply with the ESA in determining whether the bear warrants listing because activities that are permitted in the absence of listing are contributing to the extinction of the species, and, absent listing, the Service will not take the steps necessary to ensure the species' recovery. Macdonald Decl. ¶6 (Pls.' Ex. 10); Clutter Decl. ¶ 4 (Pls.' Ex. 9). See Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992); Friends of the Earth v. Laidlaw Environmental Services, 528 U.S. 167 (2000). Ms. Macdonald is a member of The Sierra Club and Defenders of Wildlife, and Ms. Clutter is a member of the Sierra Club. Macdonald Decl. ¶ 1 (Pls.' Ex. 10); Clutter Decl. ¶ 1 (Pls.' Ex. 9). The Sierra Club is dedicated to enjoying and protecting the wild places of the earth and to promoting the responsible use of the earth's ecosystems and resources, and restoring the quality of the natural and human environment, and has worked to help protect the Florida Black Bear. Sierra Club Decl. ¶¶ 2, 3 (Pls.' Ex. 11). Defenders of Wildlife is dedicated to the protection and restoration of all native wild animals and plants in their natural communities, and has worked to protect the Florida Black Bear. Defenders of Wildlife Decl. ¶¶ 2, 3 (Pls.' Ex. 12). Thus, The Sierra Club and Defenders of Wildlife have standing to bring a claim on behalf of their members. E.g., Public Citizen v. Federal Trade Commission, 829 F.2d 149 (D.C. Cir. 1987).

and 1991 - the Service issued "notices of review" that the Florida Black Bear might warrant

listing as a threatened or endangered species, but that further information was required before the

Service could take action.  1998 Decision, 63 Fed. Reg. at 67614 (Pls.' Ex. 3).

During this time, the Service also received a Petition to list the species.  In response to the

Petition the Service issued a 90-day finding in 1990 that "[s]ubstantial information has been

presented to indicate that the petitioned [listing] action may be warranted."  Notice of Finding on

a Petition to List the Florida Black Bear, 55 Fed. Reg. 42223, 42223 (Oct. 18, 1990).  The

Service then followed with a "one-year" finding in 1992 that concluded "listing the Florida black

bear as threatened is warranted" but "precluded" by other higher priority work.  1992 Decision,

57 Fed. Reg. at 599, A.R. 6409 (Pls.' Ex. 4) (emphasis added).

Later that same year, The Fund for Animals, Defenders of Wildlife, and others settled a

suit against the Service for unlawfully delaying the final listing of the Florida Black Bear, among

other species.  See The Fund for Animals, Inc., et al. v. Babbitt, No. 92-0800 (SS) (D.D.C. Jan.

21, 1997); see also,1998 Decision, 63 Fed. Reg. at 67614 (Pls.' Ex. 3).  After five years passed

without final determinations on a number of species, including the Florida Black Bear, the parties

revised the settlement, giving the Service until December 31, 1998, to make a final determination

regarding the bear.  See 1998 Decision, 63 Fed. Reg. at 67614 (Pls.' Ex. 3).

In the meantime, the Service reaffirmed its previous 1992 assessment that the Florida

Black Bear warranted listing under the ESA (but that listing was precluded).  1997 Listing Form,

A.R. 6430 (Pls.' Ex. 5).  Again, the Service reiterated that "[h]abitat loss and fragmentation has

been and continues to be the most serious threat to the continued existence of the Florida black

bear."  Id., A.R. at 6431.  The Service also stated that Florida's "rapid human population growth"

14

is "among the fastest in the United States," "will continue for the foreseeable future," and that with "major increases in Florida's human population continuing, it is likely that significant impacts from proposed highway projects and various forms of habitat alteration or conversion will also continue."  Id.

### 2.   The Service's 1998 Decision That The Florida Black Bear Did Not Warrant Listing.

In December 1998, the Service finally issued a listing decision regarding the Florida Black Bear.  See 1998 Decision, 63 Fed. Reg. at 67613 (Pls.' Ex. 3).  In striking contrast to the Service's past findings that the bear did warrant listing, and despite the fact that several outside experts whom the Service relied upon concluded that the bear warranted listing, see Letter from David S. Maehr to Dr. Jamie Clark, FWS (November 21, 1998), A.R. 6403; Letter from J. Cox Letter to Dr. Jamie Clark, Director, FWS (November 24, 1998) ("Cox Letter"), A.R. 6439, the Service determined that the bear was "not endangered, nor likely to become endangered within the foreseeable future throughout all or a significant portion of its range."  1998 Decision, 63 Fed. Reg. at 67618 (Pls.' Ex. 3).  The Service arrived at its conclusion by reasoning that of seven remnant bear populations, four were "viable" and likely to survive into the foreseeable future, and hence the bear was not endangered or threatened in a significant portion of its range.  Id. at 67616.  These four populations are the four "core" bear populations discussed above and known today as the Apalachicola population, the Ocala population, the Osceola-Okefenokee population, and the Big Cypress population.  Id.

In arriving at its conclusion, however, the Service determined that the four bear populations were likely to survive because, among other things, "proposed acquisitions" of land would increase protected bear habitat to an amount that would support the bear populations.

E.g., 1998 Decision, 63 Fed. Reg. at 67615 (Pls.' Ex. 3) ("Existing and projected acquisition of public lands will provide . . .") (emphasis added). Moreover, the Service's determination relied upon speculative future regulatory mechanisms, such as expected future land management policies, to conclude that the bear was not threatened. E.g., 1998 Decision, 63 Fed. Reg. at 67618 (Pls.' Ex. 3) (National Forest land management plan "is expected to be compatible with the continued maintenance of bears . . . .") (emphasis added).

### 3.    This Court's 2001 Order Remanding The Service's 1998 Decision

Plaintiffs challenged the 1998 Decision as arbitrary and capricious on a number of grounds. On December 13, 2001, this Court disagreed with several of plaintiffs' arguments, but the Court agreed with plaintiffs that, in refusing to list the bear, the Service could not rely upon speculative measures that may or may not protect the species. The Court found that the Service's decision "cannot be sustained" because, for example, the Service identified the "authority and responsibility" of Florida to manage the bear, but it did not indicate that Florida was "actually taking any regulatory action to protect" the bear. 2001 Order at 21 (Pls.' Ex. 2). Similarly, the Court rejected the Service's reliance on the Forest Service's Land and Resource Management Plan for the National Forests in Florida because the Service failed to indicate "whether the plan is being implemented, whether the plan requires government action, [] whether the plan merely authorizes future government action," and whether the "particular regulatory actions [provided for in the plan] actually are being undertaken as a result of the plan." Id. (emphasis added). Thus, it was "impossible for th[e] court to determine, based on the existing record, what [] regulatory actions are" being carried out "and in what manner they are being implemented." Id.

The Court therefore remanded to the Service to conduct a new section 1533(a)(1)(D)

16

analysis with the explicit mandate to "judge the viability of the black bear based on the threats to its existing status" relying "only on regulatory actions currently in effect when making its decision." 2001 Order at 21-22 (Pls.' Ex. 2) (emphasis added).  In its Order, the Court explained that the Service must make a determination "based on the present status of the species" and "'existing regulatory mechanisms' [which] are those that are currently being implemented and enforced, as opposed to regulations which might be enacted in the future, or current regulations authorizing future government action, but which do not require that such action will take place." Id. at 20.  (emphasis added).  In short, the Court rejected reliance on "speculative future actions to justify [the Service's] decisions because there is no assurance that those actions will in fact be carried out," 2001 Order at 20 (Pls.' Ex. 2) (emphasis added), and remanded "so that the Wildlife Service can examine only regulatory mechanisms which are currently being undertaken and enforced." Id. at 22.

### 4.    The Service's 2004 Decision Challenged In This Case.

In response to the Court's remand, the Service purported to reexamine whether listing the bear is warranted, and plaintiff Defenders of Wildlife submitted a variety of information to the Service. See Letter from Michael Senatore, Defenders of Wildlife, to Steven Williams, Director, U.S. Fish and Wildlife Service (June 2002) ("Defenders 2002 Letter"), S.A.R. P1 (Pls.' Ex. 6). The submissions included information that addressed, among other things, the inadequacy of existing regulatory mechanisms given the ongoing rapid development in Florida, the increasing use of public lands in ways incompatible with the black bear's use of the lands, and the steep cuts in funding for habitat acquisition. Id.  For example, Defenders supplied the Service with information indicating that over $450 million was being diverted from land acquisition programs

17

that might otherwise be used to purchase black bear habitat.  Id., S.A.R. P5 (Pls.' Ex. 6).  In

addition, Defenders of Wildlife provided the Service with a report - which the Service itself

helped generate - concluding that development in the Florida Panhandle would increase rapidly:

a conclusion directly at odds with the Service's previous conclusion that the Apalachicola

population was viable because development would proceed at slow rates.  Id., P4-P5 (Pls.' Ex.

6); 1998 Decision, 63 Fed. Reg. at 67616.

On January 14, 2004, the Service issued the 2004 Decision now under review.  See 2004

Decision, 69 Fed. Reg. 2100, A.R. 0001 (Pls.' Ex. 1).  The Service again determined that the

black bear did not warrant listing after considering, for example, the Clean Water Act's

regulation of wetlands filling that resulted in a number of "mitigation banks" being established,

and state regulations concerning land acquisition that had resulted in the acquisition of black bear

habitat.

Nonetheless, the Service's 2004 Decision violated several critical requirements of the

Court's 2001 Order.  First, rather than considering regulatory mechanisms that were "current" at

the time the Service rendered its 2004 Decision, the Service based its decision on regulatory

mechanisms that existed in 1998.  E.g., 2004 Decision, 69 Fed. Reg. at 2101, A.R. 0002 (Pls.'

Ex. 1).  Indeed, the Service expressly describes the 2004 Decision as a "reexamination of the

regulatory mechanisms being undertaken and enforced at the time of our 1998 finding."  Id.

(emphasis added).[5]

---

[5]  As discussed infra at pp. 25-28, the Service took this anomalous approach because it
concluded that the Court intended it to confine its analysis to conditions as they existed in 1998.
However, there is nothing in the Court's Order, nor anything else in the record, to suggest that
the Court wanted the Service to wait until six years after its initial decision to make a new
decision, but then restrict itself to analyzing facts as they existed in 1998.

18

Second, the Service made no inquiry into the "present status" of the Florida Black Bear with respect to the ability of regulatory mechanisms to address threats to the bear as of 2004. See 2001 Order at 20 (Pls.' Ex. 2). For example, there is virtually nothing in the record that post-dates 1998, with the only notable exceptions being documents concerning the drafting of the 2004 Decision. Indeed, the Service not only refused to consider post-1998 information concerning the present status of the bear, it has refused to include such information in the record even when Defenders sent the information to the Service in 2002. Letter from Courtney Taylor, U.S. Department of Justice, to Joshua Stebbins (August 25, 2006) (Pls.' Ex. 7) ("Taylor Letter"). As the Service explained: "the Service did not consider these documents because they were published after the 1998 Finding . . . ." Id.[6]

Third, in critical respects, the Service did not analyze whether the regulations it relied upon were "enforced" and effective as enforced. 2001 Order at 22 (Pls.' Ex. 2). For example, the Service's review of state land use laws pertaining to Developments of Regional Impacts and the "direct habitat protection [they provide] for bears" cites to nothing but the regulatory provisions themselves and the existence of 15 mitigation banks. 2004 Decision, 69 Fed. Reg. at 2104, A.R. 0005 (Pls.' Ex. 1). Nor can the record sustain a conclusion as to how the provisions

---

[6] In its 2004 Decision, the Service did include several footnotes with some "update[d]" information, e.g., 69 Fed. Reg. at 2102 n.1, A.R. 0003, but not only is there often no evidence in the record to support the assertions in the footnotes, it appears the information had no significance in the Service's determination as the Service asserts the footnotes were "separate from its court ordered reexamination." 2004 Decision, 69 Fed. Reg. at 2101, A.R. 0002. Indeed, the Service attests that it limited its consideration to information in the record, Linda Walker Decl. ¶ 2, but again, assertions made in the footnotes are often unsupported by the record.

were actually enforced, nor whether they were effective as enforced.  Id.

In short, the Service's 2004 Decision disregarded several requirements of the Court's 2001 Order.  In so doing, the Service violated the ESA's requirement that it examine the "inadequacy of existing regulatory mechanisms" using "solely" the "best available scientific and commercial information available."  16 U.S.C. § 1533(a)(1)(D), (b)(1) (emphasis added).  As discussed further below, the Service's 2004 Decision should therefore be set aside and the Court should order the Service to make a new determination as to whether existing regulatory mechanisms are adequate to protect the bear based on the present status of the Florida Black Bear and the threats to it at the time the Service renders its new decision.

ARGUMENT

**THE SERVICE'S 2004 DECISION VIOLATES THE ESA AND THE 2001 ORDER'S MANDATE TO ANALYZE WHETHER EXISTING REGULATORY MECHANISMS ARE ADEQUATE TO PROTECT THE FLORIDA BLACK BEAR FROM EXTINCTION GIVEN THE PRESENT STATUS OF THE BEAR.**

**I. Standard Of Review**

This action is brought under the ESA's citizen suit provision, 16 U.S.C. § 1540(g), and the APA, 5 U.S.C. § 706.  Courts in this Circuit review actions taken by the Service in carrying out the ESA in accordance with the standards of review established by the APA.  See Las Vegas v. Lujan, 891 F.2d 927, 932 (D.C. Cir. 1989).  Under those standards, the Court must "set aside" agency action, findings, and conclusions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of the procedure required by law."  5 U.S.C. § 706(2)(A), (D).  In conducting its review, the Court must "immerse" itself in the administrative record, and conduct a "thorough, probing, in-depth review" of the facts, Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 415 (1971), to determine

20

whether the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation

for its action including a 'rational connection between the facts found and the choice made.'"

Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Ins. Co., ("State Farm"),

463 U.S. 29, 43 (1983) (citations omitted).

## II.     Section Four Of The ESA, And This Court's 2001 Order Enforcing The ESA, Requires The Service To Analyze Whether Existing Regulatory Mechanisms Are Adequate To Protect The Florida Black Bear Given The Present Status Of The Bear And The Threats To The Species.

Section 1533 of the ESA specifies five factors that are to be considered by the Service in

determining whether to list a species as threatened or endangered. See 16 U.S.C. § 1533(a)(1).

As discussed above, the Court's 2001 Order directed the Service to examine whether the Florida

Black Bear warrants listed under the fourth factor, section four (a)(1)(D). See 2001 Order at 22

(Pls.' Ex. 2).

Section 1533(a)(1)(D) requires that the Service examine whether, in light of the threats to

the Florida Black Bear, the bear is endangered or likely to become endangered in all or a

significant portion of its range because of "the inadequacy of existing regulatory mechanisms"

that directly or indirectly afford protection to the bear. 16 U.S.C. § 1533(a)(1)(D) (emphasis

added). In conducting such an analysis, the Service can only rely upon regulatory requirements

that actually exist and are enforced in determining whether a species warrants listing under

section four (a)(1)(D). E.g., 2001 Order at 22; Oregon Natural Resources Council v. Daley, 6 F.

Supp. 2d 1139, 1142, 1158 (D. Or. 1998).

As the Court explained in its 2001 Order, the Service can "examine only regulatory

mechanisms which are currently being undertaken and enforced." 2001 Order at 22 (Pls.' Ex. 2).

In the context of section 1533(a)(1)(D):

'existing regulatory mechanisms' are those that are currently being implemented and enforced, as opposed to regulations which might be enacted in the future, or current regulations authorizing future government action, but which do not require that such action will take place.

2001 Order at 20 (Pls.' Ex. 2) (emphasis added).  Thus, the Service "cannot rely on the possibility of action in the future to justify a determination that the black bear is not currently threatened," id. at 21-22 (emphasis added), nor can it rely on regulations that merely "authoriz[e] future government action, but which do not require" action.  Id. at 20.  Instead, the Court ordered the Service to "judge the viability of the black bear based . . . on regulatory actions currently in effect when making its decision."  Id. at 21-22 (emphasis added).

Numerous other courts have held the same.  For example, in Oregon Natural Resources Council v. Daley, the court rejected a not-warranted determination where the agency relied in part on a new restoration initiative that provided for future actions that would supposedly be protective of the coho salmon.  6 F. Supp. 2d at 1142, 1158.  The court found the Service's determination unlawful because the decision was "premised upon promises of future, as well as voluntary actions," which are "necessarily speculative and uncertain."  Id.  And in Save Our Springs v. Babbitt, the court rejected a not-warranted determination that relied on a conservation agreement with the State of Texas to take future actions to protect a species of salamander.  27 F. Supp. 2d 739, 743, 745 (W.D. Tex. 1997).  Again, the court found that reliance on the conservation agreement was inherently speculative and therefore unlawful: the Court had "no way of knowing whether or not [the actions] have been implemented," and "there are no assurances that the measures will be carried out, when they will be carried out, nor whether they will be effective."  Id. at 744.  See also Southwest Center for Biological Diversity v. Babbitt, 939 F. Supp. 49, 52 (D.D.C. 1996); Biodiversity Legal Foundation v. Babbitt, 943 F. Supp. 23, 26

(D.D.C. 1996).

In addition, a section 1533(a)(1)(D) analysis requires the Service to consider whether the regulatory mechanisms relied upon are actually effective in protecting the species, an assessment that requires a factual inquiry into the state of the species and the threats to it.  Thus, in the 2001 Order, the Court explained that "an agency's determination of whether to list a species must be based on the <u>present status</u> of the species," 2001 Order at 20 (Pls.' Ex. 2) (emphasis added), and again, it directed the Service to "judge the viability of the black bear based on threats to its existing status."  Id. at 21-22 (emphasis added).  Again, other courts have held the same.  For example, in setting aside the Service's refusal to list the United States Lynx population under the ESA, the court in Defenders of Wildlife v. Babbitt rejected the Service's analysis of existing regulatory mechanisms as "one of the weakest elements of the decision" precisely because it "ma[de] no attempt to analyze past or present data to determine whether these mechanisms are effectively protecting the Lynx population."  958 F. Supp. 670, 684 (D.D.C 1997).  And in Save Our Springs v. Babbitt, the court remanded with the express warning that "[a]ny listing decision that considers the Conservation Agreement will be deemed by this Court to be arbitrary and capricious until sufficient time has elapsed to permit the Secretary to determine its effectiveness in protecting the species."  27 F. Supp. 2d at 748.

In short, this and other courts have made clear that under section 1533(a)(1)(D) the Service must determine whether the Florida Black Bear warrants listing by considering only those mandatory regulatory mechanisms that are both existing and enforced.  Moreover, the Service must examine the effectiveness of the regulatory mechanisms by inquiring into the actual present status of the Florida Black Bear and the threats to its survival using "solely" the "best

scientific and commercial data available."  16 U.S.C. § 1533(b)(1)(A) (emphasis added); see

also, Southwest Center for Biological Diversity v. Babbitt, 215 F. 3d 58, 59 (D.C. Cir. 2000).

    As a result, in the context of the Florida Black Bear, the Service was therefore required to

determine whether, in light of the "best scientific and commercial data available," there were

regulatory mechanisms "existing" at the time of the Service's decision that: a) adequately

protected large enough expanses of black bear habitat; b) in a condition that was consistent with

the black bear's habitat needs; given c) the present status of the bear and the threats to it.  But as

discussed below, the Service never conducted such an inquiry.

**III.    The Service's 2004 Decision Failed To Undertake The Analysis Required By Section
Four And The Court's 2001 Order.**

    Despite the clarity of the 2001 Order and the plain meaning of section four (a)(1)(D), the

Service violated both when it issued its 2004 Decision once again concluding that the Florida

Black Bear does not warrant listing under the ESA.  First, by its own admission, the Service did

not consider "only regulatory mechanisms which are currently being undertaken and enforced" at

the time of its 2004 Decision.  2001 Order at 22 (Pls.' Ex. 2) (emphasis added); see also id.

(Service "can rely only on regulatory actions currently in effect when making its decision"); 16

U.S.C. § 1533(a)(1)(D) ("existing regulatory mechanisms").  Instead, the Service expressly

limited its consideration to "regulatory mechanisms being undertaken and enforced at the time of

[its] 1998 finding," and not the "current" or "existing" regulatory mechanisms when the new

determination was made.  2004 Decision, 69 Fed. Reg. at 2101, A.R. 0002 (Pls.' Ex. 1)

(emphasis added).  Indeed, the Service concludes its 2004 Decision by stating that:

        Based on this review, we conclude that the existing regulatory mechanisms applicable in
        1998 are not inadequate and do not warrant listing of the Florida black bear.

Id. at 2108, A.R. 0009 (Pls.' Ex. 1) (emphasis added).

Second, the Service admittedly failed to follow the ESA's mandate to use "solely" the "best available scientific and commercial data" – i.e., the data "available" as of 2004 – in assessing the state of the Florida Black Bear. 16 U.S.C. § 1533(b)(1) (emphasis added). Again, the Service limited its decision to information from 1998, thereby ignoring important post-1998 information even when the plaintiffs took it upon themselves to submit the information to the Service. See, e.g., Email from Diane Ikeda to Kelly Bibb and John Kasbohm (August 21, 2003), A.R. 22 ("We did not look at today's situation and are only talking about the reevaluation 5 years ago") (emphasis added); Taylor Letter at 1 ("the Service did not consider [documents] because they were published after the 1998 Finding") (Pls.' Ex. 7). As a result, the Service failed to address events that transpired - and information that was gathered - between 1998 and 2004, despite the Service's own acknowledgment of its "obligation to us[e] the best available scientific information." Email from Kelly Bibb to Diane Ikeda (August 18, 2003), A.R. 25. Nor do the handful of footnotes with selectively updated information constitute the best available data.

Third, in critical respects, the 2004 Decision fails to analyze whether - and to what extent - the regulatory mechanisms it relies upon are enforced and effective as enforced. The essential inquiry with respect to the Florida Black Bear is whether existing regulatory mechanisms adequately protect "sufficient quantity and quality of bear habitat" for "the four core bear populations." 2004 Decision, 69 Fed. Reg. at 2103, A.R. 0004. But the Decision leaves unclear, for example, how much of the habitat that the Service is relying upon to support the four core populations has been, or is at risk of, loss or fragmentation, or what the net loss or gain of such habitat is. Indeed, the Service never analyzed whether some of the regulations it reviewed were

25

actually being enforced in 1998, let alone 2004. And because of its peculiar reading of the Court's remand order, the Service certainly never conducted a factual inquiry into the effectiveness of those regulations in 2004.

In its new decision the Service has taken a paradoxical position in which it confines itself to examining "current" regulatory mechanisms as of 1998, because that is what the Service contends the Court intended it to do:

> Pursuant to the Court's order, we are providing our reexamination of the regulatory mechanisms being undertaken and enforced at the time of our 1998 finding. Regulatory mechanisms that are mentioned in the "Summary of Factors" section below as part of our reexamination were in effect in 1998. However, we describe the regulatory mechanisms in the present tense because we have been asked by the court to make a current reexamination.

2004 Decision, 69 Fed. Reg. at 2101, A.R. 0002 (Pls.' Ex. 1). However, such a construction of the Court's order is certainly not supported by the plain terms of the Court's ruling. Once again, the Court directed the Service to evaluate "existing" and "current" regulatory mechanisms, and the ordinary meaning of those words - especially in the context of the Court's Order - meant that the Court wanted the Service to evaluate the adequacy of protections for the bear at the time of the new decision, not in 1998, eight years ago.

Even if there were some ambiguity in the Court's remand - which plaintiffs do not believe is the case - the Service's reading of it makes no sense. The Service has never explained why the Court would want it to go through the counterintuitive exercise of making a new decision, but don blinders to new information and developments impacting the bear's survival since 1998. More importantly, such a reading of the Court's Order would require the Service to violate section four of the ESA by ignoring the "best available . . . data" and the "existing" regulatory mechanisms at the time of the decision. 16 U.S.C. § 1533. The conclusion seems inescapable,

therefore, that the Service not only violated section four, but failed to carry out the remand order

in a manner consistent with the Court's ruling.  See Defenders Of Wildlife v. Kempthorne, Civ.

No. 04-1230 2006 WL 2844232 (D.D.C. Sept. 29, 2006) ("an agency faced with a remand order

has an affirmative duty to respond to the specific issues remanded").  It is noteworthy that in

other listing cases involving remands the Service has considered current - updated - information.

See e.g. 12-Month Finding for a Petition To List the Queen Charlotte Goshawk, 62 Fed. Reg.

46710, 46711 (Sept. 4, 1997); 12-Month Finding for a Petition To List the Contiguous United

States Population of the Canada Lynx, 62 Fed. Reg. 28653, 28654 (May 27, 1997).

**IV.    By Limiting Its Decision To Mechanisms And Information That Existed In 1998, Rather Than 2004, And By Failing To Meaningfully Examine The Efficacy Of The Regulations Analyzed, The Service Violated Section Four Of The ESA And The Court's Remand Order.**

As discussed in greater detail below, the Service's regulatory analysis can be roughly

divided into four types of regulatory mechanisms: 1) regulations that control the direct take of the

bear through, for example, hunting; 2) Clean Water Act and other land use regulations that

supposedly control the development and fragmentation of bear habitat ("land use regulations");

3) land acquisition regulations; and 4) regulations that supposedly control the management of the

public lands that support the core bear populations ("public land regulations").  Three of these

types of regulations - land use regulations, land acquisition regulations and public land

regulations - are the most critical because they address the greatest threat to the black bear today:

habitat loss and fragmentation.  Each is therefore discussed separately below.

**A.    Clean Water Act Regulations And State Land Use Regulations**

The Service relies upon the Clean Water Act's ("CWA's") section 404 dredge and fill

regulations to "protect wetland habitats important to the bear," noting that the CWA is

27

"especially relevant" to protecting black bear habitat on private lands in Florida. 2004 Decision, 69 Fed. Reg. at 2103, A.R. 0004 (Pls.' Ex. 1). Yet by its own admission, the Service's analysis is stuck in 1998 and the Service therefore never addresses significant changes in the CWA regulatory environment between 1998 and 2004. Thus, for example, the Service never considered the Supreme Court's decision in Solid Waste Agency of Northern Cook County v. Army. Corps. of Eng'rs. that significantly narrowed the scope of the CWA's dredge and fill requirements. 531 U.S. 159 (2001) ("SWANCC"). Because of SWANCC, by 2004 many Florida wetlands that support the bear may no longer be protected by Section 404 permitting processes, even if they were in 1998. But the Service never addressed the issue and never analyzed whether the CWA adequately protects bear habitat post-SWANCC. Cf. Southwest Center for Biological Diversity v. Badgley, No. 98-CV-2234, – F.Supp. 2d – , 2006 WL 2993210 at *7 (S.D.Cal. Oct. 13, 2006) (enjoining incidental take permit and requiring new consultation under ESA because, in part, SWANCC no longer required CWA permit processes with regard to the habitat at issue, and "the essential mechanism through which impacts to [the species would be mitigated] . . . has been removed.").

Second, the Service failed to make a meaningful inquiry into the efficacy of CWA regulations - as enforced - at preventing the loss of Florida Black Bear habitat. To be sure, the Service notes that fifteen wetland mitigation banks were active in Florida in 1998. See 2004 Decision, 69 Fed. Reg. at 2103, A.R. 0004 (Pls.' Ex. 1). But the Service's 2004 Decision fails to make the factual analysis most critical to the black bear's survival: how many acres of black bear wetland habitat were lost or fragmented (or are at risk thereof) under the regulations, versus how many acres of habitat were "mitigated" or are protected under the regulations, among the lands

28

that the Service deems necessary to support the "four core" bear populations.  The Service's

conclusion that the CWA adequately protects black bear habitat without clearly establishing such

measures of enforcement and efficacy is arbitrary and capricious.[7]

To be sure the record does contain, for example, an email to other Service personnel

asking for "some examples of where reviews of 404 permits . . . might have resulted in protection

of bear habitat," email from John Kasbohm to Stan Simpkins (August 7, 2002), A.R. 315, and it

includes some tables regarding acres mitigated.  E.g. A.R. 486-87.  But this is hardly sufficient to

establish that CWA regulations "[]adequately" protect the Florida black bear by "lessen[ing] or

prevent[ing] the development of bear habitat" and thereby preserving "sufficient quantity and

quality of bear habitat," as the Service contends.  2004 Decision, 69 Fed. Reg. at 2103, A.R.

0004 (Pls.' Ex. 1).

Nor can the handful of responses with "some examples" of beneficial section 404 permits

support a conclusion that CWA regulations adequately protect the four core Florida Black Bear

populations.  For example, one email referenced two mitigation banks that did, or were expected

---

[7] Such an inquiry is particularly important given evidence in the record that 19 acres of forested wetlands and agricultural land is converted to urban uses in Florida each hour.  Stewards of Florida's Land, Background on Preservation 2000, Florida Department of Environmental Protection, A.R. 6719.  Indeed, the government's own review of the CWA mitigation program - a review that included the Army Corps of Engineers' district with jurisdiction over Florida - concluded there was "limited oversight to determine the status of compensatory mitigation" and limited enforcement capacities due to a failure to "specify the requirements of compensatory mitigation in the permits."  General Accounting Office, Wetlands Protection: Corps Of Engineers Does Not Have an Effective Approach to Ensure That Compensatory Mitigation Is Occurring, What We Found, September 2005, http://www.epa.gov/owow/wetlands/pdf/GAO05898.pdf (last visited October 24, 2006); see also, id. at 26-27 ("Until the Corps takes its oversight responsibility more seriously, it will not know if thousands of acres of compensatory mitigation have been performed and will be unable to ensure that the section 404 program is contributing to the national goal of no net loss of wetlands.").

to, reach a few thousand acres in size, but these did not even pertain to the four core populations:
they pertained to the Eglin population.  See Email from Stan Simpkins to John Kasbohm (August
19, 2002), A.R. 315.  And another email actually concluded that the total number of mitigated
and protected lands for 1998 "is not great," because it "show[ed] only 70 acres protected here, 25
acres enhanced there, etc."  Email from Hildreth Cooper to John Kasbohm (October 4, 2002),
A.R. 312 (emphasis added).  In short, the 2004 Decision and the record leave unresolved how
much core population habitat has been lost, or is at risk of being lost, and how much has been
mitigated and/or protected.

The Service's reliance on Florida state environmental laws regarding "Environmental
Resource Permitting" ("ERP") and "Developments of Regional Impact" ("DRI") is flawed for
the same reasons.  See 2004 Decision, 69 Fed. Reg. at 2104, A.R. 0005 (Pls.' Ex. 1).  Again, the
Service's obligation under the ESA is to assess the "inadequacy" vel non of existing regulatory
mechanisms, 16 U.S.C. § 1533(a)(1)(D), and the Service cites to, and relies upon, state ERP and
DRI regulations to "provide direct habitat protections for black bears."  2004 Decision, 69 Fed.
Reg. at 2104, A.R. 0005 (Pls.' Ex. 1).  Thus, to assess the effectiveness of the regulations, the
Service must determine the extent to which the laws are enforced and how effective - or
"adequate" - they are as enforced at protecting habitat.  Cf. 2001 Order at 20 (Pls.' Ex. 2)
(Service can only consider laws that are "currently implemented and enforced); Defenders of
Wildlife, 958 F. Supp. at 684.  Yet the Service's Decision does not provide information
concerning the net loss, or threatened loss, of bear habitat under the regulations that supports the
four core black bear populations, despite the fact that rates of forest loss across Florida are
estimated at 200,000 acres per year.  Cox Letter, A.R. 6439.  Indeed, the only thing that the

30

Service cites to in its Decision are the laws and regulations themselves, and the existence of the 15 mitigation banks.

Such an inquiry is all the more critical given that under the DRI regulations that the Service cites - regulations that concern "large-scale developments" big enough to affect more than one county - "the local government . . . can decide to ignore in whole or in part" the impacts of development on bear habitat and the mitigation necessary to offset those impacts.  See 2004 Decision, 69 Fed. Reg. at 2104, A.R. 0005 (Pls.' Ex. 1).  Nonetheless, the Service's Pollyannaish decision concludes that the recommendations issued under the regulations "can result in preservation and mitigation of at least some bear habitat that might otherwise be lost."  Id. (emphasis added).  Not only is the Service's reliance on the DRI regulations therefore directly at odds with the Court's 2001 Order that the Service not rely on "regulations authorizing future government action, but which do not require that such action will take place," 2001 Order at 20, it also begs the question - unanswered by the 2004 Decision - of whether and to what extent the recommendations are, in practice, enforced, or whether the impacts to bear "core" habitat are ignored.

B.      Land Acquisition Programs

The Service's reliance on state land acquisition programs is arbitrary and capricious for the very same reasons.  E.g., 2004 Decision, 69 Fed. Reg. at 2104 (Pls.' Ex. 1).  First, the Service again relies upon a regulatory and factual state of affairs that existed in the past, i.e., in 1998, and therefore fails to assess the state of affairs in 2004 when the new decision was made.  For example, by 2004 the Florida Preservation 2000 Act and Trust Fund, which the Service asserted was especially relevant, id., and under which much land acquisition had been occurring, had

31

largely been replaced by a successor program, the Florida Forever Trust Fund. See Florida

Department of Environmental Protection, Preservation 2000/Florida Forever,

http://www.dep.state.fl.us/lands/acquisition/P2000/index.htm (last visited Oct. 18, 2006). Thus,

the Service irrationally based its 2004 Decision upon an assessment of land acquisition

mechanisms - the Florida Preservation 2000 programs - that had been reduced and largely, if not

completely, replaced by 2004.

        The Service selectively addresses this post-1998 change of regulatory mechanisms in a

footnote that refers to the Florida Forever Act and the Florida Forever Trust Fund, which the

Service asserts "continu[e] funding for land acquisition funding similar to Preservation 2000."

2004 Decision, 69 Fed. Reg. at 2104 n.4, A.R. 0005 (Pls.' Ex. 1) (emphasis added). But whether

land acquisitions under the Florida Forever programs in 2004 are as effective, or as adequately

funded, or implemented with the same priorities and objectives as the Florida Preservation 2000

programs is never actually analyzed, nor is there anything in the record that could support such a

conclusion. Indeed, the Service refused to consider (and include in the record) information that

Defenders submitted to the Service in 2002 concerning sharp reductions in post-1998 land

acquisition programs for bear habitat. See Defenders 2002 Letter, S.A.R. at P5 (Pls.' Ex. 6);

Taylor Letter at 1 (Pls.' Ex. 7) (Service did not consider data "because they were published after

the 1998 Finding.").

        The Service's reliance on land acquisition regulations in this case is also unlawful

because it necessarily constitutes reliance on "regulations authorizing future government action,

but which do not require that such action will take place." 2001 Order at 20 (Pls.' Ex. 2). For

example, in the 2004 Decision the Service closes its limited footnote discussion of the current

Florida Forever programs with the following entirely speculative finding:

> Considering the effective record of purchases over the last decade, and continued statutory appropriations for funding for these programs, it is reasonable to conclude that future acquisitions will continue to expand public lands and provide additional security to bear populations in Florida.

2004 Decision, 69 Fed. Reg. at 2104 n.4, A.R. 0005 (Pls.' Ex. 1).  The Service's reliance on the possibility that land - threatened by development in 2004 - might be purchased in the future violates the Court's 2001 Order proscribing reliance on "speculative future actions to justify [its] decisions because there is no assurance that those actions will in fact be carried out."  2001 Order at 20 (Pls.' Ex. 2) (emphasis added).  And, rather than making its "determination of whether to list a species . . . based on the present status of the species," as the 2001 Order required, the Service instead relied "on the assumption that future actions will suffice to protect a species' population."  Id. at 20.

Second, the Service's land acquisition analysis is flawed because, once again, by limiting itself to 1998 data, the Service failed to consider the best available information concerning the "present status" of the bear at the time the Service made its decision in 2004.  2001 Order at 20 (Pls.' Ex. 2).  See also 16 U.S.C. § 1533(b)(1) (Service must use "solely" the "best available" data in conducting section 1533(a)(1)(D) analysis).  For example, the Service concluded in 1998 that the Apalachicola population, located in the Florida Panhandle, was viable precisely because "habitat alteration and human development will occur at slow rates, significant areas of private lands are expected to remain forested habitat through the foreseeable future" and "[e]xisting and projected acquisition of public lands will provide about 4,100 sq km . . . of secure habitat."  1998 Decision, 63 Fed. Reg. at 67615 (emphasis added).  Thus, "[c]onsidering the large contiguous areas of conservation lands, the estimated number of bears present, the slow rate of human

33

<u>development</u>, and the lack of substantial mortality," the Service deemed the Apalachicola

population "secure for the foreseeable future."  <u>Id.</u> (emphasis added).  And the Service's 2004

Decision expressly refers to, and incorporates, the 1998 Decision's conclusions as to the

sufficiency of conservation lands and the private lands that will "remain as bear habitat."  <u>See</u>

2004 Decision, 69 Fed. Reg. at 2104, A.R. 0005 (Pls.' Ex. 1) (citations omitted); <u>see also</u> <u>id.</u> at

2103, A.R. 0004.

      Yet in 2001, the Service itself participated in a seminal report on the state of southern

forests that expressly anticipated "<u>a rapid increase in population and development</u> [in the Florida

Panhandle] spreading from central Florida."  <u>Southern Forest Resource Assessment Summary</u>

<u>Report</u>, S.A.R. P299 (emphasis added) (Pls.' Ex. 6).  Despite this, the Service refused to consider

its own updated assessment of development rates, even when Defenders specifically sent the

report to the Service and asked it to consider the new assessments.  Defenders 2002 Letter,

S.A.R. P4-5, P299 (Pls.' Ex. 6); Taylor Letter at 1 (Pls.' Ex. 7).  In short, the Service knowingly

premised its 2004 Decision on an assessment of development rates that the Service itself had

already concluded was outdated, and thus had revised from a "<u>slow rate[]</u>" of development, 1998

Decision, 63 Fed Reg. at 67615 (Pls.' Ex. 3) (emphasis added), to a "<u>rapid increase</u>" in

development.  <u>Southern Forest Resource Assessment</u>, S.A.R. P299 (emphasis added) (Pls.' Ex.

6).  It is difficult to imagine a more arbitrary and capricious course of action, or one more at odds

with ESA section four's mandate to base listing decisions on the "best available" evidence.

      Third, the Service's analysis of land acquisition mechanisms is flawed because, similar to

the land use regulations, the Service's Decision did not analyze how much of the habitat that the

Service is relying upon to support the four populations has been lost or fragmented (or is at risk

34

of such), how much habitat has been acquired and protected, and of the acquired and protected habitat, how much is "suitable" habitat for the Florida Black Bear: i.e., remote land connected to other conservation lands and not itself at risk of fragmentation.  Instead, the Service asserts that an estimated 374,000 acres of black bear habitat were acquired between 1992 and 1998, and in a footnote, that another 320,000 acres have been acquired since 1998 (an assertion for which plaintiffs could find no evidence in the record).  But the Service's analysis fails to address the other half of the inquiry: how many acres of core population habitat necessary to the bears' survival have been, or are at risk of, loss or fragmentation.  Thus, there is no basis on which the Service could reasonably determine whether the land acquisition programs are in fact "inadequate" under section 1533(a)(1)(D).

C.    **Regulatory Mechanisms Governing The Public Lands That Support The Four Core Bear Populations**

As with the land use and land acquisition regulations, the Service's analysis of public land regulations similarly focuses on outdated regulatory measures, fails to consider the current state of the black bear and the threats to it in 2004, and fails in important respects to meaningfully analyze whether the regulations are enforced and effective.  For example, three of the four core bear populations depend in part on National Forest lands: the Apalachicola population; the Ocala population; and the Osceola/Okefenokee population.  2004 Decision, 69 Fed. Reg. at 2102, A.R. 0003 (Pls.' Ex. 1).  Regulatory mechanisms governing the use of the National Forests are therefore central to an analysis of the adequacy of regulatory mechanisms under section four.  The Service relies upon two mechanisms in particular - 36 C.F.R. § 219.19 and Forest Service Manual section 2672.32 - under which, the Service asserts, "the USFS has a specific mandate to maintain viable populations of native species."  2004 Decision, 69 Fed. Reg.

35

at 2105, 2106 (Pls.' Ex. 1).  The Service cites these provisions no fewer than six times to contend that "USFS regulations and policies implementing the NFMA . . . require national forests to be managed to ensure the viability of populations of native species."  Id. (citing 36 C.F.R. § 219.19).

However, although it is correct that in 1998 the Forest Service had a mandate "to maintain viable populations of native species" under 36 § C.F.R. 219.19 (1998), section 219.19 no longer exists.  In fact, by 2001 the regulatory framework established by section 219.19, and upon which the Service relied in its 2004 Decision, had already been substantially amended and section 219.19 itself no longer made mention of a viable population mandate.  See 39 C.F.R § 219.19 (2001); but see 36 C.F.R. § 219.20 (2001) (establishing different viability requirements, unanalyzed by the Service in its 2004 Decision, and since repealed).  By 2002 - two years before the 2004 Decision - the Forest Service formally published a proposal to again amend part 219, including section 219.19 (and 219.20), that would significantly modify its remaining obligations with respect to viable populations, see National Forest System Land and Resource Management Planning, 67 Fed. Reg. 72770 (Dec. 6, 2002), and as the Forest Service itself explained, the final regulations now do "not include a requirement to provide for viable populations of plant and animal species."  National Forest System Land Management Planning Final Rule, 70 Fed. Reg. 1023, 1029 (Jan. 5, 2005).  Thus, the Service's analysis of public land regulations is predicated upon a regulatory mandate to maintain viable populations of species that had not only been substantially amended by 2001, but that by 2002 the Forest Service had already proposed to significantly modify or rescind, and that has now, in fact, been eliminated.

Nor can the "Forest Service Manual" substitute for the missing mandate of the old section 219.19.  The Forest Service Manual "does not have the force of law and does not bind the

36

agency."  Forest Guardians v. Animal & Plant Health Inspection Service, 309 F.3d 1141, 1143

(9th Cir. 2002).  In its 2001 Order the Court, like other courts, proscribed reliance on regulations

that authorize government action "but which do not require that such action will take place."

2001 Order at 20 (Pls.' Ex. 2).

 To be sure, the Service does cite other mechanisms, including sections of the Forest

Service Manual pertaining to National Forests, but without section 219.19 they are hardly

protective of the Florida Black Bear and its habitat.  For example, without the now-repealed

requirement to maintain viable populations of native species, plans that simply "identify,

evaluate the effects of proposed management on, and provide for the monitoring of indicator

species and their habitats" do not actually mandate action that will protect the Florida Black

Bear.  2004 Decision, 69 Fed. Reg. at 2106 (Pls.' Ex. 1).  Cf. Save Our Springs, 27 F. Supp. 2d at

744 ("the terms and phrases 'identify,' 'evaluate,' 'review,' 'develop,' 'work with,' and

'establish' . . . suggest to this Court that even if the activities have been fully implemented, they

do not take any tangible steps to reduce the immediate threat to the species.").  Nor, for that

matter, does the requirement to perform a biological evaluation that "documents and determines

the effects of proposed activities," without the concomitant binding mandate to "ensure that no

loss in viability will occur."  2004 Decision, 69 Fed. Reg. at 2106 A.R. 0007 (Pls.' Ex. 1).

 Similarly, regulatory mechanisms that require balancing "a number of equally important

purposes, including fish and wildlife, in a manner that does not impair the land's productivity"

are hardly protective - directly or indirectly - of a species like the Florida Black Bear that needs

large, remote, undeveloped tracts of land.  2004 Decision, 69 Fed. Reg. at 2105, A.R. 0006 (Pls.'

Ex.1).  Indeed, the record makes evident that the Florida Black Bear "directly compet[es] with

increasing public use and development" of land.  E.g., RARE II Evaluation of Buck Lake

Roadless Area, A.R. 5358; RARE II Evaluation of Impassable Bay Roadless Area, A.R. 5379

("[a]reas inaccessible to humans are vital to the survival of . . . the Florida black bear.").

Second, the Service again fails to consider the present status of the Florida Black Bear

and the threats to it because it limits its consideration to 1998 information.  For example,

Defenders submitted information to the Service concerning incompatible uses of the National

Forests and the Big Cypress Preserve through, for example, high road and trail densities caused

in part by extremely damaging off-road vehicle ("ORV") use of public lands.  See 2002

Defenders Letter, S.A.R. P2-P3 (Pls.' Ex. 6).  As Defenders of Wildlife explained, even the

Forest Service describes "a maze of criss-crossing roads and travelways" in the Florida National

Forests that causes "disturbance of sensitive wildlife species including . . . Florida black bears."

Id. (quoting the Record of Decision for the 1999 Revised Land and Management Resource

Management Plan, at 20).  Indeed, as mentioned above, the Forest Service estimates that Ocala

National Forest, for example, has 1,300 miles of ORV-created trails.  Defenders of Wildlife, Out

of Control: The Impacts of Off-Road Vehicles and Roads on Wildlife and Habitat in Florida's

National Forests (draft) (June 2002) (citing personal communication with Forest Service GIS

coordinator Kathy Bronson) S.A.R. P27 (Pls.' Ex. 6).  And to the extent that there are regulations

governing the use of ORVs in the National Forests, there is inadequate staff to enforce the

regulations: two officers patrol Ocala National Forest, two patrol Apalachicola, and one patrols

Osceola. Defenders of Wildlife, Out of Control: The Impacts of Off-Road Vehicles and Roads on

Wildlife and Habitat in Florida's National Forests, S.A.R. P76 (Pls.' Ex. 6).  Clearly, a "dense

network" of trails and roads would have an adverse affect on a species that requires remote areas,

38

and that directly competes with humans where humans use such habitat. <u>Cf.</u>, RARE II Evaluation of Impassable Bay Roadless Area, A.R. 5379 ("[a]reas inaccessible to humans are vital to the survival of . . . the Florida black bear."); RARE II Evaluation of Buck Lake Roadless Area, A.R. 5358 ("directly compet[es] with increasing public use and development"). But again, the Service refused to consider the information because it was "published" after the 1998 Finding. <u>See</u> Taylor Letter at 1 (Pls.' Ex. 7).

Third, it is apparent that the Service's decision was based at least in part upon speculation and not a meaningful factual inquiry into the efficacy, as enforced, of the public land mechanisms it relies upon. For example, the Service relies upon management plans to maintain state lands in a condition compatible with the Florida Black Bear. But in assessing compliance with the plans the Service essentially acknowledges that it does not know the degree to which the plans are actually enforced:

> We do not assume, nor do we believe it necessary, that every management goal or prescription in these plans has been or will be conducted. However, <u>because the plans are required under State law, they should ensure the preservation of forested bear habitats</u> on important State lands supporting the four core populations.

2004 Decision, 69 Fed. Reg. at 2107, (Pls.' Ex. 1) (emphasis added). But the simple fact that a state law may be on the books does not render it an "[]adequate[]" regulatory mechanism: the necessary analysis is whether the law is actually enforced and effective as enforced at protecting black bear habitat.

In sum, the Service's 2004 Decision violates both the Court's 2001 Order and section 1533(a)(1)(D) of the ESA. The Service failed to consider the mechanisms that existed and were enforced in 2004; it failed to consider the "present status" of the bear and the "best available scientific and commercial data" - data that post-dated 1998 - in coming to its conclusion that the

regulatory mechanisms analyzed were adequate; and it failed to consider whether the mechanisms were actually effective in preserving the large expanses of remote habitat that the Florida Black Bear needs.  As a result, 2004 Decision must be set aside as arbitrary and capricious.  5 U.S.C. § 706(2)(A); State Farm, 463 U.S. at 43.

## CONCLUSION

For the reasons identified above, the Court should set aside the Service's 2004 Decision and remand to the Service with instructions that the Service analyze whether existing regulatory mechanisms are adequate given the current state of the Florida Black Bear and the threats to its survival at the time the Service renders its decision.

Respectfully submitted,
/s/
Joshua R. Stebbins
(D.C. Bar. No. 468542)
Howard M. Crystal
(D.C. Bar. No. 446189)
Eric R. Glitzenstein
(D.C. Bar. No. 358287)

Meyer Glitzenstein & Crystal
1601 Connecticut Ave., N.W.
Suite 700
Washington, D.C.  20009
(202) 588-5206

Of Counsel:

Brian Segee
(D.C. Bar. No. 492098)
Defenders of Wildlife
1101 Fourteenth Street, N.W.
Suite 1400
Washington, D.C.  20005

October 30, 2006                    Attorneys for Plaintiffs