Westlaw.

69 FR 2100-01                                                              Page 1

69 FR 2100-01, 2004 WL 57043 (F.R.)

**(Cite as: 69 FR 2100)**

PROPOSED RULES

DEPARTMENT OF THE INTERIOR

Fish and Wildlife Service

50 CFR Part 17

Endangered and Threatened Wildlife and Plants; Reexamination of Regulatory Mechanisms in Relation to the 1998 Florida Black Bear Petition Finding

Wednesday, January 14, 2004

*2100  AGENCY: Fish and Wildlife Service, Interior.

ACTION: Proposed rule; notice of petition finding.

SUMMARY: We, the Fish and Wildlife Service (Service), announce a reexamination of regulatory mechanisms in relation to the 1998 finding for a petition to list the Florida black bear (Ursus americanus floridanus), under the Endangered Species Act (ESA) of 1973, as amended.  Pursuant to a court order, we have reexamined only one factor, the inadequacy of existing regulatory mechanisms in effect at the time of our previous 1998 12-month finding.

DATES: The finding announced in this document was made on December 24, 2003.

ADDRESSES: The complete file for this finding is available for public inspection, by appointment, during normal business hours at the U.S. Fish and Wildlife Service, Jacksonville Ecological Services Field Office, 6620 Southpoint Drive South, Jacksonville, FL 32216-0958.

FOR FURTHER INFORMATION CONTACT: Dr. John W. Kasbohm (see ADDRESSES section), telephone (904) 232-2580; facsimile (904) 232-2404.

SUPPLEMENTARY INFORMATION:

Background

 The Florida black bear (Ursus americanus floridanus) is a subspecies of the black bear (Ursus americanus), which ranges from northern Alaska and Canada south to northern Mexico.  According to Hall (1981), the Florida black bear was primarily restricted to Florida, but also occurred in coastal plain areas of Georgia, Alabama, and extreme southeastern Mississippi.  Following extensive human

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Plaintiff's Exhibit 1

69 FR 2100-01, 2004 WL 57043 (F.R.)

**(Cite as: 69 FR 2100)**

development, the distribution of the Florida black bear has become fragmented and reduced. Population sizes and densities prior to the arrival of the first European colonists are not known; but, the Florida Game and Fresh Water Fish Commission (Commission 1993; now the Florida Fish and Wildlife Conservation Commission) estimated that possibly 11,500 bears once inhabited Florida.

Our involvement with the Florida black bear began with the species' inclusion as a category 2 species in notices of review published on December 30, 1982 (47 FR 58454), September 18, 1985 (50 FR 37958), January 6, 1989 (54 FR 554), and November 21, 1991 (56 FR 53804). At that time, category 2 species were defined as those for which information in our possession indicated that listing was possibly appropriate, but for which sufficient data on biological vulnerability and threat were not currently available to support proposed *2101 rules. On May 20, 1990, we received a petition from Ms. Inge Hutchison of Lake Geneva, Florida, to list the Florida black bear as a threatened species. The petition cited the following threats: (1) Illegal hunting by beekeepers, gallbladder poachers, and others, (2) loss and fragmentation of critical habitat, (3) hunting pressure, and (4) road mortality. We made a 90-day petition finding on October 18, 1990 (55 FR 42223), that substantial information was presented. Based on the information received and information in our files, a 12-month finding was made on January 7, 1992 (57 FR 596), indicating that the Service believed that the petitioned action was warranted but precluded by higher priority listing actions.

At the time of the finding, we assigned the species a level 9 priority based on our listing priority system that had been published on September 21, 1983 (48 FR 43098). "Level 9" meant that the species was subject to imminent but moderate-to-low threats throughout its range. The species was included as a category 1 candidate in the November 15, 1994, animal review notice (59 FR 58982). At that time, a category 1 candidate (now referred to as a "candidate") was one for which we had on file sufficient information to support issuance of a proposed rule. Following the 1992 12-month finding, the Service's Southeast Region used its listing resources to process higher priority listing actions. Furthermore, designation of candidates by category was discontinued in the February 28, 1996, notice of review (61 FR 7956). In that notice, the Florida black bear was included as a candidate with a priority number of 12, indicating a species under non-imminent moderate-to-low threat.

On January 21, 1997, the Service entered into an agreement in the Fund for Animals et al. v. Babbitt case (Civil No. 92-0800 SS, U.S. District Court for the District of Columbia). Among other things, we agreed that we would resolve the conservation status of the Florida black bear by December 31, 1998. In 1998, we updated the status review for this species (Kasbohm and Bentzien 1998) to include significant additional information that had become available since the 1992 assessment. Based on this review, on December 8, 1998, we published a new 12-month finding (63 FR 67613) that listing was not warranted, and removed the species from candidate status.

In 1999, Defenders of Wildlife and others filed suit challenging the Service's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

69 FR 2100-01, 2004 WL 57043 (F.R.)

**(Cite as: 69 FR 2100)**

finding (Defenders of Wildlife et al. v. Norton, Civil Action 99-02072 HHK, U.S. District Court for the District of Columbia) claiming our decision was arbitrary, capricious, and an abuse of discretion, violating the Administrative Procedure Act (5 U.S.C. 551 et seq.) and the ESA. First, plaintiffs alleged that our determination that listing was not warranted, based on the existence of four larger secure populations distributed throughout the bear's historic range, was inconsistent with the ESA because we erroneously interpreted the phrase "all or a significant portion of its range." Plaintiffs argued that our projection of the likely loss of a large percentage (approximately 40%) of existing bear habitat over the foreseeable future obligated us to list the species because this amount constituted a significant portion of the species' range. Second, plaintiffs argued that our decision not to list was arbitrary and capricious based on our 1992 "warranted but precluded" finding, and on the combined effects of habitat destruction, habitat isolation, roadkill, and hunting. Third, plaintiffs asserted that our determination that existing regulatory mechanisms were adequate to protect the bear was incorrect because it relied on possible future regulations rather than those that were both authorized and implemented at the time of our finding.

On December 13, 2001, the District Court issued a decision in the case. On the first issue, the Court found that our interpretation of "significant portion of the range" was reasonable. On the second issue, the Court found that biological data presented in the administrative record, especially the 1998 status review, supported our determinations that positive changes in the bear's situation from 1992 to 1998 supported a "not warranted" finding, and that the overall effects of habitat loss and isolation, roadkill, and hunting would not likely result in the bear becoming endangered in the foreseeable future. However, on the third issue, the Court concluded that it was unclear from the record whether the regulations upon which we relied were currently being implemented, to what extent we relied on the possibility of future regulatory actions, and whether we would have found that the bear was threatened if we had not considered the possibility of future actions. As a result, the Court remanded the case to the Service, ordering us to examine only regulatory mechanisms that are currently being undertaken and enforced, clarify our finding regarding the regulations upon which we based our decision, and to determine whether the inadequacy of existing regulatory mechanisms warranted listing the black bear as a threatened species.

Pursuant to the Court's order, we are providing our reexamination of the regulatory mechanisms being undertaken and enforced at the time of our 1998 finding. Regulatory mechanisms that are mentioned in the "Summary of Factors" section below as part of our reexamination were in effect in 1998. However, we describe the regulatory mechanisms in the present tense because we have been asked by the court to make a current reexamination. We have also included as footnotes, separate from our court-ordered reexamination, updates on several regulatory mechanisms that have been revised since 1998 in an effort to provide the best available information regarding protections for the Florida black bear. Based upon this review, we have determined that the existing regulatory mechanisms are not inadequate so as to warrant listing the Florida black bear under the ESA.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

69 FR 2100-01, 2004 WL 57043 (F.R.)

**(Cite as: 69 FR 2100)**

Summary of Factors Affecting the Species

Section 4(a)(1) of the ESA and its implementing regulations (50 CFR Part 424) set forth the procedures for listing species as endangered or threatened. They provide that a species may be determined to be endangered or threatened if one or more of the following five factors is met:

A. The present or threatened destruction, modification, or curtailment of its habitat or range.

B. Overutilization for commercial, recreational, scientific, or educational purposes.

C. Disease or predation.

D. The inadequacy of existing regulatory mechanisms.

E. Other natural or manmade factors affecting its continued existence.

As stated above, the Court upheld the analyses and conclusions from our 1998 12-month finding regarding factors A, B, C, and E. (See 63 FR 67613 for our discussion of factors A, B, C, and E and their application to the Florida black bear).

Factor D. The inadequacy of existing regulatory mechanisms. As directed by the Court, the sole purpose of this reexamination is to clarify our previous discussion of the applicability of factor D to the Florida black bear. Specifically, we were directed to explain the regulations upon which we based our decision and to reexamine whether the inadequacy of existing regulatory mechanisms--i.e., those being implemented and enforced at the time of the 1998 finding--warrants listing the bear as a threatened species. **\*2102**

In order to conclude that the bear warrants listing under factor D, we have to find that existing regulatory mechanisms that relate to, or otherwise affect, the protection and management of bears and bear habitat are inadequate because they actively allow or encourage, or at minimum do not prevent, levels of direct take (i.e., mortality rates), habitat loss, and/or habitat degradation from reaching a point that the bear would be in danger of extinction or likely would become in danger of extinction within the foreseeable future throughout all or a significant portion of its range. In other words, we would need to document that existing core bear populations at Okefenokee National Wildlife Refuge (NWR)--Osceola National Forest (NF), Apalachicola NF, Ocala NF, and Big Cypress NF, in the States of Florida and Georgia, either are not viable or likely would become so over the foreseeable future because of the inadequacy of existing regulatory mechanisms. With this in mind, it also is important to recognize that it would not be appropriate for us to list the species merely because existing regulatory mechanisms either do not actively improve the bear's status (either by increasing the number of bears, the acreage of bear habitat or by improving habitat quality)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

69 FR 2100-01, 2004 WL 57043 (F.R.)

**(Cite as: 69 FR 2100)**

or do not prevent all negative effects of human activities.

Existing regulatory mechanisms that relate to the direct take of the Florida black bear include those that prohibit the taking of wildlife, provide specific protection to the bear, and regulate legal hunting. The States of Georgia and Florida, the Service, U.S. Forest Service (USFS), and National Park Service (NPS) all prohibit the taking of wildlife, game species, and their dens on lands under their jurisdictions unless a specific permit is issued allowing such take, or an open season, bag limit and methods of take are designated by regulation (16 U.S.C. 668dd, 36 CFR 2.2, 36 CFR 261.8, 50 CFR 27.21, 50 CFR 27.51, Fla. Admin. Code [FAC] 62D-2.014(10), FAC 68A-4.001, Official Code of Georgia [OCG] 27-1-3, OCG 27-1-30). Law enforcement officers from each of these agencies are authorized to regulate take and regularly enforce all laws and regulations relating to wildlife ( 16 U.S.C. 668dd(g), 32 CFR 190, 36 CFR 241.1, Fla. Statutes [FS] 372.07, FS 372.9906, FAC 68A.3.002, OCG 27-1-18, OCG 27-1-20). In both Florida and Georgia, the sale, purchase, or transportation of bears or bear parts are prohibited (FAC 68A-4.004, FAC 68A-12.004(12), OCG 27-3-26). These State laws and regulations, along with all others regulating the taking of bears, complement the Lacey Act (16 U.S.C. 3372), which prohibits the import, export, transport, sale, or purchase in interstate commerce of any wildlife taken, possessed, transported, or sold in violation of any State law or regulation; thus, Federal law protects against the illegal trade of bears or bear parts (e.g., gall bladders and claws) that cross State lines. Moreover, we again point out that illegal take is currently not believed to be a significant problem affecting any Florida black bear population ( 63 FR 67617, Kasbohm and Bentzien 1998).

Additional protection is provided to bears under specific State laws. In Georgia, OCG 27-3-26 prohibits the killing of a bear except during an open hunting season (maximum authorized open season is defined as September 15 to January 15, OCG 27-3-15) or by authorization of the Georgia Department of Natural Resources (Ga. DNR). The Florida Administrative Code lists the bear as threatened (FAC 68A-27.004) except in Baker and Columbia counties and in the Apalachicola NF; this designation prohibits the intentional killing, wounding, taking, possession, transportation, molestation, harassment, or sale of the species unless specifically authorized by a permit issued by the Commission (FS 372.0725, FAC 68A-27.004). By regulation (FAC 68A-27.004), Commission permits allowing the taking of a threatened species or their nests/dens are issued only for scientific or conservation purposes and only if the permitted activity will not have a negative impact on the survival potential of the species. Enforcement of these protections is aided in Florida by the establishment and implementation of the Commission's Endangered and Threatened Species Reward Program that continues to provide incentives for individuals to report the illegal killing, wounding, or possession of bears (FS 372.073, FAC 68A-27.006). Despite lack of threatened designation, bears in Baker and Columbia counties and in the Apalachicola NF remain protected by general State and Federal laws and regulations noted above that prohibit the taking of wildlife.

Florida and Georgia also regulate the ability of landowners to remove nuisance

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

69 FR 2100-01, 2004 WL 57043 (F.R.)

**(Cite as: 69 FR 2100)**

bears or bears damaging private property. In Florida, a landowner cannot remove a bear damaging personal property until a permit has been issued by the Commission (FAC 68A-12.009(2)). Landowners in Georgia must petition the Ga. DNR to remove bears threatening property (OCG 27-3-21). The DNR must investigate such claims and cannot remove the animal unless it finds the removal is justified. In both States, nuisance bear policies have been developed and implemented to deal with a wide variety of bear-human interactions including property damage complaints (Commission 1990 [FN1], Ga. DNR 1996). Both States mandate that wildlife personnel first provide technical assistance to allow effective preventative measures (such as electric fences around apiaries, i.e., bee yards) to be put in place. Only if problems continue after preventative measures are employed will the State capture and relocate the offending bear. Only on rare occasions are these nuisance animals destroyed, and neither State allows the public to remove or kill these animals directly (Commission 1990; OCG 27-3-21; W. Abler, Ga. DNR, pers. comm.). It also should be noted that, on many public lands within the occupied habitat of the Florida black bear, policies have been adopted that minimize the likelihood of conflicts between bears and beekeepers; for example, the Florida Division of Forestry prohibits apiaries on Seminole State Forest because of its large bear population and requires the use of electric fences to bear proof apiaries on all State forests that have bears (State Forest Handbook [SFH] 6.6.1). These regulations and policies help prevent bear-human conflict and ultimately the indiscriminate killing of bears, either illegally or by the States.

FN1 The Commission's nuisance bear policy was revised April 30, 2001. The revised policy provides similar guidance as that given in 1990, but specifies in more detail the responses of the Commission to nuisance complaints including providing procedures for the euthanasia of bears that have been captured at least twice following serious conflicts with humans (e.g., killing of livestock or a threat to human safety).

To date, we consider the legal hunting of bears not to be a threat to the Florida black bear (57 FR 598, 63 FR 67616). Nevertheless, hunting can affect bear populations, and adequate regulation of the activity is essential to ensure that it does not lead to population declines that could threaten the species in the future. In Florida, the Commission regulates hunting under authority of Article IV, Section 9 of the Florida Constitution and FAC 68A-1.002. In 1993, the Commission removed the species from the list of game animals (FAC 68A-1.004), ending all legal bear hunting. Likewise, because the Federal agencies that manage Federal lands in Florida are required to allow hunting only in accordance with State laws and regulations (10 U.S.C. 2671, 16 U.S.C. 668dd, 16 U.S.C. 670h, 16 U.S.C. 698j, 32 CFR 190, 36 CFR 2.2, 36 CFR 7.86(e), 36 CFR 241.2, 50 CFR 32.2, *2103 50 CFR 32.3), hunting is prohibited on these lands as well. Because four healthy and secure Florida bear populations (including a significant portion of the Okefenokee NWR--Osceola NF population that extends into south Georgia) occur under the jurisdiction of the Commission and these Federal lands, and because no biological evidence exists that demonstrates that hunting is either a threat to the bear or that it is being inappropriately managed by the State, no additional regulation is warranted regarding take associated with hunting in Florida.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

69 FR 2100-01, 2004 WL 57043 (F.R.)

**(Cite as: 69 FR 2100)**

  In Georgia, as regulated by the DNR under OCG 27-1-3(a) and OCG 27-1-4, bears remain designated a game species (OCG 27-1-2(34)) and are hunted in a 3-day season in Dixon Memorial Wildlife Management Area (Ga. Comp. R. & reg. [GCRR] 391-4-2-.70) and a six-day season in a five-county area (GCRR 391-4- 2-.64(2)) surrounding, but not in, Okefenokee NWR where bear hunting is prohibited (50 CFR 32.29). Georgia laws and regulations allow a bag limit of one bear per hunter per year (GCRR 391-4-2-.10(4)) and prohibit the killing of females with cubs or cubs weighing less than 75 pounds (OCG 27-3.1.1 and GCRR 391-4-2-.64(3)). Georgia DNR manages the hunt under a bear management plan (Ga. DNR 1984); goals in the plan include maintaining a harvest rate of less than 15% with a sex ratio being equal or primarily composed of males, holding ages of harvested females to 3.5 years or older, requiring the checking of killed bears at DNR check stations, and the collection of a variety of biological data from killed bears needed to make these determinations. [FN2] Pursuant to the management plan, Georgia DNR actively monitors the hunt; requires all killed bears to be reported to a check station where basic biological information including sex, age, and body condition are recorded (OCG 27-3.1.1, GCRR 391-4-2-.10(5), and GCRR 391-4-2-.64(2)); and has adjusted the season to meet harvest goals and ensure population viability. Bear hunting in Dixon Memorial Wildlife Management Area was closed in 1990 after monitoring indicated that females were being harvested above management plan goals (Ga. DNR 1990, Carlock 1992). Bear hunting in Dixon Memorial Wildlife Management Area was reopened in 1998. No detrimental effects to the bear population are evident. The Ga. DNR continues to monitor and regulate bear hunting in this area as per its bear management plan. These actions establish that Ga. DNR's approach to managing the bear hunt provides effective regulatory means to prevent hunting from becoming a threat to the Okefenokee population in the future.

  FN2 The Georgia DNR approved a revised bear management plan on April 8, 1999. The plan specifies similar harvest goals including a maximum harvest rate of 20%, no more than 50% of the harvest composed of females, and an average age of harvested females held at or above 3.75 years. The plan continues to provide for close monitoring and accurate data collection to insure goals are met without detrimental impacts to the Okefenokee bear population.

  Because of the significant protections provided by, and the level of enforcement of, the existing laws, regulations, and policies described above, and considering the current low levels of threat as demonstrated by a lack of significant take of bears from sources including hunting and illegal kill, we concluded in 1998, and conclude again now, that existing regulatory mechanisms are adequate to protect the bear from direct take.

  In addition to having adequate protections from take, in order to conclude that the species is not and will not become threatened, sufficient quantity and quality of bear habitat also must remain available to the four core bear populations at Okefenokee NWR--Osceola NF, Big Cypress National Park, Ocala NF, and Apalachicola NF, and to a lesser extent, at Eglin Air Force Base. Existing regulatory mechanisms that are relevant to habitat include laws, regulations, and agency policies that lessen or prevent the development of bear habitat on private lands,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

69 FR 2100-01, 2004 WL 57043 (F.R.)

**(Cite as: 69 FR 2100)**

and that ensure the management of public lands is at a minimum compatible with, although not necessarily actively directed at, maintaining viable bear populations. These must be considered in the context of the bear's current widespread distribution across its historic range, its large population size, and the large quantity of protected habitat available to the species in each of the four core populations, as well as current levels of habitat loss on private lands that we do not believe will cause the species to become endangered in the foreseeable future (63 FR 67614-16, Kasbohm and Bentzien 1998).

Provisions of section 404 of the Clean Water Act (33 U.S.C. 1344) and its implementing regulations (33 CFR 320.4, 40 CFR 230.10), which require the Army Corps of Engineers (Corps) and the Environmental Protection Agency (EPA) to regulate activities affecting the "waters of the United States," protect wetland habitats important to the bear throughout its range. Although the Corps is not specifically required to consult with the Service regarding the species as it would if the bear were federally listed, adverse effects of wetland dredge and fill proposals are evaluated through a public interest test that includes a determination of the impacts of permit issuance to wildlife and wildlife habitat generally. Such permits cannot be issued if the activities would cause a significant degradation to the waters of the United States, including significant adverse effects to wildlife, and may be vetoed by the EPA (40 CFR 230.10). Both the Service and State wildlife agencies must be consulted regarding the effects of projects and retain the opportunity to review and provide comments on the effects on wildlife, including the bear (16 U.S.C. 662, 33 CFR 320.4). These coordination requirements are especially relevant to private lands in Florida (except those in Baker and Columbia counties) because the species is listed as threatened by the Commission.

Permit reviews have resulted in modifications to projects, habitat protection, and compensatory mitigation to offset project impacts to wetlands. Fifteen wetland mitigation banks were active by 1998 in Florida that help compensate development impacts to wetlands. [FN3] Further, FS 373.4137 requires the Florida Department of Transportation (DOT) to mitigate for each acre of wetlands impacted by transportation projects and to provide $75,000 per acre (adjusted annually by the percentage change in the Consumer Price Index) to the Florida Department of Environmental Protection (DEP) to pay for these activities. The Florida legislature mandated the transfer of $12 million to initiate this program in 1996 (FS 373.4173(4)(d)).

FN3 As of October, 2002, 27 mitigation banks had been permitted in the State of Florida; several of these including the Panther Island, Big Cypress and Treyburn/Collier banks provide habitat that benefits bears.

In areas where federally listed species also depend on habitats used by bears and that may be affected by the issuance of section 404 permits, review and consultation requirements of the ESA provide additional scrutiny of 404 permit applications that can result in indirect habitat protection for the bear through development of habitat mitigation measures or project modifications. For example,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

permit reviews within the range of the endangered Florida panther in and around Big Cypress NP have resulted in benefits to bears. The installation of 24 wildlife crossings/underpasses during the construction of I-75 through the habitat of the Big Cypress bear population not only prevented vehicle-caused panther deaths, they also have *2104 had the benefit of preventing road mortalities and maintaining population connectivity for this bear population as well (Foster and Humphrey 1995, Gilbert and Wooding 1996, Lotz et al. 1996).

Threatened status under Florida law provides additional protections; because the bear is State-listed, its needs must be considered in several types of State regulatory decisions regarding development. Two applicable regulatory programs provide direct habitat protections for bears. The most important of these are the Environmental Resource Permitting (ERP) program and, to a lesser extent, the required State review of Developments of Regional Impact (DRI) proposals. Through the ERP program, the Water Management Districts (Districts) and DEP regulate developments and projects that impact water resources of the State, including wetlands. Florida law requires all activities resulting in dredge and fill of wetlands (including isolated wetlands) to be reviewed and permitted by the Districts or DEP (FS 373.118, 373.413, 373.416, 373.426, 373.414). Permits cannot be issued if the activity is determined to adversely impact the value and functions of wetlands or to be contrary to the public interest; impacts to State-listed species, including impacts to their abundance, diversity, or habitat, are specifically evaluated in both standards (FAC 40B-400.103, 40B-400.104, 40C-4.301, 40C-4.302, 40D-4.301, 40D-4.302, 40E-4.301, 40E-4.302, 62-330.200). Furthermore, secondary impacts also must not affect the ecological value of uplands to wetland-dependent listed species (including the bear) for enabling existing denning of the species (FAC 40B-400.103, 40C-4.301, 40D-4.301, 40E-4.301, 62-330.200). To be permitted, impacts must either be avoided or offset through appropriate mitigation (FS 373.414). The Commission, through the Office of Environmental Services, is provided the opportunity to submit comments and recommendations to the District and DEP regarding the impacts of wetland permit proposals on wildlife and State-listed species. As noted above, at least 15 wetland mitigation banks, several located in bear habitat, were available in Florida by 1998 to help offset development impacts to wetlands. The legal requirement for the DOT to provide funding for wetland mitigation per acre of impact applies to the ERP permitting program as well (FS 373.4137).

Development proposals in Florida that will affect more than one county and that meet certain threshold standards are required to undergo a DRI review by the Department of Community Affairs (DCA) to determine their impacts (FS 380.06). DCA guidelines and criteria for DRI reviews specifically require a determination as to whether a significant impact to State-listed species will result from the project and the identification of appropriate mitigation for any unavoidable impacts (FAC 9J-2.041). A significant impact and appropriate mitigation to a listed species are specified in a written recommendation from the Commission's Office of Environmental Services (FS 380.06, FAC 9J-2.041). These recommendations regarding listed species must be included in a report to the local government responsible for deciding whether such projects will be approved (FS 380.06, FAC 9J-2.041).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

While the local government and DCA ultimately can decide to ignore in whole or in part the recommendations made by the Commission (FS 380.06), the recommendations ensure that the needs of the bear are considered in large-scale developments and therefore can result in preservation and mitigation of at least some bear habitat that otherwise might be lost. Furthermore, lack of implementation of Commission recommendations in the DRI review does not circumvent any other required State or Federal authorizations, including ERP or section 404 wetland permits, which still must be acquired before a development occurs.

In certain areas of Florida, special provisions have been enacted to provide additional habitat protection for State-listed species. Florida Statute sections 369.305 and 369.307 established the Wekiva River Protection Area south of the Ocala NF in an area of important bear habitat. This designation, coupled with a mandate to the St. John's River Water Management District to promulgate rules establishing a protection zone adjacent to the watercourses in the Wekiva River system (FS 373.415), have resulted in specific regulatory guidelines and restrictions that provide an additional level of protection for wetlands and wetland-dependent species, including the bear. Regulations provide for strategic local and regional planning, development restrictions intended to retain a rural setting, and land acquisition (FS 369.305, 369.307, FAC 40C-41.063). Specifically, the District has designated a Riparian Habitat Protection Zone consisting of wetlands and uplands that can benefit bears (up to 550 feet landward of forested wetlands) abutting the Wekiva River, Little Wekiva River, Rock Springs Run, Black Water Creek, Sulphur Run, and Seminole Creek (FAC 40C-41.063). Permit applicants must provide assurances that developments will not adversely affect the abundance, food sources, or habitat of wetland-dependent species provided by the zone. Within the zone, construction of buildings, golf courses, impoundments, roads, canals, ditches, swales and land clearing are presumed to have adverse effects (FAC 40C-41.063).

Since the 1970s, several Florida statutes have provided authorization and funding to various State agencies to acquire land for the protection of wildlife habitat and listed species. These programs, especially the Conservation and Recreation Lands Trust Fund enacted in 1979 (FS 259.032) and the Florida Preservation 2000 Trust Fund enacted in 1990 (FS 259.101, 375.045) have benefited bears and may have been the most valuable means of ensuring the protection and preservation of bear habitat on private lands in Florida. From 1992 to 1998, publicly protected bear habitat increased by an estimated 1,500 km$^2$ (374,000 ac) as a direct result of deliberate attempts within these Florida land acquisition programs to secure wildlife habitat across the State. Much of this area was adjacent to core bear populations at Apalachicola NF, Ocala NF, Big Cypress NP, and Okefenokee NWR--Osceola NF, and has been identified by the Commission (Cox et al. 1994) as black bear strategic habitat conservation areas. In fact, the identification of bear habitat by the Commission often has been used to elevate the priority of acquisition projects (FL DEP 1997). Florida continues to emphasize land acquisition to meet a variety of environmental and wildlife related objectives. [FN4] The currently available acreage of public lands, coupled with the private lands that will remain as bear habitat, are sufficient to provide for viable bear

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

populations in the four core areas as noted in our 1998 finding (63 FR 67613-18).

FN4 The Florida Forever Act (FS 259.105) and the Florida Forever Trust Fund (FS 259.1051) were enacted in 1999, continuing funding for land acquisition similar to Preservation 2000. Since 1998, at least 320,000 acres of additional bear habitat have been acquired in Florida. Considering the effective record of purchases over the last decade, and continued statutory appropriations for funding for these programs, it is reasonable to conclude that future acquisitions will continue to expand public lands and provide additional security to bear populations in Florida.

Nevertheless, bear habitat protection cannot be assured if public lands under *2105 State and Federal ownership are not managed in a manner compatible with maintaining a viable bear population. In order to appropriately consider public land management and its impacts to bears, the habitat requirements of the bear must be considered. The Florida black bear is a habitat generalist; although it depends on forested habitats, it prospers in a variety of forest types including forested wetlands, bottomland hardwoods, pine flatwoods, and other habitats typically found on public lands throughout their occupied range. Key habitat features are tied more to maintaining large, relatively undeveloped forest communities with a juxtaposition of a variety of habitat types that provide a diverse seasonal food base and sufficient cover, rather than habitat management practices or strategies directed specifically at bears or one habitat component (Maehr and Wooding 1992). Hence, appropriate management of public lands relative to black bears includes land management practices that ensure long-term maintenance of a variety of forest cover types and successional stages and, most importantly, that prevent conversion of these habitat types to nonforest uses through development and urbanization.

Key regulatory mechanisms that provide for continued forested habitat types for bears are Federal and State laws, regulations, and policies that govern the management and management planning on public lands. The important public lands providing for viable populations include 4,668 $km^2$ (1,153,583 ac) in the National Forests in Florida (Apalachicola, Ocala, and Osceola NFs) administered by the USFS, 1,967 $km^2$ (486,079 ac) in National Wildlife Refuges (Okefenokee, Florida Panther, and St. Marks NWRs) administered by the Service, a 2,916 $km^2$ (720,440 ac) NPS unit (Big Cypress NP), a 1,878 $km^2$ (464,000 ac) Department of Defense installation (Eglin AFB), and about 3,850 $km^2$ (950,000 ac) distributed among numerous State lands owned and administered by the Florida Board of Trustees of the Internal Improvement Trust Fund, the Florida Division of Forestry, the Florida Division of Parks and Recreation, and Florida's Water Management Districts (primarily the St. Johns River WMD, South Florida WMD and the Suwannee River WMD). Each of these agencies is required by statute to conserve wildlife species and their habitats as important uses or components of resource management programs (16 U.S.C. 1, 528 et seq., 668dd(a), 670 et seq., 1601(d); FS 253.034, 253.036, 258.037 ). Furthermore, to assure that these mandates are carried out, Congress and the Florida legislature have enacted specific natural resource planning requirements that direct the management and uses of these public lands. In many cases such requirements are not explicitly directed at protection of Florida black bear

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

69 FR 2100-01, 2004 WL 57043 (F.R.)

**(Cite as: 69 FR 2100)**

habitat; however, in order for the Service to conclude that such requirements are adequate regulatory mechanisms compatible with and beneficial to the species, agency plans and active land management programs do not need to specifically address the needs of or impacts to the bear as long as the resultant management does not threaten the species with extinction. Furthermore, as long as these agencies follow existing mandates required by law, appropriate forested habitats will be maintained for bears throughout the foreseeable future. Regulatory mechanisms, including laws, regulations and policies, in effect at the time of our 1998 finding pertaining to the agencies responsible for the management of public lands supporting the core Florida black bear populations are discussed below.

1. The Department of the Interior, through the NPS, must promote and regulate the use of national parks and preserves to conserve the scenery and the natural and historic objects and the wildlife therein in an unimpaired state (16 U.S.C. 1) and must administer Big Cypress NP to assure the natural and ecological integrity of the Big Cypress watershed (16 U.S.C. 698f, 698i). The General Management Plan (GMP) for Big Cypress NP was approved in 1991 (NPS 1991). Although the GMP does not specifically address black bears in terms of direct management, its goals included the preservation of the watershed and its natural flora and fauna through prescribed burning, the control of exotic plants, and the restoration of hydrology. These habitat goals and the results of the implementation of the GMP since 1991 have been consistent with the overall purposes of a unit of the National Park System and the legislative mandate behind the creation of Big Cypress NP and, thus, have maintained and will continue to maintain appropriate forested habitats for bears that will help ensure the species' perpetuation in south Florida.

2. The Department of the Interior, through the Service, administers the National Wildlife Refuge (NWR) system. The system is a national network of lands and waters for the conservation, management, and, where appropriate, restoration of the fish, wildlife, and plant resources and their habitats within the United States (16 U.S.C. 668dd(a)). Individual NWRs are established with a mandate to restore, preserve, develop, and manage wildlife and habitat (50 CFR 25.11) to perpetuate a diversity of viable wildlife populations including big game such as bears (Fish and Wildlife Service Manual [FWM] 6 RM 3.3, FWM 7 RM 7). The National Wildlife Refuge Improvement Act of 1997 (NWRIA, 16 U.S.C. 668 et seq.) requires a comprehensive conservation plan (CCP) be developed for each NWR. The CCP must identify and describe the wildlife and related habitats in the refuge and the actions needed to correct significant problems that may adversely affect wildlife populations and habitat (16 U.S.C. 668dd(e)). Planning also must consider alternatives and the impacts each has to wildlife (FWM 620 FW 1). Forest management on each NWR must be consistent with approved plans and cannot occur until planning is complete and management prescriptions are approved (FWM 6 RM 3.4). Because the NWRIA was not enacted until 1997, the NWRs providing habitat for the Florida black bear had not completed the CCP planning process by the time of our 1998 finding. However, Okefenokee, Florida Panther, and St. Marks NWRs had at that time approved habitat and/or fire management plans (U.S. Fish and Wildlife Service 1987, 1989, 1998) that remain valid until completion of their CCPs. [FN5]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

69 FR 2100-01, 2004 WL 57043 (F.R.)

**(Cite as: 69 FR 2100)**


These approved plans in existence in 1998 required active prescribed burning and forestry programs beneficial to native species including bears. Management of these refuges adheres to national legal and policy mandates and, hence, have maintained and will continue to help maintain viable bear populations at Okefenokee NWR-Osceola NF, Apalachicola NF, and Big Cypress NP.

   FN5 The Comprehensive Conservation Plan for Florida Panther NWR was completed in March 2000. Overall goals include restoration, conservation, and monitoring of native flora and fauna, especially for providing habitat for the Florida panther. These goals continue to require the use of active prescribed fire and timber/habitat management programs that are beneficial to the bear.

   3. National Forests are to be administered by the Department of Agriculture through the USFS for a number of equally important purposes, including fish and wildlife, in a manner that does not impair the land's productivity (16 U.S.C. 528 et seq.) and that maintains forest cover characteristics to secure the maximum benefits of these uses (16 U.S.C. 1601(d)). In addition, the USFS has the specific mandate to maintain viable populations of native species (36 CFR 219.19, Forest Service Manual [FSM] *2106 2672.32). The National Forest Management Act (NFMA, 16 U.S.C. 1600 et seq.) fosters compliance with these directives by requiring the development and implementation of resource management plans for each unit of the National Forest system. Such plans provide for multiple use and sustained yield of products and services, but also must include coordination of wildlife with other forest uses that will ensure a diversity of plant and animal communities, wildlife protection, and monitoring and assessment of the effects of management (16 U.S.C. 1604). USFS regulations and policies implementing the NFMA further require national forests to be managed to ensure the viability of populations of native species (36 CFR 219.19). Plans must identify, evaluate the effects of proposed management on, and provide for the monitoring of indicator species and their habitats (36 CFR 219.19; FSM 2620.3, 2621.4, 2621.5). Goals, standards, prescriptions, and appropriate mitigation needed to meet goals for indicator species must be specified (FSM 2621.4). Following completion of the plan, proposed actions and site-specific management prescriptions cannot be conducted until a biological evaluation is completed that documents and determines the effects of proposed activities on listed and sensitive species and that will ensure that no loss in viability will occur (FSM 2670.32, 2672.4, 2672.32).

   A management plan for the National Forests in Florida was completed in 1985 meeting the requirements of the NFMA and its implementing regulations and policies as described above (U.S. Forest Service 1985a). This plan was the basis for forest management at the time of our 1998 finding. Revision of the plan was underway at that time as well, and was setting the direction for future management of these national forests. In both the 1985 plan and draft revised plan (U.S. Forest Service 1997a) [FN6], the USFS detailed its management goals and prescriptions. The Florida black bear was identified as both a management indicator species and a sensitive species, ensuring that evaluations of the impacts of site-specific actions and prescriptions to this species would be conducted. During the planning process, evaluations of the impacts of the plans

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

to bears and bear habitat were considered (U.S. Forest Service 1985b, 1997b, 1998a, 1998b). The USFS has conducted over the years, and continues to implement: (1) Prescribed burning practices that have shifted to a preference for growing-season fires beneficial to native species, (2) timber management including thinning of pine plantations, (3) uneven-age timber management, (4) retention of hardwoods for mast production, (5) the protection of wetland habitats to provide escape cover and travel corridors for bears, (6) road closures, (7) land acquisition, and (8) restrictions on visitor uses including a reduction in motorized vehicle access. These management actions are not only compatible with bears but also directly improve conditions for the species by ensuring a diversity of habitats that provide sufficient cover and a diverse seasonal food supply.

FN6 The final Revised Land and Resource Management Plan for the National Forests in Florida and its EIS were approved in February 1999. The plan continues to identify the bear as a management indicator species. Its approval finalized the USFS approach to management and monitoring of these forests as specified in the draft plan and as noted above.

USFS' annual monitoring of its adherence to the 1985 plan demonstrates achievement of planned management actions that provide for the needs of bears. In 1998, the USFS estimated that actions planned to improve wildlife habitat, implement road closures, conduct prescribed burns, and complete land acquisition projects had achieved 116%, 197%, 145% and 8,583%, respectively, of the levels directed in the 1985 plan (U.S. Forest Service 1998c). Considering past stewardship of the National Forests in Florida under the direction of the 1985 plan and the positive status bears have achieved on these forests since that time (Kasbohm and Bentzien 1998), we had in 1998, and still have, every reason to believe that the revised plan will be carried out in a similar manner pursuant to the legal mandates of the NFMA and Forest Service policies. Furthermore, national forest management as identified in the revised plan should continue to maintain quality forested habitats that will directly ensure viability for three of the four core Florida black bear populations through the foreseeable future.

4. The Department of Defense (DOD), including the Air Force, must conserve and maintain native ecosystems, viable wildlife populations, Federal and State listed species, and habitats as vital elements of its natural resources management programs on military installations, to the extent that these requirements are consistent with the military mission (32 CFR 190.4; Dept. of Defense Instruction [DODI] 4715.3 Ch 6.2.2; Air Force Instruction [AFI] 32-7064 Ch 2.2, 7). Amendments to the Sikes Act (16 U.S.C. 670 et seq.) enacted in 1997 require each military department to prepare and implement an integrated natural resource management plan (INRMP) for each installation under its jurisdiction. The plan must be prepared in cooperation with the Service and the State fish and wildlife agency and must reflect the mutual agreement of these parties concerning conservation, protection, and management of wildlife resources (16 U.S.C. 670a(a)). Each INRMP must provide for wildlife, land and forest management, wildlife-oriented recreation, wildlife habitat enhancement, wetland protection, sustainable public use of natural resources that are not inconsistent with the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

69 FR 2100-01, 2004 WL 57043 (F.R.)

**(Cite as: 69 FR 2100)**

needs of wildlife resources, and enforcement of natural resource laws (16 U.S.C. 670a(b)). The sale or lease of land, or the sale of forest products, are prohibited unless the effects of the sale or lease are compatible with the purposes of the INRMP (16 U.S.C. 670a(c)). DOD regulations mandate that resources and expertise needed to establish and implement an integrated natural resource management program are maintained (32 CFR 190.5). These regulations further define the IRNMP requirements and mandate that plans be revised every five years and that they ensure that military lands suitable for management of wildlife are actually managed to conserve wildlife resources (32 CFR Part 190, Appendix). Proposed activities and projects on installations with approved INRMPs cannot begin unless they are determined to be compatible with the plan through an environmental impact analysis that considers wildlife resources and State and Federally listed species (32 CFR Part 190, Appendix).

To implement these mandates, the DOD and the Air Force have issued policies that require installations to maintain an inventory of listed species and their habitats, and to coordinate with the State wildlife agency to ensure the INRMP agrees with State management of wildlife (AFI 32-7064 Ch 7, DODI 4715.3 ch 4.2). The Air Force has specifically directed that its facilities provide the same level of protection to State-listed species as those with Federal protection under the ESA (AFI 32-7064 Ch 7). In addition, forestry and agricultural operations must be balanced with and used to achieve or maintain the needs of listed species protection and wildlife enhancement (DODI 4715.3 Ch 4.2, AFI 32-7064 Ch 8).

The natural resource management program at Eglin AFB has complied with these mandates and directives. The AFB's Natural Resources Management Plan (Dept. of the Air Force 1993) was approved in 1993 and was under *2107 revision to meet the 1997 Sikes Act amendments requirements at the time of our 1998 finding. We noted in 1998 that ongoing management actions included maintenance of habitat diversity, prescribed burning to maintain natural conditions, uneven aged forest management, restoration of longleaf pine habitat, and maintenance of riparian and forested wetlands (63 FR 67617); all of these actions were being implemented pursuant to the approved 1993 plan in 1998 when we made our finding and are continuing to provide bear habitat on Eglin AFB today. Although this population is not one of the four core populations that we concluded would maintain the species above a Federal listing threshold as dictated by the ESA (63 FR 67616), these actions help protect bears and maintain significant forested habitats for bears in the panhandle of Florida.

5. State lands in Florida, although managed by several agencies, have similar management responsibilities related to wildlife and generally must be managed in an environmentally acceptable and sustainable manner to conserve and ensure the protection, survival, and viability of plant and animal species, especially native ecosystems and State-listed species (FS 253.034, 253.036, 258.037; FAC 62-402.070; SFH 1.3, 5.3). All State lands must have an individual management plan, approved by the Board of Trustees of the Internal Improvement Trust Fund, that includes a description of how State-listed species will be identified, located, protected, and preserved (FS 253.034, FAC 40B-9.122, 40C-9.110). These plans must be revised

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

69 FR 2100-01, 2004 WL 57043 (F.R.)

**(Cite as: 69 FR 2100)**

every five years; beginning in 1998, plan revisions must include a review of the management on the area by a team composed of individuals representing, among others, the managing agency, the Commission, and a conservation organization (FS 259.036, 373.591). The review team must determine whether previous management was in accordance with the existing plan and the purposes for which the land was acquired; the review also must include an evaluation of the extent to which the existing plan provides sufficient protection to State-listed species (FS 259.036).
 In addition to being consistent with management objectives, all uses of uplands on State lands cannot be contrary to the public interest and all direct and indirect impacts including those to wildlife values must be considered before the use can be authorized (FAC 18-2.018).

 By 1998, management plans that conformed to statutory requirements had been approved for all State lands important to the Florida black bear, including but not limited to: Apalachicola River WEA (Commission 1997a), Aucilla WMA and Big Bend WMA (Commission 1998), Caravelle Ranch WMA (Commission 1997b), Collier-Seminole State Park (FL DEP 1998a), Fakahatchee Strand State Preserve (FL DEP 1994), the Wekiva Basin GEOpark (including Lower Wekiva River State Reserve and Rock Springs Run State Reserve; FL DEP 1998b), Blackwater River State Forest (FL DOF 1994), Goethe State Forest (FL DOF 1993), Lake George State Forest (FL DOF 1998a), Picayune State Forest (FL DOF 1996a), Seminole State Forest (FL DOF 1995), Tates Hell State Forest (FL DOF 1998b), Tiger Bay State Forest (FL DOF 1998c), Withlacoochee State Forest (FL DOF 1996b), Heart Island Conservation Area (SJRWMD 1998), and Haw Creek Conservation Area (SJRWMD 1995). These plans acknowledge the presence of the Florida black bear and its threatened designation. Management practices identified in these plans that are being implemented include prescribed burning and forest management programs. Review teams have been convened and reviews conducted, including considering the needs of bears, as plans are revised. [FN7] Consequently, we conclude that the above mandates for State land management in Florida, the resultant management plans, and the past and continued implementation of those plans were in 1998 and continue to be compatible with maintaining viable populations of Florida black bears. We do not assume, nor do we believe it necessary, that every management goal or prescription identified in these plans has been or will be conducted. However, because the plans are required under State law, they should ensure the preservation of forested bear habitats on important State lands supporting the four core bear populations.

 FN7 Florida's land management agencies continue to meet legal requirements to revise and implement land management plans. Since 1998, revised plans have been approved for Blackwater River State Forest (FL DF, December 19, 2000), Goethe State Forest (FL DOF August 21, 2000), Seminole State Forest (FL DOF, December 19, 2000), and Fakahatchee Strand State Preserve (FL DEP, December 19, 2000).

 6. The Wilderness Act of 1964 (16 U.S.C. 1131 et seq.) is relevant to our evaluation of the adequacy of existing regulatory mechanisms because it affects the management of federally administered public lands. It requires that all lands designated by Congress as Wilderness Areas be managed to preserve their wilderness character. Consequently, Federal agencies must manage these areas for native

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

69 FR 2100-01, 2004 WL 57043 (F.R.)

**(Cite as: 69 FR 2100)**

habitat types primarily through natural processes. Significant amounts of land that are important to Florida bear populations are designated wilderness and thus receive these protections, including 1,433 km$^2$ (353,981 ac) in the Okefenokee NWR (with an additional 55 km$^2$ (13,660 ac) in Osceola NF), 70 km$^2$ (17,350 ac) on St. Marks NWR, two areas totaling 132 km$^2$ (32,692 ac) on Apalachicola NF, and four areas totaling 114 km$^2$ (28,199 ac) on Ocala NF (16 U.S.C. 1132). In the range of the Florida black bear, these protections provide additional security for habitat on public conservation lands by ensuring that Wilderness Areas are maintained in forested and other native habitat types that directly support the species.

We acknowledge that some bear habitat will be lost in the future on private lands and that existing wetland regulations and a lack of upland protections specific to bears do not provide complete protection to all existing habitat. However, because of the significant protections provided by, and the level of enforcement of, the existing laws, regulations, and policies described above, and considering the species widespread distribution on public and private lands at Apalachicola NF and Okefenokee NWR-Osceola NF, and public lands at Ocala NF, and Big Cypress NP, we concluded in 1998, and conclude again now, that existing regulatory mechanisms in 1998 that relate to habitat protection and management are adequate to maintain habitat of sufficient quantity and quality to ensure viable bear populations.

Finding

In 1998 the Service reviewed the petition, status review, available literature, and other information relevant to the conservation status of the Florida black bear. After reviewing the best scientific and commercial information available, we concluded that the continued existence of the Florida black bear was not threatened by any of the five listing factors alone or in combination. Following a subsequent legal challenge, the U.S. District Court for the District of Columbia upheld our conclusions regarding the applicability of four of the five listing factors, but ordered the Service to clarify our conclusions regarding, and further determine whether, the inadequacy of existing regulatory mechanisms in 1998 warrants listing the bear. Pursuant to that order, we have reexamined the inadequacy of existing regulatory mechanisms being undertaken and enforced at the time of our 1998 finding considering the laws, regulations, and policies that directly or indirectly *2108 provide protection to the bear or its habitats. Based on this review, we conclude that the existing regulatory mechanisms applicable in 1998 are not inadequate and do not warrant listing the Florida black bear.

References Cited

A complete list of all references cited in this document is available from the Jacksonville Ecological Services Field Office (see ADDRESSES section).

Author

The primary author of this notice is Dr. John W. Kasbohm (see ADDRESSES section).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

69 FR 2100-01, 2004 WL 57043 (F.R.)

**(Cite as: 69 FR 2100)**

Authority

The authority for this action is the Endangered Species Act (16 U.S.C. 1531 et seq.).

Dated: December 24, 2003.

Marshall P. Jones Jr.,

Acting Director, Fish and Wildlife Service.

[FR Doc. 04-690 Filed 1-13-04; 8:45 am]

BILLING CODE 4310-55-P

69 FR 2100-01, 2004 WL 57043 (F.R.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.