UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DEFENDERS OF WILDLIFE, et al.,

Plaintiffs,

v.

GALE NORTON, et al.,

Defendants.

Civil Action 99-02072 (HHK)

FILED

DEC 1 3 2001

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## MEMORANDUM

In this suit, plaintiffs, Defenders of Wildlife and others ("Defenders"), claim that the decision of the United States Fish & Wildlife Service ("Wildlife Service" or "Agency") not to list the Florida black bear as a threatened species pursuant to the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq.*, violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.* Defenders contend that the decision was arbitrary, capricious, and an abuse of discretion. Presently before the court are the parties' cross motions for summary judgment. Upon consideration of the motions, the oppositions thereto, and the administrative record, the court concludes that each motion should be granted in part and that this case should be remanded to the Wildlife Service for further proceedings.

## I. BACKGROUND

A.    **Statutory Framework**

The ESA was enacted in order "to provide a means whereby the ecosystems upon which

39

endangered species and threatened species depend may be conserved, [and] to provide a program

for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b).

The statute defines the term "threatened species" as "any species which is likely to become an

endangered species within the foreseeable future throughout all or a significant portion of its

range." 16 U.S.C. § 1532(20). An "endangered species" is defined as "any species which is in

danger of extinction throughout all or a significant portion of its range . . . ." 16 U.S.C. §

1532(6). The Act does not provide protection to a species unless the Secretary of Interior lists it

as endangered or threatened. *See* 16 U.S.C. § 1533. Once a species is listed as threatened or

endangered, it receives substantial federal protection. For example, it is illegal for anyone to kill,

take, hunt or capture an endangered or threatened species. *See* 16 U.S.C. § 1538(a)(1); 50 C.F.R.

§§ 17.21, 17.31.

 The ESA allows citizens to file petitions seeking to list a species as threatened or

endangered. *See* 16 U.S.C. § 1440(g)(1). Once a citizen petitions for listing of a species, the

Wildlife Service must decide within ninety days if the petition presents enough information

indicating that a listing may be warranted. *See* 16 U.S.C. § 1533(b)(3)(A); 50 C.F.R. §

424.14(b). If the Wildlife Service determines that the petition provides sufficient information, it

then conducts a study of the current state of the species, known as a status review, to determine

whether to list the species. *See* 16 U.S.C. § 1533(b)(3)(B). If the agency decides that a listing is

warranted, it must publish a proposed rule listing the species. *See* 16 U.S.C. § 1533(b)(5). The

agency must issue a final rule either listing the species or explaining its decision not to list within

twelve months of issuance of the proposed rule. *See* 16 U.S.C. § 1533(b)(5).

 In order to determine whether a species warrants listing pursuant to the ESA, the Wildlife

2

Service must consider five specific factors:

> (A) the present or threatened destruction, modification, or curtailment of its habitat or range;
> (B) overutilization for commercial, recreational, scientific, or educational purposes;
> (C) disease or predation;
> (D) the inadequacy of existing regulatory mechanisms; or
> (E) other natural or manmade factors affecting its continued existence.

16 U.S.C. § 1533(a)(1). Because the Act states that "[t]he Secretary shall . . . determine whether any species is an endangered species or a threatened species because of any of the [five factors set forth in the ESA]," *id.*; *see also* 50 C.F.R. § 424.11, the agency must list a species as long as any one factor demonstrates that it is threatened or endangered. *See, e.g., Carlton v. Babbitt,* 900 F. Supp. 526, 530 (D.D.C. 1995). The agency must base its decision whether or not to list "solely on the basis of the best scientific and commercial data available." 16 U.S.C. § 1533(b).

**B.     The Effort To Have the Florida Black Bear Listed**

The Florida black bear ("black bear" or "bear") (*Ursus americanus floridanus*) is a subspecies of the North American black bear (*Ursus americanus*). The current population of the black bear occurs primarily in Florida, although small populations are also found in Alabama and Georgia. *See* 56 Fed. Reg. 596 (Jan. 7, 1992). The animal lives in a variety of forest habitats, including pine flatwoods, hardwood swamp, cabbage palm forest and sand pine scrub forest. Its diet is diverse, but consists mainly of hard and soft mast as well as fruits, insects, and small animals. Because of human development and other factors, the black bear's habitat has been reduced to less than thirty percent of its historical range.

In 1990 Inge Hutchinson petitioned the Wildlife Service to list the black bear as a

3

threatened species. Hutchinson argued in her petition that the combined effect of legal and illegal

hunting, loss and fragmentation of habitat, and road mortality posed a threat to the animal's

continued existence. *See* 56 Fed. Reg. at 596. The Wildlife Service determined that the petition

presented substantial information indicating that listing might be warranted. *See* 55 Fed. Reg.

42,223 (Oct. 18, 1990). The Wildlife Service then conducted a status review of the black bear,

and on January 7, 1992, determined that the effects of habitat destruction, legal and illegal

hunting, and human induced mortality warranted listing the black bear as threatened. *See* 56 Fed.

Reg. at 599. The Wildlife Service concluded, however that while the threat to the black bear was

imminent, the magnitude of the threat was "moderate to low." *Id.* At the time, the Wildlife

Service ranked species on a scale of one to twelve based on their priority for listing. The black

bear was assigned to category nine in the listing hierarchy. *Id.* As a result, even though the

Agency concluded that the black bear should be listed, it found that listing was precluded until it

was able to list species with a higher priority. *See id.*

By 1997, the black bear remained unlisted. On January 21, 1997, the Wildlife Service

entered into a settlement agreement in *Fund for Animals, Inc. v. Babbitt*, Civ. No. 92-0800 (SS)

(D.D.C.), a case brought to challenge the Agency's failure to list a number of different species

within the statutory twelve-month time frame. As part of the settlement agreement, the Wildlife

Service agreed either to issue a proposed rule listing the black bear or to issue a final rule finding

that it did not warrant listing by December 31, 1998. The Wildlife Service then conducted

another study of the black bear. The ensuing report identified nine distinct populations of the

Florida black bear. It concluded that four of the nine populations – Southern Alabama,

Chassahowitzka, St. Johns, and Highlands – and possibly a fifth – Eglin AFB – were unlikely to

4

survive into the foreseeable future. The report indicated that the four remaining populations –

Okefenokee National Wildlife Refuge (NWR), Ocala National Forest (NF), Big Cypress National

Preserve, and Apalachicola NF – which house the vast majority of the black bear population,

were likely to survive into the foreseeable future. All four of those habitats are estimated to have

populations of at least 300 bears, and all contain at least 2,200 $km^2$ of publicly owned land.

On December 8, 1998, the Wildlife Service concluded, in contrast to its 1992 finding,

that the black bear did not warrant listing as a threatened species. *See* 63 Fed. Reg. 67,613,

67,618 (Dec. 8, 1998). This suit followed.

## II. STANDARD OF REVIEW

Under the APA, a reviewing court shall set aside agency action it finds to be "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. §

706(2)(A). An agency rule is arbitrary and capricious if

> the agency has relied on factors which Congress has not intended it to consider,
> entirely failed to consider an important aspect of the problem, offered an
> explanation for its decision that runs counter to the evidence before the agency, or
> is so implausible that it could not be ascribed to a difference in view or the
> product of agency expertise.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). While the

court's scope of review is narrow, as it "is not empowered to substitute its judgment for that of

the agency," the court must still conduct "a thorough, probing, in-depth review" of the agency's

decision. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415-16 (1971).

Agency actions are presumed to be valid. *See Ethyl Corp. v. EPA*, 541 F.2d 1, 31 (D.C. Cir.

1976) (*en banc*). As long as an agency considers relevant factors and can articulate a rational

5

connection between the facts found and the choices made, then its decision will be upheld. *See State Farm*, 463 U.S. at 43; *Marsh v. Oregon Natural Res. Council*, 460 U.S. 360, 378 (1989) (holding that agency action will not be reversed absent a clear error of judgment). Moreover, when an agency's action relies on scientific and technical information touching upon the agency's area of expertise, a court is particularly deferential. *See Marsh*, 460 U.S. at 377.

Because this case involves a challenge to final agency action, review is limited to the administrative record and the grounds for decision invoked by the agency. *See Camp v. Pitts*, 411 U.S. 138, 142 (1973); *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947). "Summary judgment is an appropriate procedure for resolving a challenge to a federal agency's administrative decision when review is based upon the administrative record, even though the Court does not employ the standard of review set forth in Rule 56, Fed. R. Civ. P." *Fund for Animals v. Babbitt*, 903 F. Supp. 96, 105 (D.D.C. 1995) (internal citation omitted).

### III. ANALYSIS

Defenders attack the decision of the Wildlife Service not to list the black bear on three grounds. First, Defenders argue that the Agency's decision is inconsistent with the ESA's express requirement that a species be listed if the species is threatened over "all or a significant portion of its range." *See* 16 U.S.C. § 1532(20). Second, Defenders contend that the Wildlife Service's 1998 decision not to list the black bear is arbitrary and capricious in light of the Agency's 1992 decision that a listing of the species was warranted. Specifically, Defenders maintain that the Wildlife Service erroneously concluded in its 1998 decision that the combined effects of habitat destruction, habitat isolation, roadkill, and hunting did not warrant listing.

Finally, Defenders assert that the Wildlife Service improperly relied on uncertain future regulatory activity in determining that existing regulatory mechanisms are adequate to protect the black bear's existence. Each argument is addressed in turn below.

A.    **The Agency's Interpretation of "Significant Portion of its Range"**

The ESA requires the Secretary of the Interior to list any species that it finds to be endangered or threatened. *See* 16 U.S.C. § 1533(a). Under the ESA, a species must be listed as threatened if it is likely to become endangered over "all or *a significant portion* of its range." 16 U.S.C. § 1532(20) (emphasis added). Similarly, a species is endangered if it "is in danger of extinction throughout all or a significant portion of its range . . . ." 16 U.S.C. § 1532(6). In its decision not to list the Florida black bear, the Wildlife Service acknowledged that several areas of current black bear habitat, comprising 17,821 km$^2$, or forty percent of the bear's current geographical habitat, are unlikely to survive into the foreseeable future. *See* 63 Fed. Reg. at 67,614-16 (1998).

Defenders argue that the Wildlife Service's decision not to list the black bear even though forty percent of the animal's current habitat likely will be lost results from an erroneous interpretation of what is meant by the phrase "all or a significant portion of its range." 16 U.S.C. § 1532(20). The likely loss of forty percent of the bears' current range warrants listing, according to Defenders, because that much of the species habitat is "significant" as a matter of law. In support of its position, Defenders cite several instances in which the Wildlife Service found that the loss of a particular percentage of a species' habitat warranted a listing of the species as threatened or endangered, including one where as little as one-third of a species' habitat was in

danger of disappearing. *See, e.g.*, 65 Fed. Reg. 26,762 (May 9, 2000) (listing the Koala where

the geographic range declined by fifty to ninety percent); 65 Fed. Reg. 19,686 (Apr. 12, 2000)

(listing the Santa Ana sucker where the species lost approximately seventy-five percent of its

range); 57 Fed. Reg. 45,328 (Oct. 1, 1992) (listing the Marbled Murrelet where one third of its

range was at risk of being lost).

The Wildlife Service disagrees with Defenders' reasoning. The Agency points out that the

portion of habitat likely to be lost supports only five percent of the black bear's population. The

Wildlife Service argues that under the circumstances, this loss does not constitute a significant

portion of the bear's range.

In determining whether the Wildlife Service misinterpreted the ESA, the job of the court

is not to impose its own construction of the statute, but merely to decide if the Agency's

interpretation is reasonable. When reviewing an agency's construction of a statute, the court

must first look to see if Congress has addressed the question at issue. *See Chevron, Inc. v.

Natural Res. Def. Council*, 467 U.S. 837, 843 (1984). If it has, then the court must give effect to

the meaning of the statute as determined by Congress. *See id.* But if Congress has not spoken

directly to the matter at hand, then the court must defer to any reasonable interpretation of the

statute by the agency, even if that interpretation is different from the court's preferred reading.

*See id.* at 843-44 & n.11.

Neither the ESA nor any of its implementing regulations defines the phrase "significant

portion of its range." The only court that has addressed the meaning of the phrase has found it to

be ambiguous. *See Defenders of Wildlife v. Norton*, 258 F.3d 1136, 1141 (9th Cir. 2001). In

*Defenders of Wildlife v. Norton*, the Ninth Circuit reasoned that "significance" depends on the

overall nature of the range that will be lost. That case involved a challenge to the Wildlife

Service's refusal to list the flat-tailed horned lizard as a threatened species. The Wildlife Service

had determined that although the lizard might not survive on private land, listing was not

warranted because of the likelihood that the lizard would continue to survive on its public land

habitat. *See id.* at 1140. In order to resolve the dispute, the court had to decide whether or not

the lizard's private land habitat constituted a significant portion of its range. *See id.* at 1141.

The Ninth Circuit rejected the Wildlife Service's argument that a species warrants

protection only if it would lose a portion of its range that would put the entire species in danger

of extinction. *See id.* The court found that this interpretation turned the phrase "significant

portion" into mere surplusage by equating the danger of extinction over a significant portion of

the range with extinction over the entire range. *See id.* at 1141-42. The court emphasized that

the Wildlife Service will commonly list only particular populations of species as threatened or

endangered precisely because they may be threatened over a significant portion of their range, but

not over their entire range. *See id.* at 1145 (citing examples where certain populations of species

were listed as threatened but other populations of the species were not).

The court also rejected the plaintiff's interpretation, which is substantially similar to the

argument advanced by Defenders in the present case, that significance is determined by the

percentage of habitat lost. *See id.* at 1143. The court observed that because different species

may have habitat ranges of varying sizes, and may have different migration and travel patterns

affecting the size of the habitat they require to survive, "it simply does not make sense to assume

that the loss of predetermined percentage of habitat or range would necessarily qualify a species

for listing." *Id.* Since the amount of habitat loss that will put a species in danger of extinction is

9

fact-specific, the court held that "the percentage of habitat loss that will render a species in danger of extinction or threatened with extinction will necessarily be determined on a case-by-case basis." *Id.*

Finding that neither percentage of habitat loss nor the danger of extinction over the entire range provided a proper definition, the court examined the Act's legislative history and determined that the phrase "significant portion" was included in the statute as a way of allowing for increased federal-state cooperation to protect species in areas where they are threatened, even if the species is not threatened as a whole. *See id.* at 1144-45. In other words, if a species is endangered in Florida, but not in other parts of the country, the statutory language allows the Wildlife Service to list the species as threatened in Florida if it finds that the Florida habitat constitutes a significant portion of the species' range. The court ultimately concluded "that a species can be extinct 'throughout . . . a significant portion of its range' if there are major geographical areas in which it is no longer viable but once was. Those areas need not coincide with political boundaries, but they can." *Id.* at 1145.

Following the Ninth Circuit's cogent analysis in *Defenders of Wildlife*, this court holds that the Wildlife Service's interpretation of what constitutes a significant portion of the black bear's range and its determination that the species is not likely to become endangered over that range is reasonable. First, the areas likely to be lost only support five percent of the black bear's population. Although these areas may constitute forty percent of the bear's present habitat, it is habitat that relatively few bears use. Second, the habitats likely to disappear – Southern Alabama, Chassahowitzka, Highlands, St. Johns, and Eglin's Air Force Base – are of low quality, and are geographically isolated from each other and from bear habitats likely to survive in the

foreseeable future.[1] Because none of the threatened habitats are particularly large, and because they are spread out from one another and from most of the remaining viable bear habitats, they may not exert a significant impact on the bear population as a whole. Thus, these pockets of habitat are not "major geographical areas" of the bear's range. Finally, the bears living in those habitats will remain isolated and unlikely to contribute genetically to the continuation of the species.[2]

The court's conclusion regarding the reasonableness of the Wildlife's Service's determination that the black bear is not threatened over a significant portion of its range is not altered by a consideration of Defenders' recitation of the instances in which the Wildlife Service found that the loss of a particular percentage of a species' habitat warranted the listing of a species as threatened or endangered. Simply comparing the percentages of lost habitat of different species is not illuminating. The black bear may have a different population size and may not face the same biological and environmental pressures that were faced by the species covered by the rulings in the cited instances. Indeed, there is no evidence demonstrating any similarity between the black bear and the other species that the Wildlife Service decided to list. To imbue the Wildlife Service's determinations regarding these species with significance would

---

[1] Currently, linkages do exist between St. John's and the Ocala National Forest habitat. The Wildlife Service found that there is a significant likelihood that those linkages will disappear absent a listing of the species.

[2] The court does not take the Wildlife Service to mean that the loss of forty percent of the black bear's habitat would never be significant. It could be the case that the loss of forty percent of the bear's habitat, where the habitat is of higher quality, supports a greater population, or provides increased genetic exchange and interaction, such as the loss of habitat in Okefenokee, Big Cypress, Ocala, or Apalachicola, would constitute a significant portion of the bear's range.

11

be to ignore the Ninth Circuit's admonition that species' evaluations must be made on a case-by-case basis. *See Defenders of Wildlife*, 258 F.3d at 1143.

**B.    The Combined Effects of Habitat Destruction, Hunting, and Roadkill**

Defenders argue that the Wildlife Service's 1998 decision not to list the black bear, after finding in 1992 that listing was warranted, is arbitrary, capricious and an abuse of discretion. In particular, Defenders assert that the best available scientific evidence does not provide a rational basis for the Agency's conclusion that, based on its examination of the required statutory factors, the combined effects of habitat destruction, habitat isolation, hunting, and roadkill do not create a reasonable likelihood that the black bear will become endangered in the foreseeable future.

1.    *The Wildlife Service's 1992 Decision that the Black Bear Should Be Listed*

In 1992, the Wildlife Service concluded that the black bear warranted listing as a threatened species because continued habitat destruction, increased isolation between habitats, and deaths from hunting and roadkill made it likely that the species would become endangered in the foreseeable future. Specifically, the Agency determined that future development of private land in existing black bear habitats would likely turn those areas into isolated "islands" with no linkages between individual habitats. *See* 57 Fed. Reg. 596, 598 (Jan. 7, 1992). The Wildlife Service found that the loss of habitat and the loss of habitat linkages warranted listing because habitat isolation would decrease genetic exchange between bear populations and threaten the black bear's survival. *See id.* The Agency also found that the loss of habitat reduced the amount of space available to the black bear, thereby leaving it increasingly vulnerable to human-caused

mortality such as hunting and roadkill. *See id.* Thus, the ultimate basis for the Agency's conclusion that listing was appropriate was that the combined effects of habitat destruction, legal and illegal hunting, and roadkill threatened the black bear's continued existence. *See id.* at 599.

Although the Wildlife Service determined that the black bear should be listed as threatened, the 1992 proposed rule indicated that the threat facing the black bear was not overwhelming and characterized the threat to the black bear as "moderate to low." *See id.* at 599. The Agency noted that the black bear occurs mainly on public land and that bears living on public land, primarily in the habitats of Okefenokee NWR, Ocala NF, Apalachicola NF, and Big Cypress National Preserve "enjoy a reasonable degree of habitat security." *Id.* at 598. The Wildlife Service also emphasized that future public land acquisitions could play a critical role in increasing habitat security. *See id.* Thus, while the Wildlife Service determined that habitat loss, in combination with threats from hunting and roadkill, warranted listing, the threat faced by the black bear was small enough that it would not be unreasonable for new information or positive developments regarding black bear populations to cause the Wildlife Service to determine that the black bear was no longer likely to become endangered in the foreseeable future.

2.    *The 1998 Decision that Listing is not Warranted*

In 1997, as part of the settlement of *Fund for Animals, Inc. v. Babbitt,* Civ. No. 92-0800 (SS) (D.D.C.), the Wildlife Service agreed to decide whether or not to list the black bear as threatened by December 31, 1998. After the settlement, the Wildlife Service assembled a status report on the current state of the species. The report combined older data with new data and studies compiled after the Wildlife Service's 1992 decision, and concluded that the black bear

13

was not likely to become threatened in the foreseeable future. In its 1998 rule, the Wildlife

Service found that none of the five statutory factors warranted listing for the black bear. *See* 63

Fed. Reg. at 67,618.

In its 1998 decision not to list, the Wildlife Service identified four habitats where the

black bear was not likely to become endangered in the foreseeable future: (1) Apalachicola NF,

(2) Ocala NF, (3) Okefenokee NWR, and (4) Big Cypress National Preserve. *See* 63 Fed. Reg. at

67,615-16. The Agency realized that for two of the habitats, Ocala and Big Cypress, continued

development was likely to restrict future black bear habitat to public land only. *See id.* at 67,615-

16. Based on its conclusion that those four habitats were likely to survive, the Wildlife Service

concluded that habitat destruction did not create a reasonable likelihood that the black bear

would become endangered in the foreseeable future. *See id.* at 67,618.

Defenders advance several arguments in support of its position that the Wildlife Service's

decision was unwarranted. First, Defenders argue that continued development will limit the black

bear to public land, which is not sufficient to support the black bear population. Second,

Defenders argue that continued habitat isolation will limit genetic exchange between populations,

making it difficult for the species to maintain its numbers. Third, Defenders argue that roadkill

deaths will continue to threaten black bear populations. Fourth, Defenders claim that hunting by

humans will also threaten the viability of the black bear.

Defenders' position cannot be sustained because evidence in the administrative record

supports the Agency's conclusions regarding the combined effects of habitat destruction, habit

isolation, hunting and roadkill. First, new information caused the Wildlife Service to

significantly revise its population estimates for the black bear, which changed the Agency's

14

outlook on the bear's likelihood of long-term survival.  Whereas in 1992 the Agency estimated the entire black bear population at 550-1,050, in 1998, based on new studies of population density, the Agency increased its estimate threefold, approximating the population at 1,600-3,000.  New studies caused the Wildlife Service to revise its population estimates in Ocala from 125 bears to at least 600 bears.  *See* 63 Fed. Reg. at 67,615.  The population at Big Cypress was previously estimated at 145 bears, but new information led the Wildlife Service to increase that estimate to 350-450 bears.  The Agency also concluded that the Apalachicola population exceeds 400 bears and that the Okefenokee habitat contains at least 600 bears.  *See* 63 Fed. Reg. at 67,615-16.  The Wildlife Service concluded that the higher estimates significantly increased the black bear's chances of survival.  Specifically, according to the status report, the increased population enabled the black bear to overcome deaths from hunting and roadkill much more easily than it could at its estimated 1992 population.

The Wildlife Service reasonably concluded that the increased population estimates will enable the black bear to withstand projected losses of current habitat.  According to a 1994 study prepared for the Florida Game and Fresh Water Fish Commission (FGFWFC), black bear habitats with an area of 2,000-4,000 $km^2$ and with populations of 200 bears had a ninety-five percent chance of survival for 200 years.[3]  *See* Pls.' Notice of Filing Excerpts of the

---

[3] The author of that study, however, also wrote a letter encouraging the Wildlife Service to list the black bear as threatened.  *See* AR 214 (letter from James Cox).  Plaintiffs cite several letters from scientists to the Wildlife Service arguing that the black bear should be listed.  *See* AR 213 (letter from David S. Maehr), 214 (letter from James Cox), 218 (letter from Laurie Macdonald).  Mere disagreement between scientists, however, does not invalidate the Agency's conclusion.  It is not the court's role to investigate and decide upon which expert the Wildlife Service should have relied.  When there is disagreement among expert opinions, the agency is entitled to rely on the expert of its choice, including its own experts.  *See, e.g., Central Arizona*

Administrative R., Ex. 9, at 31 [hereinafter Cox]; 67 Fed. Reg. at 67,617. All four surviving

habitats meet those two criteria.[4]  Thus, even with projected losses of current habitat, the black

bear will continue to live on habitats of sufficient size such that it is unlikely to become

endangered in the foreseeable future.

    With respect to Defenders' argument that black bear habitats in the future may be limited

to public land, while the Wildlife Service acknowledged in its final rule that the Ocala and Big

Cypress habitats would likely be restricted to public land, it concluded that because the public

land habitat in those areas exceeds 2,000 km$^2$, the amount of public land for each habitat was

sufficient to prevent the black bear from becoming endangered in those areas.  *See* 63 Fed. Reg.

at 67,615-16.  Also, the status report relied upon by the Wildlife Service contained evidence

supporting the conclusion that the slow pace of development in the Okefenokee and Apalachicola

habitats will enable black bears to continue to live on private land in those areas for the

---

*Water Dist. v. EPA*, 990 F.2d 1531, 1539 (9th Cir. 1993); *Fund for Animals v. Babbitt*, 903 F. Supp. 96, 109-10 (D.D.C. 1995).  As long as the experts relied upon provide some justification for their conclusions, the court will not disregard them.  *See, e.g., Northern Spotted Owl v. Hodel*, 716 F. Supp. 479, 483 (W.D. Wash. 1988) (holding that the position of agency experts must be conclusory and contrary to unrebutted expert opinion to be overturned).  Even though Defenders provide evidence that some experts opposed the Agency experts' conclusions about the importance of linkage zones and habitat size, "disagreement between scientists about the necessity of establishing linkage zones is not sufficient to demonstrate arbitrariness by the government." *Fund for Animals*, 903 F. Supp. at 110.  Because the Agency's experts articulated reasonable opinions based on the facts at their disposal, the Agency was entitled to rely on those opinions, even if they conflicted with those of other experts.

    [4] As of December 8, 1998, the Apalachicola NF habitat included 4,100 km$^2$ of secure land and over 10,000 km$^2$ of potential habitat; Ocala NF contained 2,223 km$^2$ of public land habitat and 8,935 km$^2$ of overall habitat; Okefenokee NWR contained 2,532 km$^2$ of occupied public land habitat, 5,872 km$^2$ of overall occupied habitat, and 4,395 km$^2$ of potentially occupied habitat; and Big Cypress National Preserve contained 2,700 km$^2$ of public land habitat (both occupied and potential) and 2,700 km$^2$ of overall occupied habitat.  *See* 63 Fed. Reg. at 67,615-16.

foreseeable future. While development is encroaching on private land habitat in Apalachicola, the rate of development is so slow that the amount of public land acquisition occurring since 1992 is greater than the amount of habitat lost to private development. According to the status report, acquisition projects in the last decade have increased public land holdings by 725 $km^2$ and existing projects are expected to add another 500 $km^2$. Between 1992 and 1998, land acquisitions by state and federal authorities increased the amount of overall public land habitat in Florida by more than 1,500 $km^2$. Because a great deal of this acquisition occurred in Apalachicola, Ocala, Okefenokee and Big Cypress, the Agency determined that these habitats were secure and contained sufficient buffer zones to protect against the threat to the black bear from private development. *See* AR 203, at 11. Moreover, this finding is consistent with the Agency's original 1992 proposed rule which indicated that increased public land acquisition could provide sufficient habitat to alleviate the threat to the black bear. *See* 56 Fed. Reg. at 598.

As for the issue of habitat isolation, the Wildlife Service reasonably concluded that this phenomenon does not pose as serious a threat to the black bear as it did in 1992. In its final ruling, the Wildlife Service cited evidence that bear populations exceeding 200 can maintain a level of genetic variation that does not threaten the population's likelihood of survival. *See* 63 Fed. Reg. at 67,617; AR 203 at 11-12. Thus, because of higher population estimates, the linkages between habitats that the Wildlife Service determined were important for the bear's survival in 1992 may not be as necessary for survival in 1998.

With respect to the danger to the black bear posed by hunting, the Wildlife Service pointed out that in 1994, Florida eliminated all open hunting seasons of the black bear. *See* 63 Fed. Reg. at 67,616. The Agency concluded that the elimination of the open hunting season

17

yielded a positive effect on black bear populations in Apalachicola, where there was formerly a

nine day hunting season, and in Baker and Columbia counties near Okefenokee NWR, where

there was formerly a fifty-eight day hunting season on private land. While Georgia still allows a

six day hunt near Okefenokee NWR, studies of bear takes indicated that the hunt was unlikely to

adversely affect black bear populations in the area. The status report indicated that the

Okefenokee hunt also provided an added benefit to the black bear by discouraging development

of private land habitat in the area because local landowners profit from the hunt and have an

interest in making their land hospitable to black bears. Additionally, new evidence in the

Wildlife Service's status report indicated that the impact of illegal poaching is minimal.

Finally, the Agency was justified in concluding that the effects of roadkill do not threaten

the black bear. According to data cited in the status report, roadkill levels for the black bear do

not differ significantly from those of other bear populations. *See* 63 Fed. Reg. at 67,617. Also,

the report explained that the rise in black bear populations from 1992 to 1998 increased the

bear's ability to overcome the effects of roadkill. Furthermore, the status report suggested that

roadkill rates in Okefenokee and Apalachicola were low due to limited private development, and

that roadkill rates in Ocala and Big Cypress would probably not increase significantly because

those habitats are composed primarily of public land, which has comparatively limited

automobile traffic. *See id.* The Wildlife Service also concluded that the construction of wildlife

underpasses in Ocala that allow for black bears to travel safely beneath state highways may also

reduce the amount of roadkill in that area. *See id.*

In sum, based upon the new data it gathered concerning the effects of habitat destruction,

hunting, and roadkill, the Wildlife Service reasonably concluded that these phenomena would not

likely result in the black bear becoming endangered in the foreseeable future.

## C.    Inadequacy of Existing Regulatory Mechanisms

Defenders contend that the Wildlife Service's decision was arbitrary and capricious because the Agency incorrectly determined that existing regulatory mechanisms are adequate to protect the black bear. According to Defenders, the Wildlife Service erroneously relied on possible future regulations to justify its decision, rather than relying solely on existing regulatory mechanisms. Defenders list several regulations cited by the Agency in its final rule that they allege are not "existing." For example, Defenders note that the Wildlife Service relied on the possibility of future land management activities that the Agency "expect[s] to be compatible with the continued existence of bears at current levels," 63 Fed. Reg. at 67,618, as well as on state and federal "authority and responsibility for management of the Florida black bear." *Id.* at 67,617. Defenders argue that because there is no guarantee that such regulations will be enacted, or that any future government action will take place, it was impermissible for the Wildlife Service to rely on the possibility of such future action in deciding not to list the black bear. The Wildlife Service responds that the regulations it cites qualify as existing regulatory mechanisms and that it was entitled to rely on them. The Wildlife Service's position on this issue cannot be sustained.

Several courts have examined the meaning of the phrase "existing regulatory mechanisms" in the Endangered Species Act and have determined that the plain language of the statute forbids the Wildlife Service from relying on speculative future regulations in making determinations regarding listing. *See, e.g., Biodiversity Legal Found. v. Babbitt*, 943 F. Supp. 23, 26 (D.D.C. 1996); *Oregon Nat. Res. Council v. Daley*, 6 F. Supp. 2d 1139, 1154 (D. Or.

1998) ("[A]ccording to the plain language of the ESA, the Secretary may not rely on plans for future actions to reduce threats and protect a species as a basis for deciding that listing is not currently warranted."). Accordingly, the Wildlife Service cannot rely on speculative future actions to justify its decisions because there is no assurance that those actions will in fact be carried out. *See, e.g., Biodiversity Legal Found.*, 943 F. Supp. at 26 ("[The agency] cannot use promises of proposed future actions as an excuse for not making a determination based on the existing record."); *see also Save Our Springs v. Babbitt*, 27 F. Supp. 2d 739, 744 (W.D. Tex. 1997).[5] The present tense of the statute and the uncertain nature of future regulations indicate that an agency's determination of whether to list a species must be based on the present status of the species and not on the assumption that future actions will suffice to protect a species' population. Thus, "existing regulatory mechanisms" are those that are being currently implemented and enforced, as opposed to regulations which might be enacted in the future, or current regulations authorizing future government action but which do not require that such action will take place.

To be sure the Wildlife Service's 1998 decision does mention several regulations that qualify as "existing regulatory mechanisms." The Agency cites new restrictions on hunting as a

---

[5] Some disagreement exists about whether agencies may rely on existing but voluntary measures being taken to protect a species. In *Oregon Natural Resources Council v. Daley*, the court held that voluntary actions cannot be considered existing regulatory mechanisms because without some method of enforcing compliance, "[v]oluntary actions, like those proposed in the future, are necessarily speculative." *Oregon Nat. Res. Council v. Daley*, 6 F. Supp. 2d 1139, 1155 (D. Or. 1998). The court in *Federation of Fly Fishers v. Daley*, however, disagreed with the reasoning in *Oregon Natural Resources Council*, and found that existing, concrete voluntary programs could be considered as part of an agency's decision-making process. *See Federation of Fly Fishers v. Daley*, 131 F. Supp. 2d 1158, 1168 n.4 (N.D. Cal. 2000).

reason why hunting poses a lesser threat to the black bear than it did in 1992. *See* 63 Fed. Reg. at 67,616. The Agency's final rule also discusses ongoing land management programs, such as prescribed timber burning and replacement of certain forest stands, which the Agency believes would have the effect of maintaining the black bear's habitat. *See id.* at 67,616-17.

It is unclear from the record, however, whether other regulations relied upon by the Wildlife Service are currently being implemented. In its discussion of the adequacy of existing regulatory mechanisms, the Wildlife Service mentions that the states of Florida, Georgia and Alabama have authority and responsibility for the management of the black bear, but does not indicate that the states are actually taking any regulatory action to protect it. While those states may be authorized to take certain actions, those actions cannot be considered existing regulatory mechanisms unless the states currently are carrying them out. The Agency also cites the USDA Forest Service Land and Resource Management Plan for National Forests in Florida, which it "expect[s] to be compatible with the continued maintenance of bears at current levels." *Id.* at 67,618. The rule, however, does not indicate whether the plan is being implemented, whether the plan requires government action, or whether the plan merely authorizes future government action. The Land and Resource Management Plan also allows for prescribed burning and timber management, but the Agency again fails to identify if those particular regulatory actions actually are being undertaken as a result of the plan.

It may be that federal and state agencies are carrying out regulatory actions pursuant to land management plans and their regulatory authority, but it is impossible for this court to determine, based on the existing record, what those regulatory activities are, and in what manner they are being implemented. The Wildlife Service must judge the viability of the black bear

21

based on threats to its existing status and therefore can rely only on regulatory actions currently in effect when making its decision. The Agency cannot rely on the possibility of action in the future to justify a determination that the black bear is not currently threatened.

The record also fails to clarify the extent to which the Agency relied on the possibility of future action, and examination of the 1998 final rule does not indicate whether the Agency would have found that the black bear was threatened if it had not considered the possibility of future regulatory actions. As a result, this case must be remanded to the Agency so that the Wildlife Service can examine only regulatory mechanisms which are currently being undertaken and enforced. Additionally, the Agency must indicate on the record the regulations upon which it bases its decision.

## IV. CONCLUSION

For the reasons set forth in this memorandum, each motion for summary judgment before the court is granted in part and denied in part. This case is remanded to the Wildlife Service to determine, in a manner consistent with this memorandum, whether the inadequacy of existing regulatory mechanisms warrants listing the black bear as a threatened species.

An appropriate order accompanies this memorandum.

Henry H. Kennedy, Jr.
United States District Judge

Dated: _12/13/01_

22