wildfire or a major hurricane. But with the relatively recent appearance of ORVs and explosion of ORV travelways on the landscape, scientists have not had time to study how ecosystems are responding. We don't know how long it will take for these landscapes to recover -- or whether recovery is even possible. But by assessing and interpreting the information that is available about the impacts of roads, road density and ORVs on ecological processes nationwide, and in Florida, we can begin to address these unknowns and encourage additional research.

On a regional scale, extensive off-trail ORV use can alter vegetation and disrupt hydrological processes, increasing risks of erosion, flooding and landslides. Schubert and Associates (1999) present an excellent literature review relating such ecological processes to ORV impacts.

## 1. HABITAT LOSS

The most direct impact of roads through natural areas is loss of the habitat they replace (McLellan and Shackleton 1988; Reed et al. 1996). The construction of a typical logging road sacrifices about 10 acres of habitat for each mile of road (Noss 1996). In a heavily roaded forest, this adds up to a substantial degree of "invisible" habitat loss.

### Soil Impacts

ORVs are particularly devastating to soil (Schubert and Associates 1999). Numerous impacts have been noted (see Webb et al.1978), including destabilization of the soil surface, fragmentation of the underground habitat, erosion and vegetation changes alongside ORV traisl. Soil type and moisture content are the primary factors affecting the nature and severity of these impacts.

Extensive ORV damage to plants also affects the soil. The removal of overlying vegetation can increase soil temperatures with consequences for soil fauna, soil fertility, nutrient cycling and hydrologic processes (Pica et al. 1998).

### *Erosion*

Studies have documented accelerated erosion on lands subject to ORV traffic (Florida Division of Recreation and Parks 2001; Knott 1978; Iverson et al. 1981; Webb and Wilshire 1983; Schubert and Associates 1999). Soils with a consistent fine texture are most vulnerable to recreation-related erosion, especially on slopes where litter and vegetation have been removed (Leung and Marion 1996).

ORVs alter soil structure and topography in ways that leads to overall depletion of the soil resource through oxidation and erosion (Yamataki 1994). They encourage sheet, rill and gully erosion, particularly on soils that are highly organic, loose and sandy or moist or wet (Kuss et al. 1990).

**Photo:Ocala National Forest severe root exposure on an ORV trail south of Lake Delancy, photo by Marcie Clutter**

Plaintiff's Exhibit 6D

P53

Once recreational activities initiate erosion, wind and water act as the agents that carry on the process (Hammitt and Cole 1987). Water is the primary agent of soil erosion in most situations, although wind erosion is an important factor on peaty or sandy soils (Hammitt and Cole 1987). Collins (personal communication) feels that both wind and water erosion are potentially problematic where ORVs have disturbed the groundcover of scrub habitats such as those in Ocala National Forest.

Dunes denuded by ORVs in Topsail Hill Preserve State Park in Destin, Florida, were essentially leveled by Hurricane Opal. Untouched vegetated areas withstood the storm much better leading park officials to attribute much of the hurricane's devastation to vegetation removal by ORV traffic, reports Eric Johnson of the Bureau of Natural and Cultural Resources (personal communication).

Erosion, especially gully erosion of trails, typically continues even after recreational use is discontinued. Unused abandoned roads also continue to capture and divert both surface and subsurface flows (Zeedyk 1996; Noss 1994).

*Compaction*

ORVs are likely to compact the soil wherever they are driven (Raghavan et al. 1976; Webb 1983). The weight and vibration of ORVs give them much greater soil compaction potential than nonmotorized forms of recreation, says hydric soils specialist Victor Carlisle (personal communication). Compaction is seldom detected more than five to six inches beneath the surface on other types of recreation sites (LaPage 1962), but researchers have found soil compaction extending more than three feet down on sites used by ORVs (Wilshire et al. 1978). Airboats compact the soil less than other ORVs whose weight bears directly on the ground, but Yamataki (1994) noted that they do produce compaction effects through hull and water pressure.

Compaction typically causes the soil to become less porous, which decreases its permeability to water and air. The hydrologically critical differences can be dramatic. Wilshire et al. (1978) reported infiltration rates almost 40 times slower on motorcycle tracks than on adjacent undisturbed ground at a California ORV area..

Soil compaction has even more far-reaching ecological implications (Hammitt and Cole 1987; Ponomarenko personal communication; Coleman et al. 1992; Rutherford and Scott 1979; Webb et al. 1978). These include:
*   lower soil moisture-holding capacity and increased vulnerability to drought stress;
*   changes in soil temperatures that can contribute to plant stress ;
*   decreased seepage and increased surface water flow volumes and velocities;
*   interference with root penetration;
*   limits to subsurface animal movements;
*   inhibited seed germination;
*   alterations to soil chemical balances;
*   toxin accumulation;
*   habitat degradation for macrofauna critical to the food chain;
*   microfauna damage which can affect soil fertility.

Loamy soils with a wide range of particle sizes, low organic content and moderate to high

moisture level are the most vulnerable to compaction, particularly where vegetation and litter have been removed (Leung and Marion 1996). Hammitt and Cole (1987) explain that dry sandy soils cannot be compacted to a very great degree because the particles are too large to be packed together very closely. However, on such soils, ORV traffic may reduce soil pore size so that the soil is actually able to hold more water, rather than less (Liddle and Grieg-Smith 1975). This could make scrubs and sandhills vulnerable to invasion by mesic plant species. Loosened surface sand may also function as mulch to conserve water in the deeper layers of the soil (Ponomarenko personal communication).

Greacen and Sands (1980) calculated that it would take more than 50 years for the sandy soils of Australian pine forests to recover from compaction. Soil genesis processes and long-term ORV impacts have not been studied in Florida, so there is no way to know how long compaction effects will persist here (Carlisle personal communication; Collins personal communication). Root action and other biological processes would probably heal the effects of one or two ORVs traveling across a typical Florida upland site within a few months if there was no further ORV traffic (Carlisle personal communication). Although impacts would be minimal on scrub sands, sandhill soils might take decades to recover (Collins personal communication). Soil scientists Vic Carlisle and Mary Collins concur that damage to soft wetland soils such as those of the Apalachicola savannas would persist for a very long time.

*Destabilization*

Dry sandy soils such as those that dominate Ocala National Forest may not be particularly susceptible to compaction (Ponomarenko personal communication; Collins personal communication), but they are very vulnerable to displacement. ATV trails through the scrub often become steeply banked as the vehicles push sand to the outside of the curves (Marion County Audubon 2000). On hillsides, such loose soil can bury downslope vegetation. Stout (2001) reports that high sand mounds persist on the outside of scrub jeep road curves on the Lake McLeod Unit of the Lake Wales Ridge National Wildlife Refuge even though these trails have not been used to any extent for the past 10 years. Duever et al. (1981) reported that destabilization was more of a problem on wet sites in Big Cypress National Preserve. In some places, the substrate was still a loose slurry a year after experimental ORV runs.

*Rutting*

Off-road vehicle routes typically become heavily rutted with water pooling in or flowing through the ruts (Kuss et al. 1990). In the Big Cypress, Duever et al. (1981) observed that rutting was the greatest impact of ORVs on soils. Ruts were deepest where established ORV trails passed through swamps. Such trails were typically worn down to bedrock and filled with standing water.

Duever et al. (1986) found that the depth of the ruts on experimental plots decreased rapidly, but they persisted indefinitely where tire gouging had dug into and displaced the soil. Duever (2000) confirmed that "...if there is soil disturbance, there will be a long term impact." He explained that rutting injures the roots of the existing vegetation so that the original plants do not grow back vigorously. New vegetation becomes established in the troughs and on the ridges and tends to further stabilize them. He stressed that "This applies to all rutting, not just deep ruts."

**Photo: ORV rut (photographer unknown).**

Carr (2001) notes that "In seepage bogs and bayheads, even occasional ORV traffic can create ruts that affect hydrology and plant composition for years." The soils of the Apalachicola savannas appear to be particularly slow to heal (Traylor personal communication). Forest Service biologists speculate it might take 100 years for ORV ruts there to disappear (Ruhl, personal communication).

Clewell (2001) observes that the loose dry sand typical of scrub habitats is "subject to severe rutting after only a few passes by vehicles." Although scrub sands are not very prone to compaction, motorcycle ruts remain visible eight years after closure of a motocross area on a scrub site at Camp Blanding near Starke, Florida (Hall personal communication). Apalachicola National Forest horseback riders report that deep rutting by motorcycles leads to erosion that creates maintenance problems on horse trails (Noyes 2001).

## 2. HABITAT FRAGMENTATION

Numerous authors have addressed the insidious long-term ecological degradation resulting from habitat fragmentation (Askins 1994, Harris 1984; Soule 1986; Forman and Godron 1986; Forman 1995; Mader 1984; Saunders et al. 1991; Andrews 1990; Salisbury 1993; Reed et al. 1996; Bennett 1991; Zuidema et al. 1996; Wilcox and Murphy 1995, Wilcove 1988; Noss and Cooperrider 1994; Soule et al. 1992). Harris and Silva-Lopez (1992) point out that "Roads are perhaps North America's number-one fragmenting force." They explain that "Clearings such as logging roads…have the net effect of fragmenting otherwise expansive tracts of closed-canopy forest and facilitating colonization by common, weedy species."

User-created ORV trails have the same habitat fragmentation effects as planned roads do, but their greater density often causes worse cumulative impacts reports Forest Service botanist Guy Anglin (personal communication). The way these networks of roads crush and fragment the habitat for soil fauna is frequently overlooked, although it may have enormous ecological implications (Marwick personal communication; Ponomarenko (personal communication). Their comments are corroborated by further research by Harris (2001); Mahoney (1976) and Kuss et al. (1990).

### Barrier Effects

Bennett (1991) explains that there are at least three aspects of a road that can act as a barrier to animal movements: the bare surface of the roadway itself, the altered roadside habitat and the noises, emissions, movements and lights associated with traffic.

For various physical and psychological reasons, some rodents, reptiles, spiders, insects, snails and other sensitive species will not cross even narrow unpaved roads with light traffic (Noss 1996; Mader 1984; Swihart and Slade 1984; Merriam et al.1989; Mansergh and Scotts 1989; Baur and Baur 1990; Oxley et al. 1974; Stamps et al. 1987; Barnett et al. 1978; Bakowski and Kozakiewiez 1988; Mader et al. 1990; Gibbs 1998). In the Big Cypress, female bobcats rarely cross roads, and define their ranges by road boundaries (Foster and Humphrey, unpublished data reported in Hannah 1992). To such animals, a road effectively becomes a prison wall, and a network of roads can, in effect, place groups of animals in separate cells. This disrupts behavior and habitat-use patterns and leads to long-term effects on population dynamics and genetics (Trombulak and Frissell 2000; Andrews 1990; Soule et al 1992; Yanes et al. 1995; Vos and Chardon 1998; Wilkens 1982;

Shaffer 1981; Gilpin and Soule 1986).

This fragmentation has serious implications because scientists view extinction as a function of forest fragment size. Maehr (2001) explains that "We lose the wide-ranging critters as patch size declines." Such population effects may be significant even for species that are willing and able to cross roads to a limited extent.

Populations of amphibians and other animals that must migrate between breeding, foraging, and/or overwintering habitats seasonally may be particularly vulnerable to fragmentation impacts (Reh and Seitz 1990; Ashley and Robinson 1996). Differences in the responses of various species may be subtle. In Maine, deMaynadier and Hunter (2000) observed that forest roads apparently were barriers to salamanders but not to frogs.

It is important not to overlook the underground barrier imposed by a compacted roadbed. As Harris (2001) explains: "Sand skinks and *Amphiuma* simply are not going to burrow under a well developed and maintained road. Probably, not even a pocket gopher would do it often. The underground effects may very well prove to be the most insidious."

Greenberg et al. (1997) point out that roads with different types of surfaces could serve as selective filters for different scrub reptiles. Paved or clay roads function as barriers to sand-swimmers like Florida crowned snake, sand skink and mole skink but could serve as corridors for species that move above ground such as Florida scrub lizard or race runner.

Noss (1996) calls attention to the often overlooked long-term impacts of habitat fragmentation on vegetation: "To the extent that various plant species depend on road-averse animals for dispersal, roads fragment plant populations as well." This would apply to pollination as well as dispersal. The effects on species relatively dependent upon vegetative reproduction (like stoliniferous groundcovers) or on wind-dispersal over short distances might be even greater.

Fragmentation can also affect the spread of diseases. In Utah, Mackelprang et al. (2001) found three times the expected incidence of *Hantavirus* in rodent populations living in habitat fragmented by ORV trails. They hypothesize that mice forced into small habitat patches fought with each other more often and hence had more opportunities to spread the infection through blood and saliva. The researchers believe that this increased incidence of the virus in rodents presents increased risk of human infection. (The *Hantavirus* is found in Florida rodents.)

**Edge Effects**

Trombulak and Frissell (2000) identified eight characteristics of the physical environment that are altered along a road corridor: soil density, temperature, soil moisture, light, dust, surfacewater flow, runoff and sedimentation. Related ecological processes are often affected along an "edge" far wider than the actual roadway (Harris 1988; Saunders et al. 1991; Murcia 1995; Reed et al. 1996; Noss and Cooperrider 1994; Williamson 1975; Wilcove et al. 1986).

In terms of ecological function, a forest edge is not just the outer line of trees, but a zone of influence extending a much greater distance into the forest. Obvious microclimatic effects and vulnerability of trees to wind damage may extend two to three tree heights back from

P57

the visible edge (Noss 1996; Grace 1977; Moen 1974; Lovejoy et al. 1986). Wind profile alterations can be detected much further. The resulting "edge effects" ecologists refer to include vulnerability to predators and invasion by exotic species and reductions in soil richness and invertebrate populations.

Predators entering from road corridors may affect wildlife far into the forest (Whitcomb et al. 1981; Rich et al. 1994; Yahner 1988; Reese and Ratti 1988). Wilcove (1985) documented that increased nest predation by edge opportunists such as raccoons and opossums can reach up to 600 meters into a natural area. Cowbirds may parasitize nests up to 100 meters into the forest (Brittingham and Temple 1983). Increased herbivory by edge species such as white-tailed deer can dramatically alter vegetation a surprising distance from a road (Alverson et al. 1988), though Bratton's 1978 work in the southern Appalachians suggests that the greatest impacts would be within one kilometer of the road. Findlay and Bourdages (2000) detected long-term effects on herpetofauna one to two kilometers away from wetlands impacted by roads.

Haskell (2000) found leaf litter reduction and decreases in soil macrofauna richness and abundance extending 200 meters from logging roads in Cherokee National Forest. These impacts are particularly disturbing because soil macroinvertebrates are critical to many ecological processes (Coleman and Crossley 1996; Springett 1976; Anderson et al. 1985; Ingham et al. 1986) and important in the diets of many birds, amphibians and other animals. Haskell points out that birds for whom this food source is particularly significant include black-and-white warblers, worm-eating warblers, ovenbirds, wood thrushes and Kentucky warblers (Nicholson 1997), all of which are declining species (Sauer et al. 1997). He cites corroborating studies (Burke and Nol 1998; Rich et al. 1994) and concludes that "...reduction in bird abundance may be caused partly by reduced food availability near roads."

Noss (1996) acknowledges that "A narrow logging road with no maintained verge would not be expected to generate substantial edge effects, particularly if surrounded by a tall forest canopy." He points out that serious edge effects, however, come into play as soon as roads are widened or "improved" to the extent that wind and sunlight are admitted into the forest. Edge processes are certainly more dramatic along wider roads, but Haskell's (2000) data suggest that even narrow roads may have far-reaching underground effects.

An extensive review of the edge effect literature shows that "the most intense effects associated with roads occur within 100 meters of the road and most other effects are into a n attenuated by 300 meters" but that there still could be substantive effects up to 1,000 meters into a natural area (Hoctor 2000). Hannah (1992) estimated that edge effects penetrate as far as 600 meters into Ocala National Forest habitats. Noting the abundance of crows, bluejays and other edge species, he comments that "In spite of the lack of edge effect research on wildlife in scrub and longleaf pine communities, there is considerable reason to believe that edge effects are at work in Ocala National Forest."

Noss (1988) and Harris and McElveen (1981) described edge effects on bird populations in Florida forests, noting that edge effects favor common species and others adapted to human disturbance over rare species and those that require forest interior habitat. Hamel et al. (1982) classified the following southeastern birds as vulnerable interior species: sharp-shinned and Cooper's hawks (potential north Florida breeders), hairy woodpecker (a central

to north Florida breeder), Acadian flycatcher (a central to north Florida breeder), winter wren (Florida breeder), wood thrush (a north Florida breeder), hermit thrush, Swainson's thrush, veery, prothonotary warbler (a north to central Florida breeder), worm-eating warbler, black-throated blue warbler, ovenbird, Louisiana waterthrush, Kentucky warbler and hooded warbler (a north Florida breeder). Cox (1988) identified the black-and-white warbler, ovenbird, parula warbler (Florida breeder) and summer tanager (Florida breeder) as species restricted to forest interior habitats in northeast Florida. Temple (1986) included the blue-gray gnatcatcher, redstart and yellow-throated vireo in his list of interior species (all Florida breeders).

University of Florida doctoral candidate and landscape ecologist Dan Smith (1995) points out that "Roads and development within and around the [Ocala National] forest threaten area-sensitive interior species and those species requiring large uninterrupted territories." Smith et al. (1996) categorized the Florida panther, red-cockaded woodpecker and Florida scrub jay as among these "interior specialists sensitive to edge and ecotones." Hannah (1992) expressed particular concern for hairy woodpeckers in the Ocala, citing Whitcomb et al.'s 1981 categorization of this bird as an interior species and noting that they breed in sand pine and/or longleaf pine forests.

Gates and Mosher (1981) and Kroodsma (1984) measured edge effects on breeding birds. Numerous studies have documented increased nest predation and parasitism along forest edges (Wilcove 1985; Laudenslayer 1986; Andren and Angelstam 1988). Hannah (1992) noted that raccoons, opossums, gray foxes, bobcats and skunks are probably causing increased nest predation near roads in Ocala National Forest. Roads have also been linked to increased predation by dogs and cats (May and Norton 1996; Bennett 1990). Gates and Gysel (1978) explained how edges can function as "ecological traps" by attracting nesting birds whose young then fall victim to predators, preventing enough successful reproduction to sustain populations.

Nest parasitism by brown-headed cowbirds that have moved through the landscape along road verges has had serious impacts on migratory songbirds (Wilcove 1985; Brittingham and Temple 1983; Noss 1996; Evans and Gates 1997), including implication in the demise of the Bachman's warbler (Harris 1988). Brown-headed cowbirds have already moved into Ocala National Forest and the population appears to be increasing (Harris and Silva-Lopez 1992). The more tropical shiny cowbird is expanding its range northward and similarly threatening Florida's avifauna (Wiley 1988; Harris and Silva-Lopez 1992).

The net result is that edges tend to function as "...terminators for specialist species, but refugia for generalist species" (Hannson 2000).

## Avoidance Zones and Displacement

Many animals avoid areas near roads (Harris 2001; Tracy 1977; Van Der Zande 1980; Frederick 1991). These are most likely to be individuals from populations subject to hunting (whether legal or not) that have learned that people who ride in cars sometimes carry guns (Noss 1996). Batcheler (1968) found that deer displaced from preferred habitat by human activity became nocturnal, lost weight, reproduced poorly and failed to return after the disturbance ceased. Black bears also avoid roads in areas open to hunting (Brody and Pelton 1989; Reiffenberger 1974; Hamilton 1978; Brown 1980; Villarrubia 1982). Preliminary research shows that Florida black bear in the Chassahowitzka population north

P59

of Tampa avoid the first 304.8 meters from paved or unpaved road edges, reports University of Kentucky masters candidate Mike Orlando (personal communication).

Mace and Manley (1993) found that grizzly bears tended to avoid areas within 100 meters of a road and preferred habitat 500 meters or more away from one. This supported findings by Kasworm and Manley (1988), who observed that areas within 500 meters of a road were used less than statistically expected, whereas areas over 1,000 meters away were used more. They also confirmed that grizzlies used areas near closed roads more than they did areas near open roads and were more frequently found in areas reserved for nonmotorized use than in places where vehicles were allowed. In a subsequent study (Kasworm and Manley 1991), they found that grizzly bears used habitat within 914 meters from an open road, or 122 meters from a trail, less than would be expected. McLellan and Shackleton (1988) calculated that grizzlies tended to avoid habitat within 100 meters of a road and preferred areas 250 to1,000 meters away. Ruediger (1996) suggested a rule of thumb for estimating generic habitat loss due to avoidance or displacement: one kilometer on either side of the road in a forested landscape road or three kilometers in an open area.

The amount of habitat abandoned through avoidance is probably more significant than is commonly recognized. As Larkin (1996) points out, "Because of the continuing exponential growth of human numbers and shrinking of relatively undisturbed habitat for wildlife, exclusion of wildlife from suitable habitat via disturbance is often equivalent to human-caused mortality."

**Firebreak Effects**
Both designated roads and trails and "outlaw" ORV tracks can serve as firebreaks and impede the prescribed burning needed for habitat management and wildfire prevention in pinelands and savannas (Anglin personal communication). In Ocala National Forest, ORV-created breaks in the wiregrass groundcover interfere with sandhill burns (Lowery personal communication; DeLotelle personal communication; Marion County Audubon 2000), as do even minor trails in the light groundcover on the sandhills at Archbold Biological Station (Deyrup personal communication). This problem has also been noted in a number of other Florida natural areas (Small personal communication; Hardin personal communication; Clewell 2001). On the Potts Preserve, Southwest Florida Wildlife Management District land managers have had problems with airboat-created firebreaks preventing normal fire spread from marshes into scrub islands (Barnwell personal communication).

According to the National Park Service (2000), prescribed burning teams usually consider the firebreak effect of trails and attempt to use multiple ignition points to compensate for it. How trails affect the behavior of natural fires has not been studied, but land managers have observed that multiple travelways negatively influence the spread of low intensity fires.

**Channelization**
Roads not only channel the movement of vehicles, but also of dispersing animals and plant propagules. Numerous organisms move along roadways (Wegner and Merriam 1979; Forman and Godron 1986; Verkaar 1988; Harris and Gallagher 1989). Pocket gophers, meadow voles, prairie dogs and other rodents have been documented to extend their ranges along roadsides (Noss 1996; Huey (1941); Adams and Geiss 1981). Anderson and Tiebout (1993) pointed out that reptiles might use low-traffic roadways to move from one patch of open scrub habitat to another. Vermuelen (1995) discussed how road verges serve as

corridors for certain beetles. Florida black bear and panther use travelways as movement corridors making them more vulnerable to ORV facilitated poaching and habituation to humans.

The use of minor roads as hunting lanes by predators has been shown to dramatically increase predation rates in some situations (Harris 2001). Several observers have noted predators such as crows and broad-winged hawks focusing on amphibian prey along linear right-of-ways (de Maynadier and Hunter 2000; Langston 1989; Knight and Kawashima 1993).

## 3. HABITAT DEGRADATION

### Hydrological Impacts

ORV use can also disrupt hydrological regimes (Adamus and Stockwell 1983). In the Big Cypress, Duever et al. (1981) found that water flowed two to four times faster in ORV trails than in the surrounding wetland and that water continued to flow in some trails after overland flow had ceased.

Pernas et al. (1995) found that surfacewater flow always followed airboat trails, even when they were not oriented parallel to the general direction of surface flow. Flow rates in these trails averaged about five times faster than those in the adjacent marsh. Airboats have changed hydrological patterns in Lake Tsala in Potts Preserve by running on dry marshes and thus displacing soil and creating erosion channels (Barnwell personal communication).

Duever et al. (1986) hypothesized that deeply rutted ORV trails oriented parallel to the direction of overland flow could drain water from a nearby wetland and shorten the local hydroperiod. Such processes may have regional hydrological implications in the Everglades (Lodge 1994).

Ruts can also redirect both surface and subsurface flow and alter the hydrology of seepage wetlands (Moler personal communication; Clewell 1985; Wunderlin 1982; Yarlett 1996; Kale and Maehr 1990; Carr 2001; Hardin personal communication; Stoeckeler 1965; Darnell 1976). Drainage and erosion resulting from such impacts have been observed in Apalachicola National Forest (Traylor personal communication; Anglin personal communication) as well as in similar pitcher plant habitats on Tar Kiln Bayou State Preserve near Pensacola (Johnson personal communication), on Lake Wales Ridge and Blackwater River State Forests (Hardin personal communication) and on other southern national forests (Carr 2001).

ORV damage to a pitcher plant bog on a hillside seepage site on Angelina National Forest in east Texas led to such damaging erosion that the Forest Service had to resort to sandbagging to prevent the bog from actually washing away (McRoberts et al. 1999). Extensive ecological restoration work was required on both this bog and another ORV-impacted Angelina seepage area (McRoberts 2000).

### Pollution

The virtually unregulated use of ORVs in national forests fails to safeguard thesepublic lands from the astonishing amounts of water and air pollution that threaten forest resources, including wildlife and forest users.

P61

*Air Quality Impacts*

Schubert and Associates (1999) review the ways in which a variety of vehicles contribute to air pollution and related impacts. They emphasize that many types of ORVs release far greater quantities of pollutants than do vehicles not intended for off-road use. Forest Service researchers have found that some types vent 25 to 30 percent of their oil and gas into the air unburned (Harrison 1976; The Wilderness Society 2000). The two-stroke engines used on many ATVs emit such toxins as nitrogen oxides, carbon monoxide, ozone, particulate matter, aldehydes, butadieness, benzenes and polycyclic aromatic hydrocarbons in concentrations far greater that those produced by automobiles (The Wilderness Society 2001). According to the California Air Resources Board (1976), motorized trailbikes and ATVs with two-and four-stroke engines produce 50 times as many smog-forming pollutants per mile as automobiles. U.S. Environmental Protection Agency (EPA) emission expert Alan Stout (1999) has pointed out that such ATVs emit over 4,000 times more carbon monoxide (His most recent data is posted at www.epa.gov/otaq/recveh.htm.). Under current laws, this means that people playing with these machines in the forest are permitted to introduce vastly more pollution into the atmosphere than commuters carpooling to work.

*Water Quality Impacts*

After reviewing the research on visitor impacts, Kuss et al. (1990) summarized that "... it would appear reasonable to assume that water resources will be impacted by ORVs under most field conditions." Parameters affected include 1) nutrients; 2) suspended sediments; 3) dissolved oxygen; 4) temperature; 5) flow; 6) pH; 7) fecal contamination; 8) dissolved solids; and 9) transparency ( Kuss et al.(1984). According to Hammitt and Cole (1987), wildland recreation impacts water quality primarily through nutrient enrichment, increased turbidity (suspended solids), reduced dissolved oxygen, and/or fecal contamination. They explain that water quality impacts are worse where temperatures are warm and water flows slowly and that recreational impacts such as the removal of streambank vegetation can increase water temperatures and thereby exacerbate the problem. Looking at ORV impacts on water quality in the Big Cypress, Duever et al. (1986) observed localized changes in water temperature and salinity, chemical pollution and increased sedimentation and turbidity, which decreased sunlight penetration and thereby decreased primary productivity of aquatic vegetation.

Use of ORV trails near water bodies causes increased sedimentation (Kuss et al. 1990). ORVs particularly disturb streambanks and bottom sediments when they cross streams, but these impacts are generally not that significant where moderate numbers of vehicles are using a limited number of defined crossings (Hammitt and Cole 1987). Mudbogging activities and numerous and/or heavily used crossings spread up and down a stream cause more damaging impacts.

The resulting concentrations of suspended sediments can kill aquatic organisms and profoundly impact aquatic systems (Newcombe and Jensen 1996). U.S. Geological Survey's Noel Burkhead expresses great concern for ORV-induced sedimentation impacts (personal communication) and explains that "excessive sedimentation destroys habitats by reducing habitat complexity and diversity" which similarly decreases fish diversity (Burkhead et al. 1997). Thus, "faunal decline caused by sedimentation diminishes trophic web complexity and the efficiency of nutrient cycling within the aquatic community." He cites supporting research by Ellis (1936), Cordone and Kelley (1961), Chutter (1969), Brusven and Prather (1974), Fuller (1974) and others.

Activities that stir up bottom sediments may release concentrations of phosphorus and other pollutants, particularly where oil and/or detergents have found their way into the sediments (Kuss et al. 1984). This increased nutrient load can be washed downstream where it can increase eutrophication of lakes. All these processes, of course, have even worse impacts on still, confined pond waters than they do on moving streams.

Biologists netted ponds in the Crawfordville area of Apalachicola National Forest and found far fewer fish species than would otherwise be expected. They attributed this to ORVs stirring up the mud (Ruhl personal communication). Bruce and Ryan Means (2001) suspect that more toxic pollutants may also be involved in many such situations. They comment that "Vehicular activity in temporary ponds often leads to pollution from oil, hydraulic fluids and gasoline that leaks from cars' motors and crankcases into the water." They also note there may be spills of antifreeze and other vehicle cooling system liquids, a potentially lethal problem for pond-breeding amphibians.

In areas with extensive heavily used ORV trail networks, sedimentation effects may influence entire watersheds (Kuss et al. 1990). Beardsley (1995) pointed out how the cumulative effects of localized water quality changes could result in regional impacts in south Florida. He described how vegetation damage from ORV use could inhibit nutrient uptake and interfere with filtering effects and thereby affect ecological processes over broad geographic areas. This level of damage is found in the Big Cypress National Preserve with potential implications for Everglades restoration.

# 6. SPOILING IT FOR OTHERS:
# THE AESTHETIC AND ECONOMIC IMPACTS OF ROADS AND ORVS

In addition to disrupting wildlife and ecosystems, ORVs seriously disturb many of the people who visit natural areas (Florida Division of Recreation and Parks 2001; McCoy and Moeller 1976; Indiana Department of Natural Resources 1972; Badaracco 1976; Schubert & Associates 1999). "Direct encounters with ORV machines simply are not compatible with the quality of outdoor experience being sought by a majority of Americans (Sheridan 1979). " Discussions with "rockhounds, birders, hikers, hunters, botanists, biology classes and similar visitors have pointed up the basic incompatibility of ORV use with nearly any other type of activity (Weinstein 1978)."

Noise is one of the major reasons why ORV use is incompatible with other types of recreation. In a densely forested setting, the noise from the average motorcycle is audible to the human ear 7,000 feet away (Harrison 1974). In an open environment, it may be detectable at two to three times that distance (Badaracco 1978 in Sheridan 1979). Hence one motorcyclist can disrupt the serenity of hundreds of square miles of wildlands in the course of a day, whereas dozens hikers or birdwatchers could be unaware of one another within the same area.

P63

Sheridan (1979) explains that noise characteristic of ORVs makes even responsible ORV users an aggravation to almost everyone else: "...silence is a resource. The sounds which man typically associates with the pristine natural environments are perceived as solitude. ... The noise of an ORV punctures that solitude."

*SIDEBAR*

*The ORV Takeover*

*Noisier, more consumptive, and less contemplative recreational activities such as ORV operation tend to drive out quieter, less consumptive, and more contemplative uses (Badaracco 1978 in Sheridan 1979). Badaracco (1978) describes a disturbing progression of ORV dominance over other uses that he calls "ISD" (Impair, Suppress, Displace). He explains that ORVs tend to first impair other activities, then suppress, then displace them, thereby shrinking the amount of land available for non-ORV recreation. He points out that "The irony of the ISD syndrome is that administrators and managers tend to measure recreational demand on the basis of current participation rates. ...Thus the administrator may allocate additional opportunities to a group which has suppressed or displaced a former traditional group." Such processes can "...change the character of outdoor recreation despite the intense feelings of a broader public" (Badaracco 1978 in Sheridan 1979). This is exactly what is now happening on the Florida national forests.*

*END*

*QUOTES TO USE THROUGHOUT*

"It ruins my experience of outdoor solitude when I encounter those horrible machines."
--Marcie Clutter, Florida Trail Association

" My wife and I no longer enjoy the Ocala National Forest. We have largely stopped going there because we were discouraged by all the ORV damage we saw or constant interruption or noise by ORVs. If we camp the Ocala, it's in wilderness areas as far away as possible from ORVers. Outside of wilderness areas it's hard to enjoy the Ocala."
-Randy Cullom, hiker and camper

Off-road vehicle users are a highly vocal, aggressive and influential minority (Pica et al. 1998; Schubert and Associates 1999, citing data from the Recreation Roundtable, a project supported by ORV interests). However, even if the total number of ORV users increases over the coming years as predicted (Florida Division of Recreation and Parks 2001), ORVers represent a relatively small percentage of forest users. But if current trends and policies continue, they will continue to ruin the outdoor experience for many other users who seek peace and quiet in nature.

**Hikers and Campers**

Hikers and campers are often annoyed by ORVs and sometimes very emotionally so -- especially when they encounter them in otherwise wild and remote places. Horror stories of noisy motorcycles and ATVs racing through campsites abound. When this sort of thing goes on late into the night, campers become increasingly irate. An Ocala National Forest

hiker succinctly states the usual reactionAlthough noise and aesthetic affronts are the most common complaints, hikers' concerns include resource impacts, trail damage, safety and crime risk.

The Florida Trail Association (FTA) has had problems with ATVs using their hiking-only trails in Ocala National Forest, reports FTA president Dick Schuler (personal communication). Hikers seldom report close encounters with ORVs, but frequently complain that ATVs have loosened the trail tread and banked the edges. Not only is walking in the resulting deep sand unduly tiring, but the sand banks degrade the natural aesthetic and ecological qualities of the trail verge. FTA has tried to curb ORV use of the Florida Trail by putting up barriers at various access points, but the ORV operators just tear them down or find a way around them (Marion County Audubon 2000; Clutter 2001). FTA has mapped Ocala National Forest hiking trail sections subject to ORV damage, and Marion County Audubon (2000) has photographed some of them.

**PHOTO: Ocala National Forest Florida National Scenic Trail widening and scouring by ORV use. 6/28/00 Photo by Marcie Clutter**

Marcie Clutter (2001) describes how the Ocala National Forest hiking experience has changed: "... one of my most memorable experiences backpacking was to hike from Lake Delancy to Juniper Prairie. The beauty and quietness... filled my soul...wet prairies that opened up like magic after hiking through dense hammocks of oak and sand pine...but starting around the year 1994/95 I noticed a great change in the forest and the Florida Trail. ORV tracks were beginning to run through the wet prairies, and the Florida Trail from Lake Delancy south was beginning to look like a speedway ...rutted with continued use of ORV tracks. In 1997, my husband and I backpacked from Salt Springs to Rodman Dam on the Florida Trail and what we saw and experienced on that hike made me decide to never backpack that section of trail again until some kind of control of ORV use could occur. We were subjected to ORV users racing up and down the Florida Trail from Grassy Pond to Lake Delancy. There were so many illegal ORV trails running off the trail that I couldn't begin to count them all. The ORV users threw up dirt and dust, polluted the air with their fumes and two-stoke engine whining, and completely ruined our experience... Two summers ago...I counted 20 crossovers of the Florida Trail by ORV trails in just one and a half miles walking south from Lake Delancy. What I saw was truly appalling. The ORV users have literally turned the Ocala Forest into a series of dusty roads. I saw pond after pond impacted by ORV use with ruts up to 20-inches deep. It is truly disheartening to see every habitat in the Ocala Forest impacted by these machines. All the reasons I loved to hike and birdwatch in the Ocala Forest, to gain serenity and peacefulness of spirit as I listened to and watched nature, are now gone...ruined by the noise and the hundreds of illegal ORV trails which have cut through the forest. I don't go to forests to look at roads made by machines. I go to the Ocala Forest to get away from the trappings of civilization, to watch animals and plants interact in a natural setting, to be away from the sound of machines and cars."

Sandra Kokernoot (2001), of the Putnam County Environmental Council complains that "The old section of the Florida National Scenic Trail, now known as the Penner Ponds trail, and the edges of the ponds have been seriously damaged over the last three years by ORVs. The Putnam County Environmental Council alerted the Forest Service about this problem three years ago, when the [public scoping] workshops were being held on the forest

P65

management plan. But, we were told to be patient; the problem would be addressed in the trail designation process. In the meantime the damage is tenfold."

## Wildlife Watchers

Those who visit the forests for nature study have objections similar to those voiced by hikers. Noise and wildlife disturbance are of even greater concern to this group, however, since ORVs directly interfere with their ability to see and hear the things they come to enjoy. These people also tend to be more aware of and more upset by evidence of resource abuse (Marion County Audubon 2000).

Ann Hodgson's (2001) comments to the Forest Service are typical. She complains about disturbance by ORV users "whose recreational objective seems to be to ride rapidly through the forest and manhandle their ORV over varied terrain. On numerous occasions, I have been involved in passive scientific study or recreation such as observing the endangered Florida scrub jay, studying native plants, wildlife observation or photography when an ORV has disrupted my activity."

Off-road vehicle transportation also facilitates the collection of rare plants, pillaging of archaeological sites, vandalizing of research areas and other raids on the resources that many visitors come to study and enjoy.

## Horseback Riders

An unexpected encounter with any type of ORV may frighten a horse and cause a serious accident. Most horseback riders therefore find it too nerve-wracking to ride in places where there is much ORV activity.

Generally speaking, those who do venture forth on horseback report few problems with hunters in 4WD vehicles in the backcountry. Most user conflict problems appear to relate to motorcycles and ATVs recklessly and inconsiderately operated in urban interface zones.

Motorcycles are exceptionally hazardous to horses because they tend to go fast and roar right past a horse without seeing the animal in time to slow down or exhibit trail courtesy. Apalachicola National Forest trail riders report seeing a number of dangerous runaways resulting from such incudents (Noyes 2001). The action of motorcycle tires also creates a washboard effect in the treadway that is out of sync with the footfall patterns of a horse's gait and make it likely to stumble. An Apalachicola National Forest horseback rider describes such a trail surface as "like a roller coaster--except the hills are 12 to 18-inches high) and they go on and on and on" (Noyes 2001).

Horseback riders also complain that ORV use of sandy Ocala National Forest trails leaves the trail surface so deep and loose that it is excessively tiring for horses (Wonser 2001).

## Mountain Bikers

Mountain bikers often object to ORV activity, particularly to the damage it does to trails. Motorcyclists and ATV users often take over trails designed for mountain biking. This leads to increased erosion and soil displacement which degrade the trail and make it more labor-intensive to maintain.

## Hunters

P66

Although some hunters use ORVs for transportation, surveys have documented that a large majority of hunters feel that ORV traffic in hunting areas degrades their recreational experience (The Wilderness Society 2001). There have been ongoing problems with conflicts between ORV users and still hunters in Ocala National Forest (Harr personal communication). The hunters want ORVs confined to specific areas so they know where they can hunt without being disturbed or having game flushed prematurely.

*Orlando Sentinel* writer Mike Archer (2002) interviewed hunters about the problems they encounter in Ocala National Forest. Fox hunter Paul Yates reported camping at Farles Prairie and losing a favorite dog to a hit and run by an ORV. Another hunter complaint is ORVs driven at night. "The noise makes it tough to sleep in camp and the constant pressure makes game nervous. The ORV drivers sometimes stay out until 3 or 4 A.M., come back to camp to sleep in the daytime, then fire up their ORVs again for another wild night in the woods," said Lake County native and lifelong hunter Robert Collins. "The loud racket keeps deer on edge all the time; there's no time for them to settle down. With all that noise, they're always moving."

Robin Lewis (2001) expressed the opinions of many hunters when he told the Forest Service that weekend ORV "thrill-riding…is not compatible with my use of the forest for passive uses such as wildlife observation, photography and active licensed fishing and hunting. Use of ORVs during hunting season by a licensed hunter to travel to a designated hunting area is the only kind of OHV/ORV use that should be allowed in the forest and should be one of the alternatives considered."

### Forest Neighbors

People who live in the residential areas adjacent to Florida's national forests or forest inholdings are also frequently disturbed by ORV activity. Ocala forest resident Debra Britt reports that "They run in and out of the forest all night long, throw their garbage (mostly alcohol containers) on our corner, and spin their wheels and tires when they leave FR 573 for SR 19 in the wee hours of the morning."

Guy Marwick, a resident of the west central Ocala near Church Lake Prairie, laments the loss what until 2001 was a 200-acre virgin prairie with a natural clear pool. Now it is "rutted a foot deep for almost 100 feet," he says . "It's churned to death, and the ORVers have been out here on weekend nights partying and chewing up the wetlands and keeping me up until 3 A.M.." Marwick has gotten no response to his repeated calls to the Forest Service, and only recently has the local sheriff looked into it.

**PHOTO: Ocala National Forest, Church Lake Prairie ORV damage. Photo by Guy Marwick**

### Economic impacts

ORV activity on the national forests can be costly to taxpayers who help subsidize the basic construction, maintenance and management of the required infrastructure and the restoration and repair of damaged lands and who pay the price for ecotourism opportunities lost because of degraded habitat. The Forest Service has already spent considerable resources repairing ORV damage to bogs in Angelina National Forest in Texas (McRoberts

P67

2000), and will have to spend an estimated $990,000 --$1,800 per acre -- to repair 550 miles of illegal trails on the Chattahoochee/Oconee National Forest in Georgia. The costs of similar repairs on the Florida national forests could be staggering.

Pineland expert Andy Clewell (2001), a past president of the Society for Ecological Restoration, is concerned about the enormous cost of restoring areas impacted by vehicular activity. He explains that ORV-damaged wiregrass groundcover is unlikely to recover without lengthy and costly ecological restoration effort. Clewell cites Kent et al. (2000) and goes on to explain the economic implications: "Dozens of ecological restoration projects are being conducted in Florida, some of them on federal lands at public expense. For example, large areas of longleaf pine-wiregrass ecosystem on sandhills are being restored at Eglin Air Force Base." He notes that "Little longleaf pine-wiregrass ecosystem remains in the Southeast, relative to what existed a century or more ago. Only a small portion of the remaining acreage can be considered ecologically healthy, and most of that acreage occurs on public lands. This acreage deserves protection and careful management. It would make no sense to condone harmful ecological impacts to intact parcels of this ecosystem on public lands. On the contrary, since public tax dollars are already dedicated to restoring this ecosystem on federal lands, the allowance of any land use that threatens the ecological health and integrity of this ecosystem would represent fiscal irresponsibility."

P68

## 8. IDLING AND STALLING:
## THE FOREST SERVICE RESPONSE

*[Boxed Quote]*
*"In the conflict between motorized and nonmotorized recreationists, both sides invoke what they feel are their fundamental rights. Nonmotorized recreationists, especially the ones who seek peace and quiet, demand freedom from these machines while motorized recreationists demand a place to enjoy their machines. But there is a third party involved in the conflict -- the land, specifically, the land which is held in trust for all U.S. citizens by our agent, the federal government. Of course, the land is silent. It cannot speak for itself. At the end of my research, I reached one inescapable conclusion: Too few federal land managers are effectively representing the interests of the land and the plants and creatures who live upon it."*

David Sheridan,
*Off-Road Vehicles on Public Lands*, a 1979 report for the
U.S. Council on Environmental Quality

Two Executive Orders (EO) govern ORV use on federal lands: EO 11644 signed by President Nixon in 1972 and EO 11989 signed by President Carter in 1977. These EOs not only empower, but required, land managers to immediately close areas where wildlife habitat, soil or cultural resources were suffering adverse effects from ORV use. Today "we know, based on the evidence, that the Forest Service has miserably failed to comply with the spirit or intent of the EO or of federal statues and regulations governing ORV management on federal lands. Off-road vehicles remain one of the most serious public land management issues facing the Forest Service and, without question, the problem has become substantially worse, not better, in the past two decades. Instead of attempting to address this expanding scourge, the Forest Service continues to largely ignore the problems posed by virtually uncontrolled and expanding ORV use on National Forests ( Schubert and Associates 1999).

The minority group of ORV enthusiasts and the vehicle manufacturers who support their protests would like us to believe that limiting ORV access to public lands is some kind of land-grab ploy devised by environmental extremists. The truth is preventing degradation by rampaging vehicles has long been a concern of Americans of all poitical stripes who love the land. As noted conservative Barry Goldwater put it in 1973, "I hope there is some way we could outlaw all off-road vehicles, including snowmobiles, motorcycles, etc., which are doing more damage to our forests and deserts than anything man ever created. I don't think the Forest Service should encourage use of these vehicles by even suggesting areas they can travel in." The even harder truth is that despite federal mandates and the adoption of science-based, long-range adaptive management plans devised for each individual forest, the Forest Service has failed to address the problem of ORVs and roads in any meaningful way.

### Revised Land and Resource Management Plan Procedures
Since 1976, national forests have been required to maintain forest plans and update them every 10 to 15 years. In 1999, the Forest Service revised the 1986 plan for the Florida national forests. The resulting *Revised Land and Resource Management Plan for the National Forests in Florida* is intended as "a guide for the overall management of National

P69

Forests in Florida for the next decade."

To develop this plan, the Forest Service first obtained a broad range of scientific information and public input, then chose "Alternative E," an overall management strategy emphasizing "adaptive management in restoring and maintaining native ecosystems, while providing for balanced human use." This is a science-driven approach requires research and monitoring to "test predictions and assumptions in management plans" and the use of the resulting information to improve the plans (Forest Service 1999)."

## Corruption of "Restricted Areas"

The 1999 plan for the Florida forests changed access for motorized vehicles and bicycles in two ways. First, cross-country" travel on land with no roads or trails is now prohibited anywhere in the forests. Second, travel within "Restricted Areas" is limited to designated roads and trails. Restricted Areas were also expanded on all three national forests (Richard Shelfer personal communication). Outside of Restricted Areas, ORV travel is still permitted on any road, trail or travelway currently in use.

According to the draft plan devised in 1997, "A system of motorized use trails will be identified, marked and maintained for motorized recreation. User conflicts would be decreased by designated trails for specific types of use. Hikers, bicyclists and horseback riders would travel cross-country and use old roads and trails. This would have a positive effect by reducing the maze of trails across the woods and providing trails designed to meet user needs. Negative effects would include an overall loss of riding area, reduced sense of freedom from exploration, and heavy or concentrated uses in some areas" (Forest Service1997). However, in the final plan issued in 1999 this goal is applied only to Restricted Areas, not forest-wide, thus undermining the original intent of a forest-wide reduction in ORV access.

This proposed system of designated motorized trails and marked, numbered roads grandfathers in thousands of miles of non-ORV designated trails, woods roads and travelways that ORVs could access and perpetuates landscape level ORV impacts by allowing ORV access to thousands of miles of travelways in Restricted Areas. It misses the point of "Restricted Area" designation: to protect ecologically sensitive areas from unlicensed vehicles such as ORVs. Travel within "Restricted Areas," which by definition was limited to the use of licensed motor vehicles on numbered forest roads, would include ORVs on of woods travelways designated as permanent ORV access routes.

## The Access Designation Process

To identify the roads and trails to be maintained in Restricted Areas, the 1999 plan authorized the Forest Service to conduct a two-year "Access Designation Process" through which consensus decisions were to be reached through a series of workshops involving groups nd individuals representing recreationists, such as ORV users, as mountain bikers, hikers, horseback riders, and conservationists.

Environmental representatives on the working groups immediately recognized that the process was fundamentally flawed. The basic premise of grandfathering ORV-created trails through areas identified as unsuitable for motorized access was distressing. The workshops were focused on meeting recreation user group objectives and resolving conflicts among

them and did not seriously address the protection of biodiversity and ecological integrity. Conservationists and ecologists attempted to remind the Forest Service of the scientific and legal facts regarding the agency's responsibilities for the protection of ecological resources, but motorized vehicle interests were allowed to dominate the consensus process.

When it became evident that the Access Designation Process was not going to create a plan based on sound scientific and ecological information, the environmental representatives withdrew from the working groups for all three national forests, citing 1) flaws in the consensus process (poor facilitation and changing the rules of consensus during the process to favor the ORV representatives); 2) the absence of sound scientific and ecological information in the development of an access plan; and 3) the Forest Service's failure to make a serious attempt to address broad natural resource issues during the working group process.

As a result, the working group access proposals for all three national forests recommended an extensive network of ORV trails, new ORV staging areas (parking lots) and a system of "open" woods roads that would seriously degrade the ecosystems. The proposal for Apalachicola National Forest calls for five new staging areas and nearly 500 miles of designated ORV trails, primarily in sensitive longleaf pine-wiregrass systems! These working group proposals are in direct conflict with the Forest Service's mandate to protect ecosystems and maintain biodiversity.

Under the working group proposals, thousands of miles of ORV-created woods roads would also become official numbered roads open to ORV travel. This would be in addition to designated ORV trails, thereby perpetuating increasingly widespread impacts. Roads endorsed by the proposals would fragment rare plant communities (including sensitive longleaf pine-wiregrass systems), encourage mud-bogging in delicate wetlands, and facilitate disturbance and habitat degradation damaging to federally listed animals including the red-cockaded woodpecker, eastern indigo snake, wood stork and bald eagle.

Forest Service personnel defend the Access Designation Process by explaining that it calls for ecological concerns to be addressed through an Environmental Assessment conducted after completion of the access proposals. Since similar Forest Service assessments have often proven to be superficial reviews that have essentially rubberstamped predetermined agency positions, conservation leaders seriously doubt that this will effectively protect ecological resources.

Inserting ecological concerns into a recreation plan as an afterthought will not adequately protect resources. Rather a a process committed to the preservation of biodiversity would *begin* with an assessment of resource management needs, a road inventory and existing ORV and road density impacts, then proceed to incorporate recreational uses into a plan designed around ecological systems.

## Current Policies in Conflict with the Revised Land and Resource Management Plan

The current level of road development and ORV use in the national forests of Florida is not compatible or in compliance with the Forestwide Desired Future Conditions, Forestwide Goals or Forestwide Objectives stated in the 1999 plan. Those in direct conflict with current ORV management and supported by the scientific research and expert opinion about ORV-impacts are identified below:

**Forestwide Desired Future Conditions, Goals and Objectives Threatened by Current Road and ORV Policies**

## Undermined.Conditions

Page 2-1.

"The national forests in Florida recognize and embraces the Florida Greenways system and role the forest plays as a major hub of greenspace in the statewide plan for greenways."

Page 2-2.

"Water quality in streams, ponds, wetlands and riparian areas reflects healthy, functioning aquatic systems. Soil productivity is maintained. Nutrient levels and nutrient -cycling processes continue to function."

"Adequate habitat is provided for threatened, endangered and sensitive species so populations are no longer considered at risk."

"Significant botanic [emphasis added], cultural/historical, geological, and scenic sites are protected, managed and interpreted."

"Forests provide a tranquil retreat from the fast pace of city life. Evidence of human activities exists in most areas of the forests, although most activities remain subordinate to the characteristic landscape. National forest landscapes show less evidence of human disturbance compared to adjacent private forestland."

"Additional areas are added to the wilderness system."

Page 2-3.

"Management of forest vegetation focuses on maintaining or restoring the natural range of diversity in age, species, and conditions for ecosystem health."

"New road construction is minimal. A higher proportion of roads are closed to motorized travel than in previous decades."

## Undermined Goals

Page 2-3.

"Maintain or, where necessary, restore ecosystem composition, structure, and function within the natural variability of all ecosystems, with emphasis on longleaf pine-wiregrass, sand pine-oak, pine flatwoods, hardwood/cypress, oak hammock ecosystems, and other imperilled specialized communities."

Page 2-4.

"Manage floodplains, groundwater, lakes, riparian areas, springs, streams, and wetlands to protect or enhance their individual values and ecological functions."[emphasis added]

"Conserve and protect important elements of diversity -- such as endangered and threatened species habitat, declining natural communities, and uncommon biological, ecological, or geological sites."

"Manage for habitat conditions to recover and sustain viable populations for all native species, with special emphasis on rare species."

"Protect, enhance and, where necessary, restore the forests' scenery resource values."

"Provide a system of marked recreational trails and support facilities that will promote a variety of experiences for both motorized and nonmotorized trail users."

**Undermined Objectives**

Page 2-4.

"Implement surveys for determining public satisfaction with National Forests in Florida programs."

Page 2-5.

"Provide habitat capability to support an increasing population of red-cockaded woodpeckers."

"Maintain a dynamic system of at least 45,000 to 55,000 acres of habitat capable of supporting scrub jays on the Ocala NF."

P73

## 8. REVVING UP FOR ACTION:
## RECOMMENDATIONS FOR MODERATING ORV IMPACTS

In a 1987 Forest Service study of vehicle issues, Lennon et al. found that successful ORV management programs involve 1) a well-designed network of roads and trails incorporating a variety of experiences and different challenge levels; 2) vehicle control structures, such as fences and barriers; 3) adequate numbers of trained Forest Service patrol personnel with appropriate vehicles and equipment; 4) good information made readily available through maps, brochures, signs, etc.; 6) cooperative relationships with users, government agencies and industry groups; 7) major volunteer programs; 8) funding from ORV registration fees; and 9) training programs for the public and Forest Service employees.

More specific actions for dealing with the impacts of ORVs based on the findings of this report are discussed below.

### 1. Restrict vehicles to designated roads and trails.

*All travelways other than public roads and specifically designated, mapped and signed ORV trails should be closed to motorized recreational vehicles.* Most of the damage done by ORVs is from vehicles traveling nondesignated, user-created trails rather than on properly designed and maintained roads and travelways. Off-trail use impacts previously pristine areas, undermines restoration, damages healthy vegetation and disturbs natural soils, displaces other recreational user groups and presents an aesthetic affront. It poses a greater roadkill risk for small animals and is more disturbing to all wildlife. Uncontrolled access allows impacts to spread over wide areas of the landscape. It also facilitates damaging and illegal activities and complicates law enforcement.

*SIDEBAR*
*Former Forest Service botanist Susan Carr (2001) explains some of the reasons why keeping vehicles on trails works well from a management perspective: "…it is better to contain ORVs to established trails, to concentrate the impacts, rather than have diffuse effects throughout a larger area. This would also keep ORVs out of 'sensitive areas'. We had this problem when I worked on the Kisatchie National Forest: Off-road vehicles were allowed anywhere on the forest (except wilderness areas).*

*"This had the effect of creating a lot of 'user trails' with low but widespread impact. Also, ORVs were getting into bogs and causing a lot of rutting damage. We had to declare bogs as 'sensitive areas' and go out and sign these places as off-limits to ORVs. This approach takes a lot of manpower. It seems more reasonable to prohibit general ORV use except [on trails] designated as open. I did notice that after the forest built about 100 miles of ORV trails, that ORVs tended to stay on the trails."*
*END*

Some managers have suggested that areas where ORV damage is evident should be closed, but less impacted places should remain open to off-road access. However, National Park Service recreation impact expert Jeff Marion (1998) points out that closing abused areas is more inclined to deflect impacts than to prevent them: "Unless additional measures are implemented to prevent the reoccurrence of the impacts, an area closure has the short-term effect of resolving the problems only to have them reoccur in new locations at a later date"

(Marion 1998).

### 2. Prohibit ORV access to ecologically sensitive forest regions.

*Ecologically sensitive areas should be closed to all ORV access.* If a trail goes near a sensitive area such as a shallow pond, ephemeral wetland, prairie, savannah, sinkhole, roadless area, red-cockaded woodpecker colony, bald eagle nest or restoration site, the temptation is there to leave the trail and explore, play or harrass the wildlife. The only way to keep ORVs out of such areas is not to let them get near them in the first place, says ecologist Jim Newman (personal communication).

What is too "near" depends on the nature of the landscape. Certainly a sensitive area immediately adjacent to, in plain view of, and/or readily accessible to an ORV trail is seriously at risk. A popular mudbogging destination might attract ORVs to travel hundreds of yards off the trail.

Phased area closures in response to user misbehavior have been suggested as a management strategy (Sekerak personal communication). This approach has some major problems: It is a response to damage that has already occurred; it has the effect of again spreading the resource damage over a large area, and it presumes that users have the desire and capability to control the activities of their peers.

There are legal problems in enforcing small prohibited area regulations. The courts have demanded that signs be in place to inform users of the boundaries of such areas, but problem visitors simply tear them down and do as they please, says Forest Service staff Kathy Briggs (personal communication). The solution is not to repeatedly put stopgap signs on every little wetland and nesting site, but to permanently prohibit vehicular access to substantial areas and make it very clear with large signs, barriers and maps located in highly public locations where users are unlikely to be able to remove them undetected. "Opening large areas to ORV use with a qualification such as [they must stay on] existing trails or roads is largely unmanageable" (Luckenbach 1975). Of course, good planning and adequate law enforcement are also necessary to prevent natural resource damage and to keep ORVers on carefully chosen designated trails in a limited area.

### 3. Avoid rest-rotation schemes.

*The practice of shifting recreational activity from one area to another periodically to let a tract of land rest and recover while another is in use should not be used because it generally has the ultimate negative effect of spreading significant levels of impact over greater areas of the landscape.* Rest-rotation was proposed by the Access Designation Working Group for Apalachicola National Forest, but as ational Park Service recreation impact specialist Jeff Marion (1998) points out such schemes tend to be impractical because trail recovery rates are substantially slower than initial impact rates.

### 4. Consider designating sacrifice areas.

*The Forest Service should confer with ORV users and other recreationists, examine the legal possibilities closely and consider establishing controlled ORV play areas around claypits and similar highly disturbed sites.* Some Forest Service employees feel that setting aside carefully selected and managed previously impacted ORV "sacrifice areas"for ORV play is a practical way to divert impacts from more sensitive areas (Briggs personal

P75

communication). This has not been regarded as a viable management alternative, however, because there are serious liability implications to designating sites as suitable for such dangerous activities, says Forest Service employee Jane Monaghan (personal communication). The popular claypits on Ocala National Forest have been closed to ORV activity for liability reasons, according to Seminole District Ranger Jim Thorsen (2001).

Florida Division of Forestry (FDOF) recreation coordinator John Waldron (personal communication) feels that designating substantial tracts of land specifically for ORV use has worked well for FDOF. On the Croom Motorcycle Area in Withlacoochee State Forest, users spend most of their time playing in already disturbed sandpits on an abandoned mine site, but are free to travel through the surrounding 1,700 acres reserved for ATV and motorcycle use. This portion of the forest is obviously impacted, but not to the extent that it does not continue to have some wildlife value. ORV problems on nearby FDOF lands are minimal. User fees bring in management funds and volunteer ORV groups help with maintenance. FDOF land managers feel that having such areas around the state would decrease ORV impacts on other lands (Waldron personal communication).

FDOF forest ecologist Dennis Hardin (personal communication) believes that such sacrifice areas should be chosen very conservatively. He is disturbed that half of the Croom area is what would otherwise be good longleaf pine habitat. Since the density of trails and ORV user preferences for dense vegetation preclude prescribed burning there, this ecosystem cannot be maintained. He is also concerned that the Croom area attracts events like motorcycle enduro races, and the courses for these competitions are allowed to spill over into state forest lands outside the designated ORV area.

**5. Improve law enforcement.**

*Improving law enforcement in the lawless environment that now exists in the Florida national forests should be a top priority.* The consensus among responsible ORVers, other forest recreationists and most Florida Forest Service employees is that the real ORV management challenge is law enforcement (Small personal communication). Meeting the cahllenge will require serious commitment to policy adjustments including steeper penalties, greatly enhanced funding, interagency cooperation, not to mention boldness and creativity. This is particularly true for Ocala National Forest where increasing ORV usage and shrinking budgets make adequate law enforcement difficult, says Lake George District Ranger Jerri Marr (2001).

The Forest Service has only two officers and one canine assigned to the heavily used 383,362-acre Ocala National Forest, only two officers on the 575,489-acre Apalachicola National Forest and just one on the 194,732-acre Osceola National Forest. These are the only law enforcement officers specifically assigned to enforce Forest Service regulations -- not nearly enough to deal with recreation areas and their issues much less the landscape level abuses of ORVers. Their effectiveness in addressing current local resource abuse problems is additionally hampered by a policy known as "stovepiping" under which law enforcement officers receive their instructions directly from the federal level and not through the District Ranger like other Forest Service personnel.

The Forest Service law enforcement staff receives some support from the Florida Fish and

Wildlife Conservation Commission (FWCC) officers, but there are only six of them assigned to an area that includes all of Marion County east of U.S. 441 as well as Ocala National Forest (Harr personal communication). Five FWCC officers and one supervising lieutenant are assigned to cover Liberty and Wakulla counties, including Apalachicola National Forest. These officers spend a good deal of time in the national forest, but frequently get called to the coast, especially during the mullet run David Pridgen (personal communication). There are six FWC law enforcement officers and one supervising lieutenant assigned to cover Columbia and Baker counties both inside and outside Osceola National Forest, says Ed Kay (personal communication).

According to Lieutenant Jeff Harr (personal communication), who supervises the FWCC officers who work on Ocala National Forest, the problem is that FWCC's few officers are seldom in the places where ORV damage is occurring. The FWCC's priority is patroling hunting lands, and most inappropriate ORV activity takes place in "party areas" closer to civilization. Local law enforcement officers will respond if they are called to a disturbance or are passing through the forest and see a problem, but the county sheriff's departments do not have staff assigned to patrol the backcountry.

## 6. Establish a toll-free number for citizens reporting violations.

*A staffed 24-hour 7-days-a-week, toll-free number should be established for reporting violations.* Another enforcement problem is the lack of local, FWCC and Forest Service law enforcement availability by phone for the public to report abuses, especially after hours on weekdays and on weekends.

ORV operators cannot be expected to effectively police each other, but other forest users with cell phones could report violations if they were provided with a number to call and encouraged to use it.

## 7. Increase the penalties for violations and funding for law enforcement.

*To protecting the resources of the Florida national forests funding should be based less on the acreage of a management unit and more on the people pressures exerted on it.* Ideally, increased penalties and funding objectives should be linked so that those who break the rules and damage the forests bear the costs of enforcing regulations and restoring degraded areas. Establishing a mechanism whereby violators' ORVs are confiscated and converted to resource management vehicles, for example, would channel equipment in the right direction and send a powerful message.

## 8. Establish a law enforcement task force and enforcement plan for each forest.

Local law enforcement agencies and FWCC should be included on a Forest Service task force to develop cooperative strategies for effective law enforcement on the forests. For example, local, state and Forest Service enforcement agents could take turns rotating through each forest to ticket rule-breaking ORVers and to enforce regulations in ORV impact problem hotspots. These agents could also hand out educational material and maps.

## 9. Establish a volunteer ranger program.

*Responsible local trail users should be trained to patrol and monitor problem areas.* Establishing such programs would extend the "eyes and ears" of law enforcement and land

management personnel, create a mechanism for fairly offering special access privileges to responsible forest users and provide opportunities to educate and communicate with adjoining landowners. Volunteer programs can turn many of those most actively concerned with the forest from complainers into supporters. They can make these people part of the solution, rather than part of the problem.

## 10. Establish an ORV management plan and monitoring programs.

*The Forest Service has been given the authority and has the responsibility to establish an ORV Management Plan and monitoring programs and should be held accountable.*

"The USFS is required to monitor[1] "the effects of use by specific types of vehicles off roads on National Forest System lands."[2] Id. at §295.5. If the monitoring determines that the use of one or more ORVs "is causing or will cause considerable adverse effects"[3] on Forest resources then the area or trail must be immediately closed to one or more types of ORVs until the adverse effects have been "eliminated and measures have been implemented to prevent future recurrence."[4] Id. at

---

[1] Monitoring activities on trails include the volume of use, type of use, and the effects of use on trail management objectives. FSH §2309.18 - 4.1. Traffic restrictions are appropriate when unacceptable resource damage or other trail management objectives have not been met. FSH §2309.18 - 4.12. Such restrictions can also include seasonal closures, for example, during wet seasons to eliminate high tread maintenance costs.

[2] The USFS Director of Recreation Management is required to identify, develop, and test the methods necessary to "monitor and evaluate the effects of the off-road vehicles on National Forest System lands and on user's expectations, characteristics, and desires." FSM §2355.04b - 2. The Regional Forester is required to ensure that monitoring is applied consistently among National Forests under his or her jurisdiction and to "issue guidelines and standards for providing off-road vehicle use opportunities and monitoring effects on resources." FSM §2355.04c - 1 and 4. Forest Supervisors must: develop and implement the National Forest program for the use of vehicles on and off of roads and trails; establish monitoring intervals, criteria, practices, and standards against which the effects of ORV use shall be evaluated and reported; solicit involvement of interested individuals and groups and other parties in planning, implementing and obtaining compliance with ORV use regulations; and close areas and trails immediately when vehicle use is causing or is likely to cause considerable adverse effects. FSM §2355.04d-1,4,6, 8.

[3] An "adverse" ORV effect includes any effect that does not meet the standards for the maintenance of the long-term productivity capacity of the land, air and water quality, wildlife habitat and stable and balanced populations of wildlife, existing and proposed uses of the Forest, and preservation of cultural and historical resource values. FSM §2355.05 - 7. A "considerable adverse effect," is any effect that will not meet the trail or area designation criteria contained in FSM §2355.14 (which is nearly identical to 36 C.F.R. §295.2(b)(1-4) and "that is or may become irreparable because of the impossibility or impracticability of performing corrective or remedial measures." FSM §2355.05 - 3. Other factors which can also be considered to make this determination include: the availability of funding and manpower to prevent or correct adverse effects; physical and biological conditions, such as slope, vegetation, soil erodibility and compaction, surface and subsurface hydrology, and a site's natural rehabilitative capability; those natural, historical, and cultural resources and areas that are susceptible to irretrievable resource damage. FSM §2355.05 - 3.

[4] Such temporary or permanent closures are authorized by Forest Service orders issued by the Chief, Regional Forester, or Forest Supervisor. 36 C.F.R. §261.50. The Forest Service chief and Regional Foresters also can prohibit activities within all or any part of a National Forest by regulation to, among other things, protect property, roads, or trails; to protect imperiled species or special biological communities; to protect objects of historic, archaeologic, geologic, or paleontological interest; or to protect public safety. Id. at §261.70(a). Roads and trails can also be closed seasonally to prevent unacceptable resource damage and to reduce conflicts between users. Emergency closures

§295.5. ORV Forest management plans are subject to review annually by Forest Supervisors. Id. at 295.6" (Wilderness Society 2001).

Monitoring programs must truly measure short-term and long-term ORV and road impacts on forest ecosystems rather than merely document wear on the trail system as most "trail impact" monitoring efforts do. Management plans and monitoring programs must also be structured to assess the success of restoration and repair efforts and provide feedback loops for adaptive management. Management plans must also be readily altered in response to new information.

## 11. Educate users.
*Users should be taught to understand trail impacts and user responsibility.*
There are two distinct aspects to forest visitor education, informing the users of the rules and teaching them to understand the forest.

Informing visitors of the rules is critical to law enforcement and resource protection. Users must be given clear maps that show them where they can and cannot go. "I didn't know" cannot be a legitimate excuse.

Teaching users about the forest and how to minimize their impacts on it is important from a long-term perspective. Users who have a sense of ecosystem dynamics and sensitive resources are less likely to cause damage.Studies have shown that most recreationists are unable to recognize ecological impacts (Hammitt and Cole 1987). Recreationists in general -- and ORV operators in particular -- typically fail to recognize natural resource damage, especially in its more subtle, cumulative forms. Thus, most ORV users are unaware of the destructiveness of their activities.Trails are generally not very damaging in themselves, but the things people do alongside them frequently are. It is unrealistic to expect people to behave responsibly until they are taught how appropriate behavior helps protect resources. Education can directly decrease resource abuse.

Some Forest Service employees advocate promotion of "Tread Lightly" (Tread Lightly 2001) or "Leave No Trace" (Leave No Trace 2001) principles (Traylor 2001). It would be helpful to distribute materials explaining these principles to Florida ORV users, but they are inadequate without more detailed Florida-specific guidelines.

The Tread Lightly Principles are specifically oriented toward ORV users. They are excellent guidelines, and ORV impacts would be greatly reduced if all vehicle operators adhered to them. Unfortunately, these highly generalized principles don't express much more than what common sense and good citizenship dictate: Stay on the trail, follow the rules, be courteous to others, and respect the wildlife and the land. Off-road vehicle groups have a history of pledging to follow the Tread Lightly Principles, then blatantly ignoring them (Marion County Audubon 2000).

The more detailed "Leave No Trace" guidelines are geared to a wider range of wildland recreation types and are less specifically pertinent to ORV use. They are oriented toward

---

can also be enacted for up to 1 year without public participation to address unsafe conditions or to prevent considerable adverse effects to resources. FSM §2355.3 - 1,2.

western forests and focus on appropriate behavior in wilderness situations and are not equally applicable under Florida urban fringe conditions. (When a few people move through a vast pristine area, impacts are lessened if they spread out. When a lot of people use a smaller already-disturbed area, the opposite is true, so it is critical that users stay on established trails and restrict their activities to defined visitor-use areas.)

*SIDEBAR*

*Rules For ORVers*

1. *Stay on the trail.*
2. *Don't speed or engage in other wreckless activities.*
3. *Don't feed or harass wildlife.*
4. *Don't pick flowers or collect anything.*
5. *Don't leave trash or waste along the trail.*
6. *Don't release toxic fumes or fluids.*
7. *Don't smoke, start fires or generate sparks.*
8. *Know where you are and what the rules are.*
9. *Obey all signage.*
10. *Make your child/horse/dog follow the rules too.*
11. *Clean seeds and dirt off your equipment before each trip.*
12. *Report trail maintenance problems and rule violations promptly.*
13. *Be courteous to other users.*
14. *Give back to the land -- volunteer for trail work.*

*END SIDEBAR*

## 10. TAKING THE HIGH ROAD: MODERATING ROAD IMPACTS

### 1. Reduce road density.

*Measures should be taken immediately to begin significantly reducing high road densities on the Florida national forests.* "Closing and/or removal of roads to minimize motorized vehicle access is the most effective solution" (Forman and Hersperger 1996). This includes not only official roads, but all travelways.

Numerous studies of the relationship between ecosystem integrity and road density have concluded that a road density of one mile per square mile is an ecologically sound road

density standard. Forest road densities should be limited to this level to minimize the ecosystem impacts of edge effects, disturbance and road-associated mortality.
As landscape ecologist Tom Hoctor (2001) explains, "The Ocala National Forest should be the highest priority for engaging in dialogue and planning for significantly reducing road densities...The fact that less than 93 percent of the Forest has road densities greater than one mile per square mile should be the cause of much concern and action."

## 2. Protect adequate roadless core habitat.

Florida's national forests have lost nearly 50 percent of the roadless areas proposed for protection, and steps must be taken to stop this trend. Designated and protected roadless areas because they are *essential to the maintenance of the true wilderness conditions that allow ecological processes to operate naturally.*.

The Forest Service should classify all motorized vehicle trails as roads and establish 5,000-acre roadless core areas in each forest, surrounded by resource buffer zones with road densities of less than one square mile. As Noss (2001) points out that, "Road closures to produce large roadless areas would reduce harassment and persecution of sensitive wildlife." Roads should be removed from the remaining roadless areas and former roadless areas. Florida's national forests are as the ecological core areas for Florida's green infrastructure (Harris 1985; Gilbrook 1986; Noss 1987; FNAI 1991; Cox et al. 1994; Florida Greenways Coordinating Council 1998; Hoctor et al. 2000), and they should be managed so that more than 60 percent of each forest lies within these contiguous areas.

The size of the roadless area necessary to minimize edge effects and maintain or restore natural conditions varies according to ecosystem type and landscape context. Based on studies of deer overbrowsing linked to movements from disturbed areas into the forest in Wisconsin national forests, Alverson et al. (1988) calculated that 200 to 400 square kilometers of roadless areas would be needed to maintain normal understory composition. In some regions, The Nature Conservancy's ecologists have used 10,000 acres as a roadless core area threshold for ecoregional planning (Hoctor 2001). Noss (2001) suggests 5,000 acres as the minimum viable size for ecological core habitat in Florida.

Based on an extensive review of the literature on edge effects, Hoctor (2001) suggests establishing core natural areas consisting of at least 5,000 to 10,000 roadless acres beyond an also roadless 1000-meter peripheral buffer zone. He points out that the intensity of many edge effects is related to road type and the actual critical buffer zone width might be narrower for low intensity roads (maybe 100 to 300 meters). He further cautions that human activity patterns would need to be taken into account because, in some situations, a crude jeep trail might actually support more intrusive human access than a typical country road.

## 3. Eliminate unnecessary roads.

*Unnecessary roads should be eliminated throughout the forests.*
This applies to all travelways accessible to motorized traffic, whether planned and officially recognized or not, and includes access trails for old projects, dead-end roads and trails, parallel and redundant routes and user-created exploratory trails.

P81

*All but genuinely critical roads should be removed from some managment areas and resource buffer zones* Walder and Bagley (1999) discuss road evaluation and removal strategies. Simply closing the roads is not enough; complete obliteration is the only way to effectively erase a road from the landscape (Walder 1996).

Complete obliteration of an improved road usually means ripping down to three feet below the ground surface, restoring drainage patterns and replacing the discarded road fill with the bottom layer (the original topsoil) on top. "Ripping" breaks up compacted layers, increases infiltration and enhances revegetation (Luce 1997 and Bagley 1998). Partial obliteration, which generally involves some soil ripping, installation of water bars and/or some outsloping may not adequately restore the original drainage patterns. It also leaves enough of a hint of the route to attract recreationists and require continued maintenance.

Although complete obliteration is costly up front, it is often less expensive than partial closure over the long-term. If ecological benefits and costs are added into the equation, complete obliteration is probably the most cost-effective approach to eliminating roads (Walder 1996).

*Areas from which roads are removed should be replanted with appropriate native vegetation and restored to natural habitat condition.* Forest Service Manual 7703.1 requires the Forest Service to "reestablish vegetative cover on any unnecessary roadway or area disturbed by road construction on National Forest system lands within 10 years after the termination of the activity that required its use and construction "(Hammer 1990). No sign of the former route should remain to tempt users.

## 4. Reduce road width.
*Roads that serve important access functions should be narrowed as much as possible.* This may involve placing logs or rocks along the edges and not mowing road shoulders.

The wider a road and its adjoining right-of-way is, the greater the edge effect it will have. On South Carolina barrier islands, Gaddy and Kohlsaat (1987) measured lower vegetation disturbance indices along narrow jeep trails than along wider roads. Rich et al. (1994) examined how forest-dividing corridor width affects nesting birds. Numerous studies have suggested that narrow trails shaded by the forest canopy are less likely to promote exotic plant invasion or seriously disrupt the movements of many animal species than broader open corridors. (de Maydadier and Hunter (2000) noted that salamanders were more reluctant to cross wider and more heavily used logging roads than lesser roads.)

## 5. Convert woods roads to nonmotorized trails.
*Roads that serve important non-ORV recreational functions should be converted to nonmotorized trails wherever possible.* This may involve constructing barriers to bar motorized vehicles. Although studies have shown that even narrow dirt roads and trails will limit movement of certain animals and fragment soil fauna, converting roads to well-managed nonmotorized trails would significantly decrease many impacts.

## 6. Close roads.

P82

*All nonessential roads -- including all unofficial ORV travelways -- should be effectively closed to motorized access if they cannot be obliterated promptly. Essential service and emergency access roads into interior areas of the forest should be kept passable to official traffic, but closed to public use. Roads into sensitive areas like the Apalachicola savannas should be closed if they cannot be eliminated altogether* (Traylor personal communication).

Effective road closure requires heavy barricades at strategic points. Dirt mounds are not sufficient barriers because vehicles can readily drive over them. Even gates and tank traps are often ineffective because they are easily vandalized. Clear signage, maps showing open versus closed routes, good user orientation, active patrol and enforcement and strong penalties for violations. The user must be aware of mapped closures and prohibited areas, know where he/she is at all times, and take responsibility for staying off closed areas. Simply erecting ordinary signs and barriers will not work because renegade users will tear them down or go around them (Lowery personal communication; Miller personal communication; Briggs personal communication; Marion County Audubon 2000; Weaver and Hagan 1990).

*Closed roads should be carefully monitored to make sure that barriers have not been breached and the roads are not being used.* In many national forests, numerous supposedly closed roads have remained passable. For example, Hammer (1986) documented that 38 percent of the "closed" roads on Flathead National Forest in Montana could still be accessed by passenger vehicles.

Although road closure is a useful tool, it is not equivalent to road removal. It is important to remember that "Roads cause more effects and have a greater cumulative effect than vehicles (Forman and Hersperger 1996)."

### 7. Minimize new roads.

*No new roads should be constructed in the national forests unless they are absolutely necessary and have been ecologically evaluated and justified in a carefully developed plan subjected to scientific and public review.* The Forest Service has prepared a useful set of guidelines to facilitate evaluation of road proposals (Forest Service 1999), but they do not specify sufficient ecological detail necessary to assure that good decisions will always result from their application.

*New roads should not be constructed into the few pristine roadless areas remaining.* Since so much of the landscape has already been damaged by vehicles, it is particularly important to avoid building new roads along as yet unimpacted routes. And roads through disturbed landscapes should be designed to follow historic travel corridors wherever possible

*The activities of forest visitors, easement holders and neighboring landowners should be carefully monitored to be certain that unauthorized roads are not created on forest lands.* These concerns apply to both planned roads and user-created ORV trails.

### 8. Route roads and trails carefully.

*Roads -- including all types of travelways used by motorized vehicles -- should be carefully routed to avoid sensitive areas such as rare plant locations, sinkholes, roadless areas,*

*important foraging areas or critical breeding sites.* Closure (obliteration) or rerouting of inadequately planned roads should be considered wherever sensitive areas are found to be in close proximity. The appropriate buffer zone between such a site and a road will depend primarily on the nature of the site to be protected. Florida scientists have suggested buffer zones based on wildlife flushing distances and nesting and life-cycle requirements (SEE BUFFER ZONE SUMMARY APPENDIX B).

Road/trail location is also critical in determining the likelihood of soil erosion (Leung and Marion 1996). It is important to recognize how various types and combinations of use will affect erosional processes in particular landscape situations. For example motorcycles cause more damage going uphill than downhill (Weaver and Dale 1978), so motorcycle trails should go up gentle and more stable slopes and down steeper and more fragile ones.

*Wetland crossings should be planned very carefully to minimize hydrological impacts.* Constructing a road or travelway or designating an ORV trail through a wetland typically alters hydrological patterns. Roadside drainage ditches also drain adjoining swamps and marshes. Raised roadbeds function as dams to impound surfacewater. Ample culverts in appropriate locations may minimize associated problems, but seldom eliminate them altogether (Duever et al. 1979). On damp slopes, poor road layout and/or inadequate culverting can result in higher groundwater levels upslope and a lower downslope (Stoeckeler 1965). Zeedyk (1996) discusses how a road's position in the landscape affects its impact on a wetland. Even simple jeep trails must be thoughtfully designed when they pass through or near wetlands because the ruts formed by vehicles on ORV routes affect flows and alter hydrology.

## 9. Plan access points wisely.

*ORV access to the forest should be through designated entryways and checkpoints at the periphery of the forest only.* To monitor users and have opportunities to orient and educate them, ORVs should not be permitted to simply take off into the woods from along a highway or out a backyard. Staging areas should be carefully located in nonsensitive wildlife or old growth habitat. Placing high-use staging and trail areas at the periphery of the national forest is good landscape-level conservation planning (Noss and Cooperrider 1994).

*The Forest Service should work with the residents of inholdings and neighboring lands on access issues.* Many of these people have habitually driven their vehicles across forest lands going to and from nearby destinations. Others are accustomed to conveniently accessing forest trails at places that are inappropriate for public entry.

A system for granting special access privileges for neighboring residents should be established. Privileges should be granted only if: 1) the proposed access point can be controlled so that it does not become an entry for outlaw users; 2) ecological resources will not be significantly affected; 3) the user has demonstrated willingness to stay on the trail, behave responsibly and follow other regulations; 4) the user participates in a volunteer ranger program that includes training in the basics of resource management and commits to reporting irregularities, helping educate other users, monitoring for exotic plants, assisting with fire management, etc. while on the forest; and 5) the user takes responsibility for the behavior of any visitors he/she allows to use that access point. Special access privileges should not be granted to allow juveniles to play on the forest unsupervised, to allow

motorized vehicles in forest interior areas where they are otherwise prohibited, to permit unrestricted off-trail activity or to allow users to create play areas or unauthorized trails on Forest Service lands.

## 10. Keep roads and trails properly signed and maintained.

*All roads and trails should be monitored and maintained regularly.*
Since trail broadening often results from users detouring around mudholes or fallen logs, regular inspection and maintenance is vital to controlling road width in open landscapes.

Road/trail maintenance is actually often more critical than type and amount of use in determining the extent of soil erosion problems (Leung and Marion 1996). Drainage problems should be corrected before gullies begin to develop. Steep slopes usually require stabilization with water bars and unstable treads often call for soil hardening. Various types of web mats can be used to stabilize routes. Geoweb has been used successfully for this purpose on St. Johns River Water Management District lands in Osceola County, reports Division of Land Management director Steve Miller (personal communication). Stream crossings stabilized with matting and gravel are also working well on shared use trails on Goethe State Forest, says trail association president Helen Koehler (personal communication).

Although proper maintenance of roads can reduce erosion and siltation impacts, pollution may result if dust control chemicals or herbicides are used. Such substances should not be applied to forest roads unless there is a special need and their ecological effects have been carefully evaluated and determined to be negligible.

Clear signage to direct visitors on to the correct routes and remind them of regulations is also essential. Road and trail maintenance must involve prompt identification and replacement of damaged or missing signs and timely installation of new signage whenever visitor confusion or misbehavior becomes evident.

## 11. Reduce traffic.

*Consideration should be given to reducing traffic on some routes.* This might be useful where roadkills or user-volume impacts are observed or anticipated. The potential value of this strategy will have to be evaluated on a case-by-case basis. Reducing traffic may or may not help minimize road impacts.

It would seem logical that roads with more traffic would do more damage, but the relationship between road/trail use and degree of impact appears to be more complicated than that. Lowering traffic volume could be expected to decrease roadkill rates on major roads and limiting the number of vehicles would also limit the quantity of pollutants they introduce. But, thresholds for avoidance and habituation behaviors complicate predictions of the correlation between road use and wildlife impacts.

Harris (2001) believes that intensity of use is an extremely important factor in determining the impact a road has on wildlife, but he emphasizes that we cannot assume that wildlife response to road use is a linear relationship. He explains that lightly used roads may have positive values for wildlife that to some degree counterbalance their negative impacts. Harris also points out that busy roads generally do not have proportionately greater habitat impacts or higher roadkill rates than roads with moderate traffic volumes.

There may also be species or region-specific differences in reaction to traffic levels. McLellan and Shackleton (1988) noted that traffic volume was irrelevant to grizzly bear avoidance of roads in Montana. The bears they studied avoided zones along infrequently traveled routes as well as those along busier roads. However, in a study of radio-collared black bears in the southern Appalachians, Brody and Pelton (1989) found that the frequency with which black bears crossed roads was inversely related to traffic volume.

*Since a disproportionate number of roadkills and poaching incidents occur at night, nighttime road access should be limited.* Kline and Swann (1998) documented decreased roadkill rates on park roads closed at night. Nighttime road closures could provide much benefit for relatively little cost (Wuerthner 1993).

## 12. Establish and enforce speed limits.

*Speeding and racing should be prohibited on forest roads and trails.* Appropriate speed limits will depend on the nature of the landscape, but recreational travel should always be held to a pace much slower than that of highway traffic.

The faster a vehicle is driven, the less likely the driver is to be able to avoid an animal in the roadway ahead. Therefore, lower speeds can be expected to reduce roadkill mortality on all types of roads and ORV routes. Indeed, Gunther et al. (1998) found that speed was the primary factor contributing to vehicle-wildlife collisions. Christoffer (1991) documented higher roadkill rates on roads with faster traffic in Florida state parks.

Hunters hurrying to head off their dogs, for example, are likely to drive at dangerous speeds. Such drivers may pose a safety hazard to other users as well as to wildlife. Recklessly driven vehicles are also more likely to damage trails and adjacent lands. Van Loan (1999) documented how speeding motorcyclists cut corners and miss turns on Withlacoochee State Forest.

*"Recreational development is a job not of building roads into lovely country, but of building receptivity into the still unlovely human mind." The ultimate objective is to foster appreciation for the wondrous complexity of the web of life. When people begin to grasp this, they will be more inclined to listen to the frogs and watch the birds than to move at high speeds in loud machines. They will understand exactly what is at risk when the landscape is abused by roads and vehicles."*

--Aldo Leoplod, 1921

P86