Marsha Kearney
Forest Supervisor
National Forests in Florida
325 John Knox Road, Suite F-100
Tallahassee, FL 32303-4160

January 4, 2002

RE: OSCEOLA NATIONAL FOREST, ACCESS DESIGNATION

Dear Mrs. Kearney,

      We are pleased to submit to you the environmental recommendations for the motorized Access Designation process for the Osceola National Forest. We request a meeting with the "ID team" to present our recommendations and analysis criteria, to clarify our recommendations, and to answer any questions about the criteria in relation to the submitted maps.

      Attached is a data list generated from the scientific literature nationally and from Florida, including personal communication with Florida scientists. We would be happy to provide you with a contact list of the Florida scientists who provided their research and input.

      The data list enclosed provides the basic parameters and criteria for an ecological analysis of a motorized access plan. We expect that the Forest Service would use such detailed criteria in an environmental analysis of the access alternatives. The data list is a product of Defenders of Wildlife's forthcoming report, "ORV's and Road Density Impacts on Florida National Forests." This report should be completed in January 2002. We will provide you with a copy as soon as possible.

RESOURCE RESPONSIBILITIES:

      It is of great concern to us that numerous Executive Orders, federal statutes, regulations, and U.S. Forest Service (USFS) policies pertaining to the management of ORVs on National Forests have been ignored. The USFS, has, intentionally or unintentionally, encouraged and facilitated increased ORV access into the national forests. A synopsis of applicable legal mandates follows, taken from the 1999, "Petition to Enhance and Expand Regulations Governing the Administration of Recreational Off-Road Vehicles on National Forests" (Wildlands Center for Preventing Roads et. al.):

Plaintiff's Exhibit 6H

In 1972, recognizing the widespread and increasing use of ORVs on federal lands, the late President Richard Nixon signed Executive Order (EO) 11644 (37 FR 2877) in an attempt to develop a unified federal policy to control ORV use on federal lands.[1]  This EO was amended in 1977 by former President Carter to provide federal agencies with greater ability to protect federal lands damaged by ORVs (See, EO 11989, 42 FR 26959).

EO 11644 provided federal land managers with policies and procedures intended to "ensure that the use of off-road vehicles on public lands will be controlled and directed so as to protect the resources of those lands, to promote the safety of all users of those lands, and to minimize conflicts among the various uses of those lands."  EO at §1 (emphasis added). To accomplish these objectives, the EO required federal agencies to develop regulations to provide for the designation of areas and trails where ORV would and would not be permitted and for the operation of such vehicles.  In rendering such designations, the agency not only had to comply with the objectives specified above, but they also were required to ensure that: 1) areas and trails were located to minimize damage to soil, watershed, vegetation, and other public land resources; 2) areas and trails were located to minimize harassment of wildlife or significant disruption of wildlife habitats; 3) areas and trails were located to minimize conflicts between ORV use and other uses of the same or neighboring land and to ensure compatibility of such uses taking into account noise and other factors; and 4) areas and trails were not located in Wilderness Areas or Primitive Areas.  EO at §3(a)(1-4).  The EO also required the agency to involve the public in the promulgation of such regulations and in the designation of areas and trails, to prescribe appropriate penalties for violations of regulations adopted pursuant to the EO, and to monitor the effects of ORVs on federal lands.

While these policies and procedures were a substantial improvement from the complete lack of such guidelines previously, EO 11644 failed to provide authority to federal agencies to protect lands damaged by ORV activities.  The 1977 amendment, EO 11989, provided such direction by requiring federal agencies to immediately close ORV areas or trails to any or all ORV activities if it is determined that the use of ORVs "will cause or is causing considerable adverse effects on the soil, vegetation, wildlife, wildlife habitat or cultural or historic resources of particular areas or trails of the public lands."  EO at §9(a) (emphasis added).  In addition, the amendment to EO 11644 also authorized federal agencies to adopt a policy closing all areas to ORV use unless specifically designated as open.  EO at §9(b).

In response to EO 11644, as amended, the USFS promulgated regulations and policies governing the management of ORVs on National Forests.  These regulations specifically pertain to the designation of "specific areas and trails of National Forest System lands on which the use of vehicles traveling off National Forest development roads is allowed, restricted or prohibited," 36 C.F.R. §295.1, and closely follow the guidelines established in the Executive Orders.

USFS policy or directives are incorporated in the Forest Service Manual (FSM) and related Forest Service Handbooks (FSH).  These documents are intended to: 1) codify the

---

[1] At the time, an estimated 5 million ORVs (motorcycles, minibikes, trail bikes, snowmobiles, dune-buggies, all-terrain vehicles) were used for recreation.  Today, the number of ORVs on our public lands has increased several fold.

agency's policy, practice, and procedures affecting more than one unit and the delegations of continuing authority and assignment of continuing responsibilities; 2) serves as the primary administrative basis for the internal management and control of all programs; and 3) is the primary source of administrative direction to Forest Service employees. 36 C.F.R. §200.4(b)(1).[2]

As directed in the regulations, the management of ORVs is intended to protect resources, the safety of all users, and to minimize conflicts among users. Id. at §295.2(b). To do this, the regulations specify that: 1) areas and trails must be located to minimize damage[3] to soil, watershed, vegetation, or other public land resources; 2) areas and trails must be located to minimize harassment of wildlife or significant disruption of wildlife habitat; 3) areas and trails must be located to minimize conflict between ORV and other existing or proposed recreational uses of the same or neighboring public lands and to ensure the compatibility of such uses with existing conditions in populated areas; and 4) areas and trails must not be located in officially designated Wilderness or Primitive Areas.[4] Id at §295.2(b)(1-4).

To meet these conditions, the USFS is required to monitor[5] "the effects of use by specific types of vehicles off roads on National Forest System lands."[6] Id. at §295.5. If the monitoring

---

[2]USFS regulations require that the public be provided an opportunity to comment on standards, criteria, and guidelines applicable for USFS programs which are incorporated into the FSM and FSHs. 36 C.F.R. §216.1. The need for comment is, however, a subjective determination made by the USFS if it determines that a substantial public interest or controversy regarding a directive can be expected. Id at §216.6(a). This determination is based on a number of factors including likely adverse or beneficial affects on the public, the significance of the change in direction compared to current direction, the extent of media coverage, and the amount of controversy. Id at 216.4(b).

[3]The USFS defines damage as "...to injure, mutilate, deface, destroy, cut, chop, girdle, dig, excavate, kill or in any way harm or disturb," 36 C.F.R. §261.2, any forest resources.

[4]To control ORV use of National Forests lands, USFS policy requires that lands available for ORV use must be designated as either open, restricted, or closed. FSM §2355.03 - 3.

[5]Monitoring activities on trails include the volume of use, type of use, and the effects of use on trail management objectives. FSH §2309.18 - 4.1. Traffic restrictions are appropriate when unacceptable resource damage or other trail management objectives have not been met. FSH §2309.18 - 4.12. Such restrictions can also include seasonal closures, for example, during wet seasons to eliminate high tread maintenance costs.

[6]The USFS Director of Recreation Management is required to identify, develop, and test the methods necessary to "monitor and evaluate the effects of the off-road vehicles on National Forest System lands and on user's expectations, characteristics, and desires." FSM §2355.04b - 2. The Regional Forester is required to ensure that monitoring is applied consistently among National Forests under his or her jurisdiction and to "issue guidelines and standards for providing off-road vehicle use opportunities and monitoring effects on resources." FSM §2355.04c - 1 and 4. Forest Supervisors must: develop and implement the National Forest program for the use of vehicles on and off of roads and trails; establish monitoring intervals, criteria, practices, and standards against which the effects of ORV use shall be evaluated and reported; solicit involvement of interested individuals and groups and other parties in planning, implementing and obtaining compliance with ORV use regulations; and close areas and trails

determines that the use of one or more ORVs "is causing or will cause considerable adverse effects"[7] on Forest resources then the area or trail must be immediately closed to one or more types of ORVs until the adverse effects have been "eliminated and measures have been implemented to prevent future recurrence."[8] Id. at §295.5.  ORV Forest management plans are subject to review annually by Forest Supervisors. Id. at 295.6.

The ORV planning process must include an analysis and evaluation of the current and potential impacts of specific types of ORVs on the soil, water, vegetation, fish and wildlife, forest visitors, and cultural and historic resources. Id. at §295.2(a).  If this review reveals that one or more specific types of ORVs used off-road will cause "considerable adverse effects on the resources or other forest visitors" use of such vehicles "will be prohibited until such time as the adverse effects can be eliminated." Id. at §295.2(a).  The planning process also requires that the public be provided an opportunity to participate in USFS decisions regarding the management and use of ORVs. Id. at §295.3.

These regulations are part and parcel of a broader statutory and regulatory framework which address the management, use, and conservation of National Forest lands.  These statutes and regulations are also applicable to the management of ORVs on National Forests.

The 1976 passage of the National Forest Management Act (NFMA), provided standards for regulating use of the forests 16 U.S.C. §1600 *et seq.*

---

immediately when vehicle use is causing or is likely to cause considerable adverse effects. FSM §2355.04d-1,4,6, 8.

[7]An "adverse" ORV effect includes any effect that does not meet the standards for the maintenance of the long-term productivity capacity of the land, air and water quality, wildlife habitat and stable and balanced populations of wildlife, existing and proposed uses of the Forest, and preservation of cultural and historical resource values. FSM §2355.05 - 7.  A "considerable adverse effect," is any effect that will not meet the trail or area designation criteria contained in FSM §2355.14 (which is nearly identical to 36 C.F.R. §295.2(b)(1-4) and "that is or may become irreparable because of the impossibility or impracticability of performing corrective or remedial measures." FSM §2355.05 - 3.  Other factors which can also be considered to make this determination include: the availability of funding and manpower to prevent or correct adverse effects; physical and biological conditions, such as slope, vegetation, soil erodibility and compaction, surface and subsurface hydrology, and a site's natural rehabilitative capability; and those natural, historical, and cultural resources and areas that are susceptible to irretrievable resource damage. FSM §2355.05 - 3.

[8]Such temporary or permanent closures are authorized by Forest Service orders issued by the Chief, Regional Forester, or Forest Supervisor. 36 C.F.R. §261.50.  The Forest Service chief and Regional Foresters also can prohibit activities within all or any part of a National Forest by regulation to, among other things, protect property, roads, or trails; to protect imperilled species or special biological communities; to protect objects of historic, archaeologic, geologic, or paleontological interest; or to protect public safety. Id. at §261.70(a).  Roads and trails can also be closed seasonally to prevent unacceptable resource damage and to reduce conflicts between users.  Emergency closures can also be enacted for up to 1 year without public participation to address unsafe conditions or to prevent considerable adverse effects to resources. FSM §2355.3 - 1,2.

In promulgating NFMA, Congress declared that the "Forest Service ... has both a responsibility and an opportunity to be a leader in assuring that the Nation maintains a natural resource conservation posture that will meet the requirements of our people in perpetuity..." 16 U.S.C. §1600(6).

NFMA requires the development, maintenance, and revision of land and resource management plans for units of the National Forest System. Forest plan development involves two levels of decisions. The first is the development of the Forest Plan which provides overall direction for forest management. The second level of planning involves the analysis and implementation of management practices to achieve Forest Plan objectives.

Each National Forest or group of National Forests administered by the same Forest Supervisor must prepare a land and resource management plan. Id. at §219.5(b)(ii)(3). Such plans are intended to "guide all natural resource management activities and establish management standards and guidelines for the National Forest System," id. at §219, and will be based on fourteen principles including: management of renewable resources without impairment of the productivity of the land; recognition that National Forests are ecosystems and that their management requires an awareness and consideration of the interrelationships among plants, animals, soil, water, air, and other environmental factors; preservation of important historic, cultural, and natural aspects of our national heritage; provision for the safe use and enjoyment of the forest resources by the public; and a responsiveness to changing conditions of land and other resources and to changing social and economic demands of the American people. Id. at §219.1(b)(1-14). The primary resources or uses which must be considered and evaluated in Forest Plans include timber, vegetation, roadless areas, wilderness, fish and wildlife, grazing, recreation, minerals, water and soil, cultural and historic resources, research natural areas, and diversity.

Each forest plan must also include a summary of the management situation, a description of the desired future condition of the forest or grassland, and multiple-use prescriptions and associated standards and guidelines for each management area. Id. at §219.11(a-c). Each management or multiple-use prescription must: 1) conserve soil[9] and water resources and not allow significant or permanent impairment of the productivity of the land; 2) minimize serious or long-lasting hazards from flood, wind, wildfire, erosion, or other natural physical forces; 3) maintain diversity of plant and animal communities;[10] 4) provide for adequate fish and wildlife

---

[9]Conservation of soil resources "involves the analysis, protection, enhancement, treatment, and evaluation of soil resources and their responses under management." 36 C.F.R. §219.28(f). Guidelines for soil conservation are allegedly contained in official technical handbooks, id., but the identify and availability of these documents is unknown.

[10]USFS regulations require that the diversity of plant and animal communities be preserved and enhances "so that it is at least as great as that which would be expected in a natural forest..." 36 C.F.R. §219.28(g).

habitat to maintain viable populations of native vertebrate species;[11] and 5) maintain air quality at a level that is adequate for the protection and use of National Forest System resources and that meets or exceeds applicable Federal, State, and/or local air quality standards or regulations. Id. at §219.27(a). In addition, each plan must contain "monitoring and evaluation requirements that will provide a basis for a periodic determination and evaluation of the effects of management practices" on forest resources.[12] Id. at §219.11(d). To effectively monitor the impacts of management actions, each Forest Supervisor is required to "obtain and keep current inventory data appropriate for planning and managing" forest resources. Id. at §219.12(d).

The NFMA regulations specifically require that "off-road vehicle use shall be planned and implemented to protect land and other resources, promote public safety, and minimize conflicts with other uses of the National Forest System lands." Id. at §219.21(g). In addition, "forest planning shall evaluate the potential effects of vehicle use off roads and on the basis of requirements of 36 C.F.R. part 295 of this chapter, classify areas and trails of National Forest System lands as to whether or not off-road vehicle use may be permitted." Id

The management and administration of renewable resources under NFMA must be consistent with the multiple use and sustained yield concepts as required by the Multiple Use Sustained Yield Act of 1960 (MUSYA). To do so, the USFS is authorized to install a "proper system of transportation to service the National Forest System ... to meet anticipated needs on an economical and environmentally sound basis," id. at §1608(a), through the creation of a forest development road system plan. Id. at §1608(b). Such a system was deemed by Congress to be "essential if increasing demands for timber, recreation, and other uses of such lands are to be met," and "to provide for intensive use, protection, development, and management of these lands under principles of multiple use and sustained yield of products and services." 16 U.S.C. §532.

To accommodate recreational and other uses of the National Forests, the USFS is

---

[11]Riparian areas, in particular, must receive special attention. Within these areas "no management practices causing detrimental changes in water temperature or chemical composition, blockages of water courses, or deposits of sediments shall be permitted ... which seriously and adversely affect water conditions or fish habitat." 36 C.F.R. §219.28(e). Management practices permitted within riparian areas must consider topography, vegetation type, soil, climatic conditions, and management objectives. Id

[12]Monitoring requirements in Forest Plans must document the effects of management prescriptions, including significant changes in productivity of the land; and must specify which actions, effects, or resources will be monitored, the frequency of monitoring, the precision and reliability of the monitoring process, and when the results of the monitoring will be reported. 36 C.F.R. §219.12(k).

required to develop Forest Development Road and Trail[13] System Plans,[14] which are part of the land and resource management planning process.  In planning for recreational use, including ORV use, the planning process must identify: 1) the physical and biological characteristics that make land suitable for recreation opportunities; 2) the recreational preferences of user groups and the settings needed to provide quality recreation opportunities; and 3) recreational opportunities on National Forest lands. 36 C.F.R. §219.21(a)(1-3).[15]  The objective of trail development is to, among other things, "provide a facility that minimally affects resources." FSH §2309.18 - 2.02 (emphasis added).  As part of this process, the visual resource of the National Forests must be inventoried and evaluated and the landscape's attractiveness and the public's visual expectation must be evaluated in recreational management alternatives in the planning process. Id. at §219.21(f).

Any trails designated for ORV use must be in compliance with the provisions included in 36 C.F.R. §295.1 et seq.  In addition to the restrictions or prohibitions placed on ORV use imposed by those specific regulations, general USFS regulations also prohibit a number of activities on and off Forest Development roads and trails.  For example, forest uses, including ORV use, which damage any natural feature or other property, damage any imperilled, sensitive, or unique plant, or which disturbs, injures, or destroys any prehistoric, historic, or archeological resource, site, artifact, or property are prohibited.[16] Id. at §261.9.  Vehicle use on Forest Development roads or trails is prohibited if such damages any such road, trail, or segment thereof. Id. at §261.12.  If used off of roads, vehicles, including ORVs are prohibited, if they violate any applicable noise emission standard imposed by any Federal or State agency, if they create excessive or unusual smoke, if used carelessly, recklessly, or without regard for the safety of the public or property, and if used in a manner "which damages or unreasonably disturbs the

---

[13]A "Forest Development Road" or "Forest Development Trail" is a road or trail "wholly or partly within or adjacent to and serving a part of the National Forest System," and which is included in a Forest Development Road or Trail System Plan. 36 C.F.R. §261.2.  A Four-Wheel Drive Way is a type of forest development road which is commonly used by four-wheel drive, high-clearance vehicles with a width greater than 50 inches. FSM §2353.05 - 3.

[14]Such plans developed to manage recreational use, including ORV use, are generally referred to as travel plans and include one or more maps which are intended to designate the roads, trails, and areas which are open to one or more forms of recreational use. (See, 36 C.F.R. §212.20(a)).

[15]In addition to non-commercial recreational activities, other activities, including group events (such as an ORV race) and commercial uses, can be authorized by Special Use Permit. 36 C.F.R. §251.50 et seq. Depending on the potential environmental impacts of the proposed activity, SUPs may be subject to review under the National Environmental Policy Act. Id. at §251.54(f)(2).  If the SUP is subject to a review in an Environmental Assessment or Environmental Impact Statement the decision of the Forest Service is subject to appeal. See, Id. at §251.82(8), §251.60(g), and §211 et seq. If the SUP was Categorically Excluded from review (See, FSH §1909.15 - -31.1b(8)) then, under existing regulations, it would not be subject to appeal. Id. at §215.8(a)(4).

[16]More specifically, USFS regulations explicitly state that "no person may excavate, remove, damage, or otherwise alter or deface, or attempt to excavate, remove, damage, or otherwise alter or deface any archeological resource located on public lands or Indian lands unless such activity is pursuant to a permit..." 36 C.F.R. §296.4.

land, wildlife, or vegetative resources." Id. at §261.13 (emphasis added).

Collectively, road and trail development plans are referred to as the Forest Development Transportation Plan (See, 36 C.F.R. §212.1(c). Such plans must be prepared for each National Forest and other areas under USFS administration. Pursuant to such plans, roads, or segments thereof, may be restricted to one or more vehicle types, including ORVs. Id. at §212.5(a)(2)(ii).

In addition to the statutes which broadly dictate planning and administrative processes for the National Forests, other statutes provide direction for the establishment of roads and trails for recreational and other uses in and outside of the National Forests and for the protection of specific forest lands.

The National Trails System Act, 16 U.S.C. §1241 et seq., provides Congressional authority for the creation of national recreation, scenic, and historic trails.[17] These trails are intended to be established in or reasonably accessible to urban areas in order to "promote the preservation of, public access to, travel within, and enjoyment and appreciation of the open-air, outdoor areas and historic resources of the Nation." Id. at §1241(a).[18] While motorized vehicles are permitted on some of these trails, except National Scenic Trails, under certain circumstances, the agencies administering trails under this Act are not required to permit motorized use, Id. at §1246(j), except in emergencies. The National Forest Roads and Trails Act, 16 U.S.C. §532 et seq., recognizes that construction and maintenance of an adequate system of roads and trails within and near the National Forests is essential to meeting the increasing demands for timber, recreation, and other uses.

A Primitive Area is an administrative designation which preceded the Wilderness Act (WA_. Within these areas there "shall be no roads or other provision for motorized transportation..." except that roads over forest lands reserved from the public domain and roads necessary for ingress and egress may be allowed under certain conditions. Id. at §293.17(a). The USFS's prohibition of ORV use in primitive areas has been upheld as a reasonable exercise of its administrative authority under the organic act. See McMichael v. U.S., 355 F.2d 283, 9th Cir. 1965.

Roadless areas are defined as undeveloped areas that meet minimum criteria for wilderness consideration under the WA. FSH §1909.12 - 7.11. Roadless areas typically exceed 5,000 acres of land and do not contain improved roads maintained for travel by standard passenger-type vehicles. In the eastern U.S., roadless areas may contain up to half a mile of improved road for each 1,000 acres. Id. at §7.11b. Management of roadless areas is generally determined through the forest planning process. However, the USFS has adopted an interim

---

[17]Trails designated under this statute which are under the jurisdiction of the USFS are managed as a component of the Forest Development Trail System. FSM §2353.11.

[18]Because the trails established under this Act are intended to be intensively used by the public, "every reasonable effort should be made to inventory federally administered lands located in or near urban areas in order to determine whether the development of recreation trails will be compatible with their Federal use." House Report No. 1631, P.L. 90-543, Page 3856.

policy barring road construction and reconstruction in most roadless areas.  64 FR 7290.[19]

In addition to the statutes and regulations that directly apply to the management of National Forests, the USFS must also comply with the National Environmental Policy Act (42 U.S.C. §4371 *et seq.*) and the Endangered Species Act (16 U.S.C. 1531 *et seq*).[20]

The National Environmental Policy Act (NEPA) is the nation's basic charter for the protection of the environment. 40 C.F.R. §1500.1(a). The Council on Environmental Quality (CEQ) has promulgated regulations implementing NEPA which all federal agencies are required to follow.  These regulations specify that "environmental information" relevant to federal actions must be "available to public officials and citizens before decisions are made and before actions are taken." Id. at §1500.1(b). (emphasis added). Not only must the information be of "high quality," but "accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA." Id. (emphasis added). Ultimately, NEPA is intended to "help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment." Id. at 1500.1(c) (emphasis added).

The "human environment" is broadly defined to include "the natural and physical environment and the relationship of people with that environment." Id. at §1508.14.  Similarly, actions and impacts under NEPA are also broadly defined.  An "action" includes "new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated or approved by federal agencies." Id. at §1508.18(a).  An "impact" or "effect" includes "ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative. Id. at §1508.8.

CEQ regulations require that federal agencies subject their actions to one of three levels of review; a CE, EA, or EIS.  If an EA or EIS is used the analysis must include a description of the purpose and need for the proposed action, a description of the affected environment, the consideration of a range of reasonable alternatives, and the evaluation of the environmental impact of the alternatives, including the preferred alternative.  A CE is intended to be used only for those actions which "do not individually or cumulatively have a significant effect on the human environment..." Id. at §1508.4.  CEQ regulations permit federal agencies to adopt their own NEPA implementing regulations which may include, among other things, a list of agency actions which would normally be subject to a CE.

---

[19]In addition, at President Clinton's direction, the USFS has initiated a rulemaking process to provide strong and lasting protection for roadless areas.  64 FR 56306.

[20]Other statutes and executive orders that are applicable to the use of off-road vehicles on public lands include the Clean Air Act 42 U.S.C. §7401 et seq., Clean Water Act 33 U.S.C. §1251 et seq, Alaska National Interest Lands Conservation Act 16 U.S.C. §3101 et seq., Migratory Bird Treaty Act 16 U.S.C. §461 et seq, Soil and Water Resources Conservation Act of 1977 16 U.S.C. §2001, Executive Order 11990 (Protection of Wetlands), Executive Order 11988 (Floodplain Management).

The USFS and its parent agency, the Department of the Agriculture (USDA), have promulgated their own NEPA implementing regulations.  USFS NEPA implementing regulations include a list of actions which are normally categorically excluded from NEPA review.  Such actions either are those listed by the USDA at 7 C.F.R. §1b.3 (and FSH §1909.15 - 31.1a) or actions listed in categorical exclusion categories established by the USFS (See, FSM §31.1b 31.2).

The USDA regulations specify that neither an EA or EIS is necessary for actions which involve policy development, funding programs, inventories, research activities, studies, educational programs, law enforcement activities, advisory actions, or which pertain to trade representation and market development abroad.  FSH §1909.15 - 31.1a(1-7).  The USFS list of Categorical Exclusion is more specific and includes road and trail repair and maintenance, repair and maintenance of recreational sites, minor short term special uses of less than 1 year duration or which requires less than five contiguous acres of land, and construction or reconstruction of trails.  FSH §1909.15 - 31.1b and 31.2.

If, however, an extraordinary circumstance is present, then a Categorical Exclusion cannot be used and the proposed action has to be subject to review pursuant to an Environmental Assessment or Environmental Impact Statement.  FSH §1909.15 - 30.3.  Potential extraordinary circumstances include, but are not limited to steep slopes, highly erosive soils, threatened and endangered species or their critical habitat, wetlands, Wilderness and Wilderness study areas, inventoried roadless areas, historic properties, and religious, cultural, and archaeological sites. Id. at §1909.15 - 30.3(2)(a-g). (emphasis added).

Finally, in recognition that certain species of plants and animals "have been so depleted in numbers that they are in danger of or threatened with extinction," 16 U.S.C. §1531(a)(2), Congress enacted the Endangered Species Act with the express purpose of providing both "a means whereby the ecosystems upon which endangered and threatened species depend may be conserved, [and] a program for the conservation of such endangered species and threatened species..." Id. at §1531(b).

The ESA prohibits the take of plant and animal species which are listed as endangered or threatened. Id. at §1538(a)(1); 50 C.F.R. §§17.21, 17.31.  The term take is broadly defined to include "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to engage in any such conduct." 16 U.S.C. §1532(19).  In addition, Section 7 of the ESA requires every federal agency to act on behalf of listed species. Id. at §1536(a)(1).  Among other things, federal agencies are required to consult with the U.S. Fish and Wildlife Service to insure that any action authorized, funded or carried out by such agency is not likely to jeopardize the continued existence of any endangered species. Id. at §1536(a)(2).

We believe that motorized access (ORVs) in the national forests can be provided for if collectively the foregoing statutes, regulations, and policies, are implemented properly.  Tragically, the USFS, except in rare circumstances, has chosen to largely ignore federal statutes and its own regulations in regard to the management and use of ORVs on and off-road.  Florida is no exception.  Considering the substantial adverse impacts of

ORVs on soils, vegetation, wildlife, air and water quality, and to other forest users, the failure of the USFS to properly execute the authorities and responsibilities delegated to it by the Congress through law, is literally destroying resources and recreational benefits of our National Forests.

ENVIRONMENTAL ASSESSMENT vs. ENVIRONMENTAL IMPACT STATEMENT:

We find that the Forest Service's decision to conduct an Environmental Assessment (EA) rather than a Environmental Impact Statement (EIS) is premature. Such a decision should be based upon high quality information, meaning monitoring, a completed road and trail inventory, updated biological information, a survey of ORV impacts, and analysis of the proliferation of roads and trails through time.

The National Forest in Florida are recognized cores of biological diversity, the largest areas of natural systems that remain in the state. Ecological management in balance with recreation of the forests is vital. Unfortunately, the Forest Service has ignored the mandate to monitor the effects of use by ORVs on the National Forests (Id. at §295.5), with resulting adverse effects on forest resources, and thus forgone the immediately closure of damaged areas, Id. at §295.5.

In the decision whether or not to conduct an EA or EIS, the following should be consider collectively: 1) the historic lawlessness demonstrated by the ORV users group and resulting damage, 2) increasing ORV use, 3) the substantial adverse impacts of ORVs on soils, vegetation, wildlife, air and water quality, 4) impacts to other forest users, 5) USFS staff ability to regulate and monitor ORV users, 6) the cumulative environmental impacts of motorized clubs, motorized events, inholding and surrounding residents with ORVs, 7) the availability of funding and manpower to prevent or correct adverse natural resource effects, 8) the natural communities rehabilitative capability, 9) the impossibility or impracticability of performing restoration, and 10) road and trail density impacts to the natural resources of the national forests.

We believe that an EIS is appropriate given the breadth and diversity of ORV damage forest-wide compared, for example, to a ski resort in a National Forest. An EIS can more appropriately address continued ORV use of trails.

ACCURATE INFORMATION:

As you know, an analysis is only as good as the materials one works from. Our recommendations are incomplete as the road/trail inventory and surveys for indicator management species on the Osceola are currently incomplete. NEPA requires that "environmental information" relevant to federal actions must be "available to public officials and citizens before decisions are made and before actions are taken." Id. at §1500.1(b). The information must be "high quality" and "accurate." During the Access

Process working group members complained of working with inadequate maps. During the Public Workshop (NEPA scoping) it was neither obvious to the public that the Working Group maps did <u>not</u> show all the roads nor species information or sensitive areas such as ephemeral pond, wetlands, and areas of elevation.

In our analysis of the Ocala National Forest, we found that the location of areas of elevation and ephemeral ponds is critical to an ecologically sound evaluation. This speaks to the need to start an analysis with accurate information. Since this information was not available to us, we would expect the Forest Service to complete such an analysis.

Realizing that the Forest Service is near completion of a road and trail inventory in Restricted Areas of the Osceola National Forest, a high quality and thorough analysis should start with this updated information. The public should have timely access to that information. Without accurate maps it is impossible for us and the general public to provide meaningful comments.

Nevertheless, we attempted to make an access recommendation based upon the information currently available. Again, this analysis is incomplete, but the methodology appropriate, and an example of what we would expect from the Forest Service. We would expect that the Forest Service would use its GIS capabilities, the data list provided, take into account sensitive hydrologic and geologic features, indicator management species and federal and state listed species and the additional recommendations for an analysis that follow. Additionally, the USFS should complete a site-specific analysis of trails proposed for ORVs as required under NEPA.

MATERIAL & DATA:
Our access recommendations are based upon the following materials and data:
The Access Plan (4 maps) at 1:24,000 served as base maps. The Working Groups recommendation maps were not available. We analyzed our base maps visually using the 1998 Administrative map to identify Forest Roads and management compartments. The Forest Service provided an additional map of A, B, C, D, O and X level roads (O and X roads are potentially excess Forest Roads). Personal knowledge was used to identify ephemeral wetland and other wetland types including ponds, streams, and lakes. The Forest Service provided federally threatened and endangered species locations (Red-cockaded woodpecker and flatwoods salamander) and gopher tortoise locations. No additional management indicator species maps or locations of ephemeral wetlands were provided in a usable format.

MOTORIZED ACCESS RECOMMENDATIONS:
The basic criteria we used to develop an access recommendation includes, the following:
[Note: Without specific additional species and more precise habitat and wetland information we were unable to use the data list (ie. buffering wetlands to accommodate species specific life- cycle

requirements, address ORV-sensitive species and sensitive areas per scientific recommendations) in our analysis, but would expect the Forest Service to complete such an analysis.]

- Develop a motorized travelway system that meets no greater than a 1 mile per square mile road/trail density.
- Give preference to motorized access on A, B, and C level Forest Roads (as long as the 1mi/sq. mi. criteria is met).
- Provide a single "Multi-Use Motorized Trail" (yellow on the Access maps). If not marked in yellow our intent was to close, to ORVs, all other roads and trails.
- Provide loops in the trail.
- Concentrate motorized access to the forest's perimeter and on "historic" travelways (as long as it meets the 1mi/sq.mi. criteria).
- Provide no additional staging areas.
- Close roads/trails through Outstanding Florida Water Waterways and their tributaries.
- Minimize motorized access in RCW HMAs.
- Provide no access through RCW active/inactive clusters and recruitment/replacement stands; avoid the perimeter of these areas when an alternative is present.
- Close roads to sensitive biological, geologic or hydrologic resources. (No further federally listed and/or indicator management species information was available for our evaluation.)
- Close most "D" level Forest Roads, O and X woods roads, and unmarked travelways with dead ends, some partially to provide some access for still hunters.
- Give preference to closing "D" level Forest Roads, O and X woods roads and travelways created in the 1980s and 1990s except when they offer an alternative to ecological damage created by "historic" travelways to meet the 1mi/sq mi criteria.
- Close access roads through wetlands, wet flatwoods, ephemeral ponds, and streams; close those dead end roads terminating at same.
- Close access to the perimeter of wetlands, ephemeral ponds, streams, and ponds (using the appropriate data list criteria for species).
- Close roads and travelways parallel to others.
- Close roads and travelways with deep mud and water holes and parallel travelways created when ORVs seek higher ground.
- Limit motorized crossing of the Florida National Scenic Trail (also any proposed hiking or horse trail). Minimize crossings with the "Multiple-use Motorized Trail".
- Provide for the aesthetics of a natural native forest without evidence of ORV damage.

We must emphasize again, that the Forest Service needs to analyze all recommendations based upon "high quality information", meaning the road /trail inventory, locations of management indicator species, updated federally threatened and endangered species locations, road density, noise effects, aesthetics, species life-cycle buffer zones and other scientifically based information found in the data list. We found that the location of areas of elevation and ephemeral wetlands is critical to an ecologically sound evaluation. This

speaks to the need to start an analysis with accurate information.

We would expect that the Forest Servie will conduct further GIS analysis using the no greater than 1mi/sq.mi. road/trail density. Start with maps identifying "historic" jeep trails/travelways (topographic maps). We found, for the Ocala National Forest, with a few exceptions, that the "historic" trails (particularly those of the 1970's ) avoided sensitive geologic and hydrologic features and occured at a reasonably low road density from which to start a road density analysis. Add the ecological and biological information, criteria from the data list (encloed), forest management areas and analyze.

Additional analysis needed by the Forest Service, including the following:

- Current road density and Access Plan Alternatives road density.

- Whether the Working Group's motorized Access Plan is located on "historical" jeep trails and travel ways or "new" trails.

- Whether the "new" and "historic" travelways damage sensitive wetland types, impact species locations and life-cycles, and concentrate motorized activities in sensitive or rare plant communities such as old growth, long-leaf pine/wiregrass communities and RCW HMA's.

- "Buffer" roads and trails per the enclosed data list (science-based recommendations for buffering ORV-sensitive species).

Be aware of the problems we observed while analyzing the Access Recommendations for the Ocala National Forest, including:

- The Working Group's motorized recommendations frequently targeted sink holes and wetland types for impacts and concentrated motorized activities in sensitive areas and RCW HMA's. The group nor public was provided adequate and complete road, ecological and geological information on which to make educated decisions.

- Working effectively with surrounding community and inholding residents is lacking. For the Osceola this would apply where these tracts access the forest on numbered roads and trails.

- Access maps (the Forest Service GIS database) was missing "historic" travelways.

- "Open Numbered Forest Roads, Improved Surface" was often unclear, obscured by section lines or not present at all.

- A high road/trail density indicated on the Working Group maps made it necessary to go back to topographic maps with our 1mi/sq.mi. road density criteria and give preference to "historic" jeep trails.

- Proposed ORV access, "Open Multiple Use" and "ATV & Motorcycle" trails were not primarily on "historical"jeep trails, instead they were on relatively new trails, created in the

1980's and 1990's and frequently targeted wetland types and concentrate motorized activities in sensitive RCW HMA's

- Multiple access roads to private inholdings were reduced to one primary access with the most direct route to an improved Forest or State Road.

- Some exceptions were made to the no more than 1mi/sq.mi road density criteria in peripheral areas of the national forest were inholdings and communities were located.

- To meet a maximum 1mi/sq.mi road density, motorized access was primarily recommended on existing A, B, and C level Forest Roads and a few jeep trails when areas had a high road density on "historic maps" (i.e. The 1970s topographic maps).

WORKING GROUP MAPS, "OPEN, PUBLIC ROADS" ISSUES:

Examining the aerial maps of the Ocala National Forest from 1943 to 2000 we noted a particular proliferation of roads and unmarked trails in the 1980s and 1990s, generally coinciding with the proliferation of ORVs. We concluded that the majority of the "Open, Public Roads" (grey/brown travelways) on the Ocala "Working Group Recommendations" maps were created in the 80's and 90's. Our impact assessment led us to conclude that many of these routes in Restricted Areas were created through irresponsible and/or inappropriate uses of motorized vehicles combined with a waning ability of law enforcement to control ORV use.

We assume that the same is true in the Osceola National Forest; further analysis by the Forest Service is warranted. In order to address ORV access it is necessary to understand the current conditions, ORV impacts, and how we got to where we are now.

Restricted Areas, are defined in the RLRMP as, areas where "licensed motorized vehicles/bicycles are restricted to open numbered roads and designated trails". Thus the recent proliferation of ORV travelways in these areas is illegal. If these travelways are officially opened as public roads by the Access process they will be used by ORVs, and are therefore "de facto" ORV trails. Designating these travelways officially "open" for ORV users, rewards illegal behavior, legitimizes years of illegal ORV activity, and represent an exponential expansion of trails for ORV users. Opening these travelways would be an unacceptable grandfathering of illegal activity. We recommend that unmarked travelways not become official "Open, Public Roads".

A final point regarding the "Open Public Roads" also identified as "Group Reached Consensus" on the "Working Group Recommendation" maps, is that these roads do not represent a consensus. In our December 2000 letter to the Forest Service, the environmental representatives withdrew from the national forest Access Designation Working Groups in part due to the access process facilitators and Forest Service staff lack of concern over road/trail density impacts and the fact that ORV users would inevitably use these "open

public roads". Facilitators and staff refused to address this issue during the Working Group process, particularly for the Ocala National Forest.

ADDITIONAL RECOMMENDATIONS:
Additional recommendations to the Forest Service include:

- Any Forest Road or unmarked trail, while closed to the public or motorized access, may be accessed by Forest Service staff for management purposes. Specifics need to be addressed in the Access Process.

- The USFS should support a limited mileage "multiple-use motorized" trail in the Restricted Areas of the forest to reduce conflicts with other non-motorized user groups by limiting noise pollution, reducing road/trail density and the probability of ecological damage and species impacts.

- Develop Alternatives and an environmental analysis starting with updated road and unmarked trails maps, archeological resource locations (not provided to us), ephemeral wetland locations (not provided), updated federally threatened and endangered species locations, updated RCW active colonies and recruitment stands, locations of indicator management species (not provided), location and criteria of forest management areas, and include analysis for species specific life-cycle requirements and migratory routes.

- Reject any proposal for a motorized trail rotation system. A 400-plus mile trails system has been recommended by the Access Designation Working Group in the Apalachicola National Forest. Due to the issue of road density, the lack of ecological community recovery time for any one of three trails proposed (three years) and USFS law enforcement inability to control ORV use on closed trails, we can not support this as an access alternative for any of the national forests.

- Any Forest Service alternatives analysis should include a comprehensive analysis including cumulative impacts to species. Defenders of Wildlife's report found that there are many ORV sensitive federal and state listed plant and animal species:

    Osceola National Forest
    Animals - Flatwoods salamander, many-lined salamander, eastern mud minnow, RCWs, striped newt, wood stork, gopher tortoise, Florida sandhill crane, little blue heron, eastern indigo snake, timber rattlesnake, eastern diamondback rattlesnake, mud sunfish, and Florida black bear.

    Plants - Florida toothache grass and pondspice.

- Consider the aesthetics of ORV trails, individually and as a network.

- The Forest Service final analysis needs also include noise effects on indicator management species and federally threatened and endangered species, noise affects on

other recreational opportunities, and conflicts with other users. There should be a conscious decision regarding the constant audible disturbance the USFS and other recreationists will tolerate. How is the audible disturbance meeting management objectives for threatened and endangered species?

- Provide for low road densities and minimal motorized impacts in critical habitat - old growth, rare plant communities (longleaf pine/wiregrass), areas with rare plants and animal species, and in areas protecting nesting, roosting and foraging habitat of state listed species, federally threatened and endangered species and management indicator species.

- Provide wetland protection and wetland dependant species buffer zones.

- Provide protection of valuable significant uplands.

- Implement an access plan based upon landscape level conservation planning principles, such as the highest use areas and trails on the periphery of the forest.

- Unmarked travelways that may be designated closed to the motorized public may be acceptable as nonmotorized trails for hikers and horseback riders.

- Plan a communication strategy for residents of forest communities and inholdings regarding the use and Forest Service regulations about ORVs. This is critical to a successful ORV management strategy if the forest should become more urbanized.

ROAD DENSITY CRITERIA:

A primary criteria we used in designating motorized access was the one mile per square mile physical presence of a road. This recommendation is based on the concern for maintaining the ecological integrity and biological diversity of the forest. It is our strongest recommendation.

As a general standard, it is frequently recommended that road densities should be below (or even well below) 1 mile per square mile to maintain high quality habitat for species sensitive to roads. The scientific literature on grizzly bear, wolves, elk, black bear, cougar, migratory and breeding birds, all suggest that habitat quality often rapidly declines when road densities exceed 1 mile per square mile. (See citations in Defenders ORV and Road Density report).

Managing the national forests with consideration for conservation is critical given that the forests in Florida are cores of biological diversity remaining in the state, also potential reintroduction sites for the endangered Florida panther, as well as regarded as hubs in the Statewide Ecological Network, part of the Florida Statewide Greenways system. In terms of the most current scientific theories on designing reserve systems and

managing conservation lands, to effectively conserve biological diversity, solving road impacts including reducing road densities are considered primary issues.

Tom Hoctor, Doctoral Candidate, Department of Wildlife Ecology and Conservation, University of Florida (UF) and member of the UF Greenways Planning Team, completed a road density analysis for the three Florida National Forests as part of his dissertation on regional landscape conservation to conserve Florida's biological diversity. His analysis is based upon Arc-Info software and 1:24000 digital line graph (dlg) roads coverage from USGS (approximately 1990 to 1995 maps). The analysis was run in GRID (raster) using a 90 meter cell size and an analysis window of one mile. Areas of open surface water within the national forests are excluded from the analysis. Wilderness and roadless areas are included.

Hoctor found significant differences in road densities in the three national forests, a synopsis of his findings are as follows:

- Less than 7 percent of the Ocala National Forest has road densities less than 1 mile per square mile.

- The Osceola National Forest (excluding the Pinhook area) appears to be only marginally better with no more than 13 percent of the area below an acceptable level.

- The Apalachicola is better with less than 40 percent with a road density below a 1 mile per square mile. It should be noted that there is a significant spatial disparity in road densities within the Apalachicola. The middle of the forest tends to have much lower road densities due to large wetlands (Wilderness areas), with the western, northwestern, and northeastern sections of the forest having higher road densities. In addition, the part of the northeastern section of the Apalachicola National Forest near Tallahassee has extremely high road densities.

The impacts of high road densities include severe habitat fragmentation, greater numbers of roadkills, extensive negative edge effects with very little of the forest, if any, not impacted by such effects, and greatly increased opportunity for human access that could include impacts such as poaching, trampling of vegetation, and noise impacts.

LAND & RESOURCE MANAGEMENT PLAN CONSIDERATIONS:

We recommend that when the Forest Service conducts its environmental analysis that road and trail density, environmental impacts, and ORV compatibility with the following elements of the Revised Land and Resource Management Plan for the National Forests in Florida (1999) also be consider (a brief synopsis of ecologically significant portions of the 1999 RLRMP follows but are not meant as a full analysis):

Remote Wetlands 4-15 & 16: Osceola only
> Recreation Opportunity Spectrum (ROS) = Provide for 50% motorized and 50% non-motorized.
> Goal: To provide conditions suitable for the recovery of proposed, endangered, threatened and sensitive species that require remote undisturbed habitat....
> Desired Future Conditions: Roads and trails are few and maintained only at low levels. Visitors are isolated from the sights and sounds of human activity... Roads are seldom seen.
> Standards and Guidelines: 1.1-2 Recreational Development 2, 1.1-3 Do not allow recreational facilities...

Research Natural Areas 4-17: Apalachicola and Osceola only
> ROS = 75% motorized and 25% non-motorized.
> Goal: To preserve areas that typify important botanic, aquatic, geological or similar natural situations that have special or unique characteristics of scientific interest and help form a national network of ecological resources.

Special Interest Areas 4-22: All forests
> ROS = 65% motorized and 25% nonmotorized
> Goal: To maintain a predominantly natural environment in which special aquatic, biotic, geologic, heritage, or scenic values can be preserved and interpreted for public enjoyment, study, and use.
> Desired Future Condition: ..ecosystems are in natural conditions. The physical site characteristics and vegetative features make the site unique. There may be nonmotorized loop trails. Undeveloped areas may be remote ..
> Standards and Guidelines:
> 3.1-1 All management activities must be consistent with the preservation of special attributes for which the area was established.
> 3.1-2 Restrict motorized vehicles to numbered roads and designated travelways.
> 3.1-4 Permit only hiking and horse trails ...

Minimum Development, Nonmotorized 4-26: Osceola only
> ROS = 100% Nonmotorized
> Goal: To provide a predominantly natural environment that gives a strong feeling of remoteness... To provide for nonmotorized recreation.
> Standards and Guidelines:
> 4.1-1 Restrict motorized vehicle use to administrative...
> 4.1-5 Develop trails for nonmotorized use only.

Minimum Development, Motorized 4-29: Ocala and Osceola
> ROS = 100% motorized
> Goal: To provide opportunities for motorized recreation...
> Desired Future Condition: Access is provided by a few unpaved roads, trails

...some old roads may be used as motorized trails.
Standards and Guidelines:4.2-2 allow traffic on service level C and D roads.

Longleaf and Slash Pine, Adaptive Management, RCW Management 4-39: All forests
ROS = 15% motorized, 10% nonmotorized and 75% Roaded Natural
Goal: To allow or mimic natural processes and patterns to maintain a rich
diversity of native plants and animals, including RCWs...
Desired Future Condition: RCW HMA
Standards and Guidelines: 7.1-3 Follow the standards established in the RCW
Record of Decision.

Longleaf and Slash Pine, Adaptive Management, No RCW Management, Cattle 4-42:
Ocala and Osceola
ROS = Semiprimitive -15% motorized, 10% nonmotorized and 75% Roaded
Natural
Goal:...to maintain a rich diversity of native plants and animals. To provide for a
wide range of opportunities for people to use ... the forest.
Desired Future Condition: no RCW HMA. Old growth longleaf pine management.
Standards and Guidelines:7.3-2 Only allow camping areas at development levels
1,2, or 3.

An access Alternative should be developed based upon the above management
areas, with consideration for the biological and ecological information.


RECOMMENDED ADDITIONAL ALTERNATIVES FOR ANALYSIS:
In conclusion, we propose that the Forest Service develop the following additional Access
Alternatives:
- Develop an Alternative with a "Multi-use Motorized Trail" system specific to
  RLRMP management areas within the Osceola. Analyze with the biological and
  ecological criteria. Consider primary ORV access to "Minimum Development,
  Motorized", "Longleaf/Slash Pine, Adaptive Management, No RCW Mgmt."
  (except in areas with old growth). Reduce access in "Special Interest Area" and
  "Longleaf/Slash, Adaptive Management, RCW Mgmt" areas.

- Develop an Alternative that designates motorized use onto A, B, and C numbered
  Forest Roads and management compartment boundaries. Analyze road densities
  to meet a 1mi/sq. mi criteria. Analyze with the biologic and ecologic information
  to assess the viability of such and Alternative.

- Develop an Alternative that designates motorized use only on compartment
  boundaries. This may facilitate management activities such as prescribed burning.
  Analyze road densities to meet a 1mi/sq. mi. criteria. Analyze species and

sensitive area impacts per the data list.

■ Develop a "No Access Alternative in Restricted Areas" with consideration for access and milage already available to ORVs in unrestricted areas. Is that milage more than adequate? Provide the public with the milage for unrestricted areas.

In conclusion, we would like to again emphasize the significance of the national forests in Florida as core conservation areas for the state, that management in recognition of their ecological importance is warranted. We believe the current level of ORV damage is significant, undermines conservation, other recreational pursuits, and is aesthetically unsightly.

We expect that the Forest Service will use updated information and detailed scientific criteria in developing the Access Alternatives and conducting the environmental analysis. The data list enclosed, methodology described, and suggested further analysis provides the basis for such an ecologically-based evaluation.

Finally, the Forest Service needs to take into account the current condition and likelihood of future delays in increasing law enforcement. We believe that motorized access (ORVs) in the national forests can be provided for if law enforcement is a available to implement collectively the statutes, regulations, and policies already in place. Without a commitment to law enforcement and to existing regulations on the national forests in Florida we would expect that ORV impacts on natural resources will continue.

We appreciate the opportunity to provide our input, and the cooperation of staff as we developed our recommendations. We would appreciate the Forest Service provide the interested public an opportunity to ground truth the developed Access Alternatives for each forest.

Sincerely,


Christine Small
Defenders of Wildlife
33104 NW 192nd Ave
Okeechobee, FL 34972


Judy Hancock
Florida Chapter of the Sierra Club
PO Box 2436
Lake City , Florida32056-2436

Jim Lyle
Florida Chapter of Sierra Club
3764 Millers Bridge Road
Tallahassee, FL 32312


cc:
Richard Shelfer
William Metz
Bob Simmons
Svenn Linskold
Laurie Macdonald
Mike Leahy