**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DEFENDERS OF WILDLIFE, *et al.*,    ) | |
|                 ) | |
|      Plaintiffs,      ) | Case No. 06-cv-00180 (HKK) |
|                 ) | |
|    v.           ) | |
|                 ) | |
| DIRK KEMPTHORNE, *et al.*,    ) | |
|                 ) | |
|      Defendants,     ) | |
|                 ) | |
| SAFARI CLUB INTERNATIONAL,    ) | |
| SAFARI CLUB INTERNATIONAL    ) | |
| FOUNDATION, U.S. SPORTSMEN'S    ) | |
| ALLLIANCE FOUNDATION, and    ) | |
| CENTRAL FLORIDA BEAR HUNTERS    ) | |
| ASSOCIATION,                 ) | |
|                 ) | |
|      Defendant-Intervenors.    ) | |
|                 ) | |

**CROSS-MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN
SUPPORT BY DEFENDANT-INTERVENORS SAFARI CLUB
INTERNATIONAL, SAFARI CLUB INTERNATIONAL FOUNDATION, U.S.
SPORTSMEN'S ALLIANCE FOUNDATION AND CENTRAL FLORIDA BEAR
HUNTERS ASSOCIATION AND OPPOSITION TO PLAINTIFFS'
<u>MOTION FOR SUMMARY JUDGMENT</u>**

Douglas S. Burdin (D.C. Bar No. 434107)      William P. Horn (D.C. Bar No. 375666)
Safari Club International                        Birch, Horton, Bittner & Cherot
501 2nd Street, N.E.                           1155 Connecticut Ave., N.W., 12th Floor
Washington, D. C.  20002                Washington, D.C.  20036
Telephone: (202) 543-8733              Telephone: (202) 659-5800
Facsimile:  (202) 543-1205              Facsimile:  (202) 659-1027

*Counsel for*                              *Counsel for*
*Safari Club International and*         *U.S. Sportsmen's Alliance Foundation and*
*Safari Club International Foundation*     *Central Florida Bear Hunters Association*

## TABLE OF CONTENTS

**Page No.**

I.    MOTION FOR SUMMARY JUDGMENT......................................................1

II.   INTRODUCTION ........................................................................1

III.  BACKGROUND FACTS AND REGULATORY SCHEME..........................3

IV.   ARGUMENT ...............................................................................3

    A.    Neither the Remand Order Nor ESA Section 4 Mandated
that the FWS Analyze the Regulatory Mechanisms Existing in 2004
in its Post-Remand Finding on the Petition to List the
Florida Black Bear ..............................................................3

        1.    The Court's Remand Order Contemplated a Review of the
Regulatory Mechanisms Existing in 1998 and a Better
Explanation of How Those Mechanisms Were Sufficient to
Support the Decision Not to List ................................3

        2.    In the Context of the FWS's Actions on Remand, ESA
Section 4 Allows Reliance on the Best Scientific and
Commercial Information Available at the Time of the
1998 Petition Finding..................................................8

    B.    The Regulatory Mechanisms Protecting the Florida Black Bear
Did Not Appreciably Change Between 1998 and 2004........................9

        1.    DOW *et al.*'s Assertions about Changes to the Clean Water
Act Wetlands Jurisdiction Blatantly Contradict Their Public
Statements about the Reach of the SWANCC Case .................9

        2.    The Forest Service Regulatory Changes Did Not Change the
Management of Forest Service Lands in Florida in 2004........12

        3.    The National Park Service's Plan for Big Cypress National
Preserve Calls for Drastic Reductions in ORV Use................13

    C.    The Current Status of the Florida Black Bear, Although Not
Relevant to the Legal Issues Before the Court, Reveals Sound
Population Numbers and Protections for the Species ..........................14

i

D.      DOW *et al.* Can Petition to Have the Florida Black Bear Listed
        If They Believe 2006 Conditions Warrant Listing .............................18

V.      CONCLUSION ................................................................................................19

# TABLE OF AUTHORITIES

**Page No.**

*Cases*

*American Bioscience Inc. v. Thompson*,
269 F.3d 1077 (D.C.Cir. 2001) ................................................................. 6

*\*American Wildlands v. Norton*,
193 F. Supp. 2d 244 (D.D.C. 2002) .......................................................5-6

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
401 U.S. 402, 91 S.Ct. 814 (1974) ........................................................... 5

*County of Los Angeles v. Shalala*,
192 F.3d 1005 (D.C. Cir. 1999)
*cert. denied*, 530 U.S. 1204 (2000) .......................................................... 6

*Defenders of Wildlife v. Babbitt*,
958 F Supp. 670 (D.D.C. 1997) ..............................................................7-8

*\*Defenders of Wildlife v. Norton*,
No. 99-02072 (HHK), slip op. (D.D.C. Dec. 13, 2001) ...................... *passim*

*Radio-Television News Directors Ass'n v. FCC*,
184 F.3d 872 (D.C. Cir. 1999) .................................................................. 6

*Solid Waste Agency of Cook County v. Army, Corps. of Eng'rs.*,
531 U.S. 159 (2001) ................................................................................ 10

*Southwest Center for Biological Diversity v. Babbitt*,
939 F. Supp. 49 (D.D.C. 1996) ................................................................. 8

*Southwest Center for Biological Diversity v. Badgley*,
No. 98-CV-2234, __ F. Supp. 2d __,
2006 WL 2993210 (S.D. Cal. Oct. 13, 2006) ........................................... 11

*Wildlife Conservation Fund of America v. Norton*,
No. 01-cv-25-FtM-29DNF, Order and Opinion (M.D. Fla. February 22, 2005).......... 14

*Statutes*

16 U.S.C. § 1533 ....................................................................................... 8
16 U.S.C. § 1604(g)(3)(B) ........................................................................ 12

*Regulations*

Notice of 12-month Petition Finding, Canadian Lynx, 62 Fed. Reg. 28653 (May 27,
1997) ....................................................................................................... 8

Notice of 12-month Petition Finding, Queen Charlotte Goshawk, 62 Fed. Reg. 46710
(September 4, 1997) ................................................................................. 8

69 Fed. Reg. 2100 (Jan 14, 2004) ........................................................... 15

\* Authorities on which Defendant-Intervenors principly relied are marked with an asterisk.

## I.    MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. Rule 56, Defendant-Intervenors Safari Club International, Safari Club International Foundation, U.S. Sportsmen's Alliance Foundation, and the Central Florida Bear Hunters Association move for summary judgment.  In support of this motion, Defendant-Intervenors submit the following Memorandum in Support of this motion, a statement of facts and opposition to Plaintiffs' statement of facts, and a proposed Order.  The following is also an opposition to Plaintiffs' motion for summary judgment, filed October 30, 2006.  Defendant-Intervenors also refer the Court to the Federal Defendants' cross-motion for summary judgment and opposition to Plaintiffs' motion for summary judgment.

## II.    INTRODUCTION

With its initial decision in December 1998 and its January 2004 clarification of its analysis of one of the Endangered Species Act ("ESA") listing factors pursuant to this Court's remand, the U.S. Fish and Wildlife Service ("FWS") made a sound and fully supported determination that the Florida black bear did not warrant listing under the ESA. This Court has already upheld the FWS's analysis and decision under four of the five ESA listing factors.  *Defenders of Wildlife v. Norton,* No. 99-02072 (HHK), slip op. at 6-19 (D.D.C. Dec. 13, 2001 ("2001 Opinion").  In remanding to the FWS its analysis and decision under the remaining factor – involving the existing regulatory mechanisms – the Court sought clarification from the FWS regarding whether the regulatory mechanisms on which the FWS relied in deciding not to list the Florida black bear were in existence and being enforced at the time of the FWS's 1998 listing decision.  *Id.* at 19-22.  The Court explained that the FWS could not rely on future or uncertain regulatory mechanisms in determining the listing status of a species and, because the Court

1

concluded that it could not determine whether the FWS's analysis relied upon such mechanisms, the Court required a better explanation from the agency. *Id.*

In their Motion for Summary Judgment, the Plaintiffs, Defenders of Wildlife *et al.* ("DOW *et al.*"), try to twist the meaning of this Court's 2001 Opinion by quoting its words in isolation. The intent of the 2001 Opinion was to make the FWS better explain its reliance on regulatory mechanisms existing at the time of its 1998 decision, not to force the agency to make a new determination based on regulatory mechanisms existing at the time of the FWS's action on remand. DOW *et al.*'s approach goes beyond the intent of the remand order and would skew the listing analysis by forcing the analysis of one factor – existing regulatory mechanisms – to occur in 2004, while leaving in place the 1998 analysis of the other four factors (which this Court has already upheld). Neither the 2001 Opinion, the ESA, nor the caselaw dictates such a result.

DOW *et al.*'s allegations related to regulatory changes since 1998 and to the current status of the Florida black bear are not relevant to the legal issues to be decided in this litigation. Nevertheless, without conceding the relevance of these allegations, Safari Club International, U.S. Sportsmen's Alliance Foundation and the other Defendant-Intervenors ("SCI and USSA") below respond to some of DOW *et al.*'s claims regarding alleged regulatory changes between 1998 and 2004 and briefly address the current status of the species. SCI and USSA do not want to leave DOW *et al.*'s assertions unchallenged. If DOW *et al.* believe that the regulatory mechanisms and other factors existing in 2004 or later suggest that the Florida black bear should be listed under the ESA, it can petition the FWS to list the species. Such a petition would require the agency

to reevaluate the factors based on that petition and the current situation of the Florida black bear.[1]

## III.    BACKGROUND FACTS AND REGULATORY SCHEME

SCI and USSA expect that the Federal government's brief will outline the relevant factual and regulatory issues (and other relevant matters such as the standard of review applicable to this case).  So as to minimize the briefing in this case and avoid duplication, SCI and USSA refer the Court to that discussion and incorporate it here.

## IV.    ARGUMENT

### A.    Neither the Remand Order Nor ESA Section 4 Mandated that the FWS Analyze the Regulatory Mechanisms Existing in 2004 in its Post-Remand Finding on the Petition to List the Florida Black Bear

#### 1.    The Court's Remand Order Contemplated a Review of the Regulatory Mechanisms Existing in 1998 and a Better Explanation of How Those Mechanisms Were Sufficient to Support the Decision Not to List

The FWS correctly analyzed on remand the regulatory mechanisms – defined by the Court as "those that are being currently implemented and enforced" – existing as of the date of its December 1998 listing decision.  The FWS properly understood the Court's direction on remand by looking at the entire 2001 Opinion and recognizing the Court's careful distinction between (1) regulatory mechanisms currently in place and implemented (*i.e.,* at the time of the decision), and (2) "regulations which might be enacted in the future, or current regulations authorizing future government action but which do not require that such action will take place."  2001 Opinion at 20.  As the FWS

---

[1]  It may be that DOW *et al.* desire to achieve this result by expanding the scope of the original remand, but, as discussed below, this was not the intent of this Court's 2001 Opinion and accordingly DOW *et al.* must submit a new petition if this is the result they seek.

correctly assessed, the 2001 Opinion focused on the certainty of the regulatory mechanisms, which is reflected in the phrases "currently being implemented and enforced" and "existing regulatory mechanisms." Nothing in these phrases, analyzed in their proper context, suggested that the FWS was being directed to bring the listing decision up to the date of the FWS's action on remand. *See* 2001 Opinion at 20 ("the Wildlife Service cannot rely on speculative future actions to justify its decision because there is no assurance that those actions will in fact be carried out.").

DOW *et al.* latches onto language at the end of the 2001 Opinion's that says "As a result, this case must be remanded to the Agency so that the Wildlife Service can examine only regulatory mechanisms which are currently being undertaken and enforced." *See*, *e.g.,* Pls. Memo in Support at 21, quoting 2001 Opinion at 22. DOW *et al.* claim this language mandates that the FWS conduct a new analysis of this single listing factor as of the date of the FWS's action on remand (*i.e.,* some date subsequent to the Court's remand or, in this case, January 2004). But this pinched view of the 2001 Opinion ignores the context of the Court's analysis of the existing regulatory mechanisms factor – mainly the distinction between (1) regulatory mechanisms that are existing, certain, and enforced, and (2) those that are future, speculative, or unenforced.

The nature of and basis for the remand further confirms the FWS's understanding of the 2001 Opinion. On review of the FWS's analysis of the existing regulatory mechanisms factor, the 2001 Opinion focused on the FWS's failure to make clear "from the record … whether other regulations relied upon by the Wildlife Service are currently being implemented." 2001 Opinion at 21. The Court concluded that the FWS had not made clear whether all the regulatory mechanisms on which it relied were "existing" – as

in certain and implemented – and did *not* conclude that the decision was arbitrary and capricious based on a clear and complete record.  2001 Opinion at 21-22.  As explained below, the former interpretation results in a remand to better explain and clarify the decision already made based on the administrative record and status quo in effect at the time of the original decision, while the latter interpretation forces a completely new and supplemental proceeding, decision, and administrative record.

In an analogous situation to the one facing this Court, Judge Sullivan of this court analyzed two types of remands available depending on why a court finds an agency's listing decision to be unlawful.  *American Wildlands v. Norton,* 193 F. Supp. 2d 244 (D.D.C. 2002).  One is when the court is "unclear of the grounds the agency asserts to defend its action… ."  *Id.* at 257 (citation omitted).  For example, in *American Wildlands,* the FWS suggested that "the appropriate remedy for an inadequate articulation of its consideration of the threat of hybridization is to remand the administrative record to the FWS for 'further explanation,' …."  *Id.*  Quoting the U.S. Supreme Court case of *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420, 91 S.Ct. 814 (1974), Judge Sullivan explained that a court will remand a determination to an agency for additional explanation when the "'bare record [does] not disclose the factors that were considered of the [agency's] construction of the evidence.'"  *Id.* (brackets in original).

In contrast, Judge Sullivan explained that a court will order a remand for new reasoned decision-making when the listing decision is based on a clear and "extensive" record, but "was not supported by the best available science and was arbitrary and capricious."  *Id.*  Faced with the latter situation, instead of remanding for a clarification of the original listing decision, the court in *American Wildlands* ordered a "*new* 12-month

Finding for [westslope cutthroat trout]…." *Id.* (emphasis added). Such a remand might analyze existing regulatory mechanisms existing at the time of the "new" decision.

Other cases support Judge Sullivan's analysis and the approach the FWS took here. For example, Judge Sullivan illustrated the distinction discussed above by reference to the case of *American Bioscience Inc. v. Thompson*, 269 F.3d 1077 (D.C.Cir. 2001) (court vacated and remanded FDA's arbitrary and capricious patent determination). In that case the D.C. Circuit described the court's practice of remanding agency rules without vacating, when the court is "unsure of the grounds the agency asserts to defend its action (and perhaps, where [the Court] perceive[s] that a ground poorly articulated might be sufficient to sustain the action.)" 269 F.3d at 1086; *see also County of Los Angeles v. Shalala*, 192 F.3d 1005, 1023 (D.C. Cir. 1999) (court remanded HHS determination concerning Medicare program to remedy inadequate explanation regarding data used for determining average length of stay), *cert. denied,* 530 U.S. 1204 (2000). Similarly, in the case of *Radio-Television News Directors Ass'n v. FCC*, 184 F.3d 872 (D.C. Cir. 1999), the D.C. Circuit remanded a determination by the Federal Communications Commission that it could not evaluate based on an inadequate Administrative Record. In that case, the court ordered further agency explanation but specifically rejected suggestions that its remand required the FCC to engage in new substantive decision-making. *Id.* at 888.

This Court here is faced with the situation in which the agency's explanation or analysis is unclear from the Court's review of the administrative record. As this Court described:  (1) the agency's explanation of the basis for its decision is "unclear from the record"; (2) "it is impossible for this court to determine, based on the existing record,

what those regulatory mechanisms are, and in what manner they are being implemented";
and (3) "[t]he record also fails to clarify the extent to which the Agency relied on the
possibility of future actions, … ."  2001 Opinion at 21-22.  Thus, the 2001 Opinion
properly remanded to the FWS for a better explanation and clarification of its 1998
analysis of the regulatory mechanisms existing at that time.  *Id.* at 22 ("Additionally, the
Agency must indicate on the record the regulations upon which it bases its decision.")
This action on remand would not involve updating the regulatory mechanisms to the
current date and making a wholly new decision.

The language of the 2001 Opinion supports this reading.  The Court remanded "so
that the Wildlife Service can examine only regulatory mechanisms which are currently
being undertaken and enforced."  *Id.*  The present tense of the phrase "currently being
undertaken and enforced" merely reflects the statutory requirement (as confirmed by case
law) that the agency can "only" consider regulatory mechanisms that are existing at the
time of the decision and are being enforced and implemented.  That language does not
amount to a mandate to reach a completely new decision.  Such a mandate would only
follow a finding that the agency's clearly explained decision, supported by a clear record,
was arbitrary and capricious and contrary to law.  The Court did not make that finding
here.

DOW *et al.* ignore this distinction when they note two other actions taken by the
FWS in response to court remands that required the agency to engage in new decision-
making.  Pls. Memo in Support at 27.  For example, DOW *et al.* refer to the FWS's
reaction to the ruling in *Defenders of Wildlife v. Babbitt*, 958 F Supp. 670 (D.D.C. 1997),
in which Judge Kessler of this court determined that, among other things, the FWS

utilized an incorrect legal evidentiary standard for making its listing decision, based its decision on conclusions and facts that were contradicted by the Administrative Record, and ignored the views of the Service's own experts. *Id.* at 679-84; *see also* Notice of 12-month Petition Finding, Canadian Lynx, 62 Fed. Reg. 28653, 28654 (May 27, 1997).[2] Here, unlike in these cases, the remand was to clarify and explain the decision and record.

>   **2.    In the Context of the FWS's Actions on Remand, ESA Section 4 Allows Reliance on the Best Scientific and Commercial Information Available at the Time of the 1998 Petition Finding**

For the same reasons discussed above, Section 4 of the ESA, 16 U.S.C. § 1533, does not require the FWS to bring its analysis of the existing regulatory mechanisms up to the date of its action on remand (*i.e.,* January 2004).  The Court's remand order determines whether the FWS had to provide a better explanation and analysis of the original decision (based on the record existing at the time of that decision) or must make a "new" decision to replace an original arbitrary and capricious one (which usually would involve updating the record to the time of the second decision).[3]  Because the former situation applies here, the "best scientific and commercial information available" would be that information existing (*i.e.,* available) at the time of the original decision and would be contained in that administrative record.

---

[2]  Similarly, Plaintiffs incorrectly point to the FWS's analysis concerning a listing decision for Queen Charlotte Goshawk in response to the remand by Judge Sorkin of this court in *Southwest Center for Biological Diversity v. Babbitt*, 939 F. Supp. 49, 52 (D.D.C. 1996); Notice of 12-month Petition Finding, Queen Charlotte Goshawk, 62 Fed. Reg. 46710, 46711 (September 4, 1997).  In that case, in contrast to the instant matter, Judge Sorkin did not request further explanation, but instead instructed the Secretary to "reconsider" the 12-month finding on the Goshawk listing.

[3] While Section 4 does address the requirement to use the "best scientific and commercial information available," 16 U.S.C. § 1533(b), it does not address the timing of the decision-making on remand.

**B.      The Regulatory Mechanisms Protecting the Florida Black Bear Did Not Appreciably Change Between 1998 and 2004**

Whether or not the regulatory mechanisms protecting the Florida black bear changed in any significant manner between 1998 and 2004 is not relevant to the central legal question of this case.  Nonetheless, DOW *et al.* argues at length that the regulatory mechanisms have changed dramatically between 1998 and 2004, presumably to suggest that if the FWS analyzed the regulatory mechanisms existing in 2004, it would have reached a different conclusion.  But as described below, DOW *et al.*'s description of the alleged regulatory changes is overstated.  SCI and USSA encourage the Court to focus on the central legal issues and ignore DOW *et al.*'s discussion of alleged changes in the regulatory mechanisms between 1998 and 2004.  But, without conceding or suggesting that the existence or extent of these alleged changes are relevant, SCI and USSA address a few of them so as not to leave DOW *et al.*'s assertions unchallenged.

**1.      DOW *et al.*'s Assertions about Changes to the Clean Water Act Wetlands Jurisdiction Blatantly Contradict Their Public Statements about the Reach of the *SWANCC* Case**

DOW *et al* claim that alleged changes in 2001 to the Federal wetlands program regulatory mechanisms would cause the FWS to change their Florida black bear listing decision.  But DOW *et al.* make statements here regarding the Federal Section 404 wetlands program that blatantly contradict public statements they made in 2003 (and likely at other times) about this program.  These contradictory statements undermine DOW *et al.*'s credibility on the issue of the alleged changes in regulatory mechanisms between 1998 and 2004.

In their summary judgment brief, DOW *et al.* state that:

the Supreme Court decision in <u>Solid Waste Agency of Cook County v. Army, Corps. of Eng'rs.</u> … *significantly narrowed* the scope of the

> CWA's dredge and fill requirements.  531 U.S. 159, (2001) ("*SWANCC*").
> Because of *SWANCC*, by 2004 many Florida wetlands that support the
> bear may no longer be protected by Section 404 permitting processes,
> even if they were in 1998.

Pls. Memo in Support at 28 (emphasis added).  But in comments on a proposed rule

following the *SWANCC* decision, filed with the Environmental Protection Agency,

Docket OW-2002-0050, on April 16, 2003 ("DOW/SC Wetlands Comments"), Plaintiffs

Defenders of Wildlife and Sierra Club, and several other groups, stated:

> We begin our comments with a discussion debunking the claim made in
> the January 15 notice that a rulemaking is necessitated by the U.S.
> Supreme Court's decision in Solid Waste Agency of Northern Cook
> County v. U.S. Army Corps of Engineers (hereafter "*SWANCC*") 531 U.S.
> 159 (2001).  In fact, nothing in the *SWANCC* decision compels any change
> in the longstanding definition of waters of the United States used by both
> EPA and the Corps, as the U.S. Department of Justice has argued
> consistently in briefs filed in federal courts in the two years since the
> *SWANCC* decision.  We also seek to correct the skewed presentation of
> post-*SWANCC* case law that is contained in the January 15 ANPRM and
> attached Guidance.  *Our comments make clear that both the ANPRM and
> Guidance go far beyond any change in law or policy necessitated by the
> narrow holding in SWANCC.*

DOW/SC Wetlands Comments at 1-2 (emphasis added).[4]  The Comments then go on for

several pages discussing DOW and Sierra Club's view on the "narrow holding in

*SWANCC.*"  *Id.* at 2-7 (headings in comments include "*SWANCC* Does Not Call Into

Question The CWA's Jurisdiction Over Non-Navigable Tributaries To Navigable

Waters").  Thus, in DOW and Sierra Club's view publicly expressed outside this

litigation, little has changed in the wetlands regulatory program between 1998 and 2004.[5]

---

[4]  Available at http://www.eswr.com/swanccnprm/swanccnwfandothers.pdf).

[5]  The EPA and Army Corps of Engineers eventually abandoned this proposed
rulemaking.  See Press Release "EPA and Army Corps Issue Wetlands Decision"
(released 12/16/2003) ("EPA and the Corps announced that they would not issue a new
rule on federal regulatory jurisdiction over isolated wetlands.").  Available at

In fact, whether one believes that *SWANCC* removed jurisdiction over only isolated wetlands with no connection with interstate commerce other than visitation by migratory birds, or over all isolated wetlands (*i.e.,* wetlands with no hydrological connection at all with navigable-in-fact waters), DOW *et al.* have not explained how a change in the regulation of isolated wetlands could affect the Florida black bear.[6]  In Florida, with its extensive network of wetlands and rivers,[7] it is unlikely that *isolated* wetlands have much significance (as to be "isolated" a wetland must be completely cut off from all other waters) and DOW *et al.* have not suggested how they could.  Thus, even under DOW *et al.'s* litigation position on the reach of *SWANCC,* any impact of the *SWANCC* decision would be minimal at most.[8]

---

http://yosemite.epa.gov/opa/admpress.nsf/b1ab9f485b098972852562e7004dc686/540f28acf38d7f9b85256dfe00714ab0?OpenDocument.

[6]  The single case cited by DOW *et al.* to suggest that *SWANCC* created a sea-change in the regulation of wetlands in Florida, Pls. Memo in Support at 28, involved "isolated vernal pools that seasonally fill with water on San Diego's mesas."  *Southwest Center for Biological Diversity v. Badgley,* No. 98-CV-2234, __ F. Supp. 2d __, 2006 WL 2993210, *7 (S.D. Cal. Oct. 13, 2006).  This case says nothing about the wetlands of Florida or the impact of *SWANCC* on wetlands in Florida.

[7] For example, Big Cypress National Preserve, one of the areas with a flourishing Florida black bear population, is described in a National Park Service document as follows:

> Water is the principal natural resource of the entire south Florida region, and about 90 percent of Big Cypress is flooded during the wet season (NPS, 1991).  Because of the high annual rainfall and the flat topography, the inundation can last for several months beyond the actual rainfall period (Duever *et al.* 1986).

http://www.nps.gov/bicy/parkmgmt/upload/high%20water%20criteria%20low%20res.pdf

[8]  In addition, the Section 404 wetlands program primarily governs dredge and fill activities and commercial development on private and non-Federal lands.  As much of the best bear habitat is within Federal lands (*e.g.*, Big Cypress National Preserve, National Forest units), it is hard to see how (and DOW *et al.* does not explain how) a narrowing of the wetlands regulatory program, even if it happened, could adversely affect the habitat

### 2. The Forest Service Regulatory Changes Did Not Change the Management of Forest Service Lands in Florida in 2004

Also having little or no impact on existing regulatory mechanisms between 1998 and 2004 are changes to U.S. Forest Service planning regulations. A Land and Resource Management Plan adopted in 1999 ("1999 Plan") governs planning for and management of the three National Forests that help support stable Florida black bear populations in Florida.[9] The 1999 Plan covers the Apalachicola, Choctawhatchee, Ocala, and Osceola National Forests. It "is a guide for the overall management of *National Forests in Florida* for the next decade" or from 1999 to 2009. *Id.* Preface at vii. The Forest Service adopted the plan to comply with its statutory duty to, among other things, "provide for diversity of plant and animal communities based on the suitability and capability of the specific land area in order to meet overall multiple-use objectives, … ." 16 U.S.C. § 1604(g)(3)(B). DOW *et al.* does not allege that the 1999 Plan is a regulatory change that adversely affects the Florida black bear, instead alleging that *planning* regulations that changed around 2002 are significant, even though the 2002 regulations do not govern and cannot change the 1999 Plan, which is in effect until 2009.

The Forest Service developed the 1999 Plan in accordance with the regulations existing in 1999, which had been in place since 1982. *See* Record of Decision for the Revised Land and Resource Management Plan for National Forests in Florida at 2

---

of the Florida black bear on Federal lands where little dredge and fill activity is occurring.

[9] The 1999 Plan is available at http://www.fs.fed.us/r8/florida/projects/documents/forest_plan/forest_plan.shtml.

(February 1999).[10]  The 1999 Plan called for the use of "management indicator species,"
which helped the Forest Service plan for and monitor activities in order to ensure a
diversity of plant and animal communities.  1999 Plan at 5-1 to 5-3 (describing the Forest
Service's use of management indicator species).  The 1999 Plan identified the Florida
black bear as a management indicator species.  1999 Plan at 5-11.

   DOW *et al.* claims that the FWS relied on regulatory mechanisms – namely the
Forest Service planning regulations – that changed between 1998 and 2004.  Pls. Memo
in Support at 35-36.  DOW *et al.* fails to explain that these are planning regulations and
mischaracterizes them as a "regulatory mandate to maintain viable populations of
species" on all National Forests.  *Id.* at 36.  In any event, the 1999 Plan, which governs
the units for 10 years, or until 2009, was adopted well before any change in the planning
regulations.  The 2002 planning regulations did not change Forest management plans
already in existence.  In addition, the statutory mandates governing Forest Service
planning and management did not change.  Thus, any changes in the planning
regulations, which address the *development* of Forest Plans, do not affect the already
existing Forest Plan governing these units.  Again, the alleged change in regulatory
mechanisms between 1998 and 2004 is not as DOW *et al.* claims.

### 3.   The National Park Service's Plan for Big Cypress National Preserve Calls for Drastic Reductions in ORV Use

   As with other alleged changes in regulatory mechanisms, DOW *et al.*'s
suggestion that off-road vehicles ("ORVs") are causing more harm in Big Cypress
National Preserve ("BCNP") in 2004 than in 1998 is unfounded.  Pls. Memo in Support

---

[10]  Available at
http://www.fs.fed.us/r8/florida/projects/documents/forest_plan/Record%20of%20Decision.pdf.

at 38 (mentioning BCNP but primarily discussing Forest Service lands). Even

mentioning ORV use in BCNP is disingenuous because the management plan the

National Park Service adopted in 2000 contains drastic reductions in the number and

amount of ORV trails available for public use. As described in a later Big Cypress

planning document:

> A recreational Off-Road Vehicle (ORV) Management Plan was completed
> by the NPS (2000) for the Preserve. It prescribes designating ORV trails
> and establishing parking/staging areas for ORV users. Implementation of
> this plan will concentrate ORVs onto the designated trails. This will result
> in beneficial impacts by reducing the estimated 22,000 miles of ORV trails
> to 400 miles, thus reducing the widespread impacts now associated with
> dispersed ORV use. This project is anticipated to have long-term,
> moderate to major benefits to wetlands, vegetation, wildlife, and special
> status species.

Environmental Assessment, Tamiami Trail Welcome Center at 39 (National Park Service

August 2003).[11] As to the Big Cypress National Preserve, DOW *et al.*'s attempt to paint

a picture of a significantly different regulatory mechanisms in 2004 than in 1998 again

fails.[12]

### C. The Current Status of the Florida Black Bear, Although Not Relevant to the Legal Issues Before the Court, Reveals Sound Population Numbers and Protections for the Species

Throughout their brief, DOW *et al.* attempt to portray a dire situation for the

Florida black bear. Because the remand was for a review and clarification of regulatory

---

[11] Available at
http://planning.nps.gov/document/bicy_FEA_tamiami_welcome_center.pdf.

[12] In an unreported decision, the District Court for the Middle District of Florida upheld
the National Park Service's ORV Plan for Big Cypress National Preserve. *Wildlife
Conservation Fund of America v. Norton,* No. 01-cv-25-FtM-29DNF, Order and Opinion
(M.D. Fla. February 22, 2005). Defenders of Wildlife and Sierra Club were intervenor-
defendants in that case; the U.S. Sportsmen's Alliance Foundation (then known as the
Wildlife Conservation Fund of America) was one of the plaintiffs.

mechanisms existing in 1998, the current status of the species is not relevant to the legal issues before the Court.  Nonetheless, and without conceding that the discussion of the more recent status of the species is relevant to the legal issues, SCI and USSA here address this issue briefly.

The FWS based its January 14, 2004 decision, in part, on the successes of several Florida agencies and organizations entrusted with the responsibility to protect, study and conserve the population of the Florida Black Bear and stated:

> [W]e concluded in 1998, and conclude again now, that existing regulatory mechanisms in 1998 that relate to habitat protection and management are adequate to maintain habitat of sufficient quantity and quality to ensure viable bear populations…and do not warrant listing the Florida black bear.

69 Fed. Reg. 2100, 2107-08 (Jan. 14, 2004).  These same entities, and others, are protecting the species today.  The Florida Fish & Wildlife Conservation Commission ("FWCC") is undertaking conservation efforts and the Bear Management Section ("BMS") of the FWCC is responsible for planning, coordinating and implementing bear management within Florida.  The BMS works with the Bureau of Wildlife Management, several state offices responsible for education and outreach, government agencies, conservation groups and private individuals.  A brief review of the facts related to the Florida black bear which arise from these efforts reveals the current status of the Florida black bear.

In 2003, the FWCC published a "Conservation Strategy for the Black Bear in Florida" ("Conservation Strategy").[13]  The project was supervised by Dr. Thomas H. Eason with cooperation from the FWCC's Florida Bear Conservation Working Group.

---

[13] *See* http://myfwc.com/bear/Reports/Conservation-Strategy-for-Florida-Black-Bear-July-2003.pdf.

The FWS contributed to the strategy, as did plaintiff Defenders of Wildlife and defendant-intervenor Central Florida Bear Hunters Association. *See id.,* at 26, Table 1. The Strategy identifies three Goals and 20 specific objectives designed to achieve these Goals:

> Goal 1 – Provide for an overall population of black bears in the wild in Florida that exceeds, over the long-term, the FWCC's minimum criteria for listing as a Species of Special Concern.
>
> Goal 2 – Secure habitat for black bears in Florida that will provide for an overall population that exceeds, over the long-term, the FWCC's minimum criteria for listing as a Species of Special Concern.
>
> Goal 3 – Attain broad-based appreciation for and tolerance of black bears in Florida and support for their conservation.

The Conservation Strategy was written as a "statewide overview of the integrated conservation efforts needed to sustain black bears in Florida."[14]  As part of this strategy, FWCC has the BMS prepare annual status reports on bear populations and related trends in Florida.[15]  The 2003 status report indicates a "stable to increasing" bear population.[16]

According to a recent study by the BMS of the FWCC, Florida black bear populations are "stable to increasing" in six core or viable populations.[17]  The Florida black bear population is presently estimated to exceed 2,042- 3,213 bears, compared to 1,282 in 1998.  *See* Conservation Strategy at 27; *see also* Statewide Assessment of Road

---

[14]  *Id*. at iv.

[15]  The BMS consists of 4 full time employees, 4 temporary employees and 3 graduate students.  *See* "Florida Status Report," Thomas H. Eason, Bear Management Section, FWCC, at 1 (2003), *available at*:  http://myfwc.com/bear/Status_Reports.htm.

[16]  *Id.*

[17]  *Id.* at 1.

Impacts on Bears in Six Study Areas in Florida from May 2001-September 2003, at 43 (2005) ("2005 Report").[18]

The FWCC and the Florida Department of Transportation conducted a joint study of road impacts on bears.[19]  The study produced additional data regarding expanding bear populations and expanding ranges.  Primary range for bears was estimated to have increased 8.1% on an additional 1,931 kilometers between 2000 and 2004.[20]  And as previously noted, the total number of bears in the six most viable populations was estimated as high as 3,312 animals – more than double the total 1998 population statewide for 9 populations.  Despite obvious concerns about increasing road kills of bears, the study noted "[t]he percent roadkill impact in Florida falls within the percent roadkill impact of other states in the Eastern United States."[21]

The FWCC has aggressively pursued other vital research projects to facilitate continued bear conservation in Florida, including the following:

- Determining the impact of relocation over nuisance Florida black bear in Central Florida;
- South-Central Florida Black Bear Conservation;
- Demodicosis (mange) in the Ocala population;
- Non-Invasive Assessment of Black Bear Movements and Abundance of Black Bear Movements and Abundance Relative to U.S. 98 Within the Aucilla Wildlife Management Area;

---

[18]  *Available at*:  http://myfwc.com/bear/Reports/RoadImpactsOnBearsStudy-Final-Report-2005.pdf.

[19]  *See* http://myfwc.com/bear/Reports/RoadImpactsOnBearsStudy-Final-Report-2005.pdf.

[20]  *Id*. at 43.

[21]  *Id*. at 25.

- Cub Survival and Denning Ecology of Florida Black Bears, Ocala National Forest;

- Genetic Structure & Gene Flow Among Florida Black Bear Populations;

- Habitat Use and Genetic Relatedness of Female Black Bears in the Ocala National Forest;

- Black Bear Movements and Habitat Use Relative to Roads, Ocala National Forest;

- Northern St. Johns River Black Bear Assessment;

- Habitat Assessment for Protective Reintroduction of Black bears to the Mobile-Tensaw Delta of Southwestern Alabama; and

- [Bear] Population Dynamics in Chassahowitzka.[22]

In short, the State of Florida has consistently worked to protect and conserve the Florida black bear population, with several agencies and organizations charged with the responsibility and possessed with the scientific knowledge necessary to make well-reasoned decisions about the "stable to increasing" Florida black bear population.

> **D.    DOW *et al.* Can Petition to Have the Florida Black Bear Listed If They Believe 2006 Conditions Warrant Listing**

If DOW *et al.* desire to have the FWS re-evaluate all the listing factors for the Florida black bear as of 2006 or some future decision date, they must file a new petition with the FWS and restart the process. Their papers filed in this Court suggest that DOW *et al.* seek to use this litigation to achieve this goal. In the conclusion of their motion for summary judgment, they seek a "remand to the Service with instructions that the Service analyze whether existing regulatory mechanisms are adequate *given the current state of the Florida Black Bear and the threats to its survival at the time the Service renders its decision.*" Pls. Memo in Support at 40 (emphasis added). Their Complaint goes even further. It requests that the Court "direct defendants to issue a proposed rule listing the

---

[22] *See* http://myfwc.com/bear/research.htm.

Florida black bear as an endangered or threatened species according to a timetable to be determined by the Court." Pls. Compl. at 28 (Docket 1). Such a result would nullify the Court's ruling upholding the FWS's decision on four of the five listing factors and transform a remand to better explain and record a decision on one listing factor into a brand new comprehensive listing decision.

If DOW *et al.* desire this result, they must again petition the FWS to list the Florida black bear. In such a petition, they can present all the post-1998 information they insist is relevant and demonstrates a need to list the species.[23] The FWS can then evaluate that information according to the procedures set out in ESA Section 4.

## V.     CONCLUSION

The Court did not appear to intend that the 2001 Opinion and remand to the FWS should result in a comprehensive new listing decision. Instead, the 2001 Opinion ordered a clarification and better explanation of one listing factor – existing regulatory mechanisms – as of the time of the 1998 Decision. Based on the Court's finding that the FWS did not adequately explain and/or document its decision, the caselaw supports this approach.

Alleged changes in regulatory mechanisms between 1998 and 2004 (many of which are overstated or insignificant) are irrelevant to the legal issues before the Court. The Florida black bear did not need ESA listing in 1998, and does not need it today. If DOW *et al.* believes the species' current status warrants listing, it can petition for that

---

[23] Defenders of Wildlife's June 2002 letter to the FWS on the Florida black bear and other documents with which DOW *et al.* wish to supplement the record would be relevant to such a petition.

listing. But they should not be allowed to transform the limited remand to the FWS into a full-blown listing determination.

SCI and USSA respectfully request that the Court grant the Defendants' and Defendant-Intervenors' motions for summary judgment, deny DOW *et al.*'s motion for summary judgment, and dismiss DOW *et al.*'s Complaint with prejudice.

Dated this 7th day of December, 2006.        Respectfully submitted,


/s/ Douglas S. Burdin
Douglas S. Burdin (D.C. Bar No. 434107)
Safari Club International
501 2nd Street, N.E.
Washington, D. C.  20002
Telephone: (202) 543-8733
Facsimile:  (202) 543-1205
dburdin@sci-dc.org

*Counsel for*
*Safari Club International and*
*Safari Club International Foundation*


/s/ Willam P. Horn
William P. Horn (D.C. Bar No. 375666)
Birch, Horton, Bittner & Cherot
1155 Connecticut Ave., N.W.
12th Floor
Washington, D.C.  20036
Telephone: (202) 659-5800
Facsimile:  (202) 659-1027
whorn@dc.bhb.com

*Counsel for*
*U.S. Sportsmen's Alliance Foundation and*
*Central Florida Bear Hunters Association*