# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DEFENDERS OF WILDLIFE, ET AL.   )
            ) Case No. 1:06-cv00180 (HHK)
    Plaintiffs,     )
            )
    v.       )
            )
DIRK KEMPTHORNE, ET AL.,    )
            )
    Defendants.    )
            )

## DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND MOTION IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. Rule 56, Federal Defendants hereby move for summary judgment and oppose Plaintiffs' Motion for Summary Judgment filed October 30, 2006 in the above-titled action. Defendants set forth the reasons why this motion should be granted in the following Memorandum in Support of this motion, a statement of facts, and a response to Plaintiffs' statement of facts, and a proposed Order. Accordingly, Defendants are entitled to summary judgment.

         Respectfully submitted,
         SUE ELLEN WOOLDRIDGE
         Assistant Attorney General

         *S/ Courtney Taylor*
         _____
         Courtney Taylor, Attorney
         U.S. Department of Justice
         Environment & Natural Resources Division
         Wildlife and Marine Resources Section
         P.O. Box. 7369
         Washington, D.C.  20044-7369
         (202) 353-7548
         Attorney for Defendants

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DEFENDERS OF WILDLIFE, ET AL. | ) |
| | ) Case No. 1:06-cv00180 (HHK) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| DIRK KEMPTHORNE, ET AL.,[1] | ) |
| | ) |
| Defendants. | ) |
| | ) |

## FEDERAL DEFENDANTS' COMBINED MEMORANDUM
## IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT
## AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d)(1), Dirk Kempthorne, Secretary of the Department of the Interior, is automatically substituted for his predecessor, Gale Norton.

## TABLE OF CONTENTS

PAGE

INTRODUCTION.................................................................................................................1

STATUTORY AND REGULATORY BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

A.    The Endangered Species Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

A.    The Florida Black Bear . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

B.    The Listing History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

C.    The Remanded Florida Black Bear Determination . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

STANDARD AND SCOPE OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

I.    THE SERVICE'S REEXAMINATION OF REGULATORY MEASURES
      COMPLIES WITH THE COURT'S REMAND ORDER AND SHOULD
      BE UPHELD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

      A.    The Service's Decision To Explain And Reconsider Its Factor D Determination
            on Remand in Light of Regulatory Mechanisms That Existed in 1998 Was A
            Proper Exercise of Discretion And Fully Comports With Governing D.C.
            Circuit Precedent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

      B.    The Service's Remanded Decision Fully Complied With the Court's 2001
            Opinion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

            1.    The Court's 2001 Opinion Did Not Require the Service to Examine
                  Regulatory Mechanisms That Existed in 2004 . . . . . . . . . . . . . . . . . . . . 18

            2.    The Court's 2001 Opinion Did Not Require the Service to Reevaluate
                  Threats to the Florida Black Bear as of 2004 . . . . . . . . . . . . . . . . . . . . 21

II.   THE SERVICE'S DECISION THAT EXISTING REGULATORY MECHANISMS
      ARE NOT INADEQUATE SO AS TO WARRANT LISTING FULLY COMPLIES
      WITH THE ESA AND IS SUPPORTED BY THE RECORD . . . . . . . . . . . . . . . . . . . . 23

      A.    The Service's Remanded Decision Complies with the Court's 2001 Opinion And
            Is Fully Supported By The Record . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

B.    The Service Considered the Best Available Science on the Present Status
of the Species . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

C.    The Service Was Not Required to Show That Existing Regulatory Mechanisms
Are Effective in Countering Habitat Loss and Fragmentation . . . . . . . . . . . . . 27

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

TABLE OF AUTHORITIES

CASES                                                                                                        PAGE

Alpharma, Inc. v. Leavitt, 460 F.3d 1 (D.C. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

American Wildlands v. Norton, 193 F. Supp. 2d 244 (D.D.C. 2002) . . . . . . . . . . . . . . . . . . . . 12

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Baltimore Gas and Elec. Co. v. Natural Res. Def. Council, 462 U.S. 87 (1983) . . . . . . . . . . . 13

Biodiversity Legal Found. v. Babbitt, 943 F. Supp. 23 (D.D.C. 1996) . . . . . . . . . . . . . . . . . . . 20

Building Indus. Ass'n v. Babbit, 979 F. Supp. 893 (D.D.C. 1997) . . . . . . . . . . . . . . . . . . . . . . . 17

Building Indus. Ass'n v. Norton, 247 F. 3d 1241 (D.C. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . 26

Califano v. Sanders, 430 U.S. 99 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Camp v. Pitts, 411 U.S. 138, 142 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402 (1971) . . . . . . . . . . . . . . . . . . . . . . 13

County of Los Angeles v. Shalala, 192 F.3d 1005 (D.C. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . 14

Ctr. for Biological Diversity v. Badgley, 335 F.3d 1097 (9th Cir. 2003) . . . . . . . . . . . . . . . . . 28

Ctr. for Biological Diversity v. FWS, 402 F. Supp. 2d 1198 (D. Or. 2005) . . . . . . . . . . . . . . . 29

Defenders of Wildlife v. Babbitt, 958 F. Supp. 670 (D.D.C. 1997) . . . . . . . . . . . . . . . . . . . . . . 22

Defenders of Wildlife v. Kempthorne, 2006 WL 2844232 (D.D.C. Sept. 29, 2006) . . . . . . . . . 16

Environmental Defense Fund v. Costle, 657 F.2d 275 (D.C.Cir. 1981) . . . . . . . . . . . . . . . . . . . 12

Ethyl Corp. v EPA, 541 F.2d 1 (D.C. Cir.1976) (en banc) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Federal Power Comm'n v. Transcon. Gas Pipe Line Corp., 423 U.S. 326 (1976) . . . . . . . . . . 14

Ford Motor Co. v. NLRB, 305 U.S. 364 (1939) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Friends of the Earth v. U.S. Army Corps of Eng'rs , 109 F. Supp. 2d 30 (D.D.C. 2000) . . . 12, 13

Friends of the Wild Swan v. FWS, 12 F. Supp. 2d 1121 (D. Or. 1997) . . . . . . . . . . . . . . . . . . . 17

Friends of Wild Swan v. FWS, 945 F. Supp. 1388 (D. Or. 1996) . . . . . . . . . . . . . . . . . . . . . . . 17

Heartland Reg'l Med. Ctr. v. Leavitt, 415 F.3d 24 (D.C. Cir. 2005) . . . . . . . . . . . . . . . . . 15, 17

James Madison Ltd. By Hecht v. Ludwig, 82 F.3d 1085 (D.C. Cir. 1996) . . . . . . . . . . . . . . . 13

Marsh v. Oregon Natural Res. Council, 490 U.S. 360 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Nat'l Tank Truck Carriers v. EPA, 907 F.2d 177 (D.C. Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . 17

Northern Spotted Owl v. Hodel, 716 F. Supp. 479 (W.D. Wash. 1988) . . . . . . . . . . . . . . . . . . 17

Oregon Natural Res. Council v. Daley, 6 F. Supp. 2d 1139 (D. Or. 1998) . . . . . . . . . . . . . 20, 22

Red Top Mercury Mines v. United States, 887 F.2d 198 (9th Cir. 1989) . . . . . . . . . . . . . . . . . 30

Save Our Springs v. Babbitt, 27 F. Supp. 2d 739 (W.D. Tex. 1997) . . . . . . . . . . . . . . . . . . . . . 20

Sw. Ctr. for Biological Diversity v. Babbitt, 939 F. Supp. 49 (D.D.C. 1996) . . . . . . . . . . . . . . 20

Sw. Ctr. for Biological Diversity v. Norton, 2002 WL 1733618 (D.D.C. July 29, 2002) . . . . . . 29

TransCanada Pipelines Ltd. v. FERC, 24 F.3d 305 (D.C. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . 15

STATUTES

5 U.S.C. § 706 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

5 U.S.C. § 706(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

16 U.S.C. § 1531 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

16 U.S.C. § 1531(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

16 U.S.C. § 1532(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 26

16 U.S.C. § 1532(15) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

16 U.S.C. §1532(16) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

16 U.S.C. § 1533(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

16 U.S.C. § 1533(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

16 U.S.C. § 1533(a)(1)(D) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24, 27, 28

16 U.S.C. § 1533(b)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

16 U.S.C. § 1533(b)(3)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

16 U.S.C. § 1533(b)(3)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

16 U.S.C. § 1533(b)(6)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 12

RULES

Federal Rule of Civil Procedure 25(d)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

FEDERAL REGULATIONS

50 C.F.R. § 424.02(k) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

50 C.F.R. § 424.11(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

50 C.F.R. § 424.15 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

**INTRODUCTION**

Despite the dramatic rhetoric about habitat loss and fragmentation in which Plaintiffs cloak their claim, the only relevant issue in this case is whether the Federal Defendants, the Secretary of Interior and the United States Fish and Wildlife Service (collectively "the Service" or "FWS"), properly exercised their discretion on remand to reexamine regulatory mechanisms that existed in 1998 and reasonably determined that those mechanisms are not inadequate so as to leave the Florida Black Bear threatened or endangered.   The answer to that question is yes.

This case concerns the Florida Black Bear, the largest land mammal in Florida, and a remand from this Court to the Service to redo part of a 1998 listing decision that the bear did not warrant listing as threatened or endangered under the Endangered Species Act ("ESA"). Specifically, the Court instructed the Service to reexamine the inadequacy of existing regulatory mechanisms and determine whether inadequate regulatory mechanisms would render the bear threatened or endangered.  Consistent with the Court's opinion, the Service conducted a thorough reexamination of the regulatory mechanisms that existed at the time of its 1998 listing decision and, on January 14, 2004, issued its decision on remand concluding again that listing the bear is not warranted based on the inadequacy of those mechanisms.

There is ample support in the remanded decision and its administrative record, and Plaintiffs have failed to demonstrate otherwise.  Plaintiffs' arguments to the contrary are largely collateral and inappropriate attempts to relitigate the Service's 1998 listing decision.  Indeed, rather than simply challenging whether the Service in 2004 properly examined the 1998 regulatory mechanisms, Plaintiffs attempt to reopen the entire 1998 listing decision by developing a non-existent requirement in the Court's 2001 opinion and a standard in the ESA that compel the Service to assess the bear's status in 2004.  Then, Plaintiffs argue that the

Service has violated that fictitious requirement and standard. Plaintiffs should not be allowed to use this case to challenge the Service's decision previously upheld by this Court.

Defendants hereby oppose Plaintiffs' motion for summary judgment and move for summary judgment on Plaintiffs' claim for relief. As Defendants will demonstrate, the Service's remanded decision fully complies with D.C. Circuit precedent governing remands, this Court's 2001 opinion, and the ESA. Moreover, the Service provided a rational basis for its conclusion that the bear should not be listed, and the administrative record supports that conclusion. Therefore, Defendants are entitled to summary judgment, and the remanded determination should be upheld.

## STATUTORY AND REGULATORY BACKGROUND

### A.    The Endangered Species Act

The ESA, 16 U.S.C. §§ 1531 et seq., was enacted in 1973 "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species..." 16 U.S.C. § 1531(b). For the purposes of the ESA, an "endangered" species is a species that is "in danger of extinction throughout all or a significant portion of its range," while a "threatened" species is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(6), (20). The ESA defines "species" to include subspecies and any "distinct population segment of any species * * * which interbreeds when mature." 16 U.S.C. §1532(16). See also 50 C.F.R. § 424.02(k); 61 Fed. Reg. 4722 (Feb. 7, 1996) (clarifying interpretation of "distinct population segment").

The ESA delegates the authority to determine whether a species should be listed as

endangered or threatened to the Secretaries of Commerce and Interior. 16 U.S.C. §§ 1533(a),

1532(15).[2] Pursuant to section 4(a)(1) of the ESA, the Secretary determines whether to list a

species as threatened or endangered based upon five statutorily prescribed factors, any one of

which is sufficient to support a listing determination: (A) the present or threatened destruction,

modification, or curtailment of its habitat or range; (B) overutilization for commercial,

recreational, scientific, or educational purposes; (C) disease or predation; (D) the inadequacy of

existing regulatory mechanisms; or (E) other natural or manmade factors affecting its continued

existence.  16 U.S.C. § 1533(a)(1).  The Secretary must make his decision whether to list a

species

>    solely on the basis of the best scientific and commercial data available to him
>    after conducting a review of the status of the species and after taking into account
>    those efforts, if any, being made by any State or foreign nation, or any political
>    subdivision of a State or foreign nation, to protect such species, whether by
>    predator control, protection of habitat and food supply, or other conservation
>    practices, within any area under its jurisdiction, or on the high seas.

Id. § 1533(b)(1)(A)); see also 50 C.F.R. §§ 424.11(b), 424.11(f).

A listing action may be initiated in two ways.  The Secretary may initiate a review of a

species of his own accord through a process known as the "candidate process."  See 16 U.S.C. §

1533(a)(1), (c); see also 66 Fed. Reg. 1295, 1296 (Jan. 8, 2001) (candidate list).  In addition, an

"interested person" may petition the Secretary to add a species to the list of endangered and

threatened species.  16 U.S.C. § 1533(b)(3)(A).

Under the petition process, within 90 days after receiving a petition to list a species, the

---

[2] Depending on the species in question, the "Secretary" referred to in the language of the Act
may be the Secretary of the Interior or the Secretary of Commerce.  16 U.S.C. § 1532(15).  The
Secretary of the Interior has jurisdiction over the Florida Black Bear. The U.S. Fish and Wildlife
Service is the agency within the Department of Interior with delegated responsibility for
administering the ESA with respect to those species within Interior's jurisdiction.

Secretary is required, "[t]o the maximum extent practicable," to make a finding as to whether the petition presents substantial scientific or commercial information indicating that the listing may be warranted ("90-day finding"). 16 U.S.C. § 1533(b)(3)(A). If the Secretary determines that listing may be warranted, the Secretary has one year from the receipt of the petition to undertake a status review to determine if a listing action is warranted ("12-month finding"). 16 U.S.C. § 1533(b)(3)(B); 50 C.F.R. § 424.15.

If the 12-month finding is "not warranted" (i.e. the Secretary determines that the petitioned listing action is not warranted), the Secretary must publish this finding in the Federal Register, and the listing process is terminated for the species. The "not warranted" finding is then subject to judicial review. 16 U.S.C. § 1533(b)(3)(C)(ii).

If the Secretary determines that the listing is warranted, he must publish a notice in the Federal Register that includes the complete text of a proposed rule to implement the action. 16 U.S.C. § 1533(b)(3)(B)(ii). The Secretary must act on a proposed rule within one year of the date of its publication. 16 U.S.C. § 1533(b)(6)(A). At that point, he may promulgate a final rule, withdraw the proposed rule if he finds that there is not sufficient evidence to justify the proposed rule, or extend the one-year period for consideration by not more than six months if he finds that there is "substantial disagreement regarding the sufficiency or accuracy of the available data relevant to the determination or revision concerned." 16 U.S.C. § 1533(b)(6)(B)(i).

## **FACTUAL BACKGROUND**

A.    **The Florida Black Bear**

The Florida black bear (*Ursus americanus floridanus*), a subspecies of the American black bear (*Ursus americanus*), is the largest land mammal in Florida. D.S. Maehr & J.B.

Wooding, Rare and Endangered Biota of Florida (S.R. Humphrey ed. 1992), A.R. 2200.[3]  Florida black bears live in a variety of landscapes ranging from temperate plant communities in northwestern Florida (as well as southern Alabama and Georgia) to subtropical communities in southern portions of the state.  Id.  A combination of several major forest types, including pine flatwoods, hardwood swamp, cabbage palm forest, and sand pine scrub, are typical of occupied bear range.  Id.  The most recent survey of the species shows that the Florida black bear population is somewhere between 1,600 and 3,000.  See 1998 Status Review at 29, A.R. 2173.

Despite reduction and fragmentation of its former range, the Florida black bear has managed to propagate in four healthy, self-sustaining populations distributed throughout its historic range.  See generally 1998 Status Review, A.R. 2145.  These four populations inhabit large areas of publicly owned and adjacent private lands at: (1) Okefenokee National Wildlife Refuge ("NWR") and Osceola National Forest ("NF") in southeastern Georgia and northeastern Florida; (2) Ocala NF in central Florida; (3) Big Cypress National Preserve, in southern Florida; and (4) Apalachicola NF in the Florida panhandle.  63 Fed. Reg.67613, 67614-16 (Dec. 8, 1998), S.A.R. 7044-46.  A fifth population in and adjacent to Eglin Air Force Base ("AFB") in the western panhandle of Florida is likely to remain viable with proper management.  63 Fed. Reg. at 67615, S.A.R. 7045.  These five populations contain the vast majority of all Florida bears in existence today.  1998 Status Review at 7-30, A.R. 2151-2174.  Sufficient habitat for the four core populations to survive is currently protected by existing, secure public land.  63 Fed. Reg. at 67615-16, S.A.R. 7044-46.

**B.**    **The Listing History**

_____

[3] Citations to documents included in the Administrative Record filed by the Service on July7, 2006 are indicated by an "A.R." and citations to the Supplemental Administrative Record filed by the Service on September 27, 2006 are indicated by "S.A.R."

Since the early 1980s, the Service has carefully monitored the status of the Florida black bear. On May 20, 1990, the Service received a petition from Ms. Inge Hutchinson of Lake Geneva, Florida, to list the Florida black bear as a threatened species. 69 Fed. Reg. 2100, 2104 (Jan. 14, 2004), A.R. 2. The Service made a 90-day petition finding on October 18, 1990 (55 Fed. Reg. 42223 (Oct. 18, 1990)) that the petition presented substantial information that the petition action may be warranted. S.A.R. 6298. Based on the information received and information in Service files, the Service concluded in the 12-month finding that listing was warranted but precluded by higher priority listing actions. (57 Fed. Reg. 596 (Jan. 7, 1992)). S.A.R. 6406. On January 21, 1997, the Service entered into a revised settlement agreement in Fund for Animals v. Babbitt, Civ. No. 92-0800 (SS) (D.D.C.) A stipulation of the agreement was that the Service would resolve the conservation status of the Florida black bear by December 31, 1998. 69 Fed. Reg. at 2101., A.R. 2. In 1998, the Service updated the status review of the Florida black bear to include additional information concerning the status that had become available since the 1992 assessment. See generally 1998 Status Review, A.R. 2145. On December 8, 1998, the Service published notice of its determination that the data on the Florida black bear failed to meet the ESA criteria to warrant listing of the species. 63 Fed. Reg. at 67613, S.A.R. 7043.

In 1999, Plaintiffs and others filed suit challenging the Service's 1998 listing decision finding as arbitrary and capricious. On December 13, 2001, this Court upheld the 12-month finding for Factors A-C and E rejecting Plaintiffs' arguments that (1) the likely loss of bear habitat indicated that the bear will become extinct throughout a significant portion of its range, notwithstanding the stability of some populations, and (2) the finding was arbitrary and capricious based on the 1992 "warranted but precluded" finding and on the combined effects of

habitat destruction, habitat isolation, roadkill, and hunting.  <u>Defenders of Wildlife v. Norton</u>, 99-

02072 at 7-18 (HHK), slip opinion (D.D.C. Dec. 13, 2001)("2001 opinion")(Pls.' Ex. 2).

Plaintiffs also argued that the finding was arbitrary and capricious because it relied on

future, speculative regulations to determine that existing regulatory mechanisms are not

inadequate.  The Court held that the Service's listing decision on the inadequacy of regulatory

mechanisms could not be sustained because it was unclear from the record whether the

regulations on which the Service relied were currently being implemented.  2001 opinion at 21-

22.  The Court remanded Factor D to the Service, so the "Service can examine only regulatory

mechanisms which are currently being undertaken and enforced."  2001 opinion at 22.

**C.**    **<u>The Remanded Florida Black Bear Determination</u>**

On January 14, 2004, the Service published in the Federal Register a reexamination of

the regulatory mechanisms in effect and enforced at the time of the 1998 12-month finding.  69

Fed. Reg. at 2100, A.R. 1.  In its remanded decision, the Service responded directly to the

Court's concerns raised in its 2001 opinion and evaluated regulatory mechanisms that were

currently in place.  69 Fed. Reg. at 2100, A.R. 1.  Specifically, the Service analyzed federal and

state regulatory mechanisms that addressed direct take of the bear, protected against habitat loss,

and ensured proper management of existing bear habitat.  69 Fed. Reg. at 2100, A.R. 1.  For

example, the Service detailed regulations that prohibit the taking of wildlife, provide heightened

protection to the bear and regulate any legal hunting.  69 Fed. Reg. at 2102, A.R. 3; <u>see</u> A.R.

5681, 5693, 5866, 5903, 6098, 6102, 6103.   The Service noted that, in addition to itself, the

States of Georgia and Florida, the U.S. Forest Service ("USFS"), and the National Park Service

("NPS") all prohibit the taking of wildlife, game species, and their dens on lands under their

jurisdictions unless a specific permit is issued allowing such take, or an open season, bag limit,

and methods of take are designated by regulation. 69 Fed. Reg. at 2102, A.R. 3; see A.R. 5681,

5693, 5866, 5903, 6098, 6102, 6103. The Service also explained that in Florida and Georgia, the

sale, purchase, and transportation of bears or bear parts are prohibited. 69 Fed. Reg. at 2102,

A.R. 3; see A.R. 5693, 5701, 5873. Finally, in relation to direct take, the Service stated that the

Georgia Department of Natural Resources prohibits the killing of a bear except during an open

hunting season or by authorization, and the Florida Administrative Code lists the bear as

threatened (except in Baker and Columbia counties and in the Apalachicola National Forest)

prohibiting the intentional killing, wounding, taking, possession, transportation, molestation,

harassment, or sale of the species. 69 Fed. Reg. at 2102, A.R. 3; see A.R. 5573, 5777. For each

of these, the Service specifically identified the applicable regulatory provisions. 69 Fed. Reg. at

2102, A.R. 3.

Next, the Service outlined federal and state programs that protect bear habitat from

further destruction. 69 Fed. Reg. at 2103, A.R. 4. In particular, the Service discussed the Clean

Water Act's Section 404 program which protects wetland habitats important to the bear either

through prohibiting wetland destruction or requiring mitigation of impacts of permitted wetland

development. 69 Fed. Reg. at 2103, A.R. 4; see A.R. 6067, 6080, 6098. The Service also

explained that Florida had similar programs that prevent wetland habitat destruction or require

mitigation for such wetland development, such as the Department of Transportation program that

provided $12 million for mitigation of transportation projects and the Environmental Resources

Permitting program that required evaluation and mitigation of projects that will impact the state-

listed bear. 69 Fed. Reg. at 2103, A.R. 4; see 5592. To apply for an Environmental Resources

Permit, applicants for development permits must provide assurances that developments will not

adversely affect the abundance, food source, or habitats of wetland-dependent species, including

the bear. 69 Fed. Reg. at 2104, A.R. 5; see 5592. Further, the Service noted that Florida has designated the Wekiva River Protection Area to protect land south of the Ocala National Forest in important bear habitat and a Riparian Habitat Protection Zone in the St. John's River region to protect wetlands and uplands adjoining the Wekiva River system. 69 Fed. Reg. at 2104, A.R. 5; see 5563, 5566, 5601, 5668.

Finally, the Service spent considerable time evaluating federal and state regulatory mechanisms that require state and federal agencies to manage their lands in ways that are protective of the bear. 69 Fed. Reg. at 2105-2108, A.R. 6-9. For example, the Service explained that the Big Cypress National Preserve's General Management Plan ("GMP"), approved in 1991, continues to be implemented to meet the goal of watershed protection through prescribed burning, control of exotic plants, and hydrologic restoration. 69 Fed. Reg. at 2105, A.R. 6; see 5967. The GMP must be, and is, implemented in a manner consistent with the purpose of the National Park System to conserve the wildlife within its units in an unimpaired state, and the purpose of the Preserve is to assure the natural and ecological integrity of the watershed. 69 Fed. Reg. at 2105, A.R. 6; A.R. 2214, 5967. The Service also noted that National Wildlife Refuges that provide habitat for the bear, including Okefenokee, Florida Panther, and St. Mark's, all had approved habitat and fire management plans in place that required prescribed burning and forest management actions that benefitted the bear. 69 Fed. Reg. at 2105, A.R. 6; see 2988, 3059, 3195. The Service explained that the 1985 management plan for national forests in Florida governed activities on those forests in 1998. 69 Fed. Reg. at 2106, A.R. 7. In that plan and its revised draft in 1997, the bear was identified as a management indicator and sensitive species which requires the United States Forest Service to evaluate the impacts of actions in each national forest on the bear and its habitat. 69 Fed. Reg. at 2106, A.R. 7; see A.R. 3642, 4735,

4988, 5506, and 5511.  The Service highlighted that, in 1998, the Forest Service estimated that

"actions planned to improve wildlife habitat, implement road closures, conduct prescribed burns,

and complete land acquisition projects had achieved 116%, 197%, 145%, and 8,583%,

respectively, of all the levels directed in the 1985 plan."  69 Fed. Reg. at 2106, A.R. 7; see A.R.

5512.  Finally, the Service noted that the 1997 Sikes Act Amendment required the Department of

Defense ("DOD") to prepare and implement an integrated natural resource management plan for

Eglin Air Force Base.  69 Fed. Reg. at 2106, A.R. 7; see 5936.  Although DOD had not

completed its plan by 1998, the Service noted that it was taking actions to protect bear habitat,

including maintenance of habitat diversity, prescribed burning, uneven-aged forest management,

restoration of longleaf pine habitat, and maintenance of riparian and forested wetlands all

pursuant to a 1993 management plan.  69 Fed. Reg. at 2106, A.R. 7; A.R. 519; A.R. 7043.

     The Service also explained that all state lands in habitat important to the bear had state

management plans in place that describe how a state-listed species, like the bear, will be

protected and preserved.  69 Fed. Reg. at 2107, A.R. 8.  The plans must also, according to

Florida statute, evaluate every five years whether the plans' requirements sufficiently protect

state-listed species.  Id.

     After this exhaustive examination, the Service reasonably concluded that the existing

regulatory mechanisms were not inadequate so as to warrant listing the bear under the ESA.

More than two years after the Service issued its remanded determination, Plaintiffs filed this suit

on February 2, 2006, challenging that determination as arbitrary and capricious.

## STANDARD AND SCOPE OF REVIEW

     Plaintiffs' claim here challenging the Service's remanded decision that listing the bear is

not warranted is subject to review under the Administrative Procedure Act ("APA"), 5 U.S.C. §

706, which provides for judicial review of final agency action.  American Wildlands v. Norton, 193 F. Supp. 2d 244, 251 (D.D.C. 2002).  The APA permits the Court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . .." 5 U.S.C. § 706(2)(A).

Review under the "arbitrary and capricious" standard is "highly deferential" and "presumes the agency's action to be valid."  Environmental Defense Fund v. Costle, 657 F.2d 275, 283 (D.C.Cir. 1981).  Under this deferential standard of review, there is a strong presumption in favor of upholding agency decisions when the agency acts within the scope of its expertise in technically complex areas.  Marsh v. Oregon Natural Res. Council, 490 U.S. 360, 375, 378 (1989); Friends of the Earth v. U.S. Army Corps of Eng'rs , 109 F. Supp. 2d 30, 35-36 (D.D.C. 2000).  "An agency action is arbitrary and capricious if an agency has entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  Id. at 34 (internal quotation marks and citations omitted).  In reviewing an agency's scientific fact findings, the Court must be especially deferential.  See Baltimore Gas and Elec. Co. v. Natural Res. Def. Council, 462 U.S. 87, 103 (1983).  "We must look at the decision not as the chemist, biologist, or statistician that we are qualified neither by training nor experience to be, but as a reviewing court exercising our narrowly defined duty of holding agencies to certain minimal standards of rationality." Ethyl Corp. v EPA, 541 F.2d 1, 36 (D.C. Cir.1976) (en banc).  Finally, as this case involves a challenge to a final administrative action under 5 U.S.C. § 706, consequently, review is limited to the administrative record compiled and relied on by the agency.  Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402 (1971), abrogated on other grounds, Califano v. Sanders, 430 U.S.

99 (1977); Camp v. Pitts, 411 U.S. 138, 142 (1973).

Summary judgment is warranted only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  Because there are generally no facts in dispute in administrative record cases, summary judgment is the appropriate procedure for resolving challenges to agency action under the APA. See, e.g., James Madison Ltd. By Hecht v. Ludwig, 82 F.3d 1085, 1096 (D.C. Cir. 1996).

## ARGUMENT

### I.     THE SERVICE'S REEXAMINATION OF REGULATORY MEASURES COMPLIES WITH THE COURT'S REMAND ORDER AND SHOULD BE UPHELD.

Despite the Service's thorough reexamination and reasonable determination, Plaintiffs argue that the Service's remanded decision was arbitrary and capricious because it failed to address regulatory mechanisms after 1998 and failed to inquire into the present status of the bear, meaning its status as of 2004.  Those arguments lack merit.  The Service's remanded decision is fully consistent with governing law, provides the explanation the Court found lacking in 2001 and is a reasonable exercise of the agency's discretion.  Thus, the agency's determination should be upheld.

####     A.     The Service's Decision To Explain And Reconsider Its Factor D Determination on Remand in Light of Regulatory Mechanisms That Existed in 1998 Was A Proper Exercise of Discretion And Fully Comports With Governing D.C. Circuit Precedent.

Plaintiffs' primary argument is that the Service erred in deciding to limit its reexamination of the inadequacy of regulatory mechanisms to ones that existed in 1998, rather than expanding its Factor D analysis to mechanisms existing in 2004.  Pls. MSJ at 1-2, 21-27. As shown below, the Service's decision to proceed in this fashion was a proper exercise of its

discretion and fully consistent with D.C. Circuit precedent governing the scope of remand to an agency.

It is well settled that it is appropriate for an agency to exercise its discretion on remand. See Federal Power Comm'n v. Transcon. Gas Pipe Line Corp., 423 U.S. 326, 333 (1976) (judicial review of agency action ordinarily requires remand to agency so that agency can exercise its discretion). This includes the discretion to determine the scope of its reconsideration of the remanded issues. See id. at 333-34; Ford Motor Co. v. NLRB, 305 U.S. 364, 374 (1939)("The 'remand' . . . means simply that the case is returned to the administrative body in order that it may take further action in accordance with the applicable law."); County of Los Angeles v. Shalala, 192 F.3d 1005, 1011 (D.C. Cir. 1999) ("when a court reviewing agency action determines that an agency made an error of law, the court's inquiry is at an end: the case must be remanded to the agency for further action consistent with the corrected legal standards"(citations omitted)).

D.C. Circuit precedent requires on remand only that an agency cure the legal deficiencies expressly identified by the court. See Heartland Reg'l Med. Ctr. v. Leavitt, 415 F.3d 24, 29 (D.C. Cir. 2005)(Heartland II). See also TransCanada Pipelines Ltd. v. FERC, 24 F.3d 305 (D.C. Cir. 1994)(remanding to the agency to explain its factual findings and its decision); Alpharma, Inc. v. Leavitt, 460 F.3d 1, 6 (D.C. Cir. 2006)(holding that an agency letter explaining the agency's rationale was sufficient to remedy the court's concern about an inadequately articulated decision). In Heartland II, the D.C. Circuit upheld the agency's rule issued in response to a remand from the district court, Heartland I. Heartland II, 415 F.3d at 29. In upholding the agency rule, the court explained that "the only obligation [the court] expressly imposed on the agency was to consider the two alternatives suggested during the comment

period.  That is precisely what the agency did."  Id. at 29.  In other words, nothing more than

filling the "analytical gap" identified by the court is required on remand.  Id.

    And so it is here.  In its December 13, 2001 Order, the Court expressly upheld the

Service's analysis of four of the five ESA listing factors as applied to the bear.  2001 Opinion at

7-18.[4]  As to the fifth factor, the Court held that the Service's determination that existing

regulatory mechanisms are not inadequate to prevent the Florida Black Bear from becoming

threatened or endangered could not be "sustained" by its explanation or the record before the

Court.  2001 Opinion at 19.  Yet, the Court did not vacate the Service's finding.  Rather, it

remanded the Factor D analysis to the Service for explanation and reconsideration.  Id. at 22.  On

remand, as directed by the Court, the Service examined existing regulatory mechanisms in place

in 1998, reconsidered whether the inadequacy of existing regulatory mechanisms warranted

listing, and explained its determination.  This is all that was required.  Alpharma, 460 F.3d at 6

(finding letter on remand that explained agency views as of the time of the original decision 13

years earlier properly responded to the court's remand order).

    Plaintiffs, nonetheless, argue that the Service's decision to limit its remanded

determination to evaluating regulatory mechanisms that existed in 1998 is arbitrary.  Pls. MSJ

(Dkt. #29) at 26-27, 34.  Tellingly, however, Plaintiffs offer no D.C. Circuit precedent to support

their argument.  The only case that Plaintiffs cite for what is required of the Service on remand

---

[4] See e.g. 2001 Opinion at 10 ("...this court holds that the Wildlife Service's interpretation of
what constitutes a significant portion of the black bear's range and its determination that the
species is not likely to become endangered over that range is reasonable."); id. at 14
("Defenders' position cannot be sustained because evidence in the administrative record supports
the Agency's conclusions regarding the combined effects of habitat destruction, habit[at]
isolation, hunting and roadkill.); id. at 15 ("The Wildlife Service reasonably concluded that the
increased population estimates will enable the black bear to withstand projected losses of current
habitat.").

actually supports the Service's decision-making in its remanded determination.  Pls. MSJ at 27

citing Defenders of Wildlife v. Kempthorne, Civ. No. 04-1230 2006 WL 2844232 (D.D.C. Sept.

29, 2006).  In Defenders, the court held that, while an agency has discretion to go beyond what

was dictated on remand, the agency is required to address only the specific issue identified by

the court in its remand order.  Id.  That is exactly what the Service did here.  The Service

reexamined the existing regulatory mechanisms as of the 1998 12-month finding to determine

whether the bear was threatened or endangered with extinction because of the inadequacy of

those mechanisms.  The court in Defenders would find anything more than that (like a total re-

examination of the listing determination with 2004 data) while perhaps within the agency's

discretion, beyond the court's remand.

 Further, in the ESA context, courts remand listing determinations to the Service for the

limited purpose of explaining a prior finding.  See Building Indus. Ass'n v. Babbit, 979 F. Supp.

893, 906 (D.D.C. 1997)("[t]his limited remand should not be interpreted as affecting the validity

of the listing itself.");  Northern Spotted Owl v. Hodel, 716 F. Supp. 479, 483 (W.D. Wash.

1988)("the court remands this matter to the Service...to provide an analysis for its decision that

listing the northern spotted owl as threatened or endangered is not currently warranted.").  In

fact, in one ESA case addressing whether the bull trout warranted listing, the court told the

Service to redo its 12-month finding based on the record that existed at the time of the original

finding.  See Friends of Wild Swan v. FWS, 945 F. Supp. 1388, 1401 (D. Or. 1996); see also

Friends of the Wild Swan v. FWS, 12 F. Supp. 2d 1121 (D. Or. 1997)(directing the Service not

to rely on 1996 Distinct Population Segment policy when responding to court's remand of 1994

12-month finding because it post-dated the original finding).

 As explained above, the D.C. Circuit affords the Service discretion to comply with the

ESA on remand and requires only that the agency cure the legal deficiencies expressly identified

by the court.  See Heartland II, 415 F.3d at 29.  The Service reasonably interpreted the Court's

opinion to require a reexamination of the inadequacy of regulatory mechanisms that existed at

the time of the 1998 finding.  It was a permissible exercise of the Service's discretion to

determine the approach it would take in responding to the Court's remand order.  Nat'l Tank

Truck Carriers v. EPA, 907 F.2d 177, 185 (D.C. Cir. 1990) ("We will not, indeed we cannot,

dictate to the agency what course it must ultimately take . . . . It may even be that the [agency]

will choose some other solution altogether.  In any event, that choice is the agency's and not

ours.") (citations omitted).

> **B.**    **The Service's Remanded Decision Fully Complied With the Court's 2001 Opinion.**

The Service's decision to limit its reexamination of Factor D to regulatory mechanisms

that existed in 1998 also fully comports with the Court's 2001 opinion.  The Court in its 2001

opinion held that the Service's determination on Factor D could not be sustained by its analysis

or the administrative record.  In remanding Factor D back to the agency, the Court stated "[t]he

Wildlife Service must judge the viability of the black bear based on threats to its existing status

and therefore can rely only on regulatory actions currently in effect when making its decision."

2001 Opinion at 21-22.   Nonetheless, Plaintiffs argue that the Court's opinion expressly

required the Service to examine regulatory mechanisms that existed in 2004, as opposed to those

in existence in 1998, and then evaluate those mechanisms in terms of threats to the species as of

2004.  Pls. MSJ at 24-27.  Plaintiffs misread the Court's opinion.  Moreover, if the Service

followed Plaintiffs' interpretation of the 2001 opinion, it would have a 12-month finding on the

bear with Factors A-C and E analyzed in terms of 1998 threats to the bear and Factor D in terms

of 2004 threats.  This would be an illogical outcome, and nothing in the Court's 2001 opinion

requires it.

1.    **The Court's 2001 Opinion Did Not Require the Service to Examine Regulatory Mechanisms That Existed in 2004**.

Plaintiffs argue that the Court's 2001 opinion required the Service to examine "current" regulatory mechanisms, that is, mechanisms that existed at the time of the remanded determination in 2004 as opposed to analyzing the mechanisms in existence at the time of the Service's 1998 listing decision.  Pls. MSJ at 18.  However, a careful reading of the Court's opinion belies Plaintiffs' argument.  Plaintiffs quote the 2001 opinion where the Court used the words "existing" and "current" to bolster their argument, but those quotes are taken out of context.  Pls. MSJ at 24, 26.  In stating that the Service can rely only on actions currently in effect in its Factor D analysis, the Court was merely explaining that that analysis must evaluate current and existing mechanisms and not speculative, future mechanisms.  This conclusion is confirmed by even a cursory review of the Court's opinion.  For example, the Court opined that "'existing regulatory mechanisms' are those that are being currently implemented and enforced, as opposed to regulations which might be enacted in the future, or current regulations authorizing future government action,but which do not require that such action will take place," and that "[t]he Agency cannot rely on the possibility of action in the future to justify a determination that the black bear is not currently threatened."  2001 Opinion at 20, 22.  These statements emphasize that the Court was discussing the difference between current, existing regulatory mechanisms and speculative, future regulatory mechanisms.  They also clarify that the Court was instructing the Service to rely only on the former in reexamining the inadequacy of regulatory mechanisms that existed when it made its 12-month finding in 1998.  Nothing in these statements suggests that the Court was dictating the time period, 1998 versus a later date, that the remand determination was to address.

In addition to taking the Court's words out of context, Plaintiffs have also misconstrued the caselaw cited by the Court in the 2001 opinion. Pls. MSJ at 22-24. Indeed, the caselaw supports the Service's interpretation that the Court's only direction on remand related to existing versus future mechanisms and not the time period for evaluating the "existing" mechanisms. For example, courts have remanded listing determinations back to the Service when it has relied on future, speculative actions to support its finding that regulatory mechanisms are not inadequate to protect a species from extinction. See Biodiversity Legal Found. v. Babbitt, 943 F. Supp. 23, 26 (D.D.C. 1996); Sw. Ctr. for Biological Diversity v. Babbit, 939 F. Supp. 49, 52 (D.D.C. 1996); Oregon Natural Res. Council v. Daley, 6 F. Supp. 2d 1139 (D. Or. 1998); Save Our Springs v. Babbitt, 27 F. Supp. 2d 739, 744 (W.D. Tex. 1997). In Oregon Natural Res. Council, the agency determined that coho salmon did not warrant listing under the ESA in part because the Oregon Coast Salmon Restoration Initiative ("OCSRI") would reverse the decline of the salmon. 6 F. Supp. 2d 1139, 1142. Plaintiffs argued that it was improper for the agency to rely on the OCSRI because its provisions were "unimplemented, future, voluntary actions..." Id. at 1153. In evaluating plaintiffs' argument, the court reviewed several other opinions in which courts have addressed the adequacy of future actions, including the above-cited ones. Id. at 1154. The court agreed with plaintiffs, and the other courts that ruled on agency analysis of similar regulatory mechanisms, holding that the Service "may only consider conservation efforts that are currently operational, not those promised to be implemented in the future." Id. The Oregon Natural Res. Council opinion and other opinions cited above provide instruction here only insofar as they illuminate the distinction between existing and future mechanisms that the ESA permits the Service to consider. They provide no guidance on the proper timeframe for evaluating those mechanisms on remand.

Moreover, this Court did not vacate the entire listing determination.  Rather, the Court

upheld the Service's determination as to whether listing was warranted based on the other four

factors and simply identified the areas in the Factor D analysis that it found unsupported.  The

Court, then, directed the Service to redo its examination and explanation only of the inadequacy

of existing regulatory mechanisms.  In response, the Service completed the original 12-month

finding by reexamining whether the bear was threatened or endangered because of the

inadequacy of regulatory mechanisms that existed in 1998 .  Had the Service followed Plaintiffs'

proffered approach, however, the Service would have evaluated Factor D against 2004

information, while all of the other listing factors which were previously upheld would be judged

against 1998 data.  Nothing in the Court's opinion or the case law requires such an anomalous

result.

**2.      The Court's 2001 Opinion Did Not Require the Service to Reevaluate
            Threats to the Florida Black Bear as of 2004**

Plaintiffs fare no better with their contention that the Service's remanded decision is

purportedly faulty for failing to reassess all of the other threats to the bear (i.e., Factors A-C and

E) as of 2004.  Pls. MSJ at 23-24.  Nothing in the Court's 2001 opinion requires the Service to

reevaluate all of the factors affecting the status of the bear in 2004.  In its 2001 opinion, this

Court already thoroughly reviewed the Service's analysis of the other factors and upheld the

Service's findings.  2001 opinion at 7-19.  Despite this fact, Plaintiffs assert that the Service was

required by the 2001 opinion to reassess all of the other potential threats to the bear as of 2004,

citing the Court's statement that the Service must evaluate the "present status" of the bear.  Pls.

MSJ at 23.  Again, this is yet another example of Plaintiffs selectively citing words out of

context from the Court's 2001 opinion.  Rather than directing the Service to evaluate threats to

the bear as of 2004, the Court stated "[t]he present tense of the statute and the uncertain nature of

future regulations indicate that an agency's determination of whether to list a species must be based on the present status of the species and not on the assumption that future actions will suffice to protect a species' population." 2001 Opinion at 20. Had Plaintiffs provided the rest of the Court's statement, then it would have become clear that the Court was not directing the Service to reevaluate the bear's status in 2004. Rather, the Court was simply pointing out that the ESA does not permit the Service to rely on what might happen to the bear in the future. Id.

Moreover, Plaintiffs' reliance on Defenders of Wildlife v. Babbitt to support their argument that the Service must evaluate threats to the species as of 2004 is misplaced. Pls. MSJ at 23. In reviewing the Service's analysis of the inadequacy of regulatory mechanisms, the court in Defenders pointed out that the Service devoted only one paragraph to Factor D, did not provide any record cites, and failed to analyze any past or present data on whether the mechanisms were protecting the Lynx from threats to its extinction. See Defenders of Wildlife v. Babbitt ("Defenders"), 958 F. Supp. 670, 684 (D.D.C. 1997). As a result of these deficiencies, the Court held that the Service's determination that Factor D did not warrant listing was arbitrary and capricious. Id. However, the Defenders opinion is relevant only insofar as it addresses Factor D in general. It does not discuss the "present status" of the species in the way that Plaintiffs here suggest. Thus, the decision is inapposite because the Defenders court did not reach the question at issue here - whether the Service must perform a "factual inquiry into the state of the species and the threats to it" as of 2004. Pls. MSJ at 23.

Essentially, Plaintiffs are trying to force the Service to redo the entire 1998 listing decision, including the Factors A-C and E analysis, without actually submitting a new petition that presents the Service with new information. Plaintiffs should not be allowed to avoid the ESA's section 4 procedures and shift the burden to the Service to seek out new information on

an old petition after the decision on that petition has been made.  Nor should Plaintiffs be allowed to ignore the Court's decision in 2001 to uphold the Service's decision that listing was not warranted based on Factors A-C and E and to remand only Factor D to the Service.

To be sure, Plaintiffs are not left without a remedy for their concern that the bear's current status has changed since 1998.  Under the ESA, plaintiffs can petition the Service with new information on the bear.   This challenge to the Factor D remanded determination, however, is not the proper venue to remedy Plaintiffs' concerns.  Plaintiffs' argument on the present status of the bear has no support in the Court's opinion or the ESA andt, therefore, must be rejected.

## II.    THE SERVICE'S DECISION THAT EXISTING REGULATORY MECHANISMS ARE NOT INADEQUATE SO AS TO WARRANT LISTING FULLY COMPLIES WITH THE ESA AND IS SUPPORTED BY THE RECORD.

This Court's 2001 opinion required the Service to reassess listing the bear in light of Factor D which requires the Service to consider "the inadequacy of existing regulatory mechanisms."  2001 opinion at 22.  The ESA requires the Service to list the bear only if it determines that existing regulatory mechanisms were so inadequate as to leave the bear threatened or endangered.  16 U.S.C. § 1533(a)(1)(D).  As shown below, after a detailed analysis, the Service reasonably concluded that existing regulatory mechanisms were not so inadequate as to leave the bear threatened or endangered.

### A.    The Service's Remanded Decision Complies with the Court's 2001 Opinion And Is Fully Supported By The Record.

In its 2001 opinion, this Court remanded the Service's Factor D determination to "examine only regulatory mechanisms which are currently being undertaken and enforced." 2001 Opinion at 22.  In response, the Service undertook an extensive review, considering over 100 existing regulatory mechanisms, including federal and state prohibitions on direct take,

federal land management practices, state land use practices, and federal and state programs that regulate development on private lands.  69 Fed. Reg. 2100 (Jan. 14, 2004).  In the remanded decision, the Service identified all existing regulatory mechanisms that relate to direct take of the species, habitat protections for private and public lands, and land management requirements and discussed why it believed those mechanisms were not inadequate.  Id.

The Service detailed federal and state regulatory mechanisms related to the bear's habitat that would address development on private lands and ensure proper management of public lands. 69 Fed. Reg. at 2103-07, A.R. 4-8.  The Service then analyzed the adequacy of the mechanisms against "the bear's current widespread distribution across its historic range, its large population size, and the large quantity of protected habitat available to the species in each of the four core populations, as well as current levels of habitat loss on private lands," all factors that the Service believed will prevent the species from becoming threatened or endangered.  69 Fed. Reg. at 2103.

To address the Court's concern raised in the 2001 opinion, the Service specifically outlined the regulatory actions that Florida is taking to protect the bear.  69 Fed. Reg. at 2102, 2105, 2107.  For example, the Service noted that Florida had allocated $12 million to pay for mitigation of wetlands impacted by Department of Transportation projects.  This wetland mitigation project directly protects potential bear habitat.  69 Fed. Reg. at 2103.  Also, because the bear is listed as threatened under Florida law, proposed development projects in wetlands under the Environmental Resource Permitting program cannot adversely impact the bear and its habitat or those projects must be mitigated.  69 Fed. Reg. at 2104.  Further, Florida enacted the Wekiva River Protection Area to provide more habitat protection to the bear adjacent to Ocala National Forest.  69 Fed. Reg. at 2104.  The Service also cited Florida's land acquisition

programs that increased publicly protected bear habitat from 1992 to 1998 by 1,500 km2.  69

Fed. Reg. at 2110.   Finally, the Service identified every state management plan for state lands

that are important to the bear.  69 Fed. Reg. at 2116.  Florida law requires that these plans

describe how a state-listed species, like the bear, will be protected and preserved.  The plans

must also, according to Florida statute, evaluate every five years whether the plans' requirements

sufficiently protect state-listed species.  69 Fed. Reg. at 2107.   These regulations require future

government action; thus, they meet the Court's standard for existing regulatory mechanisms set

forth in the 2001 opinion. While the Service acknowledged that not all these state regulatory

mechanisms will fully protect or remove all risks to the bear, it concluded after careful

consideration of the available evidence that these existing regulatory mechanisms were not

inadequate so as to leave the bear threatened or endangered.  69 Fed. Reg. at 2108.

   The Service also specifically addressed the Court's concern about whether the National

Forests in Florida were implementing Forest Service Land Management Plans.  69 Fed. Reg. at

2106.  The Service explained that the 1985 management plan for Florida Forests governed

activities on National Forests in 1998.  69 Fed. Reg. at 2106.  In that plan and its revised draft in

1997, the bear was identified as a management indicator and sensitive species which requires the

Forest Service to evaluate the impacts of actions in each national forest on the bear and its

habitat.  69 Fed. Reg. at 2106.  In 1998, the Forest Service estimated that "actions planned to

improve wildlife habitat, implement road closures, conduct prescribed burns, and complete land

acquisition projects had achieved 116%, 197%, 145% and 8,583%, respectively, of the levels

directed in the 1985 plan."  69 Fed. Reg. at 2106.  The Forest Service also has a mandate to

maintain viable populations of native species, such as the bear.  69 Fed. Reg. at 2106.

   Plaintiffs argue that simply because habitat loss and fragmentation may affect the bear,

the Service must automatically list the bear.  Pls. MSJ at 24, 34-35.  This is not the proper

standard.  Rather, listing of the bear is warranted if the Service concludes that existing regulatory

mechanisms are inadequate so as to lead the Service to conclude that the bear is "likely to

become an endangered species within the foreseeable future" or that the bear is "in danger of

extinction."  16 U.S.C. § 1532(6), (20).  As detailed above, the Service rationally articulated the

connection between the existing regulatory mechanisms and its conclusion that existing

regulatory mechanisms are not inadequate, and that decision should be upheld.

### B.    The Service Considered the Best Available Science on the Present Status of the Species.

The ESA requires the Service to base its listing decisions "solely on the basis of the best

scientific and commercial data available."  16 U.S.C. § 1533(b)(1)(A).  Plaintiffs argue that in

order for the Service to have considered the best available science, it must have evaluated threats

to the species as of 2004.  Pls. MSJ at 25.  This argument is nothing more than a re-packaging of

Plaintiffs' previous arguments, and it is no more persuasive in this context than it was earlier.

Contrary to Plaintiffs' assertion, the Service satisfied the ESA's best available science

requirement in its 2004 remanded decision.  Based on the best available data, the Service

evaluated all of the applicable regulatory mechanisms that existed at the time of its 1998 listing

decision against the threats that the Service determined also existed at that time.  69 Fed. Reg. at

2100.  Plaintiffs do not contend otherwise or point to any evidence from 1998 that the Service

did not consider.  Accordingly, their best available science argument fails.  See Building Indus.

Ass'n v. Norton, 247 F. 3d 1241, 1246 (D.C. Cir. 2001)(rejecting plaintiffs' argument that the

Service did not base its rule on the "best available data" because plaintiffs have not pointed to

data that the Service failed to consider).

Plaintiffs instead take a different tack claiming that the best available science standard

requires an evaluation of 1998 regulatory mechanisms against 2004 threats. Pls. MSJ at 27-28, 31-35, 38-39. As noted above, however, this approach would have resulted in a 12-month finding on the bear with Factors A-D analyzed based on data from different years. Nothing in the ESA or the Court's 2001 opinion requires such an outcome. Plaintiffs' argument on the best available science requirement further illustrates their true goal in challenging the Service's remanded decision - to force the Service to redo its entire 1998 listing decision. Again, Plaintiffs should not be allowed to collaterally attack this Court's 2001 opinion upholding the Service's listing decision on Factors A-C and E. Nor should Plaintiffs be allowed to ignore the Court's limited remand on Factor D.

### C. The Service Was Not Required to Show That Existing Regulatory Mechanisms Are Effective in Countering Habitat Loss and Fragmentation.

Pursuant to the plain language of the ESA, the Service was required to assess whether the existing regulatory mechanisms were <u>inadequate</u> such that they represented a threat to the bear either alone or in concert with the other listing factors, thereby leading the Service to conclude that the bear is threatened or endangered. 16 U.S.C. § 1533(a)(1)(D). As the Service explained in its remanded determination, it must list the bear if regulatory mechanisms were "inadequate because they actively allow or encourage, or at minimum do not prevent, levels of direct take..., habitat loss, and/or habitat degradation from reaching a point that the bear would be in danger of extinction or likely would become in danger of extinction within the foreseeable future throughout all or a significant portion of its range." 69 Fed. Reg. at 2102. The Service further notes that "it would not be appropriate for us to list the species merely because existing regulatory mechanisms either do not actively improve the bear's status. . .or do not prevent all negative effects of human activities." <u>Id.</u>

Despite the clear language set out in the ESA, Plaintiffs misconstrue the Factor D standard

and argue that the Service was required to show that existing regulatory mechanisms are effective in protecting habitat for the four core bear populations.  See, e.g., Pls. MSJ at 25 ("The essential inquiry with respect to the Florida Black bear is whether existing regulatory mechanisms adequately protect 'sufficient quantity and quality of bear habitat' for 'the four core bear populations.'"); id. at 23 ("...the Service [must] consider whether the regulatory mechanisms relied upon are actually effective in protecting the species..."); id. at 24 (the Service was required to determine whether regulatory mechanisms "adequately protected large enough expanses of black bear habitat...in a condition that was consistent with the black bear's habitat needs...given...the present status of the bear and the threats to it."); id. at 28 ("...the Service failed to make a meaningful inquiry into the efficacy of CWA regulations - as enforced - at preventing the loss of Florida Black Bear habitat.").

Plaintiffs' misconstruction of the standard creates a red herring.  Plaintiffs apparently seek to impose a standard that requires the Service to determine that existing regulatory mechanisms are effective in countering habitat loss or fragmentation.  Plaintiffs then seek to have this Court review the Service's remanded decision according to this non-existent standard.  As discussed above, Plaintiffs version of the standard ignores the ESA's plain language and courts' interpretation of that language.  The simple fact is that the ESA does not require the Service to analyze the adequacy of existing regulatory mechanisms with respect to any conceivable or potential threat to a species.   See Ctr. for Biological Diversity v. Badgley, 335 F.3d 1097, 1100 (9th Cir. 2003) (upholding Service finding that listing of northern goshawk was not warranted, despite status review team's conclusion that habitat has declined from historic levels); Sw. Ctr. for Biological Diversity v. Norton, Civ. No. 98-934 (RMU/JMF), 2002 WL 1733618, at *13 (D.D.C. July 29, 2002) ("[A] declining population alone does not indicate that a species is

threatened or endangered.  The operative question, rather, is *whether a population decline is so extensive or precipitous that the species may no longer survive*.").  The Service need only examine the adequacy of existing regulatory mechanisms with respect to those threats that place the species in danger of becoming threatened or endangered.  Here, the Service has determined that habitat loss and fragmentation do not rise to this level; thus, it was under no obligation to analyze the effect of existing regulatory mechanisms on this threat.

A district court in Oregon, when faced with a challenge to the Service's Factor D analysis, upheld the Service's interpretation of what such analysis requires.  See Ctr. for Biological Diversity v. FWS, 402 F. Supp. 2d 1198, 1209 (D. Or. 2005).  There, plaintiffs argued that the regulatory mechanisms that the Service relied on were not adequate to protect against threats to the coastal cutthroat trout.  Id.  The Service countered that the ESA requires only that the regulatory mechanisms are not inadequate so as to lead the Service to conclude the coastal cutthroat trout was endangered or threatened.  Id.  The court agreed with the Service holding that "[t]he ESA does not guarantee the best of all possible worlds for the species at issue. . .There can be a large gap between the best regulatory mechanisms and a situation in which the regulatory mechanisms contribute to the threat or endangerment of a species."  Id.

Plaintiffs' misconstruction of the standard is also apparent in their argument that the Service has not looked deep enough to show "how much core population habitat has been lost, or is at risk of being lost, and how much has been mitigated and/or protected."  Pls. MSJ at 30. While Plaintiffs acknowledge that the administrative record contains examples where the Service considered federal and state regulatory mechanisms that protect against bear habitat loss (i.e., Clean Water Act Section 404 program and Florida's Environmental Resource Permit program), Plaintiffs still assert that the Service's evaluation of those programs does not go far enough.  Pls.

MSJ at 28-29.  Plaintiffs, however, neglect to mention that, in the 1998 listing determination, the

Service determined that the four core populations were secure on the existing habitat, 63 Fed.

Reg. 67614 (Dec. 8, 1998), and this Court upheld that determination.  Thus, even assuming,

arguendo, that the federal and state regulatory programs fail to prevent or mitigate further wetland

destruction (which Plaintiffs do not assert, and Defendants do not concede), the current

protections, taken together, afforded habitat for the four core populations and are enough to

ensure that the bear is not threatened or endangered with extinction.  63 Fed. Reg. at 67615.

Finally, Plaintiffs complain that while Florida may have some protections in place, these

duly enacted laws and regulations are not sufficient regulatory mechanisms because the Service

has not gone out in the field to test and verify that these laws and regulations are actually being

"enforced at protecting habitat."  Pls. MSJ at 30, 39.  There is no reason for the Service to

presume that such regulatory mechanisms are not being implemented properly absent some

indication that that is the case.  Rather, the Service should be able to presume that duly enacted

state regulations are being implemented and enforced.  Cf. Red Top Mercury Mines v. United

States, 887 F.2d 198, 202-03 (9th Cir. 1989) (regulatory officials are entitled to a presumption of

regularity in the performance of their duties).  Indeed, the remanded determination clearly

illustrates that the Service assessed the existing regulatory measures in exactly the fashion in

which it is required to do so.

There is no question that the plain language of the statute and the regulation require the

Service to list a species only if it determines the species meets the definition of threatened or

endangered based on any one or a combination of the five factors.  Plaintiffs' interpretation and

any arguments to the contrary are simply wrong.  It was, therefore, reasonable for the Service to

be aware that particular regulatory mechanisms are not perfect in addressing habitat loss and

fragmentation and still find that, when considered together, the regulatory mechanisms are not inadequate so as to leave the bear threatened or endangered.

## CONCLUSION

For the foregoing reasons, the Service's remanded determination should be upheld. The administrative record and the determination itself demonstrate that the Service carefully considered the relevant factors and articulated a rational connection between the facts found and the conclusion reached. Therefore, Defendants respectfully request that the Court grant summary judgment in their favor.

Dated this 7th day of December, 2006.

Respectfully submitted,

SUE ELLEN WOOLDRIDGE
Assistant Attorney General

*S/ Courtney Taylor*
_____
Courtney Taylor, Attorney
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife and Marine Resources Section
P.O. Box 7369
Washington, D.C. 20044-7369
(202) 353-7548
Attorney for Defendants

OF COUNSEL

Michael P. Stevens, Attorney-Adviser
U.S. Department of the Interior
Office of the Regional Solicitor
75 Spring Street, S.W., Suite 304
Atlanta, Georgia   30303