IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DEFENDERS OF WILDLIFE, et al., )<br>)<br>Plaintiffs, )<br>)<br>vs. )<br>)<br>DIRK KEMPTHORNE, et al., )<br>)<br>Defendants. )<br>) | No. 06CV00180 (HHK) |

**DEFENDANTS' STATEMENT OF MATERIAL FACTS
AS TO WHICH THERE IS NO GENUINE ISSUE**

As an initial matter, Defendants dispute that the statements of fact called for by L. Civ. R. 7(h) are appropriate in this record review case. L. Civ. R. 7(h) requires any party moving for summary judgment to submit a "statement of material facts as to which the moving party contends there is no genuine issue . . .," and also requires any party opposing a motion for summary judgment to submit a "separate concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated . . . ." In determining a motion for summary judgment, the local rules state that the Court "may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." L. Civ. R. 7(h).

This local rule, and the statements of fact that it requires, have no application here because these claims are governed by the Administrative Procedure Act ("APA"). It is well-established that, in cases such as this one -- where Plaintiffs seek judicial review under the

Administrative Procedure Act ("APA"), 5 U.S.C. § 706, of the Service's listing determination – the scope of that judicial review is properly limited to the administrative record that was before the agency at the time the decision was made. See, e.g., Florida Power & Light Co. v. Lorion, 470 U.S. 729, 744 (1985); Camp v. Pitts, 411 U.S. 138 (1973). "The task of the reviewing court is to apply the appropriate APA standard of review, 5 U.S.C. § 706, to the agency decision based on the record the agency presents to the reviewing court." Florida Power & Light Co., 470 U.S. at 743-44.

Accordingly, judicial review of agency action is a unique procedure, different in both nature and scope from the procedures used to resolve civil actions within the original jurisdiction of the federal district courts. As the D.C. Circuit has aptly explained:

> [W]hen a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal. The "entire case" on review is a question of law. See, e.g., Marshall County Health Care Auth. v. Shalala, 988 F.2d 1221, 1226 (D.C. Cir. 1993) (holding that in agency review context there was no real distinction between questions presented in Rule 12(b)(6) motion to dismiss and motion for summary judgment); University Medical Ctr. of S. Nevada v. Shalala, 173 F.3d 438, 440 n. 3 (D.C. Cir. 1999) (explaining that when reviewing agency action the question of whether the agency acted in an arbitrary and capricious manner is a legal one which the district court can resolve on the agency record, regardless of whether it is presented in the context of a motion for judgment on the pleadings or in a motion for summary judgment); James Madison Ltd. v. Ludwig, 82 F.3d 1085, 1096 (D.C. Cir. 1996), cert. denied, 519 U.S. 1077 (1997) (holding that issues that appellant argued were issues of fact precluding summary judgment were issues of law in the context of agency review); County of Los Angeles v. Shalala, 192 F.3d 1005, 1011 (D.C. Cir. 1999), cert. denied, 530 U.S. 1204 (2000) (holding that rule of finality does not apply to bar appellate review of the district court's finding that the agency was arbitrary and capricious even though that court had not yet resolved the issue of remedy). Absent very unusual circumstances the district court does not take testimony. See, e.g., Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402 (1971); James Madison, 82 F.3d at 1096.

American Bioscience v. Thompson, 269 F.3d 1077, 1083-84 (D.C. Cir. 2001) (footnote omitted).

Consequently, there are no material facts for the Court to resolve in the first instance. Rather, the Court's role is limited to determining whether the facts as found by the Service are

reasonable and supported by the record. In turn, a statement of material facts as contemplated by Local Rule 7(h) is inapposite here. Nonetheless, to assure technical compliance with the local rules, the Service states as follows:

    1. The Florida black bear (bear) *(Ursus americanus floridianus)*, a subpecies of the American black bear *(Ursus americanus)*, is the largest land mammal in Florida. D.S. Maehr & J. B. Wooding, Rare and Endangered Biota of Florida (S. R. Humphrey, ed. 1992), AR 2200.

    2. Bear can live in a variety of landscapes from temperate plant communities in northwestern Florida, southern Alabama and Georgia, to subtropical communities in southern Florida. Id.

    3. A combination of several major forest types, including pine flatwoods, hardwood swamp, cabbage palm forest, and sand palm scrub, are typical of the bear's range. Id.

    4. The most recent survey of the bear as of 1998 shows that the population is between 1,600 and 3,000. 1998 Status Review at 29, AR 2173.

    5. Despite reduction and fragmentation of its former range, the bear has managed to propagate in four healthy, self-sustaining populations distributed throughout its historic range. See generally 1998 Status Review, AR 2145 et seq.

    6. The four populations occur on large populations of publicly owned and adjacent private lands at (1) Okefenokee National Wildlife Refuge (NWR) and Osceola National Forest (NF) in southeastern Georgia and northeastern Florida; (2) Ocala NF in central Florida; (3) Big Cypress National Preserve in southern Florida; and (4) Apalachicola NF in the Florida panhandle. 1998 Decision, 63 Fed. Reg. at 67614-16, AR 7044-46.

7. A fifth population, located in and adjacent to Eglin Air Force Base (AFB) in the western Florida panhandle, is likely to remain viable with proper management. 1998 Decision, 63 Fed. Reg. at 67615, AR 7045.

8. These five populations contain the vast majority of all the bears in existence today. 1998 Status Review at 7-30, AR 2151-2174.

9. Sufficient habitat for the four core populations to survive is currently protected by existing, secure public land. 63 Fed. Reg. at 67615-16, AR 7045-46.

10. On May 20, 1990, the Service received a petition from Ms. Inge Hutchinson of Lake Geneva, Florida, to list the bear as a threatened species. 69 Fed. Reg. at 2104, AR 0002.

11. On October 18, 1990, the Service made a 90-day petition finding that the petition presented substantial information that the petitioned action may be warranted. 55 Fed. Reg. 42223. Supplemental Administrative Record (SAR) 6298.

12. On January 7, 1992, the Service made a 12-month finding that listing was warranted but precluded by higher priority listing actions. 57 Fed. Reg. 596, SAR 6406.

13. On January 19, 1997, the Service entered into a revised settlement agreement in Fund for Animals et al. v. Babbitt, No. 92-0800 (SS)(D.D.C.), stipulating inter alia that the Service would resolve the conservation status of the Bear by December 31, 1998. See 69 Fed. Reg. at 2101, AR 0002.

14. In 1998, the Service updated the status review of the bear to include additional information about the status that had become available since the 1992 assessment. See generall 1998 Status Review, A.R. 2145.

15. On December 8, 1998, the Service published notice of its determination that the bear did not warrant listing as a threatened species (1998 Decision). 63 Fed. Reg. 67613, SAR 7043.

16. In 1999, Plaintiffs and others filed a lawsuit challenging the 1998 Decision. <u>Defenders of Wildlife v. Norton</u>, Civil Action 99-02072 (HHK) (D.D.C. December 13, 2001) (2001 Order), slip. op. at 5.

17. On December 31, 2001, the U.S. District Court for the District of Columbia upheld the 1998 Decision as to four of the five listing factors, rejecting the arguments that (1) the likely loss of bear habitat indicated that the bear will become extinct throughout a significant portion of its range, notwithstanding the stability of some populations, and (2) the finding was arbitrary and capricious based on a 1992 finding by the Service that listing was warranted but precluded and on the combined effects of habitat destruction, habitat isolation, roadkill, and hunting. 2001 Order, slip. op. at 7-18.

18. In response to the plaintiffs' argument that the 1998 Decision was arbitrary and capricious because it relied on future, speculative regulations to determine that existing regulatory mechanisms were not inadequate, the Court held that the Service's determination on the inadequacy of the regulatory mechanisms could not be sustained because it was unclear from the record whether the regulations on which the Service relied were currently being implemented. 2001 Order, slip. op. at 21-22.

19. Rather than vacating the entire 1998 Decision and remanding it entirely, the Court instructed the Service to revisit the analysis of existing regulatory mechanisms, instructing it to "rely on regulatory actions currently in effect" and to determine "whether the inadequacy of existing mechanisms warrants listing the black bear as a threatened species." 2001 Order, slip. op. at 22.

20. On January 14, 2004, the Service published a reexamination of the regulatory mechanisms in effect and enforced at the time of the 1998 Decision. 69 Fed. Reg. 2100 (2004 Decision), AR 0001.

21. In the 2004 Decision, the Service analyzed federal and state regulatory mechanisms that addressed direct take of the bear, protected against habitat loss, and ensured proper management of existing bear habitat, including regulations that prohibit the taking of wildlife, provide heightened protection to the bear, and regulate legal hunting. Id.

22. The states of Georgia and Florida, the Service, the U.S. Forest Service (USFS), and the National Park Service (NPS) all prohibit the taking of wildlife, game species (including bear), and their dens on land under their jurisdictions unless a specific permit is issued allowing such take, or an open season, bag limit and methods of take are designated by regulation. 69 Fed. Reg. at 2102, AR 0003; see AR 5681, 5693, 5856, 5866, 5903, 6089, 6102, 6103.

23. In Georgia and Florida the sale, purchase, and transportation of the bear or bear parts are prohibited. 69 Fed. Reg. at 2102, AR 0003; see AR 5693, 5701, 5873.

24. The Georgia Department of Natural Resources prohibits the killing of the bear except during an open hunting season or by authorization. 69 Fed. Reg. at 2102, AR 0003; see AR 5873.

25. Florida lists the bear as threatened except in Baker and Columbia Counties and in the Apalachicola NF, prohibiting the intentional killing, wounding, taking, possession, transportation, molesting, harassment, or sale of the species. 69 Fed. Reg. at 2102, AR 0003; see AR 5573, 5777.

26. The 2004 Decision outlined Federal and state programs that protect the bear habitat from further destruction. Id. at 2103, AR 0004.

27. Section 404 of the Clean Water Act requires protection of wetland habitats important to the bear, either through prohibiting destruction of wetlands or requiring mitigation of impacts of permitted development of wetlands. 69 Fed. Reg. at 2103, AR 0004; see AR 6067, 6080, 6098.

28. Florida has allocated $12 million to pay for mitigation of wetlands impacted by Department of Transportation projects, which directly protects the bear habitat. 69 Fed. Reg. at 2103, AR 0004; see AR 5592.

29. Under Florida's Environmental Resource Permitting Program, applicants for development permits must provide assurances that developments will not adversely affect the abundance, food source, or habitats of wetland-dependent species, including the bear. 69 Fed. Reg. at 2104, AR 0005; see AR 5592.

30. Florida has designated the Wekiva River Protection Area protect land south of the Ocala National Forest in important bear habitat, and a Riparian Protection Zone in the St. John's River region to protect wetlands and uplands adjoining the Wekiva River system. 69 Fed. Reg. at 2104, AR 0005; see AR 5563, 5566, 5601, 5668.

31. In the 2004 Decision, the Service spent considerable time evaluating Federal and State regulatory mechanisms that require agencies to manage their lands in ways that are protective of the bear. 69 Fed. Reg. at 2105 et seq., AR 0006 et seq.

32. Big Cypress National Preserve (BICY)'s General Management Plan (GMP), approved in 1991, continues to be implemented to meet the goal of watershed protection through prescribed burning, control of exotic plants, and hydrologic restoration. 69 Fed. Reg. at 2105, AR 0006; see AR 5967.

33. The GMP must be, and is, implemented in a manner consistent with the purpose of the National Park System to conserve the wildlife within its units in an unimpaired stated, and the purpose of BICY to assure the natural and ecological integrity of the Big Cypress watershed. Id.; see AR 2214, 5967.

34. National Wildlife Refuges that provide habitat for the bear, including Okefenokee,, Florida Panther, and St. Mark's, all have approved habitat and fire management plans in place that require prescribed burning and forest management actions that benefit the bear. 69 Fed. Reg. 2105, AR 0006; see AR 2988, 3059, 3195.

35. The U.S. Forest Service's 1985 management plan for Florida forests governs activities in National Forests in Florida in 1998. 69 Fed. Reg. at 2106, AR 0007; see AR 3330.

36. In the 1985 management plan, as well as the 1997 revised draft, the bear was identified as a management indicator and sensitive species which requires the Forest Service to evaluate the impacts of actions in each National Forest on the bear and its habitat. 69 Fed. Reg. at 2106, AR 0007, see AR 3642, 4735, 4988, 5506, 5511.

37. In 1998, the Forest Service estimated that "actions planned to improve wildlife habitat, implement road closures, conduct prescribed burns, and complete land acquisition projects had achieved 116%, 197%, 145%, and 8,583%, respectively, of the levels directed in the 1985 plan. 69 Fed. Reg. at 2106, AR 0007; see AR 5512.

38. The 1997 Sikes Act Amendment requires the Department of Defense (DOD) to prepare and implement an integrated natural resource management plan for at each installation under its jurisdiction, including Eglin Air Force Base (AFB). 69 Fed. Reg. at 2106, AR 0007; see AR 5936.

39. Although DOD had not completed preparation of the plan by 1998, it was taking actions to protect the bear habitat including maintenance of habitat diversity, prescribed burning, uneven-aged forest management, restoration of longleaf pine habitat, and maintenance of forested wetlands, all pursuant to an earlier (1993) management plan, and that continue to provide the bear habitat at Eglin AFB today.  69 Fed. Reg. at 2106, AR 0007; see AR 519, 7043.

40. Florida has in place management plans for all state lands that are important to the bear, requiring that these plans describe how a state-listed species like the bear will be protected or preserved, and evaluate every five years whether the plans' requirements sufficiently protect such species.  69 Fed. Reg. at 2107, AR 0008; see AR 821, 922, 1112, 1384, 1404, 1433, 1472, 1516, 1568, 1634, 1776, 1890, 1943, 2003, 2965, 2973.

December 7, 2006.

    Respectfully submitted,

    SUE ELLEN WOOLDRIDGE
    Assistant Attorney General
    Environment and Natural Resources Division
    JEAN E. WILLIAMS, Chief
    SETH M. BARSKY, Assistant Chief
    Wildlife and Marine Resources Section

    *S/ Courtney Taylor*
    _____
    COURTNEY A. TAYLOR
    Trial Attorney
    U.S. Department of Justice
    Environment and Natural Resources Division
    Wildlife and Marine Resources Section
    P.O. Box 7369
    Washington, D.C.  20044-7369
    Telephone: (202) 353-7548
    Facsimile: (202) 305-0275
    Email: Courtney.Taylor@usdoj.gov

Of Counsel:
Michael P. Stevens
United States Department of the Interior
Office of the Solicitor
Southeast Region
75 Spring Street, S.W., Suite 304
Atlanta, Georgia   30303
(404) 331-0722

                              Attorneys for Defendants