# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| DEFENDERS OF WILDLIFE, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 06CV00180 (HHK) |
| v. | ) | |
| | ) | |
| DIRK KEMPTHORNE, et al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Joshua R. Stebbins
(D.C. Bar. No. 468542)
Howard M. Crystal
(D.C. Bar No. 446189)
Eric R. Glitzenstein
(D.C. Bar No. 358287)

Of Counsel:

Brian Segee
(D.C. Bar. No. 492098)
Defenders of Wildlife
1101 Fourteenth Street, N.W.
Suite 1400
Washington, D.C.  20005

Meyer Glitzenstein & Crystal
1601 Connecticut Ave., N.W.
Suite 700
Washington, D.C.  20009
(202) 588-5206

January 11, 2007

Attorneys for Plaintiffs

## TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

I.    THE SERVICE'S CONSTRUCTION OF THE COURT'S 2001 ORDER IS
      NOT "REASONABLE" SINCE IT VIOLATES THE ESA, AND THE 2001
      ORDER ITSELF, AS REFLECTED BY THE SERVICE'S OWN PAST
      PRACTICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

II.   EVEN APART FROM THE COURT'S ORDER, THE NEW DETERMINATION,
      AND THE SERVICE'S RATIONALE FOR IT, CANNOT BE RECONCILED
      WITH THE ESA. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

III.  BECAUSE THE SERVICE'S REMAND DETERMINATION NEVER
      ANALYZED THE BEAR'S "EXISTING STATUS" OR THE "REGULATORY
      ACTIONS CURRENTLY IN EFFECT WHEN MAKING ITS DECISION,"
      AND BECAUSE IT MOST CERTAINLY DID NOT RELY "SOLELY" ON
      THE BEST AVAILABLE DATA, THE SERVICE HAS NOT LAWFULLY
      DETERMINED WHETHER EXISTING REGULATORY MECHANISMS ARE
      INADEQUATE TO PROTECT THE BLACK BEAR. . . . . . . . . . . . . . . . . . . . . . . . . . 22

      A.    The Service Violated The ESA and the Court's Order Because It Failed To
            Analyze Post-1998 Information Concerning Existing Regulatory Mechanisms
            And The Bears' Status. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

      B.    Even With Respect To Its Determination As Of 1998, The Service's 2004
            Decision Is Fatally Flawed Because It Violates The ESA's, And The Court's,
            Mandate To Consider Only Existing Regulatory Mechanisms Currently In
            Effect, And Because It Is Not Supported By The Record. . . . . . . . . . . . . . . . . 25

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

# TABLE OF AUTHORITIES

**FEDERAL CASES**                                                           **PAGE**

American Wildlands v. Norton,
     193 F. Supp. 2d 244 (D.D.C. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21

*Biodiversity Legal Foundation v. Babbitt,
     943 F. Supp. 23 (D.D.C. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 11, 12, 14, 24, 26

Building Industrial Association v. Babbitt,
     979 F. Supp. 893 (D.D.C. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

County of Los Angeles v. Shalala,
     192 F.3d 1005 (D.C. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

*Defenders of Wildlife v. Babbitt,
     Civ. No. 99-2072 (HHK) (D.D.C. Dec. 13, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Defenders of Wildlife v. Babbitt,
     958 F. Supp. 670 (D.D.C. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26

Federation of Fly Fishers v. Daley,
     131 F. Supp. 2d 1158 (N.D. Cal. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

Heartland Regional Medical Center v. Leavitt,
     415 F.3d 24 (D.C. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Northern Spotted Owl v. Hodel,
     716 F. Supp. 479 (W.D. Wash. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

Oregon Natural Resources Council v. Daley,
     6 F. Supp. 2d 1139 (D.Or. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11, 14

*Save Our Springs v. Babbitt,
     27 F. Supp.739 (W.D. Tex. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11, 14, 26

Securities and Exchange Commission v. Chenery,
     332 U.S. 194 (1947) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24

_____

Authorities upon which we chiefly rely are marked with an asterick

Solid Waste Agency of Northern Cook County v. Army. Corps. of Eng'rs.,
    531 U.S. 159 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Southwest Center for Biological Diversity v. Babbitt,
    939 F. Supp. 49 (D.D.C. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 12, 14

Southwest Center for Biological Diversity v. Bartel,
    457 F. Supp. 2d 1070 (S.D.Cal. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 24

## FEDERAL STATUTES

*16 U.S.C. § 1533 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 9, 11, 13, 15, 18, 22, 31

## FEDERAL REGULATIONS

36 C.F.R. § 219.19 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 6, 23

36 C.F.R. § 219.20 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 6

## MISELLANEOUS

12-Month Finding for a Petition to List the Alexander Archipelago Wolf,
    62 Fed. Reg. 46709 (Sept. 4, 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 12

12-Month Finding for a Petition to List the Queen Charlotte Goshawk,
    62 Fed. Reg. 46710, 46711 (Sept. 4, 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 31

12-Month Finding for a Petition to List the Florida Black Bear,
    63 Fed. Reg. 67613 (Dec. 8, 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 8, 21, 27, 28, 29

Final  Listing Determination for Klamath Mountains Provinces Steelhead,
    66 Fed. Reg. 17845, 17849, 17856 (Apr. 4, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Final Rule to List the Barton Springs Salamander as Endangered,
    62 Fed. Reg. 23377, 23377-79 (Apr. 30, 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

_____

Authorities upon which we chiefly rely are marked with an asterick

Finding on a Petition to List the Florida Black Bear as a Threatened Species,
     57 Fed. Reg. 596, 597 (Jan. 7, 1992) ....................................... 31

National Forest System Land and Resource Management Planning,
     67 Fed. Reg. 72770 (Dec. 6, 2002) ........................................ 6

National Forest System Land Management Planning Final Rule,
     70 Fed. Reg. 1023, 1029 (Jan. 5, 2005) ..................................... 7

Notice of Status Reviews,
     61 Fed. Reg. 64496 (Dec. 5, 1996) ........................................ 12

Reexamination of Regulatory Mechanisms in Relation to the 1998 Florida
     Black Bear Petition Finding,
     69 Fed. Reg. 2101, 2104 (Jan. 14, 2004) .. 1, 2, 7, 8, 17, 18, 20, 23, 25, 26, 27, 28, 30, 31

Threatened Status for the Oregon Coast Evolutionarily Significant Unit of Coho Salmon,
     63 Fed. Reg. 42587 (Aug. 10, 1998) ....................................... 14

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| DEFENDERS OF WILDLIFE, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 06CV00180 (HHK) |
| v. | ) | |
| | ) | |
| DIRK KEMPTHORNE, et al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT AND REPLY IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

In 2004, the Fish and Wildlife Service ("Service") decided not to list the Florida black

bear based upon obsolete regulatory mechanisms and factual information that dated from 1998.

As a result, by the time of the Service's 2004 remand determination, regulatory mechanisms that

were critical to the Service's decision not to list the bear had effectively expired or been repealed,

or otherwise no longer had the legal effect the Service ascribed to them.  In addition, information

that the Service relied upon concerning threats to the bear, such as the rate of development in the

bears' remaining habitat, was simply no longer accurate.  None of this is disputed by the Service

in its brief.

Thus, for example, the Service does not dispute that it relied upon a 1998 land acquisition

program, the Florida Preservation 2000 Trust Fund, Reexamination of Regulatory Mechanisms in

Relation to the 1998 Florida Black Bear Petition Finding, 69 Fed. Reg. 2101, 2104 (Jan. 14,

2004) ("2004 Decision"), A.R. 0005, to protect bear habitat, even though the program had

effectively expired in 2000, as its name suggests.  Similarly, the Service does not dispute that it

relied upon the Forest Service's legal duty to maintain "viable populations of species" to protect

bears and bear habitat in National Forests, id., 2004 Decision, 69 Fed. Reg. at 2105-06, A.R.

0006-07, even though by 2004 the regulation it relied upon, 36 C.F.R. § 219.19, no longer

required the Forest Service to maintain viable populations of species.  Compare 36 C.F.R. §

219.19 (1998) with 36 CFR § 219.19 (2001).  But see 36 C.F.R. § 219.20 (2001) (establishing

different Forest Service requirements, unanalyzed by the Service and since repealed).  And the

Service does not dispute that in concluding that the core Apalachicola population was secure, the

Service relied on its 1998 assessment that there would be "slow rates" of human development in

the Florida Panhandle Apalachicola area, see 12-Month Finding for a Petition to List the Florida

Black Bear, 63 Fed. Reg. 67613, 67615 (Dec. 8, 1998) ("1998 Decision"); 2004 Decision, 69

Fed. Reg. at 2104, A.R. 0005 (incorporating 1998 Decision), despite the fact that the Service

itself had already determined in 2001, in conjunction with the Forest Service, that there would be

a "rapid increase in population and development" in the Panhandle.  USDA Forest Service,

Southern Forest Resource Assessment Summary Report at 90 (Nov. 19, 2001), S.A.R. P299

(emphasis added).

      Instead, the Service simply asserts that it was "reasonable" for it to rely on outdated

regulations and information because the Court did not "dictate" what year the Service must use

for its examination of "existing" regulatory measures.  Defendants' Cross Motion For Summary

Judgment And Motion In Opposition To Plaintiffs' Motion For Summary Judgment at 24-25

("FWS Brief").[1]  However, whatever else one can say about the approach taken by the Service here, it certainly was <u>not</u> reasonable for the Service to wait several years and then refuse to consider highly pertinent developments that had come to the agency's attention in the meantime.

Indeed, the Court could not possibly have intended the Service to rely upon regulations and data so completely out of date when it ordered the Service to determine whether the bear warrants listing under § 1533(a)(1)(D) of the Endangered Species Act ("ESA").  16 U.S.C. § 1533, <u>et seq.</u>  The Service's remand determination, and its arguments in support of it, fly in the face of the ESA and the express language of the 2001 Order enforcing the ESA, as evidenced by the Service's own § 1533(a)(1)(D) remand determinations in this and other cases.  Furthermore, it reduces the Court's 2001 Order to a paperwork exercise with no practical significance whatsoever.

Most obviously, the government never explains <u>why</u> the Court would have wanted the Service to proceed in so bizarre a fashion that it cannot even be reconciled with the ESA itself.  The plain meaning of the ESA requires the Service to determine whether "<u>existing</u> regulatory mechanisms" are inadequate to protect the bear from threats reaching a point where the bear is likely to become endangered.  16 U.S.C. § 1533(a)(1)(D) (emphasis added).  And it requires that the determination be based "<u>solely</u> upon the best scientific and commercial data available."  16 U.S.C. § 1533(b) (emphasis added).  Here, however, the Service cannot dispute that, in 2004, the Service evaluated what were then non-existing, or significantly amended, regulatory

---

[1]  Citations to the Service's brief are to the page numbers automatically inserted by the Electronic Case Filing system.  Citations to the Interveners' brief are to the page numbers noted at the bottom of each page.

mechanisms, and that it ignored readily "available" data on such mechanisms. Clearly an unlawful determination is hardly a "reasonable" reading of the Court's 2001 Order.

Moreover, the Court's 2001 Order specifically enforced § 1533(a)(1)(D) of the ESA. It explicitly "remanded to the Wildlife Service to determine . . . whether the inadequacy of regulatory mechanisms warrants listing the bear" under § 1533(a)(1)(D). Defenders of Wildlife v. Babbitt, Civ. No. 99-2072 (HHK) (D.D.C.) at 22 ("2001 Order") (emphasis added). And it directed the Service to "judge the viability of the black bear based on threats to its existing status and therefore [it can] rely only on regulatory actions currently in effect when making its decision." Id. at 21-22.

But, while compiling an entirely new administrative record including new land management plans and other evidence, the Service refused to consider any updated information about the "existing status" of the bear and the threats it faced, or the "regulatory actions currently in effect when making its decision," id. at 22, including the specific information plaintiffs submitted for this very purpose. See Letter from Michael Senatore, Defenders of Wildlife, to Steven Williams, Director, U.S. Fish and Wildlife Service (June 2002) ("Defenders 2002 Letter"), S.A.R. P1.

As discussed below, the Service's own actions in other § 1533(a)(1)(D) remand cases demonstrate the fallacy of its arguments. For example, in Biodiversity Legal Foundation v. Babbitt, 943 F. Supp. 23 (D.D.C. 1996) ("BLF"), one of several cases that the Court followed in its 2001 Order, the court similarly remanded to the Service to consider the present status of the species at issue and the adequacy of "current" regulatory mechanisms. On remand, the Service explicitly analyzed the adequacy of the "current" regulatory mechanisms, that is, the regulatory

4

mechanisms that existed at the time of its remand decision, viz-a-viz the threats the species faced. 12-Month Finding for a Petition to List the Alexander Archipelago Wolf, 62 Fed. Reg. 46709 (Sept. 4, 1997) ("1997 Wolf Determination"). So too here: the Service was clearly required to analyze the adequacy of regulatory measures as of the time it made its new decision, not as of 1998, six years earlier.

Indeed, in BFL, the Service even argued that it would be "contrary to law" for it to rely on obsolete regulatory measures, including a land management plan that would purportedly protect the species. BLF, Federal Defendants' Status Conference Statement at 7-8, May 27, 1997, 96 CV00227 (SS) (D.D.C.) (Pls'. Ex. A) ("BLF Status Conference Statement"). See also Southwest Center for Biological Diversity v. Babbitt, 939 F. Supp. 49 (D.D.C. 1996) ("Southwest") Federal Defendants' Status Conference Statement at 7-8, May 27, 1997, 95 CV02138 (SS) (D.D.C.) (Pls'. Ex. B) ("Southwest Status Conference Statement"). More specifically, the Service asserted that ESA § 1533(a)(1)(D) not only "precludes consideration of possible future revisions, it also prevents consideration of outdated [regulatory mechanisms]," and therefore the "ESA requires that the FWS examine the relevant regulatory system, and, now, that is the revised [regulatory mechanism]." BLF Status Conference Statement at 7 (emphasis added). Moreover, the Service argued that relying on outdated regulatory mechanisms would also violate its duty under the ESA to consider "the best scientific and commercial information available." Id. (citing 16 U.S.C. § 1533(b)(1)(A)).

In short, nothing in the ESA itself, or the Court's 2001 Order enforcing the ESA, supports the Service's assertion that it was lawful – let alone reasonable – to render a determination based upon outdated regulatory mechanisms. Thus, because the 2004 remand determination failed to

5

analyze the regulatory mechanisms and facts that actually existed at the time of its 2004 decision,

as required by the ESA and the Court's 2001 Order, the 2004 Decision must be set aside.

## ARGUMENT

I.    **THE SERVICE'S CONSTRUCTION OF THE COURT'S 2001 ORDER IS NOT "REASONABLE" SINCE IT VIOLATES THE ESA, AND THE 2001 ORDER ITSELF, AS REFLECTED BY THE SERVICE'S OWN PAST PRACTICE.**

The Service does not dispute that in 2004 it determined the Florida black bear does not

warrant listing under the ESA, and based this determination on laws and facts from 1998, six

years earlier.  Nor does the Service dispute that by the time of its 2004 determination, the laws

and facts from 1998 had changed significantly.

Thus, for example, the Service does not dispute that in examining the efficacy of existing

regulatory mechanisms, it decided bear habitat within National Forests was secure largely

because the Forest Service was legally required to maintain "viable populations of species" under

36 CFR § 219.19.  2004 Decision, 69 Fed. Reg. at 2105-6, A.R. 0006-07.  Nor does the Service

dispute that by 2001, 39 C.F.R. § 219.19 no longer contained the viability requirement that the

Service had relied so heavily upon.  Compare 36 C.F.R. § 219.19 (1998) with 36 CFR § 219.19

(2001).  But see 36 C.F.R. § 219.20 (2001) (establishing different viability requirements,

unanalyzed by the Service and since repealed).  In fact, by 2002 the Forest Service proposed to

further amend part 219, including section 219.19 (and 219.20), potentially reducing even further

its remaining obligations with respect to viable populations, see National Forest System Land

and Resource Management Planning, 67 Fed. Reg. 72770 (Dec. 6, 2002), and as of today, the

Forest Service has no "requirement to provide for viable populations." National Forest System
Land Management Planning Final Rule, 70 Fed. Reg. 1023, 1029 (Jan. 5, 2005).[2]

Likewise, the Service does not dispute that its 2004 Decision relied upon a 1998 land
acquisition program, the Florida Preservation 2000 Trust Fund ("Florida 2000"), to acquire and
protect bear habitat, and that it believed Florida 2000 "may have been the most valuable means
of ensuring protection" of such habitat. 2004 Decision, 69 Fed. Reg. at 2104, A.R. 0005. But
again, however, the Service also does not dispute that when it made its 2004 determination not to
list the bear, the Florida 2000 land acquisition program had effectively expired several years
earlier.[3]

And with regard to the Clean Water Act, which the Service relied upon in its 2004
Decision to "protect wetland habitats important to the bear throughout its range," id. at 2103,
A.R. 0004, the Service does not dispute that it never addressed the 2001 Supreme Court decision
that significantly narrowed the scope of the Act's protections. See Solid Waste Agency of
Northern Cook County v. Army. Corps. of Eng'rs. 531 U.S. 159 (2001) ("SWANCC"). See also
Southwest Center for Biological Diversity v. Bartel, 457 F. Supp. 2d 1070, 1080-81, 1112

---

[2] Even in its brief, however, the Service persists in asserting that 1998 regulations still
exist when they don't. For example, the Service asserts that the "Forest Service also has a
mandate to maintain viable populations of native species, such as the bear," FWS Brief at 30,
when, as a matter of law, the Forest Service has no such mandate.

[3] Indeed, the Service acknowledges in its 2004 remand determination that Florida 2000
had since been replaced with another, supposedly "similar" program, 2004 Decision, 69 Fed.
Reg. at 2104, n.4, A.R. 0005, though the Service never takes the new program into consideration
in making its 2004 Decision. Instead, as with all the footnotes in the 2004 Decision, the Service
explicitly states that it provides post-1998 information "separate from [its] court ordered re-
examination," id. at 2101, A.R. 0002, and thus it never analyzes the replacement program's new
requirements and priorities.

7

(S.D.Cal. 2006) (enjoining incidental take permit by the Service and requiring new consultation for failure to consider effect of SWANCC on CWA wetlands regulation).

Perhaps even more jarring, the Service does not dispute that its 2004 determination relied upon the Service's 1998 assessment of "slow rates" of growth in the Florida Panhandle Apalachicola region, despite the fact that in 2001 the Service (with the Forest Service) reversed its 1998 assessment and now anticipates a "rapid increase in population and development" in the area. Compare 1998 Decision, 63 Fed. Reg. at 67615 and 2004 Decision 69 Fed. Reg. at 2104, A.R. 0005, with Southern Forest Resource Assessment Summary Report at 90, S.A.R. P299 (emphasis added).

Nonetheless, the Service contends it was perfectly reasonable to rely on laws and facts so completely out of date that some had been effectively repealed, and others the Service itself disagreed with. According to the Service, this was all a proper exercise of its discretion because the "Court's only direction on remand related to existing versus future mechanisms and not the time period for evaluating the 'existing' mechanisms." FWS Brief at 25 (emphasis added).

The implications of this are astounding. For example, under the Service's interpretation, it would have been a proper exercise of discretion to determine that the bear did not warrant listing in 2004 even if the Service also acknowledged that only a handful of bears remained at that time, and that this was the direct result of inadequate regulatory mechanisms that had developed since 1998. In the Service's view, so long as the Service's determination is supported by 1998 data (which, as discussed below, it is not), a decision not to list under those circumstances would have complied with the Court's Order.

8

Indeed, if the terms "current" and "existing" in the Court's Order do not dictate "the time period for evaluating the 'existing' mechanisms," id. at 25, the Service could have waited until 2018 to issue its remand determination, and then it could have decided that as of twenty years earlier, in 1998, the bear did not warrant listing. Clearly, such an interpretation renders the Court's 2001 Order a pointless exercise with nothing but academic significance.[4]

Contrary to the Service's contentions, this approach is patently not a "reasonable" reading of the Court's ruling. It is not only impossible to reconcile with the plain terms of the ESA – which alone is sufficient to compel its rejection – but it makes no sense in view of the language used by the Court itself. Indeed, the Service's interpretation of "current" and "existing" as contemplating "current" and "existing" in some entirely historical period in time is nonsensical.

The ESA expressly requires the Service to analyze "the inadequacy of existing regulatory mechanisms" to determine whether a species warrants listing. 16 U.S.C. § 1533(a)(1)(D) (emphasis added). As the Court noted in its 2001 Order, the provision speaks in the present tense. 2001 Order at 20. Plaintiffs can find no instances where § 1533(a)(1)(D) was found to embrace historical regulatory regimes that existed at some past point in time. Moreover, the ESA requires listing determinations to be based "solely" upon the best available information. 16 U.S.C. § 1533(b).

To be sure, the Service does not argue that § 1533 itself allows an analysis of historical facts and law. Rather, the Service argues that the 2001 Order allows for such an historical

_____

[4] Contrary to the Intervener's implied assertions otherwise, the 2004 remand determination was not a review of the 1998 administrative record, but a new record, generated specifically for the 2004 remand determination. See Intervener's Brief at 5-8.

analysis.  But even a brief review of the 2001 Order, its language, its reasoning and its purpose,

belies the reasonableness of the Service's "interpretation."

For example, the Court explicitly directed the "Service [to] examine only regulatory

mechanisms which are <u>currently being undertaken and enforced</u>."  2001 Order at 22 (emphasis

added).  It instructed the Service that "'existing regulatory mechanisms' are those that are

<u>currently being implemented and enforced</u>."  <u>Id.</u> at 20 (emphasis added).  It remanded to the

"Service <u>to determine</u> . . . whether the inadequacy of <u>existing</u> regulatory mechanisms warrants

listing the black bear as a threatened species."  <u>Id.</u> at 22 (emphasis added).  And it specifically

told the Service to "judge the viability of the black bear based on . . . regulatory actions <u>currently</u>

<u>in effect when making its decision.</u>"  <u>Id.</u> at 21-22 (emphasis added).

The plain meaning of the terms "current" and "existing" <u>required</u> the Service to examine

regulations that had actual "reality or actual being" at the time it made its decision, not a wholly

historical reality.  <u>Webster's New World Dictionary</u>, 3rd College Ed. (1988) at 476 (defining exist

to "have reality or actual being. . . to occur or be present . . . to continue being"); <u>id.</u> at 340

(defining "current" as "now going on; now in progress . . . at the present time; contemporary . . .

of most recent date").  And again, lest there be any doubt as to the Court's intention, it even

specified that the Service "must" examine "<u>only</u>" those "regulatory actions currently in effect

<u>when making its decision.</u>"  2001 Order at 21-22 (emphasis added).

To be sure, the 2001 Order forbid reliance on future regulations when it repeatedly

directed the Service to review only current regulations.  But even if the plain meaning of the

Court's direction did not unmistakably proscribe consideration of historical regulations, the

Court's reasoning did.  As the 2001 Order explained, the Service cannot "rely on speculative

10

future actions to justify its decisions because there is no assurance that those actions will in fact be carried out," id. at 20, nor is there any assurance they will be effective. E.g., Save Our Springs v. Babbitt, 27 F. Supp. 2d 739, 748 (W.D. Texas 1997). And if it is arbitrary and capricious to rely upon future regulations that may not come into play and may not be effective, it is equally, if not more, arbitrary and capricious to rely upon historical regulatory mandates from six years ago that in fact no longer exist and cannot therefore be effective.

Even if the Court were at liberty to depart from the ESA's clear requirements – which is not the case – the 2001 Order tracks the language of § 1533(a)(1)(D) verbatim. It specifically "remanded to the Wildlife Service to determine . . . whether the inadequacy of existing regulatory mechanisms warrants listing" the bear. 2001 Order at 22 (emphasis added). And the Service has identified nothing in the 2001 Order that suggests the Court intended to deviate from the ESA's mandate to consider "existing regulatory mechanisms," nor from the ESA's mandate to use "solely . . . the best scientific and commercial data available." 16 U.S.C. § 1533(a), (b). Indeed, the Service has pointed to nothing in the Court's 2001 Order that even remotely suggests the Court granted the Service discretion to rely on non existent regulatory mandates from six years earlier when it directed the Service to "rely only on regulatory actions currently in effect when making its decision." 2001 Order at 22.

The very cases that the Court's 2001 Order followed – Biodiversity Legal Foundation v. Babbitt, 943 F. Supp. 23 (D.D.C. 1996), Save Our Springs v. Babbitt, 27 F. Supp.739 (W.D. Tex. 1997), and Oregon Natural Resources Council v. Daley, 6 F. Supp. 2d 1139 (D.Or. 1998) – refute the Service's claims to having acted "reasonably" in this case. To be sure, these cases, like the 2001 Order, proscribed reliance on future regulatory actions. But it is far from true that they

11

"provide[d] no guidance on the proper timeframe for evaluating those mechanisms on remand," as the Service claims.  FWS Brief at 25.  To the contrary, the manner in which the Service undertook the remand in these cases demonstrates that even in these cases the Service understood its obligation to look at existing regulatory mechanisms and current information, not relics from when it made its prior determination.

In BLF and its companion case Southwest, the court rejected not-warranted determinations that were premised on "promises of proposed future actions."  943 F. Supp. at 26; 939 F. Supp. at 52.  And, much like in this case, the court "remanded to the Secretary . . . [to] reconsider the 12-month finding," and required that the "determination must be made on the basis of the current Forest Service Plan, and the status of the [species] and its habitat, as they stand today."  943 F. Supp. at 26; 939 F. Supp. at 52 (emphasis added).

On remand in BLF and Southwest, the Service reopened the public comment period not once, but twice: the first time through April 1997, and then, again, in June 1997 to update information that was at that time just three months old.  1997 Wolf Determination, 62 Fed. Reg. 46709; see also, Notice of Status Reviews, 61 Fed. Reg. 64496 (Dec. 5, 1996) (requesting "any information, data, comments, and suggestions . . . concerning the status of these species.").  In so doing, the Service specifically cited the court's "order that a finding be based upon the 'current forest plan.'" 1997 Wolf Determination, 62 Fed. Reg. 46709 (emphasis added).

Indeed, in stark contrast to the Service's position here, in these cases the Service sought an extension of the deadline to make a new decision so that it could update its information, arguing that:

12

> **Consideration of the obsolete [regulatory mechanism]** in face of the new [regulatory mechanism] **would be contrary to law**. As plaintiffs and this Court have repeatedly stressed, ESA Section 4(a)(1)(D) requires that FWS consider the adequacy of <u>existing</u> regulatory mechanisms. **Since this requirement precludes consideration of possible future revisions, it also prevents consideration of outdated plans.** The ESA requires that the FWS examine the relevant regulatory system, and, now, that is the revised [regulatory mechanism].
>
> Moreover, to ignore the revised plan and the information contained therein **may also violate** the ESA's requirement to base the petition finding on **the best available scientific and commercial information available. 16 U.S.C. § 1533(b)(1)(A)**. . . . **The FWS cannot ignore relevant information when making findings under ESA section 4.**

<u>BLF</u> Status Conference Statement at 7, (Pls'. Ex. A) (underline in original) (bold added); <u>id.</u>, Ex. A at ¶¶ 3-6, 10. <u>See also</u> <u>Southwest</u> Status Conference Statement at 7-8, (Pls'. Ex. B) (same). Thus, in both cases, the Service's position was that, in carrying out a court ordered remand to reconsider the adequacy of existing regulatory mechanisms, it had <u>no</u> discretion to consider outdated regulatory mechanisms because doing so would be contrary to the ESA and the Court's order. <u>Id.</u>[5]

<u>BLF</u> and <u>Southwest</u> are indistinguishable from this case. Again, the Court expressly cited and followed <u>BLF</u> in its 2001 Order. 2001 Order at 19, 20. All three authorities - <u>BLF</u>, <u>Southwest</u> and the 2001 Order - used the terms "current" and/or "existing" when they set the applicable legal standard, and all three then required the Service to "[re]examine" or "reconsider" and "determin[e]" on remand whether "current" and "existing" regulatory mechanisms and

_____

[5] The Court granted the extension over plaintiffs' opposition that the final contents of the new forest plan, which was also subject to appellate review, had not yet been finalized and thus an extension simply delayed even longer a lawful remand determination and left the species' status dependant upon expectations of future actions. <u>BLF</u>, Plaintiffs' Opposition To Defendants' Proposed Schedule For Complying With This Court's September 26, 1996 Decision.

information warranted listing.  BLF, 943 F. Supp. at 26; Southwest, 939 F. Supp. at 52; 2001

Order at 21, 22.

Surely the Service's position in this case – that it has the discretion to limit its decision to

six year old data and to refuse to consider regulatory mechanisms that actually exist – is

inconsistent with its position in BLF and Southwest.  The Service certainly argued just the

opposite to Judge Sporkin of this Court.

Likewise, in Save Our Springs, which the 2001 Order also cited and followed, the court

similarly remanded a not-warranted determination that relied on untested, future regulatory

mechanisms.  27 F. Supp. 2d at 748-49.  And, on remand, the Service again sought an extension

"so that the Service could reopen the comment period and consider new information," even

though the last comment period had closed only eight months earlier.  Final Rule to List the

Barton Springs Salamander as Endangered, 62 Fed. Reg. 23377, 23377-79 (Apr. 30, 1997)

("Salamander Decision").[6]  And in Federation of Fly Fishers v. Daley, 131 F. Supp. 2d 1158

(N.D. Cal. 2000), the court also remanded a not-warranted determination that relied on future and

voluntary mechanisms.  131 F. Supp. 2d at 1165-70.  And again, on remand, the agency (NMFS)

updated its three year old information, specifically citing the ESA's mandate that listing

determinations "be based solely on the best scientific and commercial data available."  Final

---

[6]  The court, which had specifically found that political considerations underlaid the
Service's previous actions, 27 F. Supp. 2d at 48-49, rejected the Service's request and so held the
Service to a 30 day remand period.  Salamander Decision, 62 Fed. Reg. at 23377-79.  Similarly,
on remand in Oregon Natural Resources Council v. Daley, 6 F. Supp. 2d 1139 (D. Oregon 1998),
NMFS was unable to incorporate updated information in its remand determination because the
court required it to issue its new determination in just two months.  Threatened Status for the
Oregon Coast Evolutionarily Significant Unit of Coho Salmon, 63 Fed. Reg. 42587, 42587 (Aug.
10, 1998) ("Coho Salmon").

14

Listing Determination for Klamath Mountains Provinces Steelhead, 66 Fed. Reg. 17845, 17849, 17856 (Apr. 4, 2001).

All of these cases offer unmistakable parallels to this case. The Court's 2001 Order expressly relied on a number of them, and it remanded using the same language that they employed. In these cases the agency involved sought to update its information to bring it "current," often citing its legal <u>duty</u> to do so, provided the Court allowed it sufficient time. In none of the cases did the agency purport to have the discretion to analyze wholly historical points in time nor outdated data: doing so would have been contrary to the law that the Service itself acknowledged was controlling. <u>But see</u> FWS Brief at 24 (arguing that it had discretion to ignore data after 1998).

If anything, D.C. Circuit precedent regarding an agency's "discretion" on remand undermines the Service's claim that it "reasonably" exercised its discretion in this case when it ignored 2004 regulations and data. FWS Brief at 20-22. <u>See also</u> Interveners Brief at 5-6. There is simply nothing in the precedent that suggests the Service could violate the ESA in carrying out its remand. As the Service itself argues, an agency's action on remand must be consistent with the corrected legal standard. FWS Brief at 20 (citing <u>County of Los Angeles v. Shalala</u>, 192 F.3d 1005 (D.C. Cir. 1999)). In this case, the legal standard under the ESA is, as discussed above, an analysis of "existing regulatory measures" using solely the "best available" data, 16 U.S.C. § 1533, which the Service itself has asserted precludes "consideration of outdated plans." <u>BLF Status Conference Statement</u> at 7. The Court repeated this standard verbatim when it remanded to the Service with a direction to determine "whether the inadequacy of existing regulatory mechanisms warrants listing the bear." 2001 Order at 22. It was therefore neither reasonable –

15

nor lawful – for the Service to ignore the correct legal standard, and the information the standard required the Service to analyze, and to instead review obsolete information.

Unlike in Heartland Regional Medical Center v. Leavitt, plaintiffs are not asking the Court to go beyond the terms of its 2001 Order, nor are they requesting that the Court direct the agency to reach a final determination as to a matter within the agency's discretion, such as a final rule that the bear is endangered.  415 F.3d 24, 29 (D.C. Cir. 2005).  Instead, plaintiffs are simply asking the Court to enforce its previous order and the ESA itself, that is, the "obligation it expressly imposed on the agency," id. to "judge the viability of the black bear based on threats to its existing status and . . . regulatory actions currently in effect when making its decision," which the Service failed to do in its 2004 Decision.  2001 Order at 21-22 (emphasis added).  Stated in other terms, plaintiffs are merely asking the Court to require that the "agency cure the legal deficiency" in its listing determination and apply the correct legal standard previously articulated by the Court in its 2001 Order, because the Service failed to do so in its 2004 remand determination.  FWS Brief at 20.  In fact, the Service in effect repeated its previous mistake in its 1998 Decision of relying on other than "existing regulatory mechanisms."

In short, the "discretion" the Service purports to have exercised in this case is inconsistent with the plain language, and reasoning, of the Court's order.  It is inconsistent with the ESA. And it is inconsistent with the Service's own past practices, and its own representation of what the ESA, and similar cases, require.  For all of these reasons, the Service has not acted in a "reasonable" – nor even lawful – manner in intentionally donning blinders to highly pertinent developments occurring between 1998 and 2004.

16

II.    **EVEN APART FROM THE COURT'S ORDER, THE NEW DETERMINATION, AND THE SERVICE'S RATIONALE FOR IT, CANNOT BE RECONCILED WITH THE ESA.**

The Service seeks to justify its departure from the plain terms of the ESA by arguing that reviewing the bear's "existing status" as of 2004 would amount to reopening or redoing its 1998 determination.  FWS Brief at 27.  Moreover, it even contends that it never had an obligation to analyze the inadequacy of regulatory mechanisms with respect to habitat loss:

> the Service has determined that habitat loss and fragmentation do not rise to this level [of threatening the bear's survival]; thus, it was under no obligation to analyze the effect of existing regulation mechanisms on this threat."

Id. at 34 (emphasis added).  And it asserts that updating its information to make a contemporaneous 2004 determination under § 1533(a)(1)(D) would be "illogical": the bear's listing determination under Factors A-C and E would reflect its 1998 status while Factor D alone its 2004 status.  FWS Brief at 23, 32.

The Service's own remand determinations, both in this and other § 1533(a)(1)(D) remand cases, demonstrate the fallacy of the Service's arguments.  The ESA, and the Court's order enforcing the ESA, required the Service to determine whether regulatory protections that existed at the time of its decision were inadequate to protect the bear from becoming in danger of extinction in light of the significant threats that the bear faced.

The Service itself explicitly states in its 2004 Decision that its duty on remand was to analyze the inadequacy of regulatory measures viz-a-viz the principal threats to the black bear, namely habitat loss/fragmentation.  2004 Decision, 69 Fed. Reg. at 2102, A.R. 0003.  Under the analysis the Service itself espouses, the Service therefore had to determine whether "existing" regulatory mechanisms were adequate to protect the bear from becoming endangered in the

17

foreseeable future by preventing the loss or fragmentation of black bear habitat from reaching levels that threatened the bear's survival.  Id.  Thus, in its remand determination, the Service explains that to make a positive listing determination

> under factor D, we have to find that <u>existing regulatory mechanisms that</u> relate to, or otherwise <u>affect, the protection and management of bears and bear habitat are inadequate because they</u> actively allow or at a minimum <u>do not prevent, levels of</u> direct take (i.e. mortality rates), <u>habitat loss, and/or habitat degradation</u> from reaching a point where the bear would be in danger of extinction, or likely would become in danger of extinction within the foreseeable future . . . .

Id. (emphasis added).

The Service's entire remand determination in fact hews to this analysis in-so-far as it purports to examine habitat loss, habitat fragmentation, and habitat degradation, and the adequacy of the regulatory mechanisms that "affect" these threats.  Id. at 2103- 07, A.R. 0004-08. The Service even concludes its analysis by explaining that is has "consider[ed] the laws, regulations, and policies that directly or indirectly <u>provide protection to the bear or its habitats</u>," and that "[b]ased on this review, we conclude that the existing regulatory mechanisms applicable in 1998 are not inadequate . . . ."  Id. at 2107-08, A.R. 0008-09.

Accordingly, the Service itself has admitted that it must evaluate the adequacy of regulatory mechanisms to stem habitat loss and degradation.  It simply failed to do so in a manner consistent with the ESA's requirements that it evaluate "<u>existing</u>" mechanisms and the best available data. 16 U.S.C. § 1533.

In short, it is far from "illogical" that the Service would render its determinations of Factors A-C and E as of 1998 – determinations that were not found lacking by the Court – and its analysis of Factor D in 2004.  It is simply a product of the required § 1533(a)(1)(D) analysis of

"existing regulatory mechanisms;" the ESA's mandate to use "solely" the best available data; and the fact that the Service waited until 2004 to conduct its analyses.

Contrary to the Interveners' arguments, Interveners' Brief at 3-8, and the Service's implications, FWS Brief at 21, 22, the Court's 2001 Order clearly intended that the Service render a new determination under factor § 1533(a)(1)(D). The Court held that "[t]his case is remanded to the Wildlife Service to determine, in a manner consistent with this memorandum, whether the inadequacy of existing regulatory mechanisms warrants listing the black bear as a threatened species." 2001 Order at 22 (emphasis added). It repeatedly referenced the new decision and the new examination the Service was required to make: the "Wildlife Service must judge the viability . . . only on regulatory actions currently in effect when making its decision," id. at 21-22 (emphasis added); "the Agency must indicate on the record the regulations upon which it bases its decision," id. at 22 (emphasis added); "this case must be remanded to the Agency so that the Wildlife Service can examine . . . ." Id. (emphasis added). And it explicitly concluded that the Service's assertion that "the regulations it cites qualify as existing regulatory mechanisms [] that it was entitled to rely on" "cannot be sustained." Id. at 19.

Moreover, the remand determination itself - and the Service's brief - clearly reflect the Service's understanding that a new determination had to be, and was, made. The Service generated an entirely new record, adding many new documents and excluding other documents it had relied upon before. This was not a review of a previously existing record from the 1998 decision, and an explanation of the 1998 decision based upon that preexisting record, as Interveners suggest. Interveners Brief at 5; see generally, id. at 3-8. It was a new decision based on a new record of evidence.

19

Perhaps more importantly, the Service opened and closed its remand determination by explicitly <u>making a determination</u> that the black bear does not warrant listing: "Based upon this review, <u>we have determined</u> that the existing regulatory mechanisms are not inadequate so as to warrant listing the Florida black bear under the ESA," 2004 Decision, 69 Fed Reg. at 2101, A.R. 0002 (emphasis added); "Based on this review, <u>we conclude</u> that the existing regulatory mechanisms applicable in 1998 are not inadequate and do not warrant listing the Florida black bear." <u>Id.</u> at 2108, A.R. 0009 (emphasis added). Even a cursory review of the remand determination makes clear that the Service was, in fact, making a determination, not explaining a previous determination: it articulates the analyses it will undertake at the start, it conducts the analysis on a new record, and then it renders its determination. <u>Id.</u> at 2102-07, A.R. 0003-08. And in its brief the Service repeatedly refers to its 2004 Decision as a "remanded determination." <u>E.g.</u> FWS Brief at 9, 17, 21, 24.

For these reasons, the cases in which courts remanded for an additional "explanation" are completely inapposite, as is obvious from the fact that it took the Service several <u>years</u> to announce a new decision. <u>See</u> FWS Brief at 22 (citing <u>Building Indus. Ass'n v. Babbitt</u>, 979 F. Supp. 893 (D.D.C. 1997); <u>Northern Spotted Owl v. Hodel</u>, 716 F. Supp 479 (W.D. Wash. 1988)). Not once in the Court's entire discussion of the Service's Factor D analysis did the Court use the term "explain," and it never ordered the Service to "clarify" anything. To the contrary, the Court ordered the Service to make a § 1533(a)(1)(D) determination that complied with the law. <u>E.g.</u> 2001 Order at 22 ("remanded to the Wildlife Service <u>to determine</u> . . .") (emphasis added). And it did so after reviewing everything the Service reviewed, that is, the entire administrative record, and concluding, among other things, that there was no basis upon which one could have

20

determined that the regulatory measures the Service relied upon were "existing." Id. at 21 ("it is impossible for this court to determine, based upon the existing record, what [] regulatory activities are [being carried out], and in what manner they are being implemented"). Indeed, the Service itself acknowledges that the "Court in its 2001 opinion held that the Service's determination on Factor D could not be sustained by its analysis or the administrative record." FWS Brief at 23.[7]

The defendants' focus on vacatur, or lack thereof, is also off-base. See FWS Brief at 21. This is not a case wherein the Service took some affirmative action that had practical consequences without vacatur. Rather, this is a case in which the Service decided not to issue a rule, and thus, there was no affirmative action to set aside or vacate. In other words, in a case in which an agency refuses to act, there is no practical difference between a remand and a remand and vacatur. Indeed, none of the courts in BLF, Southwest, or Save Our Springs vacated the Service's determination not to list, and in all those cases the Service still recognized that it had a

---

[7] Interveners argue that the Service only needed to "better explain and clarify the decision already made based on the administrative record and status quo in effect at the time of the original decision." Interveners' Brief at 5. The assertion simply denies, or otherwise seeks to second guess, the Court's decision in its 2001 Order to remand for a new determination. Like the court in American Wildlands v. Norton, 193 F. Supp. 2d 244 (D.D.C. 2002) that the Interveners rely upon, the Court here never directed the Service to explain or clarify anything. Instead, it specifically directed the Service "to determine" whether the bear warranted listing, 2001 Order at 22, and the Service in fact, therefore, developed a new administrative record and expressly made a new determination. The dicta from American Wildlands actually supports the Court's decision in its 2001 Order to "remand to the Wildlife Service to determine" whether the bear warrants listing. Id. at 22. This is not a case in which the 1998 record was "bare." 193 F. Supp. 2d at 257. This is a case in which the Service failed to limit its consideration to the factors it was legally allowed to consider – that is, regulations that it knew actually existed and were implemented – and as a result, the Service was reduced to unlawfully speculating about regulatory mechanisms that it "expect[ed] to be compatible with the continued existence of the bears at current levels." 2001 Order at 21 (quoting 1998 Decision, 63 Fed. Reg. at 67618).

legal duty to adduce new information, and it made a new determination based upon that information.

In short, the "analytical gap" identified by the Court in its 2001 Order, FWS Brief at 21, was a faulty § 1533(a)(1)(D) analysis of whether "regulatory actions <u>currently in effect when making its decision</u>" are inadequate to protect the bear from "the threats to its existing status." 2001 Order at 22.  And because the Service failed to undertake this analysis in its remand determination, the determination should once again be remanded.

**III.    BECAUSE THE SERVICE'S REMAND DETERMINATION NEVER ANALYZED THE BEARS' "EXISTING STATUS" OR THE "REGULATORY ACTIONS CURRENTLY IN EFFECT WHEN MAKING ITS DECISION," AND BECAUSE IT MOST CERTAINLY DID NOT RELY "SOLELY" ON THE BEST AVAILABLE DATA, THE SERVICE HAS NOT LAWFULLY DETERMINED WHETHER EXISTING REGULATORY MECHANISMS ARE INADEQUATE TO PROTECT THE BLACK BEAR.**

      **A.    The Service Violated The ESA and the Court's Order Because It Failed To Analyze Post-1998 Information Concerning Existing Regulatory Mechanisms And The Bears' Status.**

Despite the clarity of the Court's Order, despite the Service's recitation of the analysis required, and despite the Service's past practice with § 1533(a)(1)(D) remand determinations, the Service never performed the analysis required by the ESA and the Court's 2001 Order.  Quite simply, the Service failed to examine "existing regulatory mechanisms," 2001 Order at 22; 16 U.C.S. § 1533(a)(1)(D), and it failed to base its decision "solely on the basis of the best scientific and commercial data available."  16 U.S.C. § 1533(b).

As discussed at length above, the Service never analyzed "regulatory actions <u>currently in effect</u>" in 2004, the year the Service actually made its determination.  Nor did the Service consider <u>any</u> information, much less the best available information, concerning the existing status

of the bear in 2004.  The Service even acknowledges that it did not consider the best available information: it included footnotes in its remand determination with updated, post-1998 information "in an effort to provide the best available information," but it then states that it <u>did not take any of this information into consideration</u> in rendering its remand determination.  2004 Decision, 69 Fed. Reg. at 2101, A.R. 0002.  In fact, the Service did not consider <u>any</u> information at all from the preceding <u>six</u> years, even when plaintiffs sent such information to the Service.[8]

Thus, for example, the Service never analyzed the existing regulatory regime in 2004 governing National Forests, a regime that lacked the viability requirement of 36 C.F.R. §219.19 (1998).  It never analyzed the land acquisition programs under the successor to the Florida 2000 program.  It never, for example, considered whether the Apalachicola population was secure given the rapid increase in development and population that it now expects in the Florida Panhandle region.  <u>Southern Forest Resource Assessment Summary Report</u> at 90, S.A.R. P299. And it never considered updated statistics reflecting rapidly increasing road mortality.  <u>E.g.</u> http://myfwc.com/bear/roads.htm (last visited Jan. 10, 2007).  These are only examples, and not an exhaustive list, of the 2004 Decision's reliance on laws and facts that did not exist or were significantly changed by the time the Service relied on them.

To be sure, the Interveners' brief provides those parties' analysis of the intervening changes in law and facts between 1998 and 2004, and it is an analysis that is noticeably lacking

---

[8]  Again, this "updated" information, selectively compiled as it was, was "separate from [its] court-ordered re-examination" and was not, for that matter, included in the record.  2004 Decision, 69 Fed. Reg. at 2101, A.R. 0002.  Thus, for example, there is nothing in the record to support the claim that 320,000 acres of additional land that qualifies as bear habitat has been procured since 1998.  <u>See id.</u> at 2104 n.4, A.R. 0005.  Moreover, neither the record nor the footnotes contain or address the data plaintiffs themselves submitted in 2002.  <u>See</u> Defenders 2002 Letter and attachments, S.A.R. P1-P302.

in the 2004 Decision.  See Interveners' Brief at 9-18.  For example, Interveners cite post-1998

regulations to explain why in their view - a view which plaintiffs strongly disagree with - the

regulatory mechanisms have not changed "appreciably" and the bears' survival is secure.  Id.  But

it is the Service's duty to undertake such an analysis, it is the Service's expertise that the Court

defers to, and it is the Service's analysis that is lacking in this case.  See Securities and Exchange

Commission v. Chenery, 332 U.S. 194 (1947).[9]  Because the Service failed to perform such an

------

[9]  The Interveners challenge the significance of the changes to the regulatory and factual landscape that plaintiffs have identified, asserting for example that plaintiffs have not shown how a change in regulations "could affect the [bear]."  Interveners Brief at 11.  Again, however, it is the Service's duty to analyze the adequacy of the current regulatory environment regarding the bear's prospects for survival, and it is this analysis that the Service should have, but did not, perform.  Nonetheless, the Interveners assertions are erroneous.  For example, the Forest Service's duty to maintain viable species, which no longer exists, is just as relevant now as it was when the Service relied upon it in the 2004 Decision.  Even assuming, arguendo, that current forest plans covering black bear habitat incorporated that mandate, Interveners' Brief at 12-13, the Service relied on the viable population mandate itself in its decision, presumably because it recognized (correctly) that those plans are temporary, and thus it is the Forest Service's permanent regulatory regime, even more that the elements of a specific, temporary plan, that is pertinent to evaluating the adequacy of existing regulatory mechanisms to protect the bear.  2004 Decision, 69 Fed. Reg. at 2105-06, A.R.0006-07.  Similarly, with regard to wetlands protection, Interveners Brief at 9-11, although Defenders of Wildlife may well have argued for as narrow a rollback of regulatory mechanisms as possible under SWANNC, the narrowing effects of SWANNC on wetlands regulation is undeniable.  For example, in Southwest Center for Biological Diversity v. Bartel, a district court recently enjoined an incidental take permit issued by the Service precisely because the Service had failed to address the effect of SWANCC on CWA wetlands regulation.  457 F. Supp. 2d. at 1080-81, 1012.

Finally, Interveners' efforts to portray estimates of the bears' population as having risen from 1,282 in 1998 to as many as 3,213 bears in 2006 is misleading to say the least.  Interveners Brief at 16.  While the Service had estimated as many as 3,000 bears in 1998, 2001 Order at 15, road mortalities (and habitat fragmentation) is rapidly increasing: it is not the current population today that is dispositive of listing, but whether the population can survive the continuation of current conditions.  See BLF, 943 F.Supp at 26, n.5 ("If, with the continuation of current circumstances, the [species] will be endangered in the future, it is clearly 'threatened' today.").

analysis in the 2004 Decision, the decision violates both the ESA and the Court's 2001 Order, and should be set aside.

      **B.**      **Even With Respect To Its Determination As Of 1998, The Service's 2004 Decision Is Fatally Flawed Because It Violates The ESA's, And The Court's, Mandate To Consider Only Existing Regulatory Mechanisms Currently In Effect, And Because Is Not Supported By The Record.**

Even were the Service's approach of restricting its analyses to regulatory mechanisms as they existed in 1998 lawful, the Service's determination was still faulty with regard to its analyses of that 1998 information. The Service did not rely exclusively on "<u>existing</u> regulatory mechanisms," which the Court clarified "are those that are being currently implemented and enforced" and <u>not</u> "regulations which might be enacted in the future, or current regulations authorizing government action but which do not require that such action take place." 2001 Order at 20.

Instead, for example, the Service persisted in relying upon Development of Regional Impact regulations that allowed impacts on bears of large scale developments to be "ignore[d] in whole or in part": the Service reasoned that they nevertheless "<u>can</u> result in preservation and mitigation <u>of at least some bear habitat.</u>" 2004 Decision, 69 Fed. Reg. at 2104, A.R. 0005. Similarly, the Service continued to rely upon state land management plans whose implementation, and thus efficacy, it evidently was unsure of, justifying its reliance on the plans because "the plans are required under state law." Id. at 2107, A.R. 0008 ("[w]e do not assume . . . that every [state land] management goal or prescription . . . has been or will be conducted").[10]

_____

    [10] The Service's argument that it is entitled to assume that agencies are complying with, and fulfilling, their duties, FWS Brief at 35, underscores the fact that the Service does not, in fact, know whether, and to what extent, regulatory mechanisms it has relied upon are actually "implemented and enforced," as required by the Court. 2001 Order at 20. Contrary to the

And it still relied upon "speculative future actions," that is, the "assumption that future actions

will suffice to protect a species population," 2001 Order at 20, when it relied upon the possibility

that bear habitat would be acquired in the future to justify not listing the bear in 2004. E.g., 2004

Decision, 69 Fed. Reg. at 2104, A.R. 0005.

 In addition, the Service's rule, and the record, lack the factual basis on which the Service

could have reasonably concluded that existing regulatory mechanisms are adequate to protect the

bear from becoming endangered given ongoing rates of habitat loss and fragmentation. See BLF,

943 F. Supp at 26, n.5 ("If, with the continuation of current circumstances, the [species] will be

endangered in the future, it is clearly 'threatened' today."). This is because it is impossible to

determine from the record whether there has been a net loss, or a net gain, in land that is needed

for the four core populations' survival, much less the extent of the net loss or net gain, or the

extent to which protected land has been fragmented into smaller islands isolated from other

protected land.

 For example, the Service asserts that 374,000 square acres was acquired between 1992

and 1998, and it asserts that an unknown amount – "much" – of this was near core population

habitat. 2004 Decision, 69 Fed. Reg. at 2104, A.R. 0005. This is impressive, but the other half

---

Service's assertions, it has an affirmative duty under the ESA to inquire into whether regulatory mechanisms are actually being implemented, and are effective as implemented: it cannot simply assume that they are. The 2001 Order – and the cases the Order relies upon such as Save Our Springs, 27 F. Supp. 2d at 744 – make this clear. See also Defenders of Wildlife v. Babbitt, 958 F. Supp. 670, 684 (D.D.C. 1997). Otherwise, for example, the Service's duties under the ESA in Southwest would have been satisfied by assuming that the Forest Service would comply with its duty to maintain viable populations of the Queen Charlotte Goshawk: instead, the Service investigated whether Forest Service plans threatened the species' survival. Cf. e.g., 12-Month Finding for a Petition to List the Queen Charlotte Goshawk, 62 Fed. Reg. 46710, 46711 (Sept. 4, 1997) ("1997 Goshawk Determination").

of the equation – how much core population habitat that the Service is relying upon to support

the bears has been lost – is left unanswered by the rule and the record.  The record does reflect

that as much as 200,000 acres of Florida forest are lost each year.  Letter from J. Cox, Wildlife

Biologist, FWS, to Dr. Jamie Clark, Director, FWS (Nov. 24, 1998) ("Cox Letter"), A.R. 6439.

If, for example, one assumes that all of the loss (200,000 acres over 7 years, or 1,400,000 acres)

and all of the gain (374,000 acres) has taken place in core population habitat, then the net loss of

core population habitat during the same period of time would still be 1,026,000 acres, or roughly

three times the size of Ocala National Forest.[11]

Of course, this is only speculation, as neither the rule nor the record provides this

information, but that is precisely point: without this information, the Service has no way of

making a judgment as to whether existing regulatory measures, such as land acquisition, are in

fact adequate or not.  Nor does the Court have any basis to review the agency's judgment to

determine if it is arbitrary and capricious.

---

[11]  It must be emphasized that the Service never determined that "[s]ufficient habitat for the four core populations to survive is currently protected by existing, secure public land" as the Service asserts in its brief.  FWS Brief at 12 (emphasis added).  To the contrary, the Service has expressly and repeatedly relied on private lands to support the bear.  Thus, it concluded that the "currently available acreage of public lands, coupled with the private lands that will remain as bear habitat, are sufficient to provide for the four core populations."  2004 Decision, 69 Fed. Reg. at 2104, A.R. 0005 (discussing land acquisition) (emphasis added).  And in its 1998 decision the Service's analysis expressly relied on private land when it reviewed core populations individually and concluded that sufficient acreage existed for them to persist.  E.g., 1998 Decision, 63 Fed. Reg. at 67615 ("Existing and projected acquisition of public lands will provide . . .") (emphasis added); ("Based on the fact that 2,600 sq km (642,000 ac) of protected habitat are projected to be available to bears in the future (2,223 sq km is already protected) . . . .") (emphasis added).  The fact that private lands are needed for the bears' survival is also reflected in the repeated analysis of regulations that pertain to private lands.  E.g. 2004 Decision, 69 Fed. Reg. at 2103, A.R. 0004 ("to conclude that the species is not and will not become endangered, sufficient . . . bear habitat must remain;" "[e]xisting regulatory mechanisms that are relevant" include laws that "lessen or prevent the development of bear habitat on private lands.").

Just as critically, the Service never provided a meaningful inquiry or analysis of the way habitat fragmentation has been progressing under existing regulatory mechanisms. It is impossible to determine from the decision or the record, for example, the extent to which protected lands that the Service is relying upon to support the bear are becoming fragmented from each other. Yet if lands such as state forests are fragmented away from other protected areas like National Forests, they become isolated islands and their utility as habitat for bears is greatly diminished, if not eliminated entirely, even if the total number of acres of protected bear habitat has not dropped. Without this information, it is impossible for the Service to have rationally determined that regulatory mechanisms are <u>not</u> inadequate to prevent the bear from becoming endangered.[12]

Take, for example, Wekiva GEOpark, state parkland that supports part of the core Ocala population but is in "one of the fastest growing areas in southern Florida, with over one million permanent residents and millions of tourist visitors." Florida Department of Environmental Protection, Wekiva Basin GEOPark Unit Management Plan at 91 (Nov. 10, 1998) ("1998 Wekiva Plan"), A.R. 1236. "Low to high density residential development and commercial development surrounds the majority of the GEOPark . . . south, west and east are heavily developed residential subdivisions:" the park is "bounded" by "arterial roadways that service th[e] urbanizing area." <u>Id.</u> at 92, A.R.1237. Newer and wider roads in the vicinity of the park will "<u>increase barriers to wildlife movements</u>, [and] <u>encourage the conversion of adjacent</u>

_____

[12] Both the 1998 Decision and the 2004 Decision make clear that the Service is relying upon federal lands and state owned lands such as state forests to provide habitat for the bear's survival. 1998 Decision, 63 Fed. Reg. 67616-18; 2004 Decision, 69 Fed. Reg. at 2107, A.R. 0008.

agricultural and undeveloped land to residential and commercial uses . . . ." Id. at 93, A.R. 1238 (emphasis added).

Yet the record reflects that Wekiva GEOPark lacks a corridor of protected land connecting it to Ocala National Forest ("NF"), and thus is at danger of becoming isolated from Ocala NF: as of 1998 (and, in fact, even as of 2004), efforts to ensure that the Wekiva population "remain[s] linked to the Ocala National Forest population," id. at 51, A.R. 1190, by purchasing land to "physical[ly] connect[]" Wekiva to Ocala NF, were incomplete. Id. at 93, 120, A.R. 1238, 1271. Seminole State Forest is the same. See Forest Resource Management Plan for Seminole State Forest at 8 ("Seminole Plan") A.R. 1441 ("access to and from other state and federal lands is imperative" for the bear) (emphasis added); id. at 18, A.R. 1451 (no connection to Ocala yet exists). Meanwhile, escalating road mortalities reflect that the fragmentation is worsening: 187 road kills for the Ocala population in twenty years between 1976 and 1995, and 428 more in the nine years through 2004. Compare Overview of Black Bear Roadkills in Florida, (1976-1995 data), at 8, A.R. 2129, with http://myfwc.com/bear/roads.htm (last visited Jan. 10, 2007) (615 deaths by 2004). See also Overview of Black Bear Roadkills at 4, A.R. 2125 (roadkills "symptomatic" of "larger and more serious problem of habitat loss and fragmentation."); 1998 Wekiva Plan at 73, A.R. 1216 (Wekiva "park staff must be very vigilant to assure that the perpetuation of Wekiva bear population is not compromised by road widening projects"); Seminole Plan at 8, A.R. 1441 ("many black bear deaths occur as animals cross State Road 46 going to and from Seminole State Forest").[13]

_____

[13] Notably, as of 1998, the Wekiva population has the highest density, and thus has been the most productive, bear population in Florida. 1998 Wekiva Plan at 51, A.R. 1190. In fact, the Wekiva population was one of the reasons the Service decided not to list the bear in 1998: radio

It may be that fragmentation and isolation of lands such as Wekiva GEOPark and Seminole State Forest ultimately will not jeopardize the bear's survival, though the Service itself describes such lands as important.  2004 Decision, 69 Fed. Reg. 2107, A.R. 0008.  And perhaps there has been no major net loss of core population habitat necessary to the bear's survival, as unlikely as this seems.  But no one can tell from the rule, or the record, if this is the case.  And without such information, the record fails to provide a basis on which the Service could reasonably determine whether existing regulatory mechanisms are or are not inadequate to "prevent, levels of . . . habitat loss, and/or habitat degradation from reaching a point that the bear would be in danger of extinction or likely would become in danger of extinction."  2004 Decision, 69 Fed. Reg. at 2102, A.R. 0003 (emphasis added).  In other words, the Service has not, and cannot, perform the precise analysis it asserted it was required to undertake, and that it purported to undertake, in its 2004 remand determination.  Id.

The Service implicitly acknowledges that this is the case when it now asserts that it is not required to conduct such an analysis on remand.  Instead, it asserts that plaintiffs "misconstrue the Factor D analysis [when plaintiffs] argue that the Service was required to show that existing regulatory mechanisms are effective in protecting [enough] habitat for the four core populations" to protect the bear from becoming endangered.  FWS Brief at 32-33.  According to the Service, it need not "analyze the adequacy of existing regulatory mechanisms with respect to any conceivable or potential threat to a species."  Id. at 33.  And, because it "determined that habitat

---

collar studies indicated there were more Wekiva bears than expected, and thus the Service increased the total population estimate for the overall Ocala population.  See 1998 Decision, 63 Fed. Reg. at 67615; Status of the Florida Black Bear at 17-18, A.R. 2161-62.  Yet, as reflected in the record, the "perpetuation" of the population is clearly in jeopardy.  1998 Wekiva Plan at 73, A.R. 1216.

loss and fragmentation do not rise to [a threatening] level; [] <u>it was under no obligation to
analyze the effect of existing regulatory mechanisms on this threat.</u>"  FWS Brief at 34 (emphasis
added).

There are at least two problems with the Service's fatuous argument.  First, as described
earlier, it flies in the face of the ESA, the Court's 2001 order, and its own 2004 remand
determination, all of which required and/or purported to undertake an analysis of the "inadequacy
of existing regulatory mechanisms" with respect to the significant threats the bear faces.  <u>See</u> 16
U.S.C. § 1533(a)(1)(D); 2001 Order at 21-22; 2004 Decision, 69 Fed. Reg. at 2101-02, A.R.
0002-03.  Indeed, what else would the Service analyze regulatory mechanisms with respect to;
certainly not things that do not threaten the bear.  And no one disputes that the <u>single greatest</u>
threat the bear faces is habitat loss and degradation: it is written all over the record and thus is a
central theme of the remand determination.  <u>E.g.</u>, 2004 Decision, 69 Fed. Red. 2102-08, A.R.
0003-09; 1997 Candidate and Listing Priority Assignment Form, A.R. 6431; Finding on a
Petition to List the Florida Black Bear as a Threatened Species, 57 Fed. Reg. 596, 597 (Jan. 7,
1992), A.R. 6408.

Second, the mere fact that the Service concluded in its 1998 determination that the bear
did not warrant listing under § 1533(a)(1)(A) ("the present or threatened destruction [or]
modification" of habitat) does not relieve the Service of its duty to conduct a § 1533(a)(1)(D)
analysis that meaningfully considers habitat loss.  If it did, § 1533(a)(1)(D) would be rendered
superfluous in most if not all cases given the scope of Factors A-C, and E.  Thus, for example,
the Service plainly analyzed whether existing regulatory mechanisms were inadequate given the
threats of loss of habitat in <u>Southwest</u>.  1997 Goshawk Determination, 62 Fed. Reg. 46710-11.

31

In short, the Service's remand determination failed to carry out the analysis required by the Court and the ESA for a number of reasons.  By limiting its consideration to 1998 data and ignoring the intervening six years, it failed to consider "existing regulatory mechanisms" and the best information available, as required by the ESA and the Court's 2001 Order.  Moreover, even with respect to the 1998 information it did analyze, it failed to gather and analyze critical information - such as the rate of habitat loss - necessary to a reasoned determination that regulatory mechanisms are in fact adequate to protect the bear from becoming in danger of extinction.

## **CONCLUSION**

For the above stated reasons, Plaintiffs' Motion For Summary Judgment should be granted, Defendants' Motions For Summary Judgment should be denied, and the Service's 2004 Decision should be remanded once again for a decision that considers whether regulatory mechanisms as they exist at the time the Service makes its decision are adequate to protect the bear.

Respectfully submitted,

/s/
Joshua R. Stebbins
(D.C. Bar. No. 468542)
Howard M. Crystal
(D.C. Bar No. 446189)
Eric R. Glitzenstein
(D.C. Bar. No. 358287)

Meyer Glitzenstein & Crystal
1601 Connecticut Ave., N.W.
Suite 700
Washington, D.C.  20009
(202) 588-5206

32

Of Counsel:

                        Brian Segee
                        (D.C. Bar. No. 492098)
                        Defenders of Wildlife
                        1101 Fourteenth Street, N.W.
                        Suite 1400
                        Washington, D.C.  20005

January 11, 2007                  Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

DEFENDERS OF WILDLIFE, et al.          )
                                       )
              Plaintiffs,              )
                                       )        No. 06CV00180 (HHK)
                  v.                   )
                                       )
DIRK KEMPTHORNE, et al.                )
                                       )
              Defendants.              )
                                       )
_____)

**PLAINTIFFS' RESPONSE TO THE FEDERAL DEFENDANTS' STATEMENT OF
MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE**

Pursuant to Local Rule 7.1(h), plaintiffs hereby submit the following response to

Defendants' Statement Of Material Facts As To Which There Is No Genuine Issue (December 7,

2006).

1-3)  Plaintiffs maintain that the information on page 2200 of the Administrative Record

("A.R.") speaks for itself and is the best evidence of its contents, and any statements contrary to

its plain meaning and context are disputed.

4)  Plaintiffs maintain that the information on page 2173 of the A.R. speaks for itself and

is the best evidence of its contents, and any statements contrary to its plain meaning and context

are disputed.

5)  Plaintiffs maintain that the information on page 2145 of the A.R. speaks for itself and

is the best evidence of its contents, and any statements contrary to its plain meaning and context

are disputed.  Moreover, plaintiffs dispute that the four core bear populations are healthy, self-

sustaining populations given, for example, the increasing loss and fragmentation of their habitat

as reflected in increasing road mortalities.  E.g., Overview of Black Bear Roadkills in Florida,
A.R. 2129; http://myfwc.com/bear/roads.htm (last visited October 17, 2006).

6)  Plaintiffs maintain that the information on pages 7044-46 of the A.R. speaks for itself
and is the best evidence of its contents, and any statements contrary to its plain meaning and
context are disputed.

7)  Plaintiffs maintain that the information on page 7045 of the A.R. speaks for itself and
is the best evidence of its contents, and any statements contrary to its plain meaning and context
are disputed.  Plaintiffs dispute that the Eglin population referenced is likely to remain viable
with proper management given, for example, increasing development in the Florida Panhandle.
David N. Wear & John G. Greis, The Southern Forest Resource Assessment Summary Report
(November 19, 2001) (draft) ("Southern Forest Resource Assessment Summary Report"), S.A.R.
P299.

8)  Plaintiffs maintain that the information on pages 2151-2174 of the A.R. speaks for
itself and is the best evidence of its contents, and any statements contrary to its plain meaning
and context are disputed.

9)  Plaintiffs maintain that the information on pages 7045-46 of the A.R. speaks for itself
and is the best evidence of its contents, and any statements contrary to its plain meaning and
context are disputed.  Moreover, Plaintiffs specifically dispute that sufficient habitat for the four
core populations to survive is currently protected by existing, secure public land: all of the
Service's determinations that the bear is secure have relied upon a combination of public and
private lands.  E.g., Reexamination of Regulatory Mechanisms in Relation to the 1998 Florida
Black Bear Petition, 69 Fed. Reg. 2100, 2108 (Jan. 14, 2004) ("2004 Decision"), 69 Fed. Reg. at

2104 ("currently available acreage of public lands, coupled with the private lands that will remain as bear habitat, are sufficient to provide for the four core populations"); 1998 Decision, 63 Fed. Reg. at 67615 ("Existing and <u>projected acquisition</u> of public lands will provide . . ."); ("Based on the fact that 2,600 sq km (642,000 ac) of protected habitat <u>are projected</u> to be available to bears in the future (2,223 sq km is already protected) . . . .").

10) Plaintiffs maintain that the information on page 0002 of the A.R. speaks for itself and is the best evidence of its contents, and any statements contrary to its plain meaning and context are disputed.

11) Plaintiffs maintain that the information on page 6298 of the Supplemental Administrative Record ("S.A.R.") speaks for itself and is the best evidence of its contents, and any statements contrary to its plain meaning and context are disputed.

12) Plaintiffs maintain that the information on page 6406 of the S.A.R. speaks for itself and is the best evidence of its contents, and any statements contrary to its plain meaning and context are disputed.

13) Plaintiffs maintain that the information on page 0002 of the A.R. speaks for itself and is the best evidence of its contents, and any statements contrary to its plain meaning and context are disputed.

14) Plaintiffs maintain that the information on page 2145 of the A.R. speaks for itself and is the best evidence of its contents, and any statements contrary to its plain meaning and context are disputed.

3

15)  Plaintiffs maintain that the information on page 7043 of the A.R. speaks for itself and is the best evidence of its contents, and any statements contrary to its plain meaning and context are disputed.

16)  Plaintiffs admit that they filed a lawsuit challenging the Service's New 12-month Finding for a Petition to List the Florida Black Bear, 63 Fed. Reg. 67613, 67614 (Dec. 8, 1998) ("1998 Decision").

17)  Plaintiffs maintain that the Court's December 13, 2001, Order in Defenders of Wildlife v. Norton, No. 99-02072 (HHK), slip op. (D.D.C. Dec. 13, 2001) ("2001 Order") speaks for itself and is the best evidence of its contents, and any statements contrary to its plain meaning and context are disputed.

18)  Plaintiffs agree that the Court held that the Service's determination on the inadequacy of the regulatory mechanisms could not by sustained: with respect to the rest of the statement in paragraph 18, Plaintiffs maintain that the Court's 2001 Order speaks for itself and is the best evidence of its contents, and any statements contrary to its plain meaning and context are disputed.

19)  Plaintiffs maintain that the Court's 2001 Order speaks for itself and is the best evidence of its contents, and any statements contrary to its plain meaning and context are disputed.  Moreover, plaintiffs aver that the Court specifically remanded to the Service for a new determination of whether the Florida black bear warrants listing under 16 U.S.C. § 1533(a)(1)(D).

20)  Plaintiffs maintain that the Service's 2004 Decision, A.R. 0001, speaks for itself and is the best evidence of its contents, and any statements contrary to its plain meaning and context

are disputed.  Moreover, plaintiffs dispute that the 2004 Decision analyzed solely regulatory mechanisms that were actually in effect and enforced at the time of the 1998 Decision: for example, the 2004 Decision reflects the fact that the Service did not actually know whether some of the regulatory mechanisms it relied upon were in effect and enforced.  E.g. 2004 Decision, 69 Fed. Reg. 2107.

21)  Plaintiffs maintain that the Service's 2004 Decision, A.R. 0001, speaks for itself and is the best evidence of its contents, and any statements contrary to its plain meaning and context are disputed.

22)  Plaintiffs maintain that the Service's 2004 Decision, and the information on pages 0003, 5681, 5693, 5856, 5866, 5903, 6089, 6102, and 6103 of the A.R., speak for themselves and are the best evidence of their contents, and any statements contrary to their plain meaning and context are disputed.

23)  Plaintiffs maintain that the Service's 2004 Decision, and the information on pages 0003, 5693, 5701, and 5873, of the A.R., speak for themselves and are the best evidence of their contents, and any statements contrary to their plain meaning and context are disputed.

24)  Plaintiffs maintain that the Service's 2004 Decision, and the information on pages 0003 and 5873 of the A.R., speak for themselves and are the best evidence of their contents, and any statements contrary to their plain meaning and context are disputed.

25)  Plaintiffs maintain that the Service's 2004 Decision, and the information on pages 0003, 5573, and 5777 of the A.R., speak for themselves and are the best evidence of their contents, and any statements contrary to their plain meaning and context are disputed.

26)  Plaintiffs maintain that the Service's 2004 Decision, A.R. 0004, speaks for itself and is the best evidence of its contents, and any statements contrary to its plain meaning and context are disputed.

27)  Plaintiffs maintain that the Service's 2004 Decision, and the information on pages 0004, 6067, 6080, and 6098, of the A.R., speak for themselves and are the best evidence of their contents, and any statements contrary to their plain meaning and context are disputed.

28)  Plaintiffs maintain that the Service's 2004 Decision, and the information on pages 0004 and 5592 of the A.R., speak for themselves and are the best evidence of their contents, and any statements contrary to their plain meaning and context are disputed.

29)  Plaintiffs maintain that the Service's 2004 Decision, and the information on pages 0005 and 5592 of the A.R., speak for themselves and are the best evidence of their contents, and any statements contrary to their plain meaning and context are disputed.

30)  Plaintiffs maintain that the Service's 2004 Decision, and the information on pages 0005, 5563, 5566, 5601, and 5668 of the A.R., speak for themselves and are the best evidence of their contents, and any statements contrary to their plain meaning and context are disputed.

31)  Plaintiffs maintain that the Service's 2004 Decision, and the information on page 0006 of the A.R., speak for themselves and are the best evidence of their contents, and any statements contrary to their plain meaning and context are disputed.

32)  Plaintiffs maintain that the Service's 2004 Decision, and the information on pages 0006 and 5967 of the A.R., speak for themselves and are the best evidence of their contents, and any statements contrary to their plain meaning and context are disputed.  Moreover, there is no evidence to support the Service's purported statement of fact as the Service did not consider or

6

include any such information in the record: the Service contends that events that have transpired since 1998 are irrelevant to its 2004 Decision.

33) Plaintiffs maintain that the Service's 2004 Decision, and the information on pages 2214 and 5967 of the A.R., speak for themselves and are the best evidence of their contents, and any statements contrary to their plain meaning and context are disputed.

34) Plaintiffs maintain that the Service's 2004 Decision, and the information on pages 0006, 2988, 3059, and 3195 of the A.R., speak for themselves and are the best evidence of their contents, and any statements contrary to their plain meaning and context are disputed.

35) Plaintiffs maintain that the Service's 2004 Decision, and the information on pages 0007 and 3330 of the A.R., speak for themselves and are the best evidence of their contents, and any statements contrary to their plain meaning and context are disputed.

36) Plaintiffs maintain that the Service's 2004 Decision, and the information on pages 0007, 3642, 4735, 4988, 5506, and 5511 of the A.R., speak for themselves and are the best evidence of their contents, and any statements contrary to their plain meaning and context are disputed.

37) Plaintiffs maintain that the Service's 2004 Decision, and the information on pages 0007 and 5512 of the A.R., speak for themselves and are the best evidence of their contents, and any statements contrary to their plain meaning and context are disputed.

38) Plaintiffs maintain that the Service's 2004 Decision, and the information on pages 0007 and 5936 of the A.R., speak for themselves and are the best evidence of their contents, and any statements contrary to their plain meaning and context are disputed.

39)  Plaintiffs maintain that the Service's 2004 Decision, and the information on pages 0007, 0519 and 7043 of the A.R., speak for themselves and are the best evidence of their contents, and any statements contrary to their plain meaning and context are disputed.

40)  Plaintiffs maintain that the Service's 2004 Decision, and the information on pages 0008, 0821, 0922, 1112, 1384, 1404, 1433, 1472, 1516, 1568, 1634, 1776, 1980, 1943, 2003, 2965, and 2973 of the A.R., speak for themselves and are the best evidence of their contents, and any statements contrary to their plain meaning and context are disputed.

Respectfully submitted,
/s/
Joshua R. Stebbins
(D.C. Bar. No. 468542)
Howard M. Crystal
(D.C. Bar No. 446189)
Eric R. Glitzenstein
(D.C. Bar. No. 358287)

Meyer Glitzenstein & Crystal
1601 Connecticut Ave., N.W.
Suite 700
Washington, D.C.  20009
(202) 588-5206

January 11, 2007                    Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| DEFENDERS OF WILDLIFE, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 06CV00180 (HHK) |
| v. | ) | |
| | ) | |
| DIRK KEMPTHORNE, et al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |

## PLAINTIFFS' RESPONSE TO THE DEFENDANT-INTERVENERS' STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE

Pursuant to Local Rule 7.1(h), plaintiffs hereby submit the following response to Defendant-Interveners' Statement Of Material Facts As To Which There Is No Genuine Issue (December 7, 2006).

1) Plaintiffs maintain that the Court's December 13, 2001, Order in <u>Defenders of Wildlife v. Norton</u>, No. 99-02072 (HHK), slip op. (D.D.C. Dec. 13, 2001) ("2001 Order") speaks for itself and is the best evidence of its contents, and any statements contrary to its plain meaning and context are disputed.

2) Plaintiffs maintain that the Fish and Wildlife Service's Reexamination of Regulatory Mechanisms in Relation to the 1998 Florida Black Bear Petition, 69 Fed. Reg. 2100, 2108 (Jan. 14, 2004) ("2004 Decision") speaks for itself and is the best evidence of its contents, and any statements contrary to its plain meaning and context are disputed.

1

3)  Plaintiffs maintain that the Fish and Wildlife Service's 2004 Decision speaks for itself and is the best evidence of its contents, and any statements contrary to its plain meaning and context are disputed.

4)  Paragraph four contains conclusions of law to which no response is needed.  To the extent a response is required, plaintiffs maintain that the Fish and Wildlife Service's 2004 Decision and the Court's 2001 Order speak for themselves and are the best evidence of their content, and any statements contrary to their plain meaning and context are disputed.  Moreover, plaintiffs dispute that the 2004 Decision complies with the Endangered Species Act ("ESA") and the Court's 2001 Order.  The ESA, and the 2001 Order enforcing the ESA, required the Service to analyze existing regulatory mechanisms using the best available evidence, 16 U.S.C. § 1533, 2001 Order at 22, and the Service failed to do so.

Respectfully submitted,
/s/
Joshua R. Stebbins
(D.C. Bar. No. 468542)
Howard M. Crystal
(D.C. Bar No. 446189)
Eric R. Glitzenstein
(D.C. Bar. No. 358287)

Meyer Glitzenstein & Crystal
1601 Connecticut Ave., N.W.
Suite 700
Washington, D.C.  20009
(202) 588-5206

January 11, 2007                    Attorneys for Plaintiffs

2