**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DEFENDERS OF WILDLIFE, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) Case No. 06-cv-00180 (HKK) |
| | ) |
| v. | ) |
| | ) |
| DIRK KEMPTHORNE, *et al.*, | ) |
| | ) |
| Defendants, | ) |
| | ) |
| SAFARI CLUB INTERNATIONAL, SAFARI CLUB INTERNATIONAL FOUNDATION, U.S. SPORTSMEN'S ALLLIANCE FOUNDATION, CENTRAL FLORIDA BEAR HUNTERS ASSOCIATION, | ) |
| | ) |
| Defendant-Intervenors. | ) |
| | ) |

**REPLY OF DEFENDANT-INTERVENORS SAFARI CLUB INTERNATIONAL
AND U.S. SPORTSMEN'S ALLIANCE FOUNDATION TO PLAINTIFFS'
OPPOSITION TO CROSS-MOTION FOR SUMMARY JUDGMENT**

Douglas S. Burdin (D.C. Bar No. 434107)
Anna M. Seidman (D.C. Bar No. 417091)
Safari Club International
501 2nd Street, N.E.
Washington, D. C. 20002
Telephone: (202) 543-8733
Facsimile: (202) 543-1205

*Counsel for
Safari Club International and
Safari Club International Foundation*

William P. Horn (D.C. Bar No. 375666)
Birch, Horton, Bittner & Cherot
1155 Connecticut Ave., N.W., 12th Floor
Washington, D.C. 20036
Telephone: (202) 659-5800
Facsimile: (202) 659-1027

*Counsel for
U.S. Sportsmen's Alliance Foundation and
Central Florida Bear Hunters Association*

TABLE OF CONTENTS

I.   INTRODUCTION ............................................................................................... 1

II.  ARGUMENT....................................................................................................... 2

   A.   The FWS Properly Understood the 2001 Opinion to Require
        Reexamination of Existing Regulatory Mechanisms as of the
        Time of the 1998 Decision.......................................................................... 2

   B.   The Regulatory Mechanisms Protecting the Florida Black Bear
        Did Not Appreciably Change Between 1998 and 2004............................... 6

        1.   The *SWANCC* Case Changed Little About the Clean Water
             Act Wetlands Jurisdiction, Especially in Florida............................. 6

        2.   The Forest Service's Regulatory Changes Did Not Change
             the Management of Forest Service Lands in Florida in 2004......... 9

        3.   The National Park Service's 2000 Plan for Big Cypress
             National Preserve Calls for Drastic Reductions in ORV Use....... 10

   C.   The Current Status of the Florida Black Bear, Although Not Relevant
        to the Legal Issues Before the Court, Demonstrates that DOW *et al.*'s
        Fears are Unfounded ................................................................................. 10

   D.   DOW *et al.* Can Petition to Have the Florida Black Bear Listed If
        They Believe 2007 Conditions Warrant Listing ....................................... 11

III. CONCLUSION.................................................................................................. 12

**I.     INTRODUCTION**

In 2001, this Court remanded to the U.S. Fish and Wildlife Service ("FWS") a single factor of the FWS's 1998 decision not to list the Florida black bear under the Endangered Species Act ("ESA"). The Court intended for the FWS to reevaluate regulatory mechanisms as of the date of the original decision in 1998, not as of the date of the FWS's action on remand. The Court remanded this one factor because the Court determined it was not clear from the 1998 Record whether the FWS relied on only regulatory mechanisms that were existing and being implemented at that time or whether the FWS had considered future or uncertain mechanisms. Memorandum Opinion, *Defenders of Wildlife v. Norton,* 99-02072 (HHK) (Dec. 13, 2001) ("2001 Opinion") at 19-22. The Court wanted to be certain that the FWS's decision not to list relied exclusively on existing and implemented regulatory mechanisms and, if that was not the case, the Court directed the FWS to reanalyze, if necessary, this listing factor in light of the appropriate standard. *Id.* Reevaluation of this single factor as of 1998 makes sense because then the FWS will have considered all five listing factors as of a single point in time (1998).

The FWS correctly understood the parameters of the remand and appropriately conducted their Court-ordered review and analysis of regulatory mechanisms in existence in 1998. The Service correctly did not carry out an entirely new determination of all five factors as of the time of the decision on remand (*i.e.,* 2004), as Plaintiffs, Defenders of Wildlife *et al.* ("DOW *et al.*") appear to desire. DOW *et al.* continue to challenge the FWS's decision to reevaluate regulatory mechanisms in existence at the time of FWS's 1998 listing decision, the action that the Court remanded. As the FWS was under no

1

obligation to evaluate regulatory mechanisms existing in 2004, DOW *et al.*'s challenge must fail.

Despite the FWS's appropriate focus on 1998, DOW *et al.* continue to attempt to distract the Court with irrelevant subsequent matters. For example, DOW *et al.* argue the existence of significant regulatory mechanism changes between 1998 and 2004. So as not to leave these assertions unchallenged, SCI and USSAF, in their Cross-Motion for Summary Judgment of Safari Club International, U.S. Sportsmen's Alliance Foundation, *et al.* ("SCI/USSAF Opening Br."), convincingly demonstrated that DOW *et al.* had overstated significantly any regulatory changes. In their opposition/reply, DOW *et al.* offered no persuasive response. SCI and USSAF also countered these attempted distractions by demonstrating that current population numbers of the Florida black bears are healthy and some specific populations are increasing. Again, DOW *et al.* had no response other than to try to deflect attention away from this fact.

It is apparent that DOW *et al.*'s true goal is to force the FWS to conduct an entirely new listing determination, involving all the listing factors. This lawsuit is an inappropriate tool to seek such a result. Instead, DOW *et al.* must petition the FWS for a listing based on any new information (i.e., post-1998), including alleged changes in regulatory mechanisms, they believe support such a petition.

II.    ARGUMENT

    A.    **The FWS Properly Understood the 2001 Opinion to Require Reexamination of Existing Regulatory Mechanisms as of the Time of the 1998 Decision**

The 2001 Opinion focused on the Court's inability to tell from the administrative record whether the FWS relied on regulatory mechanisms that were in effect and implemented or whether the Service considered regulatory mechanisms that were future,

2

uncertain, or unimplemented. *See* SCI/USSAF Opening Br. at 3-5. The Court ordered an examination of "only regulatory mechanisms which are currently being undertaken and enforced." The Court also required that "the Agency must indicate on the record the regulations upon which it bases its decision." 2001 Opinion at 22. To comply with the remand, the FWS properly analyzed additional applicable regulatory mechanisms and made them part of the existing administrative record. Nonetheless, the thrust of the 2001 Opinion was on a reevaluation of the decision FWS made in 1998, not a wholly new determination based on a wholly new administrative record.

In disputing the extent of the FWS's obligation upon remand, DOW *et al.* ignore the 2001 Opinion's focus on the Court's inability to tell from the record whether the FWS relied on the proper type of regulatory mechanisms. *See* Plaintiffs' Opposition to Defendants' Motion for Summary Judgment and Reply in Support of Plaintiffs' Motion for Summary Judgment ("DOW Reply") at 9 n.4, 19-20. And for this reason, despite DOW *et al.*'s assertions to the contrary (*id.* at 21 n.7), the case of *American Wildlands v. Norton,* 193 F. Supp. 2d 244 (D.D.C. 2002) provides support for the propriety of the FWS's actions as directed by this Court's 2001 Opinion. *See* SCI/USSAF Opening Br. at 5-7.

By incorrectly arguing that the FWS had to examine existing regulatory mechanisms as of 2004 as opposed to 1998, DOW *et al.* put far too much weight on the words "existing" and "current" from the Court's 2001 Opinion. DOW *et al.* erroneously ignore the context in which the Court used these words – to distinguish between regulatory mechanisms that were in existence and certain at that time (i.e., in 1998) and mechanisms that were future, unimplemented, and speculative in 1998. While the terms

"existing" and "current" *can* be used to refer to the present and now of today, they can just as logically refer to the present and now *of a past time*. For example, a college assignment to analyze "existing" governmental regulations that may have caused or exacerbated the Great Depression would look to regulations in existence and implemented in the 1920s and early 1930s. Properly done, this assignment would analyze only the regulations that were "current" (meaning in effect and implemented) during this time period, as opposed to proposed or unimplemented regulations, which could not have contributed to the situation. Thus, the idea of "current" and "existing" regulatory mechanisms can easily be framed by a past date and this appears to have been the Court's intent in the 2001 Opinion.[1]

DOW *et al.* also persist in arguing that ESA § 4 requires that the FWS analyze existing regulatory mechanisms as of 2004, which was the date that the FWS issued its determination in compliance with the Court's 2001 remand order. DOW Reply at 17-18. Because the proper timeframe for the FWS's actions on remand is the 1998 decision, Section 4 requires an analysis of "existing" regulatory mechanisms" by reference to the best scientific information "available" at that time, as opposed to some later, future date. In other words, "available" is defined by the proper timeframe for the analysis, not the time of the second decision. For example, to conduct a current day analysis of why scientists living 600 years ago believed that the world was flat, one would need to look at

---

[1] Read literally and out of context, as DOW *et al.* seem to suggest, the Court's direction to the FWS to "examine only regulatory mechanisms which are *currently* being undertaken and enforced," 2001 Opinion at 22 (emphasis added), could mean as of the date of the 2001 Opinion (December 13, 2001). Thus, DOW *et al.*'s repeated attempts to rely on some kind of literal reading of this phrase do not work.

4

the best scientific information "available" in 1407, as opposed to the scientific data that is available today.

DOW *et al.* have little response to the argument that forcing the FWS to analyze existing regulatory mechanisms as of 2004 would create the untenable situation of a listing decision in which the FWS analyzes four of the five factors as of 1998 (which the Court upheld) and one factor as of 2004. SCI/USSAF Opening Br. at 2; Defendants' Cross-Motion for Summary Judgment ("FWS Opening Br.") at 27-28. If, as DOW *et al.* suggests, this odd situation is merely the result of the 2001 Opinion and the ESA, DOW Reply at 18-19, then this instead suggests that DOW *et al.* is misreading both the 2001 Opinion and ESA § 4. What DOW *et al.*'s argument really reveals is their desire to force a wholly new listing determination on all five factors, without the submission of a new petition. *See* Section D.

Instead of responding to all these points, DOW *et al.* attack the FWS's action by posing the unlikely hypothetical scenario in which the Florida black bear populations in 2004 consist of only a "handful of bears" as a result of "inadequate regulatory mechanisms" and the FWS would not have to list the species on remand under the FWS's reading of the 2001 Opinion. DOW Reply Br. at 8. But two statutory mechanisms address this preposterous concern. One, the FWS can list a species on an emergency basis long before the situation got to that which DOW *et al.* described. *See* 16 U.S.C. 1533(b)(7) (emergency listing shall "take effect immediately upon the publication of the regulation in the Federal Register"). Second, as described in Section D below, DOW *et al.* or any other concerned group could petition (including on an emergency basis) for a listing of the species based on any new facts (including facts such as the hypothetical

5

facts DOW *et al.* advance).  In addition, as a matter of fact (a highly inconvenient one for DOW *et al.*), the Florida black bear population has expanded its range and numerically since 1998.

> B.  **The Regulatory Mechanisms Protecting the Florida Black Bear Did Not Appreciably Change Between 1998 and 2004**

SCI and USSAF provided a caveat in their opening brief regarding their discussion of alleged regulatory mechanism changes between 1998 and 2004 bears. Since DOW *et al.*'s Reply apparently ignored this caveat, it bears repeating here in pertinent part:

> Whether or not the regulatory mechanisms protecting the Florida black bear changed in any significant manner between 1998 and 2004 is not relevant to the central legal question of this case – did the FWS properly utilize the regulatory mechanisms existing in 1998 instead of 2004 when it issued its 2004 "Notice of Petition Finding" on remand. . . . SCI and USSA encourage the Court to focus on the central legal issues and ignore DOW *et al.*'s discussion of alleged changes in the regulatory mechanism between 1998 and 2004.  But, without conceding or suggesting that the existence or extent of these alleged changes are relevant, SCI and USSA address a few of them so as not to leave DOW *et al.*'s assertions unchallenged.

SCI/USSAF Opening Br. at 9.  DOW *et al.* attempt to obscure SCI and USSAF's arguments by claiming that it was the FWS that should have conducted this analysis. DOW Reply at 23-24.  What DOW *et al.* cannot obscure is the fact that they have no persuasive response to the argument that they vastly overstated the extent and impact of alleged regulatory changes between 1998 and 2004.

> 1.  **The *SWANCC* Case Changed Little About the Clean Water Act Wetlands Jurisdiction, Especially in Florida**

In their opening brief, SCI and USSA explained that DOW *et al.* made assertions in their briefs that blatantly contradicted public statements DOW *et al.* made in 2003 (and

6

likely at other times) about the impact of the *SWANCC* case[2] on Federal jurisdiction over wetlands.  SCI/USSAF Opening Br. at 9-10.  In response, DOW *et al.* allege that their previous public statements merely *argued* for "as narrow a rollback of regulatory mechanism as possible under *SWANCC*."  DOW Reply at 24 n.9.  But as the following quote demonstrates, they asserted that as a matter of law *SWANCC* had little effect on the extent of Clean Water Act jurisdiction and that the Department of Justice took the same legal position in wetlands permit litigation.

> In fact, nothing in the *SWANCC* decision compels any change in the longstanding definition of waters of the United States used by both EPA and the Corps, as the U.S. Department of Justice has argued consistently in briefs filed in federal courts in the two years since the *SWANCC* decision.  We also seek to correct the skewed presentation of post-*SWANCC* case law that is contained in the January 15 ANPRM and attached Guidance.  *Our comments make clear that both the ANPRM and Guidance go far beyond any change in law or policy necessitated by the narrow holding in SWANCC.*

DOW/Sierra Club Wetlands Comments at 1-2 (emphasis added); *see also* SCI/USSAF Opening Br. at 9-10.

This same position was advanced not only by the Department of Justice, but by the Army Corps of Engineers and has been accepted by most Circuit Courts that addressed the issue, and was only somewhat modified by the Supreme Court in 2006. *See Rapanos v. United States,* 126 S. Ct. 2208, 2217 (2006) (discussing lower court decisions following *SWANCC*).  As the concurring opinion by Justice Scalia and three other justices explained: "Following our decision in *SWANCC*, the Corps did not significantly revise its theory of federal jurisdiction under § 1344(a). … Even after

---

[2] *Solid Waste Agency of Northern Cook County v. Army Corps of Eng'rs,* 531 U.S. 159 (2001).

7

*SWANCC*, the lower courts have continued to uphold the Corps' sweeping assertions of jurisdiction over ephemeral channels and drains as 'tributaries.'"  *Id.*

Ignoring the Supreme Court's assessment of the post-*SWANCC* regulatory status, DOW *et al.* again cites to a single case, *Southwest Center for Biological Diversity v. Bartel,* 457 F. Supp. 2d  1070 (S.D. Cal. 2006), *amended and superceded* __ F. Supp. 2d __, 2006 WL 3914425 (S.D. Cal. 2006), to suggest a regulatory sea-change brought on by *SWANCC.*  This case remains inapposite.  The *Bartel* Court's description of the waters at issue confirms the inapplicability of this case to any conceivable situation in Florida (where "isolated" waters would be rare indeed):  "But it is clear to this Court that the ACOE [Army Corps of Engineers] will not undertake review through its CWA permit process of impacts to *isolated vernal pools that seasonally fill with water on San Diego's mesas*."  2006 WL 3914425 at *8 (emphasis added); *see also* SCI/USSAF Opening Br. at 11 (describing wetlands in Florida).  As Federal jurisdiction over isolated intrastate wetlands was the exact issue resolved by *SWANCC,* the District Court in *Bartel* properly took note of its impact on that case.

DOW *et al.* had no response at all to SCI and USSAF's points that a narrowing of jurisdiction over isolated wetlands – the effect of *SWANCC* – would have little or no impact on wetlands preservation in Florida.  SCI/USSAF Opening Br. at 11 & notes 6-8.  As their own previous comments demonstrate, DOW *et al.* in this case have overstated the impact of the *SWANCC* decision, and have consequently failed to demonstrate any significant regulatory change related to wetlands between 1998 and 2004 that would affect the Florida black bear.

##         2.    The Forest Service's Regulatory Changes Did Not Change the Management of Forest Service Lands in Florida in 2004

DOW *et al.* also could not rebut SCI and USSAF's argument that any changes to U.S. Forest Service planning regulations after 1998 had no impact on Forest Service management of units in Florida for the benefit of the Florida black bear. DOW *et al.* erroneously claim that the FWS's "duty to maintain viable species … no longer exists, …." DOW Reply at 24 n.9. That duty still exists in several forms.

First, as SCI and USSA explained, the Land and Resource Management Plan for U.S. Forests in Florida adopted in 1999, which identified the Florida black bear as a management indicator species (as did the draft plan available in 1998), remains in effect until 2009. SCI/USSAF Opening Br. at 12. Second, although there have been changes to planning regulations affecting *future* planning, the statutory duty remains the same, including, among other things, to "provide for diversity of plant and animal communities based on the suitability and capability of the specific land area in order to meet overall multiple-use objectives, …." 16 U.S.C. § 1604(g)(3)(B). Thus, DOW *et al.* are wrong when they assert that, "as a matter of law," the Forest Service has no mandate to maintain viable populations of native species. DOW Reply Br. at 7 n.2. And third, although the new planning regulations, again which only apply to future planning, may have substituted ecosystem monitoring methodologies for the management indicator species methodology, the underlying wildlife management obligation persists via the current rules, which still require the Forest Service to provide for the statutorily-required animal diversity and habitat preservation. *See* Final Rule, 70 Fed. Reg. 1023, 1028 (Jan. 5, 2005) ("NFMA [National Forest Management Act, 16 U.S.C. §§ 1600 *et seq.*] requires guidelines for land management plans which provide for diversity of plant and animal

9

communities (16 U.S.C. 1604 (g)(3)(B)) based on the suitability and capability of the land area to meet overall multiple-use objectives. … The Department developed the final rule based on the following concepts related to diversity. First, maintenance of the diversity of plant and animal communities starts with an ecosystem approach. In an ecosystem approach, the plan will provide a framework for maintaining and restoring ecosystem conditions necessary to conserve most species."). Again, DOW *et al.* have vastly overstated the regulatory changes.

> 3. **The National Park Service's 2000 Plan for Big Cypress National Preserve Calls for Drastic Reductions in ORV Use**

Big Cypress National Preserve is home to one of the stable Florida black bear populations. 1998 Finding, 63 Fed. Reg. at 67616; 2004 Decision, 69 Fed. Reg. at 2103. As SCI and USSA previously pointed out in their opening brief, the National Park Service adopted a management plan in 2000 that contains drastic reductions in the number and amount of off-road vehicle ("ORV") trails available for public use. SCI/USSAF Opening Br. at 13-14. Although suggesting in their opening brief that OVR use in BCNP had worsened since 1998, DOW *et al.* did not, and could not, respond to the fact that ORV use has been significantly curtailed in BCNP under the new management plan, presumably to the benefit of the Florida black bear. DOW *et al.*'s attempt to paint a grim "regulatory" picture for the Florida black bear is at odds with the facts.

> C. **The Current Status of the Florida Black Bear, Although Not Relevant to the Legal Issues Before the Court, Demonstrates that DOW *et al.*'s Fears are Unfounded**

Continuing the same pattern, DOW *et al.* ignore the facts presented by SCI and USSAF regarding the present and projected health of Florida black bear populations. DOW *et al.* grudgingly acknowledge that black bear populations have more than doubled

10

over the past eight years but claim that this increase is "misleading." DOW Reply at 24 n.9. Dismissing this good news, and empirical evidence that past and present regulatory mechanisms are protecting the bears, DOW *et al.* proceed to argue that the state of the "current population" is not the important fact or legal criterion. Rather, they claim, it is the extrapolation (i.e, "continuation") of current conditions that is the crucial consideration. *Id.*

Unfortunately for their case, but fortunate for all those who are truly interested in Florida black bear conservation, Florida's black bear population is "stable to increasing" and the range occupied by bears is also increasing according to the Florida Wildlife Commission's Bear Management Section. SCI/USSAF Opening Br. at 16-17. These facts are unchallenged by DOW *et al.* Accordingly, continuation of these trends into the future indicates that the Florida black bear is not facing extinction or endangerment and listing as a federal threatened species is not warranted. Moreover, these uncontroverted facts provide clear empirical evidence that past and present regulatory mechanisms are indeed protecting and enhancing Florida black bear populations.

**D.    DOW *et al.* Can Petition to Have the Florida Black Bear Listed If They Believe 2007 Conditions Warrant Listing**

Finally, DOW *et al.* fail to respond to the point that submitting a new petition is the proper course of action if an evaluation of all five factors, brought up to 2007, is their true goal. *See* SCI/USSAF Opening Br. at 18-19; FWS Opening Br. at 28. With such a petition, the FWS could evaluate the information contained in the petition and in its own files according to the procedures set out in ESA Section 4. The FWS then could reach a completely new determination about the current status of the species.

11

**III.   CONCLUSION**

For the reasons described above and in SCI and USSAF's opening brief and the briefs of the Federal Defendants, the Court should grant the Defendants' and Defendant-Intervenors' motions for summary judgment, deny the Plaintiffs' motion for summary judgment, and dismiss the Plaintiffs' complaint with prejudice.

Dated this 15th day of February, 2007.

Respectfully submitted,

/s/ Douglas S. Burdin
Douglas S. Burdin (D.C. Bar No. 434107)
Anna M. Seidman (D.C. Bar No. 417091)
Safari Club International
501 2nd Street, N.E.
Washington, D. C.  20002
Telephone: (202) 543-8733
Facsimile:  (202) 543-1205
dburdin@sci-dc.org
aseidman@sci-dc.org

*Counsel for*
*Safari Club International and*
*Safari Club International Foundation*


/s/ Willam P. Horn
William P. Horn (D.C. Bar No. 375666)
Birch, Horton, Bittner & Cherot
1155 Connecticut Ave., N.W., 12th Floor
Washington, D.C.  20036
Telephone: (202) 659-5800
Facsimile:  (202) 659-1027
whorn@dc.bhb.com

*Counsel for U.S. Sportsmen's Alliance*
*Foundation and Central Florida Bear*
*Hunters Association*

12

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DEFENDERS OF WILDLIFE, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | Case No. 06-cv-00180 (HKK) |
| ) | |
| v. ) | |
| ) | |
| DIRK KEMPTHORNE, *et al.*, ) | |
| ) | |
| Defendants, ) | |
| ) | |
| SAFARI CLUB INTERNATIONAL, ) | |
| SAFARI CLUB INTERNATIONAL ) | |
| FOUNDATION, U.S. SPORTSMEN'S ) | |
| ALLLIANCE FOUNDATION, ) | |
| CENTRAL FLORIDA BEAR HUNTERS ) | |
| ASSOCIATION, ) | |
| ) | |
| Defendant-Intervenors. ) | |
| ) | |

## CERTIFICATE OF SERVICE

I certify that on February 15, 2007, I caused the Reply of Defendant-Intervenors Safari Club International and U.S. Sportsmen's Alliance Foundation to Plaintiffs' Opposition to Cross-Motion for Summary Judgment to be filed with the Court via the ECF system in the above captioned case. The Court's ECF system will automatically generate service of the above documents on the following counsel of record in this case:

howardcrystal@meyerglitz.com
eric@meyerglitz.com
bsegee@defenders.org
jstebbins@meyerglitz.com
courtney.taylor@usdoj.gov
whorn@dc.bhb.com
dburdin@sci-dc.org

13

Dated this 15th day of Feburary, 2007.

                              Respectfully submitted,

                              /s/ Douglas S. Burdin_____
                              Douglas S. Burdin
                              (D.C. Bar No. 434107)
                              Safari Club International
                              501 2nd Street N.E.
                              Washington, D. C.  20002
                              Telephone: (202) 543-8733
                              Facsimile: (202) 543-1205
                              **dburdin@sci-dc.org**