## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **DEFENDERS OF WILDLIFE, et al.,**<br><br>**Plaintiffs,**<br><br>v.<br><br>**DIRK KEMPTHORNE, et al.,**<br><br>**Defendants.** | **Civil Action 06-00180  (HHK)** |

## MEMORANDUM OPINION

In this suit, plaintiffs, Defenders of Wildlife and others ("Defenders"), claim that the 2004 decision of defendant United States Fish & Wildlife Service ("Wildlife Service"), in which the Wildlife Service reexamined regulatory mechanisms in relation to a 1998 decision not to list the Florida black bear ("black bear") under the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1521 *et seq.*, violated the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 *et seq.* and this court's December 13, 2001 memorandum opinion and order in *Defenders of Wildlife v. Norton*, No. 99-02072 ("2001 Opinion").  The Safari Club and others ("the Safari Club") have intervened as defendants.  Presently before the court are the parties' cross motions for summary judgment. Upon consideration of the motions, the oppositions thereto, and the administrative record, the court concludes that Defenders' motion should be denied and that defendants' and defendant-intervenors' motions must be granted.

## I.  BACKGROUND

### A.    Statutory Framework

The ESA was enacted in order "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program

for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b).

The Act does not provide protection to a species unless the Secretary of Interior lists it as

threatened or endangered. *See* 16 U.S.C. § 1533. The statute defines the term "threatened species"

as "any species which is likely to become an endangered species within the foreseeable future

throughout all or a significant portion of its range." 16 U.S.C. § 1532(20). An "endangered

species" is defined as "any species which is in danger of extinction throughout all or a significant

portion of its range." 16 U.S.C. § 1532(6). Once a species is listed as threatened or endangered, it

receives substantial federal protection. For example, it is illegal for anyone to kill, take, hunt or

capture an endangered or threatened species. *See* 16 U.S.C. § 1538(a)(1); 50 C.F.R. §§ 17.21,

17.31.

The ESA allows citizens to file petitions seeking to list a species as threatened or

endangered. *See* 16 U.S.C. § 1533(b)(3)(A). Once a citizen petitions for listing of a species, the

Wildlife Service must decide within ninety days if the petition presents enough information

indicating that a listing may be warranted. *See id*. If the Wildlife Service determines that the

petition provides sufficient information, it then conducts a study of the current state of the species,

known as a status review, to determine whether to list the species. *See* 16 U.S.C. § 1533(b)(3)(B).

If the Wildlife Service decides that a listing is warranted, it must publish a proposed rule listing the

species. *See* 16 U.S.C. § 1533(b)(5). The Wildlife Service must issue a final rule either listing the

species or explaining its decision not to list within twelve months of issuance of the proposed rule.

*See id.*

In order to determine whether a species warrants listing pursuant to the ESA, the Wildlife

Service must consider five specific factors:

(A) the present or threatened destruction, modification, or curtailment of
its habitat or range;
(B) overutilization for commercial, recreational, scientific, or educational
purposes;
(C) disease or predation;
(D) the inadequacy of existing regulatory mechanisms; or
(E) other natural or manmade factors affecting its continued existence.

16 U.S.C. § 1533(a)(1).  The agency must list a species as long as any one factor demonstrates that

it is threatened or endangered.  *See id.* ("[t]he Secretary shall . . . determine whether any species is

an endangered species or a threatened species because of any of the [five factors set forth in the

ESA]"); *Carlton v. Babbitt*, 900 F. Supp. 526, 530 (D.D.C. 1995).  The agency must base its

decision whether or not to list "solely on the basis of the best scientific and commercial data

available."  16 U.S.C. § 1533(b).

**B.     Procedural History**

On December 8, 1998, the Wildlife Service issued a finding that the black bear did not

warrant listing under the ESA.  63 Fed. Reg. 67613 (Dec. 8, 1998) ("1998 Decision").  In 1999,

Defenders brought suit against the Wildlife Service in this court challenging this finding as

arbitrary, capricious, and an abuse of discretion under the APA.  The parties cross-moved for

summary judgment, and in the 2001 Opinion, this court granted both parties' motions in part and

remanded the 1998 Decision back to the Wildlife Service.

The 2001 Opinion found that the 1998 Decision did not satisfactorily explain why the black

bear did not warrant protection due to the inadequacy of existing regulatory mechanisms.[1]  2001

Opinion at 22.  The 2001 Opinion noted that it was unclear whether the regulatory mechanisms

---

[1]  Regulatory mechanisms include regulations and statutes, such as state laws that prohibit
the killing of bears.  *See, e.g.,* Ga. Code Ann. § 27-3-15.

cited in the 1998 Decision were in effect at the time of the decision, or whether they were instead future or speculative regulatory mechanisms – that is, regulatory mechanisms that had not yet been enacted.  The 2001 Opinion noted that it is impermissible for the Wildlife Service to rely on future or speculative regulatory mechanisms.  The 2001 Opinion further stated that it was unclear whether the Wildlife Service would have found that the black bear was threatened had it not considered regulatory mechanisms that were not yet enacted.  Accordingly, the court remanded the 1998 Decision to the Wildlife Service.

Upon remand, the Wildlife Service issued a decision in 2004.  69 Fed. Reg. 2100 (Jan. 14, 2004) ("2004 Decision").  In this decision, the Wildlife Service analyzed regulatory mechanisms that were in effect in 1998 and found that various federal and state regulatory mechanisms adequately protected the black bear from becoming threatened or endangered.  Defenders then brought this action, asserting that the Wildlife Service's 2004 Decision is arbitrary and capricious and violated the 2001 Opinion.

## II.  LEGAL STANDARD

Under the Administrative Procedures Act ("APA"), a reviewing court shall set aside agency action it finds to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."  5 U.S.C. § 706(2)(A).  An agency rule is arbitrary and capricious if

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  While the court's scope of review is narrow, as it "is not empowered to substitute its judgment for that of the

4

agency," the court must still conduct "a thorough, probing, in-depth review" of the agency's decision. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415-16 (1971).

Agency actions are presumed to be valid. *See Ethyl Corp. v. EPA*, 541 F.2d 1, 31 (D.C. Cir. 1976). As long as an agency considers relevant factors and can articulate a rational connection between the facts found and the choices made, then its decision will be upheld. *See State Farm*, 463 U.S. at 43; *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 378 (1989) (holding that agency action will not be reversed absent a clear error of judgment). Moreover, when an agency's action relies on scientific and technical information touching upon the agency's area of expertise, a court is particularly deferential. *See Marsh*, 460 U.S. at 377.

Because this case involves a challenge to final agency action, review is limited to the administrative record and the grounds for decision invoked by the agency. *See Camp v. Pitts*, 411 U.S. 138, 142 (1973); *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947). "Summary judgment is an appropriate procedure for resolving a challenge to a federal agency's administrative decision when review is based upon the administrative record, even though the Court does not employ the standard of review set forth in Rule 56, Fed. R. Civ. P." *Fund for Animals v. Babbitt*, 903 F. Supp. 96, 105 (D.D.C. 1995) (internal citation omitted).

### III. ANALYSIS

Defenders attack the Wildlife Service's 2004 Decision on two grounds. First, Defenders contend that the Wildlife Service erred by analyzing regulatory mechanisms that were in effect at the time of the 1998 Decision. Defenders contend that the Wildlife Service should have relied on more current regulatory mechanisms that were in effect at the time of its 2004 Decision. Second, Defenders argue that, even if it was permissible for the 2004 Decision to rely on regulatory

mechanisms that were in effect in 1998, the 2004 Decision was arbitrary, capricious, and an abuse

of discretion.  Defenders contend that the 2004 Decision did not contain a factual basis on which

the Wildlife Service could have reasonably concluded that black bears were adequately protected,

by regulatory mechanisms, from threats due to habitat loss or fragmentation.

**A.    Regulatory Mechanisms in Effect in 1998**

The 2004 Decision analyzed the efficacy of regulatory mechanisms that were in effect in

1998.  Defenders argue that the Wildlife Service should have instead analyzed regulatory

mechanisms that were in effect at the time of the 2004 Decision.  Defenders assert that there are

three reasons why the Wildlife Service should have updated its analysis to include regulatory

mechanisms that were in effect in 2004: (1) the plain language of the 2001 Opinion required it; (2)

in three other cases in which the Wildlife Service's listing determination was remanded, the

Wildlife Service analyzed, or attempted to analyze, regulatory mechanisms that were in effect at

the time of the decision on remand; and (3) the ESA mandates that the Wildlife Service must rely

on the "best available scientific and commercial data," 15 U.S.C. § 1533(b)(1), when determining

whether to list a species.  None of these arguments have merit.

**1.    The 2001 Opinion**

Defenders contend that the plain language of the 2001 Opinion required the Wildlife

Service to analyze regulatory mechanisms that were in effect in 2004, as opposed to 1998.  They

point out that the 2001 Opinion directed the "Service [to] examine only regulatory mechanisms

which are *currently being undertaken and enforced*."  2001 Opinion 22 (emphasis added).

Defenders also point out that the 2001 Opinion required that the Wildlife Service "determine . . .

whether the inadequacy of *existing* regulatory mechanisms warrants listing the black bear as a

6

threatened species." *Id.* at 22. Defenders assert that because the 2001 Opinion directed the

Wildlife Service to examine "current" and "existing" regulatory mechanisms, the 2001 Opinion

required the Wildlife Service to examine regulations that had "actual 'reality or actual being' at the

time it made its decision on remand [in 2004] ." Pls.' Opp'n 10.

Defendants rejoin that Defenders are taking several passages in the 2001 Opinion out of

context. Defendants assert that, when read as a whole, the 2001 Opinion makes clear that the

remand was for the limited purpose of clarifying whether the regulatory mechanisms in effect in

1998 adequately protected the black bear.

Defendants are correct. The 1998 Decision was remanded because the court could not

ascertain whether it was based on regulatory mechanisms that were in effect in 1998 or on

regulatory mechanisms that had not yet been implemented. As the court explained, "it is

impossible for this court to determine, based on the existing record, what those regulatory

mechanisms are, and in what manner they are being implemented." 2001 Opinion 21. The court

further noted that "[t]he record also fails to clarify the extent to which the Agency relied on the

possibility of future actions." *Id.* at 22. Thus, the 1998 Decision was remanded for clarification as

to whether the regulatory mechanisms that were in effect in 1998 adequately protected the black

bear.[2]

---

[2] A remand for this limited purpose is well within the powers of the court. *Am. Wildlands v. Norton*, 193 F. Supp. 2d 244, 257 (D.D.C. 2002) (court can remand agency determinations for further explanation when the court is "unclear of the grounds the agency asserts to defend its action") (internal citation omitted).

## 2.    Other Cases in Which a Listing Determination was Remanded

Defenders contend that the Wildlife Service's actions upon remand in three other cases –

*Oregon Natural Resources Council v. Daley*, 6 F. Supp. 2d 1139 (D. Or. 1998)*, Save Our Springs*

*v. Babbitt*, 27 F. Supp. 2d 739 (W.D. Tex. 1997), and *Biodiversity Legal Foundation v. Babbitt*,

943 F. Supp. 23 (D.D.C. 1996) – demonstrate that the Wildlife Service should have analyzed the

regulatory mechanisms that were in effect in 2004.  In these cases, the court remanded the Wildlife

Service's decisions not to list three species because, *inter alia*, the Wildlife Service improperly

relied on regulatory mechanisms that were either speculative or had not yet been implemented.

*Daley*, 6 F. Supp. 2d at 1159; *Save Our Springs*, 27 F. Supp. 2d at 748; *Biodiversity Legal Found.*,

943 F. Supp. at 26.  According to Defenders, after remand in all three cases, the Wildlife Service

updated, or attempted to update, its analysis of applicable regulatory mechanisms.  Defenders

contend that these cases demonstrate that, in the present action, the Wildlife Service should have

updated its analysis to include regulatory mechanisms that were in effect in 2004, as opposed to

regulatory mechanisms that were in effect in 1998.

The court disagrees because these three cases are inapposite.  In these cases, the court

concluded that the Wildlife Service's analysis of whether regulatory mechanisms adequately

protected the species at issue in those actions was flawed as a matter of law because the Wildlife

Service improperly relied on future or speculative regulatory mechanisms.  In contrast here, this

court never reached this issue because it was unclear whether the regulatory mechanisms cited in

the 1998 Decision had been implemented.  2001 Opinion 21 ("It is unclear from the record . . .

whether the regulations relied upon by the Wildlife Service are currently being implemented.").

Accordingly, this court remanded the 1998 Decision for clarification on this point.[3]  This is precisely what the Wildlife Service did in its 2004 Decision.  *See* 69 Fed. Reg. at 2100 (stating that the 2004 decision "reexamines regulatory mechanisms in relation to the 1998 finding for a petition to list the Florida black bear."); *id.* ("we are providing our reexamination of the regulatory mechanisms being undertaken and enforced at the time of our 1998 finding.").  Accordingly, the Wildlife Service was not obligated to analyze regulatory mechanisms that were in effect in 2004.

### 3.    Best Available Scientific and Commercial Data

Defenders next argue that the Wildlife Service's 2004 Decision failed to comport with the ESA's mandate that the Wildlife Service must rely on the "best available scientific and commercial data" when making listing determinations.  15 U.S.C. § 1533(b)(1).  Defenders assert that the regulatory mechanisms that were in effect in 1998 did not constitute the "best available scientific and commercial data" that were available in 2004.[4]  *Id.*

Defendants rejoin that, because the 2001 Opinion only required the Wildlife Service to analyze regulatory mechanisms that were in effect in 1998, the Wildlife Service was only obligated to rely on the "best available scientific and commercial data" that were available in 1998.

The court agrees with defendants.  As discussed *supra*, this court did not require the Wildlife Service to make a wholly new determination as to whether to list the black bear.  Instead,

---

[3]  Defenders also assert that the court could not have meant to require the Wildlife Service to simply explain its earlier 1998 Decision.  To the contrary, this is exactly what the court required. The court's role in reviewing an administrative decision is to ensure there is a rational connection between the facts found and the choices made.  *See State Farm*, 463 U.S. at 43; *Marsh v. Oregon Natural Res. Council*, 460 U.S. 360, 378 (1989).  By remanding for further explanation, the court sought to ensure that there was a rational connection between the facts as they existed in 1998 and the Wildlife Service's decision not to list the black bear.

[4]  The Wildlife Service did, however, include some post-1998 data in footnotes throughout the 2004 Decision.

this court only required the Wildlife Service to clarify its determination that, as of 1998, regulatory mechanisms adequately protected the black bear.  The ESA requires that the Wildlife Service rely on the best available "scientific and commercial data" when the Wildlife Service makes "*determinations* required by subsection (a)(1)" as to whether a species is threatened.  15 U.S.C. § 1533(b)(1)(A) (emphasis added).  It does not require the Wildlife Service to rely on the best available data when *reexamining or clarifying* an earlier determination.  Because the 2004 Decision was a reexamination as opposed to a wholly new determination, the Wildlife Service was not required to rely on "scientific and commercial data" that were available in 2004.

Indeed, requiring the Wildlife Service to rely on data that were available in 2004, as opposed to 1998, would defeat the very limited purpose of the 2001 remand.  The court sought clarification as to whether regulatory mechanisms available in 1998 adequately protected the black bear.  To require the Wildlife Service to include and analyze data that were not available in 1998 would contradict the limited purpose of the remand.[5]  Accordingly, the fact that the Wildlife Service relied only on data that were available in 1998, as opposed to 2004, did not violate the ESA's mandate to rely on the best available "scientific and commercial data."  15 U.S.C. § 1533(b)(1).[6]

---

[5]  The 2004 Decision does have some language indicating that the Wildlife Service "determined," in 2004, that the black bear was not a threatened species.  This language, however, does not constitute a new determination.  Rather, this language is responsive to the 2001 Opinion's mandate that the Wildlife Service confirm that, taking all future speculative regulatory mechanisms out of the calculus, it still would find regulatory mechanisms that existed in 1998 adequately protected the black bear.

[6]  Because the Wildlife Service properly relied on 1998 data in its 2004 Decision, the court does not need to address the Safari Club's arguments that regulatory mechanisms did not change appreciably between 1998 and 2004 and that the current status of the black bear reveals sound population numbers.

**B.    The 2004 Decision Was Not Arbitrary Nor Capricious**

Defenders assert that, even if it was permissible for the Wildlife Service to rely on

regulatory mechanisms that were in effect in 1998, its 2004 Decision was arbitrary, capricious, and

an abuse of discretion because there was no factual basis for the Wildlife Service's conclusion that

the regulatory mechanisms that were in effect in 1998 adequately protected the black bear.

Defenders argue that the 2004 Decision lacks a factual basis because (1) the Wildlife Service did

not determine whether regulatory mechanisms preserved enough habitats for black bears; and (2)

the Wildlife Service improperly relied on future and speculative regulatory mechanisms.  Neither

argument has merit.

**1.    Amount of Habitat Lost**

In its 2004 decision, the Wildlife Service found that numerous regulatory mechanisms

helped preserve black bear habitats.  For example, the 2004 Decision found, *inter alia*: (1)

numerous federal and state public conservation lands contained at least two million acres of

potential habitats for four core populations of black bears; (2) Florida had acquired 374,000 square

acres of land between 1992 and 1998, and that much of this land was located near core population

habitats; (3) Section 404 of the Clean Water Act provided for various mitigation banks;[7] and (4)

Florida state environmental laws regarding "Environmental Resource Permitting" ("ERP") and

"Developments of Regional Impact ("DRI") placed some restrictions on developments.  The

Wildlife Service concluded, however, that habitat loss would still occur despite these regulatory

--------------------------------------------------

[7]  A mitigation bank is "a wetland, stream, or other aquatic resource area that has been
restored, established, enhanced, or (in certain circumstances) preserved for the purpose of
providing compensation for unavoidable impacts to aquatic resources permitted under Section 404
or a similar state or local wetland regulation."  United States E.P.A., Mitigation Banking Factsheet,
*available at* http://www.epa.gov/owow/wetlands/facts/fact16.html.

mechanisms.  The Wildlife Service did not measure the extent of this habitat loss, but concluded

that it did not pose a threat to black bears because "the currently available acreage of public lands,

coupled with the private lands that will remain as bear habitat, are sufficient to provide for viable

bear populations."  69 Fed. Reg. at 2104.

Defenders argue that the Wildlife Service should have measured the amount of habitat loss

that would occur.  Defenders assert that without such an analysis, the Wildlife Service could not

have reasonably determined that these regulatory mechanisms preserved *enough* habitats for black

bears.  According to Defenders,  it is "impossible to determine from the record whether there has

been a net loss, or a net gain, in land that is needed for the four core populations' survival."  Pls.'

Opp'n 26.  Defenders further contend that the Wildlife Service failed to analyze the efficacy of

regulatory mechanisms in preventing habitat fragmentation and that Defenders are unable to

determine the extent of habitat fragmentation.  This is a critical issue, Defenders assert, because if

habitat fragmentation occurs, habitats "become isolated islands and their utility as habitat for bears

is greatly diminished."  Pls.' Opp'n 28.

Defendants rejoin that there was no need for the Wildlife Service to analyze either the

amount of habitat lost or the efficacy of regulatory mechanisms in preventing habitat fragmentation

because the 1998 Decision, which was affirmed by this court, found that black bears were secure

on public conservation lands.  Thus, to the extent there is any habitat loss or fragmentation, this

loss does not threaten the existence of black bears.

Defendants' argument is well taken.  The ESA permits some habitat loss, so long as that

loss does not rise to the level of a threat.  *Ctr. for Biological Diversity v. Badgley*, 335 F.3d 1097,

1100 (9th Cir. 2003)*; Ctr. for Biological Diversity v. FWS*, 402 F. Supp. 2d 1198, 1209 (D. Or.

2005); *Southwest Ctr. for Biological Diversity v. Norton*, 2002 WL 1733618, *13 (D.D.C. July 29,

2002).  Accordingly, habitat loss or fragmentation can occur, so long as the black bear is not

threatened.  *Ctr. for Biological Diversity*, 402 F. Supp. 2d at 1209.

    The 1998 Decision explicitly found that there were four viable core bear populations on

public conservation lands in the: (1) Apalachicola National Forest, (2) Ocala National Forest, (3)

Osceola National Forest- Okefenokee National Wildlife Refugee, and (4) Big Cypress National

Preserve.  63 Fed. Reg. at 67618.  The 2004 Decision reiterated this finding, and stated that there is

enough land available on public conservation sites to support these four core populations, such as:

1,153,583 acres in the National Forests of Florida, including the Apalachicola, Ocala, and Osceola

forests; 486,079 acres in National Wildlife Refugees including the Okefenokee refugee; and

720,440 acres in the Big Cypress National Park.  69 Fed. Reg. at 2105.  In addition, there are

464,000 acres at Eglin Air Force where a smaller population of black bears reside.  *Id.*  Lastly,

there are 950,000 acres available on state lands owned by Florida.  *Id.*[8]

    The 2004 Decision further found that various regulatory mechanisms help ensure that these

public conservation lands provide the specific types of habitats necessary for black bears to thrive.

According to the 2004 Decision, black bears require large, relatively undeveloped forested habitats

with a diverse seasonal food base.  *Id.*  Along these lines, the Department of Interior is required to

preserve the watershed and the natural flora and fauna in the Big Cypress National Park and engage

---

    [8]  For this reason, Defenders' complaint that the 2004 Decision improperly failed to discuss
the issue of whether as much as 200,000 acres of Florida are lost each year, is without merit.  This
figure is derived from a letter that was included in the administrative record, A.R. 06439, but the
letter does not indicate whether this loss occurred in core bear habitat.  As discussed in the text
*supra*, it is permissible for there to be habitat loss, so long as this habitat loss does not threaten
black bears' survival.  There is no evidence that, even if 200,000 acres are lost every year, that this
lost occurred in core black bear habitat.

in active prescribed (forest) burning in the Okefenoke reserve.  *Id.*  Furthermore, the United States

Forest Service has engaged in timber management, road closures, protection of wetlands, and

restrictions on visitor usage pursuant to management plans in National Forests such as

Apalachiocola and Osceola.  *Id.* at 2105-06.  Similarly, the U.S. Air Force has engaged in

prescribed burning and maintenance of wetlands pursuant to a Natural Resources Management plan

at Eglin Air Force Base.  *Id.* at 2106-07.  And all Florida state owned lands that are important to

the black bear are governed by individual management plans that describe how the black bear will

be identified, located, protected, and preserved.  *Id.* at 2107.[9]

Regardless of the above considerations, Defenders assert that it was not reasonable for the

Wildlife Service to conclude that regulatory mechanisms adequately protected black bears from

habitat loss or fragmentation.  Defenders point out that the Wildlife Service did not just rely on the

availability of public conservation lands when it concluded that enough lands were available.

Instead, in the 2004 Decision, the Wildlife Service concluded that these public lands, "*coupled with*

*the private lands that will remain as bear habitat*, are sufficient to provide for viable populations."

69 Fed. Reg. at 2104 (emphasis added).  Defenders argue that because the Wildlife Service relied

on the availability of habitats on private lands, the Wildlife Service should have analyzed the extent

to which regulatory mechanisms prevent habitat loss on private lands.[10]  Defenders assert that

because the Wildlife Service did not do so, the Wildlife Service could not have reasonably

concluded that enough lands were preserved for black bear habitats.

---

[9]  Furthermore, the Wilderness Act of 1964, 16 U.S.C. § 1131, requires that all lands
designated by Congress as "Wilderness Areas" must be managed to preserve their wilderness
character.   Several such areas are included in the Okefenokee, Osceola, Apalachicola, and Ocala
forests.

[10]  Specifically, Defenders argue that the Wildlife Service should have analyzed the amount
of habitat lost on private lands despite the existence of the Clean Water Act and Florida
environmental laws regarding DRI and ERP.

The court disagrees.  The 2004 Decision does not state that these private lands are *necessary* to the survival of black bears.  The 2004 Decision only states that these private lands, in conjunction with public conservation lands, provide for viable populations of black bears.  Because the 1998 Decision explicitly found that black bears were secure on public conservation lands, it is logical to conclude that these additional private lands are *not necessary* to the survival of black bears.  Thus, any habitat loss on private lands does not pose a threat to black bears.  Accordingly, it was not necessary for the Wildlife Service to analyze the extent of habitat loss on private lands.[11]

### 2.    Future or Speculative Regulatory Mechanisms

Defenders also argue that the 2004 Decision improperly relied on future or speculative regulatory mechanisms.  Specifically, Defenders point to the 2004 Decision's statement that all Florida state lands important to the Florida black bear are governed by management plans, and that these plans are compatible with the goal of maintaining viable populations of Florida black bears.  Defenders assert that these management plans are speculative because the Wildlife Service acknowledged that "[not] every management goal or prescription identified in these plans has been or will be conducted."  69 Fed. Reg. at 2107.[12]

---

[11]  For this same reason, Defenders' argument that regulatory mechanisms are ineffective because they do not prevent habitat fragmentation between Wekiva GEOpark and Ocala Forest must fail.  As discussed in the text *supra*, some habitat loss is permissible under the ESA.  Defenders do not demonstrate how the habitat loss due to Wekiva GEOpark poses a threat to the survival of the black bear.  And, as defendants point out, in the 1998 Decision the Wildlife Service found that the Ocala population was secure as evidenced by the existence of over 600 bears in the Ocala Forest.

[12]  Defenders also assert that the Wildlife Service decision improperly relied on regulatory mechanisms that had not yet been implemented when it concluded, in a footnote, that "future acquisitions [under a Florida state land acquisition program called "Florida Forever"] will continue to expand public lands and provide additional security to bear populations in Florida."  64 Fed. Reg. 2104.  Defenders are incorrect.  Here, the Wildlife Service was discussing a land acquisition program that was implemented *after* 1998.  The Wildlife Service included this information in an effort to provide "updates on several regulatory mechanisms that have been revised since 1998 . . . to provide the best available information regarding protections for the Florida black bear."  69 Fed.

Defenders correctly point out that it is improper for the Wildlife Service to rely on future or speculative regulatory mechanisms. *Biodiversity Legal Found.*, 943 F. Supp. at 26. However, the management plans are not future nor speculative regulatory mechanisms. The 2004 Decision specifically states that these management plans exist and that they are being implemented. 69 Fed. Reg. at 2107 ("Management practices identified in these plans *that are being implemented* include prescribed burning and forest management programs.") (emphasis added). Thus, the Wildlife Service concluded that, even if not all the goals contained in these plans are achieved, the plans are still effective in maintaining and preserving habitats for black bears. There is no basis for the court to question this conclusion.

Defenders further assert that by relying on these management plans, the Wildlife Service violated its duty to inquire into whether regulatory mechanisms are actually being implemented and are effective as implemented. For support, Defenders rely on *Save Our Springs*, 27 F. Supp. 2d at 744 and *Defenders of Wildlife v. Babbitt*, 958 F. Supp. 670, 684 (D.D.C. 1997). In *Save Our Springs*, the court faulted the Wildlife Service for de-listing a species based on the existence of one conservation agreement that had "no proven track record" when: (1) the agreement was not in the administrative record because it was created after the close of the public comment period; (2) there was no information in the record as to whether any of the agreement's provisions had been implemented; and (3) in multiple places the agreement relied on speculative and future regulatory mechanisms. 27 F. Supp. 2d at 748. In *Defenders of Wildlife,* the court faulted the Wildlife Service for failing to cite record evidence to support the proposition that regulatory mechanisms were adequate. 958 F. Supp. at 684.

---

Reg. 2101. Because the Wildlife Service was only required to examine regulations that were in effect in 1998, the court does not need to reach the issue of the adequacy of the Wildlife Service's discussion of regulatory mechanisms that were enacted after 1998.

These two cases differ from the present action.  Here, the 2004 Decision cites numerous management plans that have been enacted on Florida state lands, and which are included in the administrative record.  Furthermore, the Wildlife Service specifically found that these plans have been implemented and that they include tangible steps to preserve black bear habitats. Accordingly, these two cases are inapposite and the Wildlife Service did not improperly rely on future or speculative regulatory mechanisms.

## IV.  CONCLUSION

For the foregoing reasons, Defenders' motion for summary judgment is denied, and defendants' and defendant-intervenors' motions for summary judgment are granted.  An appropriate order accompanies this memorandum opinion.

Henry H. Kennedy, Jr.
United States District Judge

Dated: March 5, 2008